```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   -------------------------------x
                                       15-CR-95(WFK)
 3   UNITED STATES OF AMERICA,
                                       United States Courthouse
 4            Plaintiff,               Brooklyn, New York

 5            -against-                September 17, 2019
                                       9:30 a.m.
 6   DILKHAYOT KASIMOV,

 7            Defendant.
     -------------------------------x
 8

 9            TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
            BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
10                UNITED STATES DISTRICT JUDGE
                        BEFORE A JURY
11

12   APPEARANCES

13   For the Government:      UNITED STATES ATTORNEY'S OFFICE
                              Eastern District of New York
14                            271 Cadman Plaza East
                              Brooklyn, New York 11201
15                            BY:  DOUGLAS M. PRAVDA, AUSA
                                   DAVID K. KESSLER, AUSA
16                                 MATTHEW HAGGANS, AUSA

17

18   For the Defendant:      ELIZABETH E. MACEDONIO, P.C.
                              40 Fulton Street - 23rd Floor
19                            New York, New York 10038
                              BY:  ELIZABETH E. MACEDONIO, ESQ.
20
                              KELLEY J. SHARKEY
21                            26 Court Street - Suite 2805
                              Brooklyn, New York 11242
22                            BY:  KELLEY J. SHARKEY, ESQ.

23                            LORD & SCHEWEL
                              233 Broadway - Suite 2220
24                            New York, New York 10279
                              BY:  ABRAHAM RUBERT-SCHEWEL, ESQ.
25
```

```
1    APPEARANCES(Continued)

2

3    Also Present:              ERIKA LOPEZ, PARALEGAL SPECIALIST
                                SPECIAL AGENT MEGAN DOLAN
4
                                SANJAR BABADJANOV, INTERPRETER
5                               NODIRA MATYAKUBOVA, INTERPRETER

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20
     Court Reporter:           GEORGETTE K. BETTS, RPR, FCRR, CCR
21                             Phone:  718-804-2777
                               Email:  Georgetteb25@gmail.com
22

23

24   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
25
```

PROCEEDINGS

1               (In open court; jury not present.)

2               THE COURTROOM DEPUTY:  All rise.  The Honorable

3    William F. Kuntz, II is now presiding.

4               Criminal Cause for Trial, Docket Number 15-CR-95

5    U.S.A. V. Kasimov.

6               Counsel, please state your appearances for the

7    record, spell your names for the court reporter, including the

8    Uzbek interpreter.

9               MR. PRAVDA:  Good morning, Your Honor.  Doug Pravda,

10   David Kessler, Matthew Haggans, Erica Lopez and Megan Dolan.

11              THE COURT:  Good morning.  We have the spellings.

12              MS. MACEDONIO:  Good morning, Your Honor.  Elizabeth

13   Macedonio for Mr. Kasimov.

14              MS. SHARKEY:  Good morning, Your Honor.  Kelley

15   Sharkey for Mr. Kasimov.

16              THE COURT:  Good morning.

17              MR. RUBERT-SCHEWEL:  Good morning.  Abraham

18   Rubert-Schewel for Mr. Kasimov.

19              THE COURT:  Good morning.

20              I see the interpreters are here.  Just waiting for

21   Mr. Kasimov to be brought out, he's been brought out now.

22              Good morning, Mr. Kasimov.

23              THE DEFENDANT:  Good morning, Your Honor.

24              THE COURT:  All right.  You may be seated everyone,

25   and everyone in the public.

4

PROCEEDINGS

1          Before we get started, do we have any procedural

2   matters to address outside of the presence of the jury?

3          MR. PRAVDA:  Not for the government, Your Honor.

4          MS. MACEDONIO:  Your Honor, I noticed that seated at

5   counsel table is Special Agent Megan Dolan.  It's my

6   understanding from the government's witness list and the 3500

7   material that they have given over that Special Agent Dolan

8   will be a witness in this case.

9          THE COURT:  Is this the special agent who is the

10  designated, if you will, corporate representative of the

11  government?

12         MR. PRAVDA:  Yes, she is, Your Honor.

13         THE COURT:  Then she has a right to be seated here.

14         MS. MACEDONIO:  Very well, Your Honor.

15         And we would ask -- we understand there are a number

16  of representatives from the U.S. Attorney's Office here to

17  watch the opening statements.  We would ask that they not

18  leave in a mass exodus once the defendant stands up to -- the

19  defense stands up to give their opening statement in the case.

20         THE COURT:  This is a free country, and this is a

21  free court.  They're welcome to stay.  They are welcome to

22  leave.  You're welcome to have everyone come who wishes to

23  hear your opening statements as well.  I don't think that it

24  makes a whit of difference to the jurors, and I know you're

25  distinguished counsel, and I'm sure all eyes will be on you

PROCEEDINGS

 1    when you're giving your opening statement.

 2            So perhaps the federal prosecutors will be well

 3    advised particularly to stay and hear your fine opening

 4    statements.  So if they wish to lose the opportunity of

 5    hearing one of the greatest lawyers in America give an opening

 6    statement, that's up to them, but I'm not going to tell them

 7    when they can come and when they can go.

 8            Anything else?

 9            MS. MACEDONIO:  Yes, Your Honor.  One final

10    application.  If there are additional witnesses that the

11    government intends to call that are seated within the

12    courtroom, we ask that after the opening statements, that they

13    not be permitted to come back until their testimony has been

14    given.

15            THE COURT:  That application is granted because

16    that's what the rules provide --

17            MS. MACEDONIO:  Thank you.

18            THE COURT:  -- and I would be very unhappy if they

19    were to violate the rules in that regard.

20            Do we have any motions that I need to address before

21    opening statements?

22            MR. PRAVDA:  No, Your Honor.

23            MS. SHARKEY:  Actually, Judge, there were two

24    motions that were filed by the government concerning

25    limitations of cross-examination.

PROCEEDINGS

1        THE COURT:  Right.  One on the 13th and one this

2   morning.  I've read them both.

3        MS. SHARKEY:  The one -- Ms. Macedonio is going to

4   address the one on the 13th.  The one this morning, I'm going

5   to address.  I don't think --

6        THE COURT:  You want to address them now or do you

7   want to address them after openings?

8        MS. SHARKEY:  I think after openings, right?

9        THE COURT:  Does that work for you?

10        MS. MACEDONIO:  That's fine, Your Honor.  Thank you.

11        THE COURT:  Does that work for you?

12        MR. KESSLER:  Yes.

13        THE COURT:  Okay.  We'll do it that way then.

14        MS. SHARKEY:  Yes, Judge.

15        Mr. Jackson, let the Court Security Officer know and

16   the marshals know we're ready to have them bring in the jury.

17        THE COURTROOM DEPUTY:  Sure.

18        (Pause in proceedings.)

19        (Jury enters courtroom.)

20        THE COURT:  Good morning, ladies and gentlemen of

21   the jury.  Welcome back.  Thank you for being here promptly.

22   I've had a little business to do with the lawyers, so that

23   will help move the case along so we won't have to have quite

24   so many annoying sidebars.  So periodically, we will have

25   these little timeouts, but we're using the time productively.

PROCEEDINGS

1              Please be seated.  Ladies and gentlemen of the

2    public, you can be seated as well.

3              We're going to begin now with opening statements,

4    that as I told you yesterday, opening statements are not

5    evidence.  They are just arguments and they are the road maps

6    that the respective attorneys will provide to you in the hope

7    of persuading you of the rightness of their position.  So

8    again, it is not evidence.  The evidence will come from the

9    witnesses and from the documents.

10             You will see that the podium that they speak from is

11   right there.  They would love to be able to wander and invade

12   your personal space and get up front and personal and show you

13   how wonderful and personable they are.  I don't allow them

14   that.

15             I have what one judge in another district referred

16   to as the mother-may-I rules.  "Mother, may I leave the

17   podium?"  And the answer is, "No, you may not."  So they are

18   going to stay there not because they are being standoffish,

19   but because those are the rules of engagement.  So they will

20   address you from the podium.

21             You will hear first from the government and then you

22   will hear opening statements from defense counsel.  And with

23   that, we will have the opening from the government.

24             Please go to the podium and stay at the podium.

25   Thank you.

OPENING STATEMENT – MR. HAGGANS

1          MR. HAGGANS:  Late one night in February 2015, that

2     man, Dilkhayot Kasimov, drove out to JFK Airport in Queens.

3     He went into Terminal 7.  It was just before midnight.  The

4     defendant was trying to find a man, a man who was about to

5     board a plane.

6          The defendant found that man and he handed him a

7     stack of cash.  The man at JFK was headed to Syria.  He

8     intended to join ISIS, the Islamic State, to become a fighter,

9     a Jihadist or holy warrior.  Jihadist fighters were fuel for

10    ISIS's campaign of terror, and brought death and destruction

11    around the world.

12         The defendant gave his money to that man to help him

13    get to Syria to join ISIS.  It is a crime to give money and

14    fighters to ISIS, a terrorist organization, and that is why we

15    are here today.

16         Good morning, ladies and gentlemen.  My name is

17    Matthew Haggans and I am an Assistant United States Attorney

18    here in the Eastern District of New York.  It's my privilege

19    to represent the United States in this case.

20         I'm joined by my colleagues, Douglas Pravda, David

21    Kessler, who are also Assistant U.S. Attorneys here in this

22    district; Erica Lopez, who is a paralegal specialist in our

23    office and Megan Dolan, who is a special agent with the

24    Federal Bureau of Investigation.

25         During the course of this trial, we will present

OPENING STATEMENT - MR. HAGGANS

1   evidence to you that will take you back to the period of 2014

2   and early 2015.  You'll learn about what ISIS was and what it

3   did during this period, how it waged a Jihad, a holy war, with

4   a campaign of violence, particularly in Iraq and Syria, in an

5   effort to bring all Muslims under ISIS's rule.  You'll learn

6   that ISIS committed and claimed credit for violent, deadly

7   acts of terrorism designed to further that objective, and

8   you'll learn that ISIS tried to recruit fighters from around

9   the world, including from the United States.

10        One particular group of men, including the

11  defendant, heard that call, and some of them wanted to become

12  fighters for ISIS.  That included the man that the defendant

13  met with that night at JFK.  The man at JFK was Akhror

14  Saidakhmetov.  Saidakhmetov and his roommate both wanted to

15  join ISIS.  You'll hear how they began to develop a plan to do

16  just that.  The others in the group agreed to help the

17  aspiring fighters by contributing or collecting money and

18  delivering money, all to ensure that the group's plan to get

19  these men to Syria to ISIS was a success.

20        By February of 2015, the plan had moved from plan

21  into action.  Saidakhmetov booked a plane ticket to Istanbul,

22  Turkey.  The defendant knew about that booking within hours.

23  Saidakhmetov planned to cross the border between Turkey and

24  Syria in order to join ISIS, and the defendant discussed that

25  plan with other members of the group.  He offered to give his

OPENING STATEMENT – MR. HAGGANS

1  own money to aid Saidakhmetov in his travel.

2          Just a few hours before Saidakhmetov's flight was

3  scheduled to depart, the defendant learned that Saidakhmetov

4  still needed money for his trip, and that he needed it soon,

5  before he had to board his plane.

6          The defendant volunteered to go out to JFK, to

7  ensure that Saidakhmetov got that money.  Though the defendant

8  had been working since the early morning hours that day, he

9  got money together, $1600, and he drove out to the airport.

10 He arrived just before midnight.  He said he would like to see

11 those who are leaving, Saidakhmetov.  He found Saidakhmetov at

12 Terminal 7 and he made the handoff, right here in Queens, in

13 the Eastern District of New York.

14          For his conduct, the defendant is charged with two

15 crimes:  Conspiring or agreeing to support -- to provide

16 material support to a foreign terrorist organization or ISIS,

17 and attempting to provide that support.  Here, the conspiracy

18 and the attempt were both designed to ensure that Saidakhmetov

19 made it to Syria to join ISIS.

20          How will we prove that the defendant committed these

21 two crimes?  Through documents, recordings and text messages,

22 witness testimony and the defendant's own words.

23          You'll see video footage of the defendant's meeting

24 with Saidakhmetov at JFK, and you will see the defendant's

25 money.  It was recovered from Saidakhmetov when he was

OPENING STATEMENT - MR. HAGGANS

1    arrested.

2          You'll also see text messages and hear recorded

3    calls of the members of the conspiracy in the weeks and days

4    leading up to that meeting at JFK.  These calls and texts will

5    give you an inside look into this effort to provide ISIS with

6    a fighter.  You'll also see in some of these messages how the

7    members of conspiracy tried to hide what they were doing in

8    order to evade detection.

9          You will also hear testimony from a witness who is

10   an expert in ISIS's history and activities.  He'll describe

11   ISIS's conduct during the period of the events at issue in

12   this case.  He'll discuss the means used by ISIS to achieve

13   its objectives:  A Jihad or holy war, frequently via deadly

14   terrorist attacks.  This witness will also explain how

15   aspiring fighters often made their way to Syria and ISIS via

16   Turkey, and how important those fighters were to achieving

17   ISIS's goals.

18         You will also get an inside look inside the

19   conspiracy via testimony from one of its members, a man who

20   spoke to the defendant the night the defendant agreed to go

21   out to JFK.  He will tell you how the defendant offered to

22   provide his own funds to Saidakhmetov to support his journey

23   to ISIS.  This witness has pleaded guilty to serious terrorism

24   crimes, and he will be testifying before you pursuant to a

25   cooperation agreement with the government.  He will be doing

OPENING STATEMENT - MR. HAGGANS

1    that in hopes of achieving a more lenient sentence.

2           Finally, you will see and hear the defendant in his

3    own words.  You will see his text messages to the cooperating

4    witness, asking when to give Saidakhmetov money.  You'll see

5    him ask how much he himself should contribute personally.

6    You'll hear his voice as he talks to Saidakhmetov about how

7    they would meet up and find one another at JFK, and you'll

8    hear his voice as the two tried to find each other within

9    Terminal 7.  And you'll hear a recording of their conversation

10   after they met up, right up until the moment Saidakhmetov had

11   to go to board his flight.

12          At the conclusion of this case, after you've seen

13   all the evidence and heard all the testimony, we'll return to

14   you and we'll ask you to deliver the only verdict supported by

15   that evidence:  Guilty of conspiracy and guilty of attempt to

16   provide material support to ISIS.  Thank you.

17          THE COURT:  We will now have the opening statement

18   from defense counsel and, again, opening statements are just

19   arguments, not evidence.  The evidence will come later from

20   the witnesses.

21          MR. RUBERT-SCHEWEL:  May it please the Court, ladies

22   and gentlemen of the jury, my name is Abraham Rubert-Schewel,

23   and I, along with my co-counsel, Elizabeth Macedonio and

24   Kelley Sharkey, have the privilege of representing Dilkhayot

25   Kasimov.

OPENING STATEMENT - MR. RUBERT-SCHEWEL

1       This trial will be an incredibly important event in

2   his young life because you, as the jury, have the awesome

3   responsibility of deciding whether or not the government can

4   prove their case, can prove their allegations beyond a

5   reasonable doubt.

6       With each of us in our everyday lives, there is the

7   real possibility that our perspectives, that our narratives,

8   that our experiences in life will affect how we look at

9   people, how we think about things, what we assume is true,

10  what we assume is right, especially when you have experiences

11  as you have over the last two days, and you walk into this

12  federal courthouse and you see the United States Government

13  with their files and their carts, and they stand up here and

14  they tell you this frightening narrative.

15      And of course, the real danger is that you're going

16  to look at my client, Mr. Kasimov, and you're going to say to

17  yourself not what is he accused of, but what must he have done

18  to get himself into this situation?  And that is why it is so

19  crucial that you keep an open mind, because of course nothing

20  that the government has said, nothing that I have said is

21  evidence.  Their opening statement was not evidence.  What I'm

22  saying now is not evidence.  This case is about those

23  witnesses who are going to sit up there and take the stand and

24  for you to determine whether or not they are saying the truth

25  and whether or not you believe them.

OPENING STATEMENT - MR. RUBERT-SCHEWEL

1        Now, let's talk a little bit about the government's

2   witnesses.  They just told you -- Mr. Haggans just told you

3   that some of their key witnesses are cooperators, that they

4   pled guilty to serious terrorist crimes, but are now

5   testifying for the government.

6        I ask that you consider their motives, that you

7   scrutinize with particular caution those who are receiving

8   some sort of favor or benefit from the government, and as you

9   do this, keep in mind guilt by association is a repugnant

10  concept in this country.  The United States Government cannot

11  prosecute you, cannot convict you of a crime based solely on

12  who you spend your time with.

13       You've now heard what the government believes the

14  evidence will establish.  You know their theory.  The

15  government now has the burden of proving beyond a reasonable

16  doubt that their version of the facts is the accurate version.

17       Mr. Kasimov, on the other hand, has no burden.  He

18  does not have to call any witnesses.  He does not have to

19  testify.  He has the right to remain silent throughout this

20  trial.

21       As jurors, you are vital to our system.  You are

22  what provides actual life to the rights we are entitled to if

23  accused of a crime:  The burden of proof, the presumption of

24  innocence.

25       You provide vitality because if you don't have an

OPENING STATEMENT - MR. RUBERT-SCHEWEL

1   open mind, if you can't be fair and impartial, if you're

2   biased or whatever your life's perspective has so affected you

3   to the point that you have already decided the fate of

4   Mr. Kasimov, then this whole process is meaningless.  What I'm

5   saying means nothing.  What the government is saying means

6   nothing.  What the witness is saying means nothing, because

7   you've already decided.  You provide the life to Mr. Kasimov's

8   constitutional rights.

9           This trial will last approximately two weeks.  It

10  will be a brief episode in each of your lives, but your

11  verdict, the decision that you make, will affect Mr. Kasimov's

12  life forever.

13          Each of you were chosen as jurors because we

14  believed you could be fair and impartial, that you could keep

15  an open mind, and because we trust that you can decide this

16  case solely based upon the evidence presented to you.

17          So I ask that you listen carefully, that you get

18  past the nature of the allegations against my client, and that

19  you determine for yourself if the government has met its

20  burden.  I ask that you give Dilkhayot Kasimov the same fair

21  trial that any of you would expect if you or someone you loved

22  found yourself in this position.  Thank you.

23          THE COURT:  All right, ladies and gentlemen.  We've

24  had opening statements and now we will begin to have evidence.

25          Government, please call your first witness.

DICAPRIO - DIRECT - PRAVDA

1      MR. PRAVDA:  The government calls Special Agent

2   Michael DiCaprio.

3          THE COURT:  Thank you.

4          Mr. Pravda, before you begin and before the witness

5   is sworn.  I'm going to step out for one minute.

6          (Pause in proceedings.)

7          THE COURTROOM DEPUTY:  Please raise your right hand.

8          (Witness sworn.)

9          THE WITNESS:  I do.

10  **MICHAEL DICAPRIO**, called as a witness, having been first duly

11  sworn/affirmed, was examined and testified as follows:

12         THE COURT:  Good morning, sir.  Would you please

13  state your name clearly, spell it clearly, speak into this

14  microphone.  Make sure that little green light is on.  And

15  then counsel will inquire.

16         THE WITNESS:  Yes, Your Honor.

17         THE COURT:  Is that green light on?

18         THE WITNESS:  That green light is on.

19         THE COURT:  Okay.  Speak a little more clearly into

20  it, so the jury can hear you.

21         THE WITNESS:  Yes, Your Honor.  Michael DiCaprio.

22         THE COURT:  See the difference?

23         Go ahead.

24         THE WITNESS:  I do.

25         MR. PRAVDA:  Good morning, Agent DiCaprio.

DICAPRIO - DIRECT - PRAVDA

1        THE COURT:  Would you spell your name?

2        THE WITNESS:  Yes.  M-I-C-H-A-E-L, D-I-C-A-P-R-I-O.

3        THE COURT:  Thank you.

4        Counsel you, may inquire.

5        MR. PRAVDA:  Thank you, Your Honor.

6   DIRECT EXAMINATION

7   BY MR. PRAVDA:

8   Q    Good morning, Agent DiCaprio.

9   A    Good morning.

10  Q    Where do you work?

11  A    I work with the FBI.

12  Q    That's the Federal Bureau of Investigation?

13  A    Yes, sir.

14  Q    What is your position within the FBI?

15  A    I'm a special agent.

16  Q    For how long have you been a special agent?

17  A    Almost 12 years.

18  Q    What is your current assignment?

19  A    I work out of the Albany field office, the Joint

20  Terrorism Task Force.

21  Q    How long have you done that?

22  A    Approximately one week.

23  Q    What did you do before that?

24  A    I worked out of the New York field office, out at one of

25  the resident agencies.  There's a satellite office out at JFK

DICAPRIO – DIRECT – PRAVDA

```
 1   Airport.
 2   Q    And is that also in connection with working with the
 3   Joint Terrorism Task Force?
 4   A    Yes.
 5   Q    What is the Joint Terrorism Task Force?
 6   A    The Joint Terrorism Task Force is a multiagency task
 7   force with the FBI as the lead, focusing on counterterrorism
 8   matters as it pertains to national security.
 9   Q    And how long were you a special agent with the New York
10   office of the Joint Terrorism Task Force?
11   A    Eleven years.
12   Q    Where were you stationed at that time?
13   A    JFK Airport.
14   Q    That's John F. Kennedy International Airport?
15   A    Yes.
16   Q    In Queens, New York?
17   A    Yes.
18   Q    And what were your general duties and responsibilities as
19   a special agent at that time?
20   A    Well, to investigate suspicious activity as it pertains
21   to aviation security.  In addition, at the airports,
22   networking, liaisoning with various other law enforcement
23   agencies or private entities like specific airlines, corporate
24   security, or security management at the different terminals at
25   the airports.  In addition, we provided case support to our
```

19

DICAPRIO - DIRECT - PRAVDA

1    fellow case squads out of the New York office.

2    Q    Let me direct your attention to February 24th, 2015.

3    Were you providing case support, as you said, on that day?

4    A    Yes.

5    Q    And to whom were you providing support?

6    A    One of the case squads out of our -- out of -- one of our

7    CT offices in Manhattan.

8    Q    And what did your case support consist of?

9    A    I was a member of a surveillance team, tasked with

10   conducting surveillance of a traveler of interest that was

11   scheduled to travel out of JFK Airport on that day.

12   Q    What was the name of the traveler for whom you were

13   conducting surveillance?

14   A    The name of the traveler was Mr. Akhror Saidakhmetov.

15          THE COURT:  Would you spell that for the reporter,

16   please, at least phonetically?

17          THE WITNESS:  I have to take a look at the -- the

18   report that we generated, the document.

19          THE COURT:  Well, just do the best you can.

20          THE WITNESS:  Okay.  A-K-H-O-R, [sic] Akhor.

21   Saidakhmetov would be S-A-D-E-K-H-M-A-T-O-V. [sic]

22          THE COURT:  Okay.  Go ahead.

23          MR. PRAVDA:  Thank you, Your Honor.

24   BY MR. PRAVDA:

25   Q    Now, Agent DiCaprio, you referenced a report that you had

DICAPRIO – DIRECT – PRAVDA

1   written about the surveillance?

2   A    That's correct.

3   Q    Did you do anything to prepare for your testimony today?

4   A    Yeah.  I've reviewed the reports.

5   Q    And those are reports that you had written at the time in

6   February of 2015?

7   A    That's correct.

8   Q    That was about four and-a-half years ago, right?

9   A    Correct.

10  Q    And did reviewing the reports refresh your recollection

11  about the surveillance that you had conducted?

12  A    Yes.

13  Q    Now, was the surveillance you conducted for an

14  investigation you were working on?

15  A    No.

16  Q    So the case support you were providing was for an

17  investigation run by a different squad at the FBI?

18  A    That's correct.

19  Q    How did you come to be assigned to that surveillance?

20  A    As –– well, we are a stand-alone squad out at the

21  airports, so our area of responsibility is JFK and LaGuardia

22  International Airports.  I was one of many assigned as a

23  surveillance due to, you know, our knowledge and expertise of

24  our area of responsibility.

25  Q    And so did you have experience conducting surveillance at

DICAPRIO - DIRECT - PRAVDA

1    JFK Airport?

2    A    Yes.

3    Q    Now, turning your attention back to February 24th, 2015,

4    were you conducting surveillance that evening?

5    A    Yes.

6    Q    And where were you conducting surveillance?

7    A    Surveillance was conducted at the -- one of the

8    international terminals, Terminal 7, at JFK International

9    Airport.

10   Q    What was Terminal 7?

11   A    Terminal 7 is one of the international terminals.  It is

12   run by British Airways.  Yeah.  So one of the international --

13   one of many international terminals at JFK.

14   Q    Now, where within Terminal 7 did you position yourself to

15   conduct surveillance?

16   A    On the departures level, near the east side of the

17   terminal front entrance.

18   Q    Why were you in that particular location?

19   A    The traveler, Mr. Saidakhmetov, was scheduled to utilize

20   a specific airline, Ukrainian International Airlines.  Their

21   ticket counter is located on the east end of the terminal.

22         So I positioned -- we positioned at that location,

23   so as to put ourselves in the best position to observe

24   Mr. Saidakhmetov entering the terminal.

25   Q    Directing your attention to 9:45 p.m. on February 24th,

DICAPRIO - DIRECT - PRAVDA

1   2015, what, if anything, did you observe?

2   A    I'd have to look at the specific report given at that

3   specific time.  I know we were executing the surveillance at

4   that point, but I'd have to look at my interview report.

5   Q    And do you believe that that report would refresh your

6   recollection?

7   A    Yes.

8            MR. PRAVDA:  Your Honor, if I could respectfully

9   request that Mr. Jackson hand the witness a copy of 3500-MD-1.

10           THE COURT:  Have you provided that to your adversary

11  prior to the moment?

12           MR. PRAVDA:  I have, Your Honor.

13           THE COURT:  Okay.

14           You may do that, Mr. Jackson.  Thank you.

15           THE COURTROOM DEPUTY:   (Complies.)

16           THE COURT:  Thank you, Mr. Jackson.

17           THE WITNESS:  Thank you, sir.

18  BY MR. PRAVDA:

19  Q    Agent DiCaprio, does reviewing that report refresh your

20  recollection as to what you observed specifically at

21  9:45 p.m.?

22  A    Yes.

23  Q    What did you observe?

24  A    At that time, I observed Mr. Saidakhmetov and another

25  individual entering the terminal, on the east side of the

DICAPRIO – DIRECT – PRAVDA

1   terminal, and walking toward the Ukrainian International

2   Airlines ticket counter.

3   Q    And at that time, did you take a photograph of the two

4   men?

5   A    Yes.

6   Q    Showing you what has been marked for identification as

7   Government Exhibit 12.

8           MR. PRAVDA:  Mr. Jackson, if I can have the Elmo for

9   the witness only, please?

10          THE COURT:  Does opposing counsel have a view of it

11  as well?

12          MS. MACEDONIO:  Yes, Your Honor.

13          THE COURT:  Go ahead.

14          (Exhibit published to the witness.)

15  BY MR. PRAVDA:

16  Q    Do you recognize the photograph that is Government

17  Exhibit 12?

18  A    Yes.

19  Q    What do you recognize that to be?

20  A    That is a picture of Mr. Saidakhmetov and the individual

21  that entered the terminal with him, as they enter and walk

22  toward the ticket counter.

23  Q    And is that a true and accurate depiction of what you

24  observed at 9:45 p.m. on February 24th, 2015?

25  A    Yes.

DICAPRIO – DIRECT – PRAVDA

1      MR. PRAVDA:  Your Honor, the government moves

2  admission of Government Exhibit 12.

3      THE COURT:  Any objection?

4      MR. RUBERT-SCHEWEL:  No, Your Honor.

5      THE COURT:  It is admitted.  You may publish it to

6  the jury.

7      It is the first bit of documentary evidence that

8  you're seeing.

9      Go ahead.

10     (Government Exhibit 12, was received in evidence.)

11     (Exhibit published.)

12 Q   Agent DiCaprio, can you describe for the jury what they

13 are viewing in this picture?

14 A   Well, as stated, you're looking at Mr. Saidakhmetov and

15 his co-traveler entering the terminal.  You see -- as you look

16 at the picture, the individual to the left is -- with the

17 green hood is Mr. Saidakhmetov.

18 Q   So to be clear, what you're describing, the shorter man

19 with the green hooded sweatshirt as Mr. Saidakhmetov?

20 A   That's correct.

21 Q   After you took this photograph, where did you observe the

22 two men walk to?

23 A   They walked past my location and went toward the

24 Ukrainian International Airlines ticket counter.

25 Q   Did you have a view of the Ukrainian Airlines ticket

DICAPRIO – DIRECT – PRAVDA

1   counter from your location?

2   A    I did not.

3   Q    So after they walked over to the ticket counter, you

4   could no longer see them?

5   A    That's correct.

6   Q    What did you do at that point?

7   A    I held my position at the east entrance -- the entrance

8   of the east side of the terminal.

9   Q    Did there come a time later that evening when you were

10  alerted to watch for another individual?

11  A    Yes.

12  Q    And how did you learn that?

13  A    When we received notification -- we were communicating as

14  a group, as an operational team, and the notification came

15  across the whole group that there was someone scheduled to

16  come meet with Mr. Saidakhmetov at the terminal.

17  Q    When you say "we," to whom are you referring?

18  A    The whole operational team, the surveillance team

19  consisting of our personnel at JFK, as well as members of the

20  case squad.

21         MR. PRAVDA:  Mr. Jackson, if I could have the Elmo

22  again only for the witness.

23         THE COURT:  You stepped away from the microphone.

24  I'm not sure we could hear you.

25         MR. PRAVDA:  Oh, I'm sorry, Your Honor.

DICAPRIO - DIRECT - PRAVDA

1          THE COURT:  That's okay.  Would you just speak into

2    the microphone because sometimes we have difficulty hearing

3    the lawyers when they step away, okay.

4          Go ahead.

5          Would you repeat your question for Mr. Jackson?

6          MR. PRAVDA:  Of course, Your Honor.

7          Could the Court please request Mr. Jackson to show a

8    document only to the witness through the Elmo.

9          THE COURT:  Yes.

10   BY MR. PRAVDA:

11   Q    Special Agent DiCaprio, I'm showing you what's been

12   marked as Government Exhibit 9.

13         Do you recognize this document?

14   A    Yes.

15   Q    What do you recognize it to be?

16   A    This is a Pennsylvania State Department of Transportation

17   driver's license that had the information sheet pertaining to

18   the individual identified as coming to meet Mr. Saidakhmetov

19   at the airport.

20   Q    And is this a -- so this is a true and accurate copy of

21   the contents of an email that you received regarding the

22   individual who you learned was coming to meet

23   Mr. Saidakhmetov?

24   A    Yes.

25         MR. PRAVDA:  Your Honor, the government moves

DICAPRIO – DIRECT – PRAVDA

1    Exhibit 9 into evidence.

2              THE COURT:  Any objection?

3              MR. RUBERT-SCHEWEL:  No, Your Honor.

4              THE COURT:  It's admitted.

5              You may publish it to the jury.

6              (Government Exhibit 9, was received in evidence.)

7              (Exhibit published.)

8    BY MR. PRAVDA:

9    Q    Agent DiCaprio, could you describe for the jury please

10   what they're looking at?

11   A    Again, this is a Pennsylvania State Department of

12   Transportation driver's license information sheet pertaining

13   to a specific operator.

14   Q    What was the name of the individual on this particular

15   driver's license information sheet that you were advised would

16   be coming to the airport to meet Mr. Saidakhmetov?

17   A    Dilkhayot Kasimov.

18   Q    Was there a photograph of Mr. Kasimov with this document?

19   A    Yes.

20             MR. PRAVDA:  Showing you page 2 of Government

21   Exhibit 9.

22   Q    Is that the photograph of Mr. Kasimov that you received?

23   A    Yes.

24   Q    After receiving this document, were you on the lookout

25   for an individual matching Mr. Kasimov's description?

DICAPRIO – DIRECT – PRAVDA

1    A    Yes.

2    Q    Did there come a time when you observed an individual

3    matching Mr. Kasimov's description arrive at John F. Kennedy

4    International Airport?

5    A    Yes.

6    Q    When was that?

7    A    I'd have to refer to the document that I generated in

8    order to get a specific time.

9    Q    And to be clear, you don't remember independently as you

10   sit here today?

11   A    That's correct.

12   Q    Would your notes refresh your recollection as to the time

13   you made that observation?

14   A    Yes.

15        MR. PRAVDA:  So go ahead and review your notes with

16   the Court's permission.

17        THE COURT:  You have the permission.  That's the

18   3500 material we've already placed before the witness,

19   correct?

20        MR. PRAVDA:  Yes.  This is 3500-MD-1.

21        THE COURT:  Yes, you may look at that document, sir,

22   if it refreshes your recollection.

23        Ladies and gentlemen, there are some documents that

24   come into evidence and you'll see the actual documents.  There

25   are other documents that are used for a limited purpose.  The

DICAPRIO - DIRECT - PRAVDA

1   document itself is not in evidence, but it's used to refresh

2   the recollection of the witness.  Something you're familiar

3   with I'm sure in your everyday lives, but that's the technical

4   difference.  Sometimes you'll see the documents because they

5   are admitted in evidence.  Other documents are just used to

6   refresh the witness' recollection and he or she refers to

7   them.

8          So that's the reason for this somewhat formalistic

9   approach; just wanted you to understand, but we're getting the

10  evidence to you.

11         Go ahead.  So you may refer to the document, sir.

12  If it refreshes your recollection.

13         Mr. Pravda, ask your question.

14         MR. PRAVDA:  Thank you, Your Honor.

15         THE COURT:  Of course.

16  BY MR. PRAVDA:

17  Q    All right.  Agent DiCaprio, having reviewed your notes,

18  is your recollection refreshed as to what time you observed an

19  individual matching Mr. Kasimov's description arrive at John

20  F. Kennedy International Airport on February 24th, 2015?

21  A    Yes.

22  Q    And what time was that?

23  A    11:43 p.m.

24  Q    And at that time what did you observe?

25  A    I observed an individual who matched the appearance of

DICAPRIO – DIRECT – PRAVDA

1    Mr. Kasimov enter the -- walk -- enter the terminal,

2    Terminal 7, and walk toward the east end of the terminal past

3    my location and walk to the Ukrainian International Airlines

4    ticket counter.

5    Q    Was that the same place that you had observed

6    Saidakhmetov walk towards earlier that evening?

7    A    Yes.

8    Q    What did you -- I'm sorry.  Could you see what happened

9    then?

10    A    No.

11    Q    And why was that?

12    A    Because it was out of my field of view given my position.

13    Q    What did you do next?

14    A    I stood fast.  I held my position.

15    Q    Why did you do that?

16    A    In the event that Mr. Saidakhmetov or Mr. Kasimov, at

17    that point, left the area, we all held our -- our positions to

18    make sure that we maintained visibility if they moved around

19    the terminal.

20    Q    What observation did you see next?

21    A    My next observation was observing Mr. Kasimov exit, walk

22    past my location and exit the -- the terminal and walk, walk

23    out of the building.

24    Q    What time did that happen?

25    A    11:46 p.m.

DICAPRIO - DIRECT - PRAVDA

1    Q    So three minutes after he arrived?

2    A    That's correct.

3    Q    What did you do at that point?

4    A    Again held my position.

5    Q    And what did you see next?

6    A    Next Mr. Kasimov reentered the terminal and walked back

7    toward the Ukrainian International Airlines ticket counter.

8    Q    What time was that?

9    A    11:50 p.m.

10   Q    So four minutes after he departed the terminal he came

11   back into the terminal?

12   A    That's correct.

13   Q    Did he appear the same as he had previously?

14   A    The only difference was he was wearing a cap, a winter

15   cap, at that point.

16   Q    What did you do next?

17   A    Again held my position.

18   Q    What did you next personally observe that evening?

19   A    The next observation was Mr. Kasimov exiting the

20   terminal, again walking past my location and exiting the

21   terminals to go street side.

22   Q    And what time was that?

23   A    That was at 12:06 a.m. on the 25th of February.

24   Q    So approximately 15 minutes after he had walked in for

25   the second time?

DICAPRIO — DIRECT — PRAVDA

1    A     That's correct.

2    Q     Did you make any further observations that evening or

3    early the next morning?

4    A     No.

5    Q     Now, did you do anything else in connection with your

6    assistance in this investigation, Agent DiCaprio?

7    A     Yes.

8    Q     What was that?

9    A     We coordinated with terminal security management to

10   obtain CCTV footage covering the operation as well as Port

11   Authority operation to obtain parking lot data.

12   Q     Did you obtain the CCTV security footage?

13   A     Yes.

14           MR. PRAVDA:  Your Honor, with the Court's

15   permission, may I have Mr. Jackson hand to the witness three

16   DVDs that are marked for identification as Government's

17   Exhibit 14A, 14B and 14C.

18           THE COURT:  All right.  You may do that.

19           Any objection to 14A, 14B and 14C?  Are you going to

20   admit those into evidence at some point?

21           MR. PRAVDA:  I will, Your Honor.

22           THE COURT:  All right.  Any objections to those

23   being admitted?

24           MR. RUBERT-SCHEWEL:  No, Your Honor.

25           THE COURT:  All right.  So you may bring them

DICAPRIO - DIRECT - PRAVDA

1   forward and you may publish them to the jury.

2          They are admitted.

3          (Government Exhibits 14A, 14B and 14C, were received

4   in evidence.)

5          (Exhibit published.)

6   BY MR. PRAVDA:

7   Q    Agent DiCaprio, what is contained on the DVDs that are

8   Government's Exhibit 14A, 14B and 14C?

9   A    This is going to be closed-circuit television footage,

10  surveillance camera footage of Terminal 7 departures area on

11  the dates of February 24th through 25th, early morning of

12  25th, 2015.

13  Q    And how do you recognize the DVDs to be the ones that

14  contain security camera footage?

15  A    I initialed and dated all three disks.

16          MR. PRAVDA:  Your Honor, at this time I would like

17  to read into evidence a stipulation between the parties.

18          THE COURT:  Yes.  Has it been marked?

19          MR. PRAVDA:  This is going to be Government

20  Exhibit 200.

21          THE COURT:  Any objection?

22          MS. MACEDONIO:  No, Your Honor.

23          THE COURT:  It's admitted.

24          You may publish it to the jury.  You may read it to

25  the jury and the jury will have an opportunity to have it when

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

1      you go to begin your deliberations.

2              As I mentioned in my opening statements there may be

3      some stipulations between the parties.  This is the first such

4      stipulation in the case.

5              Go ahead.  Admitted.

6              MR. PRAVDA:  I apologize, Your Honor.

7              My colleagues have advised me this is actually

8      Government Exhibit 201.

9              THE COURT:  Oh, Exhibit 201.

10             Any objection to Exhibit 201?

11             MS. MACEDONIO:  No, thank you.

12             THE COURT:  It is admitted.

13             You may publish Exhibit 201 to the jury.

14             MR. PRAVDA:  Thank you, Your Honor, may I read it to

15     the jury?

16             THE COURT:  Of course.

17             (Government Exhibit 201, was received in evidence.)

18             MR. PRAVDA:  It has the case caption on the top.

19     Then it reads:  It is hereby stipulated and agreed by and

20     between the undersigned attorneys for the government and for

21     the defendant, Dilkhayot Kasimov that:

22             Paragraph 1.  Government's Exhibits 14A, 14B, 14C

23     contain true and accurate copies of surveillance video

24     recorded at Terminal 7 at JFK Airport between 9:40 p.m. on

25     February 24th, 2015, and 12:10 a.m. on February 25th, 2015.

DICAPRIO – DIRECT – PRAVDA

1          Paragraph 2.  Government's Exhibits 15A, 15B, 15C,

2   15D, 15E, 15F, 15G, 15H, 15I, 15J, 15K and 15L, sorry about

3   that, are true and accurate clips from the surveillance video

4   contained on Government's Exhibits 14A, 14B and 14C.

5          Paragraph 3.  Government Exhibit 19 contains a true

6   and accurate vehicle activity report for the automobile with

7   license plate number T622543C at JFK Airport from

8   February 24th, 2015 through February 25, 2015.

9          And I am placing a Government Exhibit sticker that

10  says Government Exhibit 201 on this.

11          And paragraph 4.  Government's exhibit -- I'm going

12  to read a list I apologize to the jury in advance.  14A, 14B,

13  14C, 15A, 15B, 15C, 15D, 15E, 15F, 15G, 15H, 15I, 15J, 15K,

14  15L, and 19, and this stipulation may be admitted as evidence

15  at trial.

16          It is dated September 16th, 2019, and signed by

17  attorneys for both parties.

18          Your Honor, the government moves into evidence the

19  exhibits contained in paragraph 4 of this stipulation and

20  Government Exhibit 201.

21          THE COURT:  Any objection?

22          MS. MACEDONIO:  No, Your Honor.

23          THE COURT:  Those exhibits are admitted.

24          (Government Exhibits 15A, 15B, 15C, 15D, 15E, 15F,

25  15G, 15H, 15I, 15J, 15K, 15L and 19, were received in

DICAPRIO – DIRECT – PRAVDA

1    evidence.)

2              THE COURT:  You may publish them to the jury.

3              (Exhibits published.)

4    BY MR. PRAVDA:

5    Q    Special Agent DiCaprio, what, if anything, did you do

6    with the security footage after you recovered it from John F.

7    Kennedy International Airport security managers?

8    A    Upon receipt of the footage, I was able to observe the

9    footage and document all key points detailing the operation

10   during that time period.

11             MR. PRAVDA:  Your Honor, with the Court's permission

12   could Mr. Jackson give the government the podium at the laptop

13   to play some video clips?

14             THE COURT:  We can do that.  We had promised the

15   jury a break at 11:00 or 11:15, so why don't we take a

16   10-minute break now while you get set up with the electronics;

17   okay?

18             MR. PRAVDA:  That will be fine, Your Honor.

19             THE COURT:  That's fine.

20             You can step down.  Do not talk with anyone about

21   your testimony, sir, during the break.

22             Ladies and gentlemen of the jury, we'll take our 10-

23   to 15-minute comfort break now, and then we'll come back.

24             Do not talk about the case, obviously, until we get

25   to the end of the case.  We're just at the beginning.

DICAPRIO – DIRECT – PRAVDA

1          Okay.  Thank you.

2          You wait, sir, for the jury to exit.  Then you can

3   step down.

4          (Jury exits courtroom.)

5          (Witness steps down.)

6          THE COURT:  All right.  You may be seated, ladies

7   and gentlemen of the public.

8          The jury has left the room for the first mid-morning

9   break.  Any issues from either side we need to address in the

10  absence of the jury?

11         MR. HAGGANS:  Not from the government, Your Honor.

12         MS. MACEDONIO:  No, thank you, Judge.

13         THE COURT:  Okay.  Thanks.  We'll see you in 10, 15

14  minutes.  Thanks.

15         (Recess.)

16         (Continued on the next page.)

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1      THE COURTROOM DEPUTY:  All rise.

2      THE COURT:  You may be seated.

3      Before we bring the jury back and resume the

4  testimony, I'd like to address the standing procedural issues

5  that we touched on before.  We said we would address them

6  after opening statements and before we get too deep in the

7  weeds, I thought it would be appropriate to address them now.

8      As you know, we'll be breaking a little past 12:30,

9  and the jury will have their lunch together, so we'll probably

10  do it around 12:45 or 10 to one, but let's talk about the

11  outstanding motions.  Perhaps you want to address the

12  September 13th motion first, regarding Special Agent Neas?

13      MR. PRAVDA:  Would you like the government to go

14  first?

15      THE COURT:  Well, it's your motion, right?  So

16  perhaps it would make sense for you to go first.

17      MR. PRAVDA:  Yes, Your Honor.

18      I had a brief discussion with defense counsel.  I

19  hope I correctly represent the position.

20      THE COURT:  If you don't, she'll let you know.

21      MR. PRAVDA:  My understanding is they are seeking to

22  cross-examine about one of the two instances referenced in the

23  government's letter.

24      And with regard to the second incident, there are

25  allegations that are set forth in a complaint.  They have not

PROCEEDINGS

1   been tested in any way through the judicial system.  There

2   have been no findings of liability, no admission by any party,

3   including the defendant, and therefore, we think it's

4   inappropriate for the special agent to be cross-examined about

5   those allegations, and I'm happy to address any points that

6   the defense counsel makes after their argument.

7              THE COURT:  Okay.  I've read your submission.

8              What's your response, counsel?

9              MS. MACEDONIO:  Your Honor, the government is

10  correct that the defense does not seek to cross-examine

11  Special Agent Neas with regard to the DWI.

12             THE COURT:  Right.

13             MS. MACEDONIO:  However, we do think it's

14  appropriate to cross-examine Special Agent Neas with regard to

15  the allegations contained in the two complaints that were

16  filed in the Southern District of New York.

17             THE COURT:  When were those complaints filed, more

18  than 10 years ago?

19             MS. MACEDONIO:  No, Your Honor.  One was filed in --

20  October 1st, 2013.  And one was filed on April 22nd, 2014.

21             THE COURT:  Okay.

22             MS. MACEDONIO:  So --

23             THE COURT:  About events that occurred at what time?

24             MS. MACEDONIO:  About offenses that occurred in --

25  I'm sorry, Your Honor.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS

1       THE COURT:  Take your time.

2       MS. MACEDONIO:  2011.

3       THE COURT:  All right.  Go ahead.

4       MS. MACEDONIO:  Specifically, Your Honor, the

5   allegations are that Special Agent Neas, along with another

6   FBI agent, demanded that the complainant in the case meet with

7   FBI agents after he had met with FBI agents several times --

8       THE COURT:  Right.

9       MS. MACEDONIO:  -- providing the same information to

10  them when he was attempting to leave the United States of

11  America and travel to Pakistan to visit his ailing mother.

12      He agreed to do so.  The agents then, according to

13  the complaint, abused the U.S. policy about a no-fly list

14  because they were refusing to let him leave the United States

15  if he did not agree to be both debriefed before and after, and

16  provide information to the FBI agents regarding individuals

17  within the Pakistani community.

18      I don't think that the fact that these allegations

19  have never been admitted by Special Agent Neas really is

20  telling.

21      THE COURT:  Well, have the allegations been proven

22  in a court of law?

23      MS. MACEDONIO:  That's correct.  They have not.

24      THE COURT:  All right.  So at this point, they

25  continue to be allegations.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS

1          MS. MACEDONIO:  That's correct, Your Honor.

2          But they are certainly probative, perhaps, depending

3    on the answers to the questions of Special Agent Neas'

4    possible biases or prejudice to the members of the Muslim

5    community.

6          THE COURT:  Well, the problem I have with it, to use

7    the analogy from the criminal law world would be, mere

8    allegations being brought forward where there has not been a

9    conviction, there has not been a plea, I think you would be

10   the first to say these are mere allegations, and that the

11   prejudice of bringing them in when they are contested, they

12   are not proven, should be weighed under a 403 standard.

13         And it just seems to me that while the allegations

14   might ultimately be proven, they might ultimately be not

15   proven.  They don't relate to the specifics of this case and I

16   also think there is a problem with what is generally referred

17   to in the literature, in the cases, as satellite litigation.

18         Once you start going down the road of what was

19   involved in that case, what were the defenses in that case,

20   what was the standing in that case, where is it on appeal,

21   from the district court to the circuit, to the Supreme's, you

22   wind up very often in a morass of ancillary litigation.

23         So I'm going to note your objection.  It's preserved

24   for the record, but I'm going grant the government's motion

25   with respect to the *in limine*.  I will give you enormous

PROCEEDINGS

1    latitude, as you will see in the cross-examination of

2    witnesses, but I really don't want this to turn into a broad

3    policy debate and that's sort of the opening of the tent to

4    get into areas that are truly ancillary to the issues in this

5    case.

6            So your objection is noted and preserved, but I'm

7    ruling in the government's favor on that one.

8            MS. MACEDONIO:  Thank you very much.

9            THE COURT:  Okay.  Thank you.

10           Anything else we need to address before we bring the

11   jury in?

12           MS. SHARKEY:  Your Honor, there is the 7:30 motion

13   this morning.  I'm not sure that we're going to get to that

14   witness today, so if you'd rather do it closer in time to his

15   testimony.

16           THE COURT:  You're the ones driving the bus.  I'm

17   just a passenger.  If you want to deal with it now, we can

18   deal with it now.  If you want to deal with it later, we can

19   deal with it later.  It's totally up to you.

20           MS. SHARKEY:  So I think we should address it now.

21           THE COURT:  Okay.

22           MS. SHARKEY:  The government prospectively seeks to

23   limit cross-examination of two proposed witnesses, focusing in

24   on whether or not statements made by those witnesses in

25   proffer sessions are appropriate impeachment.

PROCEEDINGS

1          Contained in the government's letter is the practice

2    endorsed by the Second Circuit in *Treadaway*.  The Court is a

3    trial attorney, the government are trial attorneys, the

4    questions can be asked, the witness can be confronted, and the

5    author of the report can be called.  And that is the

6    methodology endorsed by the circuit and it is time-honored

7    cross-examination.

8          So I don't see the point of making a prospective

9    shot across the bow when, in fact, it has to be decided on a

10   case-by-case.

11          THE COURT:  I understand your argument.

12          What is the response?

13          MR. KESSLER:  Your Honor, it sounds like we actually

14   agree on the procedure.  The purpose of the motion was to

15   preclude a different process which would be the introduction

16   of FBI notes or 302s with the cooperating witness instead of

17   with the agent.

18          If the plan is that the actual -- let's call it --

19   say they are inconsistent.  If they are actually inconsistent

20   statements, we don't object to the cooperating witness being

21   asked about them on cross-examination, you know, assuming

22   everything else satisfies the rules, that's perfectly fair.

23   And we wouldn't object if it's appropriate for an agent who

24   wrote the notes of the reports from being asked about that

25   inconsistent statement, if it is inconsistent.

PROCEEDINGS

1          The purpose of this motion was I think much more

2     narrow, which was to preclude the defense from attempting to

3     admit the notes or the reports of the FBI with the cooperating

4     witness.  That's the only request.

5          THE COURT:  What is your response to what you just

6     heard?

7          MS. SHARKEY:  I guess we're in agreement.

8          THE COURT:  Well, you know, one of the things I like

9     about the distinguished and learned counsel is that you very

10    often can come to an agreement.  But since I'm not as

11    distinguished or as learned as you folks, I'm going to ask

12    you, if you would be so kind as during the luncheon recess, to

13    perhaps reduce your agreement on this point to a written

14    stipulation.

15         Would you be willing to do that?  It doesn't have to

16    be read to the jury, obviously, but it's a stipulation between

17    the parties that's so ordered by the Court, so that it's clear

18    what you folks have agreed on.

19         Because you just said you've agreed on something, I

20    think, and it would be nice if you could reduce to writing

21    what you've agreed on, so that when I make my ruling, I am

22    guided not just by my dim recollection of your oral agreement,

23    but by my focused observation of your written agreement.

24         Are you prepared to do that or at least entertain

25    that?

PROCEEDINGS

1          MS. SHARKEY:  Sure.  We can try to do that.  Of

2     course.

3          THE COURT:  Okay.  And if you can't do it, then

4     you'll be stuck with my recollection of what you folks have

5     agreed on and my interpretation of what you folks have agreed

6     on.

7          MR. KESSLER:  Your Honor, the only request I have is

8     depending on the pace of the trial, we may be -- may have a

9     couple of things on our plate at lunch -- no pun intended.

10    Would the Court mind if we submitted that stipulation by some

11    point tonight?  I don't think it's going --

12         THE COURT:  As you know, I'm a 24/7 shop, so when

13    you submit things at 7:30 in the morning or 10:45 on a Sunday

14    night, I have no other life but this, and I'm reading it all

15    the time.

16         MR. KESSLER:  Thank you.

17         THE COURT:  So I'm happy to devote the time,

18    whenever you want to submit it.

19              Yes, counsel?

20         MS. SHARKEY:  No, Judge.  I was going to comment on

21    the 24/7 capabilities.  Not everybody has that capability.

22         THE COURT:  You know, I'm just an old school

23    prodding along litigator-turned-judge, and I have to do it to

24    try to keep up with you rock stars.  What can I tell you?

25         MS. SHARKEY:  Or you could say there's a 7:30 p.m.

PROCEEDINGS

1    deadline in filing motions.

2              THE COURT:  I would never say that.  Remember, I

3    used to bill by the hour.  So deep inside, 24/7 is just a

4    billable day, unless you're flying to California, in which

5    case it's 27 hours.  That's another story.

6              All right.  Shall we have the witness return to the

7    witness stand and we'll bring the jury back in?

8              MR. KESSLER:  Yes.  Thank you.

9              THE COURT:  Fair enough?

10             Why don't you get the witness now.  He'll be seated,

11   then we'll bring the jury in.  Fair enough?

12             MR. PRAVDA:  I'll get him, Your Honor.

13             THE COURT:  Yes.  That will be great.  Thank you.

14             Remember what I said about the green light:  When

15   it's on, we hear.

16             MS. MACEDONIO:  Okay.

17             (Witness resumes stand.)

18             THE COURT:  Here you are, Mr. Jackson.  Hand that

19   back.  Would you tell the Court Security Officers to bring the

20   jury back in?

21             (Jury enters courtroom.)

22             THE COURT:  Thank you.  Welcome back, ladies and

23   gentlemen of the jury.  I'm sorry for the overly long break,

24   but don't worry.  When I said 5 o'clock, I meant 5 o'clock.

25   That's the one time you can bank on.

DICAPRIO - DIRECT - PRAVDA

1    So please be seated and we will continue with the

2    direct examination of the witness.

3    And, sir, I just want to ask you, did you speak with

4    anyone about your testimony during the break?

5    THE WITNESS:  No, Your Honor.

6    THE COURT:  Good.  That's the right answer, and it

7    always better be.

8    Okay.  You're on.

9    MR. PRAVDA:  May I proceed, Your Honor?

10    THE COURT:  You may.

11    MR. PRAVDA:  Thank you.

12    DIRECT EXAMINATION(Continued)

13    BY MR. PRAVDA:

14    Q    All right, Agent DiCaprio.  Before the break, we were

15    discussing your obtaining the video surveillance from JFK

16    Airport on February 24th, 2015 through February 25th, 2015,

17    correct?

18    A    Yes.

19    Q    Now, I want to show you what's in evidence now as

20    Government Exhibit 15A.

21    MR. PRAVDA:  Your Honor, if I could?

22    THE COURT:  Yes.  You may publish it to the jury.

23    It's in evidence.

24    And you have it on the screen, ladies and gentlemen

25    of the jury.  Those of you in the back row, you can also see

DICAPRIO – DIRECT – PRAVDA

1    it on the big picture, so you don't have to loom over your

2    colleagues to see it.

3          Mr. Jackson, do you want to dim the lights just

4    slightly, maybe make it more visible for those in the back

5    row, but not completely.  Not that kind of a place.

6          Okay.  Let's go.

7    BY MR. PRAVDA:

8    Q    Agent DiCaprio, what are we looking at in this image?

9    A    So this image shows CCTV footage covering the front of

10   Terminal 7 departures level.

11         What you're looking at in the center, the far end

12   center of the screen is some sliding glass doors that leads to

13   the Air Train, which is the public transportation that takes

14   you from terminal-to-terminal.  That is the Air Train platform

15   entrance as well as the parking garage for Terminal 7.

16   Q    And I'm going to draw on the screen -- and do you see the

17   circle I just made?

18   A    Yes.

19   Q    In the very center of the image, is that the area that

20   leads to the Air Train and the parking garage for Terminal 7?

21   A    Yes.

22   Q    And so where is Terminal 7 in this picture?

23   A    From this view, Terminal 7 -- the entrance to Terminal 7

24   is directly behind the camera.

25         And you'll see as I said earlier, there is a center

DICAPRIO - DIRECT - PRAVDA

1   entrance and an east and a west entrance.

2   Q    Would it be fair to say that we're looking at what's

3   commonly referred to as the passenger drop-off area in front

4   of Terminal 7?

5   A    Yes.

6   Q    And then what is the timestamp on this video?

7   A    11:30.  Yeah, 11:30 p.m.

8   Q    On February 24th, 2015?

9   A    That's correct.

10            MR. PRAVDA:  Your Honor, at this time, I will play

11  Government Exhibit 15A, which is a 35-second video.

12            THE COURT:  Yes.  It's in evidence.  You may play

13  it.

14            MR. PRAVDA:  And I will direct the jury's attention

15  at the outset to the image on the left side of the screen

16  where I'm circling.

17            (Video recording played.)(Video recording stopped.)

18  BY MR. PRAVDA

19  Q    Agent DiCaprio, can you describe for the jury what we

20  just observed in Government Exhibit 15A?

21  A    We observed a dark-colored sedan enter off of the

22  Terminal 7 exit ramp, drive from the east end of the terminal

23  and park curbside on the west end in front at the passenger

24  drop-off area in front of Terminal 7.

25  Q    And that was at 11:30 p.m.?

DICAPRIO – DIRECT – PRAVDA

1   A    That's correct.

2   Q    Showing you what is in evidence as Government

3   Exhibit 15C.

4        Agent DiCaprio, what is the timestamp on this video?

5   A    11:39 p.m., on February 24th.

6   Q    So about nine minutes after the first clip that we

7   watched?

8   A    Correct.

9        MR. PRAVDA:  And I will play this 45-second video,

10  Government Exhibit 15C, and I'll direct the jury's attention

11  to the area that I'm circling on the right.

12       (Video recording played.)(Video recording stopped.)

13  BY MR. PRAVDA:

14  Q    Agent DiCaprio, what did you see in this video clip?

15  A    I observed an individual exit the dark sedan, walk across

16  the street towards the entrance to Terminal 7, and enter the

17  terminal on the west side of the terminal.

18  Q    And that was at 11:39 p.m.?

19  A    That's correct.

20  Q    Now, are the timestamps on these videos accurate?

21  A    They are not accurate to realtime.  It is an estimate

22  because the video -- it's different at every terminal, but the

23  camera system is tied into the internal server of the

24  terminal, and again, it's an estimate.  It may not be truly

25  accurate to realtime.

DICAPRIO - DIRECT - PRAVDA

1    Q    So these are approximate times?

2    A    That's correct.

3    Q    But with regard to each camera, would the time gaps be

4    consistent from one video to the next?

5    A    Yes.  That's correct.

6    Q    So regardless of whether the Government Exhibit 16 -- I'm

7    sorry, 15C happened at 11:39 or 11:40, it would be nine

8    minutes after the first video?

9    A    Correct.

10   Q    Agent DiCaprio, I'm showing you what's in evidence as

11   Government Exhibit 15F, as in "Frank."

12            (Exhibit published.)

13   Q    Let me ask you first what this camera depicts.

14   A    So this is the front of Terminal 7 again, but it is

15   coming from the perspective of the east side of the terminal.

16            And again, you see passenger drop-off in the front

17   of the terminal.

18            (Continued on the next page.)

19

20

21

22

23

24

25

DiCaprio – direct – Pravda

1    (Continuing)

2    Q    And what time is noted on the top of the video, the time

3    stamp of Government's Exhibit 15F?

4    A    11:41 p.m.

5    Q    It's at 11:41 or 11:44?

6    A    It's hard to tell.

7    Q    I'm going to play this 15-second clip from Government's

8    Exhibit 15F.

9              (Video played for jury.)(Video stopped.)

10   Q    Agent DiCaprio, what did you see in that clip?

11   A    I see an individual exiting the east side of terminal

12   seven, walking across the street toward the dark sedan that

13   was staged in the passenger drop-off area.

14   Q    And to be clear, was the individual dressed in clothing

15   and did the individual match the description of the individual

16   that you observed inside terminal seven and identified earlier

17   as the defendant Kasimov?

18   A    Yes.

19   Q    Special Agent DiCaprio, showing you what's in evidence as

20   Government's Exhibit 15G.

21             (Exhibit published.)

22   Q    What are we looking at here?

23   A    Again, this is the front center of terminal seven

24   entrance, looking toward the parking garage and air train

25   platform entrance.

DiCaprio – direct – Pravda

1   Q    And what time stamp is noted on the video clip?

2   A    11:44 p.m.

3         MR. PRAVDA:  MR. PRAVDA:  I will play it for the

4   jury.  It's a 1-minute and 8-second video clip.  Directing the

5   jury's attention at the outset to an area on the left side of

6   the screen.

7         (Video played for jury.)(Video stopped.)

8   BY MR. PRAVDA:

9   Q    Agent DiCaprio, what do you see in Government's

10  Exhibit 15G?

11  A    I saw the same individual walking across the street

12  toward the sedan, toward the dark sedan parked curbside,

13  entering the vehicle and the vehicle departing.

14  Q    And placing that in the context of the observations that

15  you made of Mr. Kasimov earlier that evening, what did this

16  clip depict?

17  A    That depicts the first time that I encountered

18  Mr. Kasimov entering the terminal and departing the terminal.

19  Q    Showing you what is in evidence as Government's

20  Exhibit 15H.

21        What is the time stamp on the video?

22  A    11:48 p.m.

23  Q    And that is four minutes after the previous video clip we

24  watched; is that correct?

25  A    Yes.

DiCaprio – direct – Pravda

1   Q    And on the same camera?

2   A    Yes.

3        MR. PRAVDA:  I'm going to play for the jury this

4   38-second clip directing the jury's attention at the outset to

5   the very center of the clip.

6        (Video played for jury.)(Video stopped.)

7   BY MR. PRAVDA:

8   Q    Agent DiCaprio, what did you see in this video clip?

9   A    See the same individual exiting the glass doors in the

10  center of the screen leading from the air train platform and

11  terminal seven parking garage, walking toward the terminal and

12  entering the east side of the terminal.

13  Q    Is that individual Mr. Kasimov?

14  A    That's correct.

15  Q    And how did his appearance differ from when you had

16  previously observed him during the first meeting?

17  A    He was wearing a winter skull cap, a winter hat.

18       MR. PRAVDA:  Showing you what is in evidence as

19  Government's Exhibit 15I.

20  Q    What does this camera angle depict in Government's

21  Exhibit 15I?

22  A    So this camera is located in the west inside the

23  terminal, departures level, terminal seven, located on the

24  west side of the terminal, pointing toward the east side of

25  the terminal.

DiCaprio - direct - Pravda

1              As you see on the left side, those are the -- that's

2    ticket counter areas and where this tree is located on the

3    right side of the screen, that is close toward the -- to the

4    entrance to the terminal.

5    Q    Now, to be clear, when you refer to the ticket area, are

6    you referring to the area I am circling in the center left of

7    the photo?

8    A    That's correct.

9    Q    Now, is the ticket counter for Ukrainian International

10   Airlines one of the ticket counters in that area?

11   A    No.

12   Q    Where is the -- what is the location of the Ukrainian

13   International Airline terminal within terminal seven?

14   A    You can't see it from this, from this vantage point.

15   It's actually located -- if you -- where the tree is to the

16   right side of the screen, that is a hallway.  That leads to

17   the east side of the terminal, the far east side of the

18   terminal, which then takes you down another hallway in which

19   the Ukrainian International Airlines ticket counter is located

20   down that hallway.

21   Q    And so to be clear, the direction you're talking about is

22   to the right of the terminal where the tree is, consistent

23   with the arrow that I'm drawing on the right side of the

24   screen; is that correct?

25   A    That's correct.

*VB      OCR      CRR*

56

DiCaprio – direct – Pravda

1   Q    Now, using this image, can you describe for the jury

2   where you were seated during the time that you were conducting

3   surveillance in terminal seven?

4   A    Yes.  So if you head down past the tree in that direction

5   that the arrow is pointing, there is seating at the end of

6   that hallway right before you make the turn down to go toward

7   the Ukrainian International Airlines ticket counter.  I was

8   seated right there at that bend, at that turn.

9   Q    Now, what is the time stamp on Government's exhibit --

10  A    11:48 p.m.

11  Q    Sorry.  Government's Exhibit 15I?

12  A    11:48 p.m.

13          MR. PRAVDA:  And playing the seven-second clip and

14  directing the jury's attention to the right side of the

15  screen.

16          (Video played for jury.)  (Video stopped.)

17  BY MR. PRAVDA:

18  Q    Agent DiCaprio, what do you see in that clip?

19  A    We see the individual identified as Mr. Kasimov entering

20  terminal seven west side entrance and walking past my location

21  toward the east, and making that turn down toward the

22  Ukrainian International -- walking toward the Ukrainian

23  International Airlines ticket counter.

24  Q    And placing this particular video clip in the context of

25  your overall observations that evening, where does this fit?

DiCaprio – direct – Pravda

1    A    This was the second encounter, the second observation of

2    Mr. Kasimov entering the terminal.

3    Q    When you say second encounter, the first encounter is the

4    one you described where he entered and left, and the second

5    encounter is he reentered and left again; is that correct?

6    A    That's correct.

7         MR. PRAVDA:  Showing you what is in evidence as

8    Government's Exhibit 15K.

9    Q    Can you remind the jury what we are looking at in this

10   video clip?

11   A    Yes.  This is the terminal frontage, terminal seven, east

12   side of the terminal facing the parking garage facility.

13   Q    What is the time stamp on this video clip?

14   A    12:05 a.m. on February 25th, 2015.

15        MR. PRAVDA:  And I'll play this eight-second clip

16   directing the jury's attention to around the approximate right

17   side of the video.

18        (Video played for jury.)(Video stopped.)

19   BY MR. PRAVDA:

20   Q    Agent DiCaprio, what did you see in Government's

21   Exhibit 15K?

22   A    I observed the individual identified as Mr. Kasimov

23   exiting the east side of terminal seven departures.

24        MR. PRAVDA:  Showing you what's in evidence as

25   Government's Exhibit 15L.

DiCaprio – direct – Pravda

1   Q     Would you remind the jury what we're looking at here.

2   A     Again, footage from the center of the terminal, exterior

3   terminal seven departures, looking at -- on the far end of the

4   screen in the center is the entrance to the air train and

5   parking garage.

6   Q     What is the time stamp on the video?

7   A     12:05 a.m.

8         MR. PRAVDA:  And showing a 51-second clip of

9   Government's Exhibit 15L, I will direct the jury's attention

10  to the movement that starts on the left side and continues

11  through the center.

12        (Video played for jury.)(Video stopped.)

13  BY MR. PRAVDA:

14  Q     Agent DiCaprio, what did you see in Government's

15  Exhibit 15L?

16  A     I observed the individual identified as Mr. Kasimov

17  exiting the terminal, walking across the street and entering

18  the entrance to the air train platform and terminal seven

19  parking garage facility.

20  Q     Now, does the security footage that you recovered capture

21  every moment of what happened on the evening of February 24th,

22  2015, and in the early morning the February 25th, 2015?

23  A     No.

24  Q     And why is that?

25  A     Certain cameras are -- they operate on motion, so they're

59

DiCaprio – direct – Pravda

1   motion–detection technology.  So whenever there's movement

2   they activate and they record.

3   Q    So if there's no motion, then the camera will not record

4   an image?

5   A    That's correct.

6   Q    Did you obtain any other records relating to this event?

7   A    Yes.

8   Q    What was that?

9   A    That was the parking lot data for the terminal seven

10  parking garage during the time of the operation.

11           MR. PRAVDA:  I'm showing you what has been marked as

12  Government's Exhibit 13.

13           Your Honor, could I have one moment, please?

14           THE COURT:  You may.

15           (Pause in the proceedings.)

16           MR. PRAVDA:  Your Honor, showing the witness what is

17  in evidence as Government's Exhibit 19, and I request

18  permission to use the ELMO.

19           THE COURT:  Yes.

20           Mr. Jackson.

21           (Exhibit published.)

22  BY MR. PRAVDA:

23  Q    Special Agent DiCaprio, what is this document,

24  Government's Exhibit 19?

25  A    This is a document capturing all vehicle activity for a

60

DiCaprio – direct – Pravda

1   specific time period that occurred in the Port Authority

2   parking lot facility located at terminal seven JFK

3   International Airport.

4   Q    So this is specific to the parking lot that's associated

5   with terminal seven?

6   A    That's correct.

7   Q    And is that the parking lot that's located through the

8   same set of doors as the air train entrance?

9   A    Yes.

10   Q    Now, what does the record that we're looking at show?

11   Which specific automobile is it referencing?

12   A    The record shows a vehicle associated with license plate

13   number Tango 622543 Charlie entered the parking lot facility.

14   Q    And you requested these records; right?

15   A    Yes.

16   Q    And when you did that, how did you get the license plate

17   number that was entered here?

18   A    I don't recall exactly how we received the license plate

19   but I know it came from the case file.

20   Q    The record you requested is specific to that license

21   plate number.

22   A    That's correct.

23   Q    And what does the record for the car with license pate

24   number T622543C show?

25   A    It shows that the vehicle associated with that license

Proceedings

1    plate entered the terminal seven parking garage on

2    February 24th, 2015, at 11:47 p.m. and exited the parking lot

3    facility on February 25th, 2015, at 12:10 a.m.

4    Q     And how was the parking paid for?

5    A     It was paid for in cash for a total of four hours.

6    Q     Agent DiCaprio, after obtaining the security camera

7    footage and these parking records that is Government's

8    Exhibit 19, did you have any other involvement in this

9    investigation?

10   A     No.

11          MR. PRAVDA:  Your Honor, at this time I have no

12   further questions.

13          THE COURT:  All right.

14          Ladies and gentlemen, we are going to have

15   cross-examination, but since it is almost 12:30, we will have

16   cross-examination right after lunch.  Your lunch is being

17   delivered as promised at 12:30 and, again, do not talk about

18   the case amongst yourselves.

19          The agent will continue on cross-examination.  I

20   will ask him whether he has discussed his testimony with

21   anyone during the break, but I am sure he will not do that

22   because it will be a very bad thing if he did.

23          Thank you.  We will break for lunch now.

24          Thank you.

25          THE COURTROOM DEPUTY:  All rise.

62

Proceedings

1                    (Jury exits.)

2                    (In open court; outside the presence of the jury.)

3                    THE COURT:  All right.  The jury has left the

4      courtroom.

5                    You may be seated everyone.

6                    (Witness excused.)

7                    THE COURT:  Do we have procedural issues to discuss

8      outside the province of the jury?

9                    MR. KESSLER:  Not from the Government.

10                   MS. MACEDONIO:  No, thank you, Your Honor.

11                   THE COURT:  All right.  Then we will see you in

12     about an hour and 15 minutes.

13                   ALL:  Thank you, Judge.

14                   (Continued on following page with AFTERNOON

15     SESSION.)

16

17

18

19

20

21

22

23

24

25

                    VB      OCR      CRR

Proceedings

```
 1              A F T E R N O O N   S E S S I O N

 2                      (2:00 p.m.)

 3          (In open court.)

 4          THE CLERK:  All rise.  Judge Kuntz presiding.

 5          THE COURT:  Good afternoon.  You may be seated.

 6          We have the appearances.

 7          We have not yet brought the jury in.  Are there any

 8   procedural issues we need to address before we bring in the

 9   jury and we have the witness return to the stand for

10   cross-examination?

11          MR. PRAVDA:  No, Your Honor.

12          MS. MACEDONIO:  No.  Thank you.

13          THE COURT:  Okay.  Would you please bring the

14   witness back in for cross-examination.

15          The defendant is now present.  We will have the

16   witness return to the stand, and we will have cross.

17          (Defendant present.)

18          THE COURT:  Welcome back.

19          THE WITNESS:  Thank you, Your Honor.

20          THE COURT:  All right.  Mr. Jackson, will you let

21   the CSO know he can bring the jury back now.

22          THE CLERK:  Yes, judge.

23          (Pause.)

24          (Jury enters.)

25          THE COURT:  Welcome back, ladies and gentlemen of
```

*MICHELE NARDONE, CSR -- Official Court Reporter*

DiCaprio - Cross/Rubert-Schewel

1   the jury.  Again, thank you.  Please be seated, and we are now

2   going to have cross-examination of the witness.

3              Sir, I will ask you:  Did you speak with anyone

4   about your testimony during the break?

5              THE WITNESS:  No, Your Honor.

6              THE COURT:  Okay.  Thank you.  You may

7   cross-examine, sir.

8              MR. RUBERT-SCHEWEL:  Thank you, Your Honor.

9   CROSS-EXAMINATION

10  BY MR. RUBERT-SCHEWEL:

11  Q    Good afternoon, Agent DiCaprio.

12  A    Good afternoon.

13  Q    You testified on direct examination that on February 24,

14  2015 you were provided case work?

15  A    That's correct.

16  Q    As part of the squad CT-23?

17  A    Yes.

18  Q    And that squad initiated surveillance at JFK Airport?

19  A    Yes.

20  Q    Terminal 7?

21  A    Yes.

22  Q    You were actually present inside of the terminal?

23  A    That's correct.

24  Q    And at approximately 9:45 p.m. you testified that you

25  observed Saidakhmetov --

DiCaprio - Cross/Rubert-Schewel

1    A    Correct.

2    Q    -- enter Terminal 7, the target of the surveillance?

3    A    Yes.

4    Q    You testified on direct examination that he was traveling

5    with a companion.

6    A    Yes.

7            MR. RUBERT-SCHEWEL:  Your Honor, permission to

8    publish what has previously been entered into evidence as

9    Government Exhibit 12.

10           THE COURT:  Permission granted.  It's in evidence.

11   You may publish it to the jury.

12           (Published.)

13   Q    Now, just to be clear, you testified on direct

14   examination that the individual on the left with the green

15   hood is Saidakhmetov?

16   A    That's correct.

17   Q    And the individual on the right is -- who you testified

18   was the traveling companion?

19   A    Yes.

20   Q    And he is actually an FBI informant?

21   A    I do not recall specifics of that.

22   Q    Your testimony is you do not recall if the individual on

23   the right was an FBI informant?

24   A    That's correct.

25   Q    But at some point you observed Saidakhmetov and the

                      DiCaprio - Cross/Rubert-Schewel

1   individual on the right walk towards the Ukrainian

2   International Airlines counter?

3   A    Yes.

4   Q    And at approximately 11:30 p.m. you received an alert to

5   watch for another individual?

6   A    I would have to look at the specific times as a reminder,

7   on the report; but from what I recall, yes.

8   Q    And the alert was that another individual would be

9   arriving at Terminal 7?

10  A    Correct.

11  Q    You stated on direct examination that you previously

12  reviewed CCTV footage showing Mr. Kasimov arrive at JFK

13  Airport.

14  A    Yes.

15  Q    Included in Government's Exhibit 15?

16  A    Yes.

17  Q    And you testified on direct that shortly after 11:30 p.m.

18  a black sedan double parked in front of the Airtran walkway?

19  A    In the passenger drop-off area, that's correct.

20  Q    And at approximately 11:39 p.m. Mr. Kasimov exited the

21  black sedan and entered the terminal?

22  A    Correct.

23  Q    And at some point later Mr. Kasimov exited the terminal

24  to park his black sedan in a parking garage?

25  A    Yes.

DiCaprio - Cross/Rubert-Schewel

1        MR. RUBERT-SCHEWEL:  No further questions.

2        THE COURT:  Thank you.  Anything else on redirect?

3        MR. PRAVDA:  No direct, Your Honor -- I mean no

4    redirect, Your Honor.

5        THE COURT:  You may step down.

6        THE WITNESS:  Thank you, Your Honor.

7        THE COURT:  Please call your next witness.

8        MR. PRAVDA:  Your Honor, the government calls

9    Special Agent Thais Canin.

10       THE COURT:  Okay.  Thank you.  You may call the

11   special agent.  You may come forward and be sworn.

12       Please come forward and be sworn by the courtroom

13   deputy.  Thank you.

14       THE CLERK:  Good afternoon.  Raise your right hand,

15   please.

16       THE COURT:  The other right hand.

17       THE WITNESS:  Sorry.  Thank you.

18       THE COURT:  That's why they pay me the big bucks.

19       THE WITNESS:  I followed you.

20       THAIS CANIN, called as a witness, having been first

21   duly sworn/affirmed, was examined and proceeded to testify as

22   follows:

23       THE COURT:  Thank you.  Please be seated.

24       I'm going to ask you to state your name and to spell

25   it clearly for the court reporter, and then counsel will

*MICHELE NARDONE, CSR -- Official Court Reporter*

Canin – Direct/Pravda

1   inquire.  So speak into this microphone because when you move

2   away from it you sound like this, and when you move to it or

3   move it to you you will sound louder.  You won't sound like

4   that, but you will sound louder.

5            THE WITNESS:  Okay, sir.

6            THE COURT:  State your name.

7            THE WITNESS:  My name is Thais Canin T-H-A-I-S

8   C-A-N-I-N.

9            THE COURT:  Thank you.  You may inquire, counsel.

10           MR. PRAVDA:  Thank you, Your Honor.

11  DIRECT EXAMINATION

12  BY MR. PRAVDA:

13  Q    Good afternoon, Agent Canin.

14  A    Good afternoon.

15  Q    Where do you work?

16  A    I currently work for the Federal Bureau of Investigation.

17  Q    What is your position within the FBI?

18  A    Supervisory special agent.

19  Q    For how long you been a supervisory special agent?

20  A    For two years.

21           THE COURT:  Ma'am, excuse me.  We don't want you to

22  keep having to bob your head.  The microphone will swing to

23  you.  If you want to keep bobbing your head, that's cool too,

24  however you want to do it, but you can move the mic as well.

25  Q    Prior to being a supervisor were you a special agent?

Canin - Direct/Pravda

1   A    Yes.

2   Q    For how long were you a special agent?

3   A    In totality, 15 years.

4   Q    What is your current assignment?

5   A    I am a squad supervisor in the intelligence and specials

6   ops division, the New York City office.

7   Q    What's specials ops?

8   A    You have --

9           THE COURT:  You have to let the witness finish the

10  question because you will step on her answer.  So why don't we

11  have the question again and then the answer, and we will

12  continue.

13  Q    What is special ops?

14  A    Special operations.

15  Q    Prior to your current assignment where were you assigned?

16  A    I was an 18-month TDY supervisory special agent in the

17  cyber division at headquarters.

18  Q    How about prior to that?

19  A    I was assigned to JFK office squad, out at JFK, in

20  terrorism.

21  Q    Is that the Joint Terrorism Task Force squad that's

22  stationed at JFK Airport?

23  A    Yes, it is.

24  Q    How long were you assigned to that squad?

25  A    Four and a half to five years.

Canin – Direct/Pravda

1  Q    What were your duties as a member of the JFK

2  counter-terrorism squad?

3  A    We handled pretty much anything that came our way.  We

4  have jurisdiction over the airplanes and the airport, anything

5  terrorism related, criminal; and we provided assistance to

6  other squads in New York as well as other field offices.

7  Q    Let me direct your attention to February 24, 2015.

8  A    Uh-huh.

9  Q    Were you working with the JFK counter-terrorism squad on

10 that date?

11 A    Yes.

12 Q    And did you conduct surveillance as part of your duties

13 that day?

14 A    Yes.

15 Q    What was the target of your surveillance?

16 A    Akhror Saidakhmetov.

17 Q    Where did you conduct surveillance on February 24, 2015?

18 A    It was at the British Airways Terminal 7 departures,

19 departure level.

20 Q    Now, were you conducting surveillance with other members

21 of your squad?

22 A    Yes.

23 Q    And among those agents was one of them Michael DiCaprio?

24 A    Yes.

25 Q    Now, where within Terminal 7 were you personally

Canin - Direct/Pravda

1   conducting surveillance?

2   A    I was stationed at the Ukrainian International Airlines

3   ticketing area.

4   Q    Did there come a time when you observed Saidakhmetov, the

5   subject of your surveillance, that night?

6   A    Yes.

7   Q    When was that?

8   A    I first saw him approximately 9:48 p.m. that evening.

9   Q    Just to be clear, you are testifying about events that

10  took place approximately four and a half years ago?

11  A    Yes.

12  Q    Did you do anything to prepare for your testimony today?

13  A    Yes.

14  Q    What did you do?

15  A    Reviewed the reports.

16  Q    And did the reports document the observation you made and

17  the times you made them?

18  A    Yes.

19  Q    Did reviewing these reports refresh your recollection

20  about the events that you observed on February 24, 2015?

21  A    Uh-huh, yes.

22       THE COURT:  You can't say "uh-huh."  You have to say

23  yes or no.

24  A    (Continuing) Yes.

25  Q    So drawing your attention back to 9:48 p.m., what did you

Canin - Direct/Pravda

1   observe at that time?

2   A    I observed Saidakhmetov arrive, walking towards the

3   ticket counter with a co-traveler.

4   Q    Do you know anything about the identity of the

5   co-traveler?

6   A    No, not really.  I think initials, and that was it.

7   Q    Was he a subject of your surveillance?

8   A    No.

9   Q    Now, what happened after Saidakhmetov and the co-traveler

10  arrived at the Ukrainian International Airline ticket counter?

11  A    They were getting ready, it seemed like, to be prepared

12  to get on the flight, documents out and standing at the

13  counter.

14  Q    Was it crowded in Terminal 7 at this point?

15  A    No.

16  Q    What did you observe them do after they were at the

17  ticket counter?

18  A    Just, you know, waiting around, going between the ticket

19  counter and sitting next to me and going to the ticket counter

20  and sitting next to me throughout that time period.

21  Q    Well, Agent Canin, I want to show you what's been marked

22  for identification as Government Exhibit 17.

23  A    Okay.

24         MR. PRAVDA:  Your Honor, may I have the laptop for

25  the witness only?

Canin – Direct/Pravda

1    THE COURT:  Yes, for the witness only.

2    Any objection to 17 coming into evidence, from

3  defense counsel?

4    MR. RUBERT-SCHEWEL:  No, Your Honor.

5    THE COURT:  All right.  You may publish it to the

6  jury.  It's in evidence, Government 17.

7    (Government Exhibit 17, was received in evidence.)

8    (Published.)

9  Q   Agent Canin, do you recognize what's depicted in

10  Government Exhibit 17?

11  A   Yes.

12  Q   What is depicted in Government Exhibit 17?

13  A   It is the ticket counter area of Ukrainian International

14  Airlines at Terminal 7.

15  Q   Now --

16    THE COURT:  Mr. Pravda, I'm going to ask you and all

17  counsel and all witnesses to swivel that mic.  Okay.  Go

18  ahead.

19    MR. PRAVDA:  Will do, Your Honor.  Thank you.

20    THE COURT:  Just don't turn it off.

21  Q   Agent Canin, I'm circling --

22    THE COURT:  It's off now.

23    THE CLERK:  Mr. Pravda --

24    MR. PRAVDA:  Sorry about that, Your Honor.

25    THE COURT:  That's okay.  That's why my kids at home

Canin – Direct/Pravda

1    won't let me do anything that's electronic.  Go ahead.

2    Q    Agent Canin, I'm circling a portion of the document in

3    front of you, Government Exhibit 17.

4         On the right side of the image, what is that?

5    A    That's the ticket counter area.

6    Q    Then just setting the scene, what is the area that's

7    straight down the center, where I'm drawing this arrow?

8    A    That's in the direction of the entrance/exit of the

9    departure area for Terminal 7.

10   Q    I'm drawing an arrow that goes toward the right of the

11   screen in that direction.

12        Where is that?

13   A    That's headed toward the TSA screening check point.

14   Q    Now, this was taken on February 24, 2015?

15   A    Yes.

16   Q    Is it an image that fairly and accurately depicts what

17   you observed on -- from your vantage point on February 24,

18   2015?

19   A    Yes.

20   Q    Where does the area come from?

21   A    The security cameras at Terminal 7.

22   Q    Is the time stamp large enough for you to read?

23   A    Yes, 11:22 p.m.

24        MR. PRAVDA:  Let me see if I can help with that.

25        THE COURT:  I think she said 11:22 p.m.

Canin – Direct/Pravda

1   Is that what you said, ma'am?

2   THE WITNESS:  Uh-huh.

3   THE COURT:  Uh-huh, no, yes?

4   THE WITNESS:  Yes.

5   THE COURT:  Okay.

6   Q   11:22 p.m., is that what you said?

7   A   That's what I said, yeah.

8   Q   Now, I'm circling an individual who is sitting in a chair

9   on the left side of the waiting area.

10   Who is that?

11   A   That would be me.

12   Q   I'm circling two individuals who are sitting to your -- I

13   guess it would be your left.

14   Who are those two individuals?

15   A   That is the co-traveler and Saidakhmetov.

16   Q   So what did you do at this point?

17   A   I just maintained my position.

18   Q   How long was Saidakhmetov and the other traveler present

19   in the area of the Ukrainian International Airline terminal

20   that night?

21   A   I would say approximately two to two and a half hours.

22   Q   You watched them for all of that time?

23   A   Yes.

24   Q   Now, at some point did you receive information that a

25   third individual might be coming to meet with Saidakhmetov?

Canin – Direct/Pravda

1   A    Yes.

2   Q    How did you receive that information?

3   A    An e-mail.

4   Q    I'm showing you what is in evidence as Government

5   Exhibit 9.

6        MR. PRAVDA:  Your Honor, if this could be published

7   for the jury.  It's already in evidence.

8        THE COURT:  Yes, of course.

9        (Published.)

10  Q    Agent Canin, do you recognize this document?

11  A    Yes.

12  Q    What is this document?

13  A    It's looks like a Pennsylvania license information

14  document, state driver's license document.

15       THE COURT:  It's a little blurry.  Can you unfuzz

16  it?  That's better, I think.

17       Better for the jury?  Can you see it more clearly

18  now, ladies and gentlemen of the jury?  Fine.  Go ahead.

19       MR. PRAVDA:  Thank you, Your Honor.

20  Q    Was this document attached to the e-mail that you

21  received alerting you that another traveler might be meeting

22  with Saidakhmetov?

23  A    Yes.

24  Q    And what is the name of the individual that you were

25  alerted might be meeting with Saidakhmetov?

Canin - Direct/Pravda

1   A    Dilkhayot Kasimov.

2   Q    Now, directing your attention to the second page of

3   Government Exhibit 9, did you receive a photograph of

4   Mr. Kasimov as well?

5   A    Yes.

6   Q    Is this the photograph that you received?

7   A    Yes.

8   Q    Did there come a time when you observed an individual

9   matching this photograph?

10  A    Yes.

11  Q    Tell us about that.

12  A    It was approximately 11:44 p.m. when I noticed a

13  gentleman matching that description coming to meet with the

14  two individuals that night, Kasimov and the co-traveler -- I'm

15  sorry, Saidakhmetov and the co-traveler.

16  Q    So the individual Kasimov met with Saidakhmetov and the

17  co-traveler?

18  A    That's correct.

19  Q    How long did you observe them meeting for?

20  A    The first time it was only about a minute or two.

21  Q    What did you see them do during that minute or two?

22  A    They greeted each other, shook hands; and then, about

23  within a minute or two, Kasimov departed.  He headed

24  towards -- well, I didn't see him actually leave the terminal,

25  but he was headed towards the direction of the entrance/exit

Canin – Direct/Pravda

1    of Terminal 7.

2    Q    During that minute or two did you take any photographs?

3    A    I did.

4         MR. PRAVDA:  I'm showing you what is marked for

5    identification only as Government Exhibit 10.

6         THE COURT:  Any objection to 10 being published for

7    the jury?

8         MR. RUBERT-SCHEWEL:  No, Your Honor.

9         THE COURT:  It's admitted in evidence.  You may

10   publish it to the jury.

11        (Government Exhibit 10, was received in evidence.)

12        (Published.)

13   Q    Agent Canin, can you describe to the members of the jury

14   what we are seeing in Government Exhibit 10?

15   A    You are seeing the three individuals –– Kasimov, the

16   co-traveler, and Saidakhmetov –– meeting.

17   Q    And where are they meeting?

18   A    In front of the Ukrainian International Airlines ticket

19   counter.

20   Q    So you had a direct view of Kasimov meeting with

21   Saidakhmetov and the co-traveler?

22   A    Yes.

23   Q    Now, you said after a minute or two Kasimov departed?

24   A    That's correct.

25   Q    And what time was that, approximately?

Canin - Direct/Pravda

1    A    Around 11:00 -- somewhere between 11:45 and 11:46.

2    Q    What did you do at that point?

3    A    Maintained my position.

4    Q    Why did you maintain your position?

5    A    Because Saidakhmetov and the co-traveler were still at

6    the counter and in the area.

7    Q    What did you see after that?

8    A    You know, I just waited and maintained my position, but

9    at about 11:51 p.m. I saw the same gentleman returned back

10   into the ticket counter area.

11   Q    So Kasimov came back to meet with Saidakhmetov and the

12   co-traveler again?

13   A    Yes.

14   Q    What time was that?

15   A    Approximately 11:51 p.m.

16   Q    How long did they speak for?

17         How long did they -- were they together for at that

18   point?

19   A    That was a little bit of a longer period of time, maybe

20   about 14, 15 minutes.

21   Q    What did you observe them do during that time?

22   A    They were just talking; and then at some point, when

23   Kasimov departed, they hugged each other, and Kasimov

24   departed.

25   Q    Did you take any photographs during that time?

Canin - Direct/Pravda

1   A    I did.

2        MR. PRAVDA:  I'm showing you what's been marked for

3   identification as Government Exhibit 11.

4        THE COURT:  Any objection to 11 coming into

5   evidence?

6        MR. RUBERT-SCHEWEL:  No, Your Honor.

7        THE COURT:  It's admitted.  You may publish it to

8   the jury.

9        (Government Exhibit 11, was received in evidence.)

10       (Published.)

11  Q    Agent Canin, can you describe what the jury is seeing in

12  Government Exhibit 11?

13  A    It's meeting of Kasimov, Saidakhmetov, and the

14  co-traveler.

15  Q    Did this occur in roughly the same location as the prior

16  meeting?

17  A    Roughly, with the exception that they were moved over

18  more to the right, and the position of the gentlemen standing

19  was slightly different in relation to each other, that's it.

20  Q    Turning your attention back to Government Exhibit 10 --

21  which you said was taken during the first meeting; is that

22  correct?

23  A    Yes.

24  Q    -- is Kasimov wearing anything on his head?

25  A    Not at that time, no.

Canin - Direct/Pravda

1    Q    Now I'm showing you Government Exhibit 11, during the

2    second meeting; is that right?

3    A    Uh-huh.

4    Q    At that time --

5         THE COURT:  No uh-huh.

6    A    Yes.

7    Q    Does Kasimov appear any different?

8    A    Just slightly.  He had a cap on.

9    Q    Now, after approximately 15 minutes in their meeting,

10   what did you see at the end of that meeting?

11   A    They took hands, greeted each -- not shook hands.  I take

12   that back.  They hugged, hugged each other good-bye, and

13   Kasimov headed back out towards the exit/entrance of the

14   departure terminal.

15   Q    What time was that?

16   A    Approximately 12:05 a.m.

17   Q    On February 25, 2015?

18   A    That's correct.

19   Q    After Kasimov left what happened with Saidakhmetov and

20   the co-traveler?

21   A    Very shortly after that they both headed towards the TSA,

22   you know, screen point, you know, check point, towards the

23   other gates.  That's where they were headed.

24   Q    Is that the check point through which they would go to

25   the gate that was opened?

Canin – Direct/Pravda

1    A    Yes.

2    Q    Is that the end of your surveillance that evening?

3    A    Yes.

4    Q    Did you participate in obtaining security footage from

5    Terminal 7?

6    A    Yes.

7    Q    With any other individuals?

8    A    Special Agent Mike DiCaprio.

9    Q    Have you had the opportunity to review any of the

10   security footage clips from that evening?

11   A    Yes.

12   Q    Agent DiCaprio (sic), I'm showing you --

13            THE COURT:  Microphone, please.

14   Q    Agent DiCaprio (sic), I'm showing you what's in evidence

15   as Government Exhibit 15B.

16            Do you see that?

17   A    Yes.

18   Q    Just generally, what does that depict?

19   A    That depicts Saidakhmetov and the co-traveler being

20   brought around by an airport employee.

21   Q    What is the time stamp on this clip?

22   A    11:34 p.m.

23            MR. PRAVDA:  I'm going to play this 13-second clip,

24   Government Exhibit 15B.

25            (Recording played.)

Canin - Direct/Pravda

1   Q    Agent Canin, can you describe for the jury what you

2   observed in that clip?

3   A    Saidakhmetov and the co-traveler were being summoned by

4   an airport employee and taken to the ticket counter.

5   Q    To be clear, I'm drawing a circle around the waiting area

6   on the left side of Government Exhibit 15B.

7         What's depicted there?

8   A    That would be me.

9   Q    Agent Canin, I'm showing you what's in evidence as

10  Government Exhibit 15D.

11        What is the time stamp on this clip?

12  A    11:40 p.m. -- I'm sorry, 11:41 p.m.

13        MR. PRAVDA:  I'm going to play this approximately

14  30-second video.

15        (Recording played.)

16  Q    Now, Agent Canin, can you describe for the jury what we

17  observed on Government Exhibit 15D?

18  A    The co-traveler headed towards the front, headed towards

19  the entrance/exit of the departure terminal.

20  Q    Was he doing anything?

21  A    It appeared like he was on the phone.

22  Q    Was Saidakhmetov with him?

23  A    Still remained at the ticket counter.

24  Q    Just locating this clip, within the time frame of your

25  surveillance, is this before Kasimov arrived the first time?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Canin – Direct/Pravda

1    A    Yes.

2    Q    Agent Canin, I'm showing you what is in evidence as

3    Government Exhibit 15E.

4              What is the time stamp on Government Exhibit 15E?

5    A    11:42 p.m.

6    Q    So within a minute after the co-traveler was on the

7    phone?

8    A    Yes.

9              MR. PRAVDA:  I'm going to play this approximately

10   18-second video.

11             (Recording played.)

12   Q    Agent Canin, what did you observe in Government

13   Exhibit 15E?

14   A    I observed the third party come and meet and greet the

15   co-traveler and Saidakhmetov.

16   Q    Was this the first meeting that you described earlier in

17   your testimony?

18   A    Yes, it is.

19   Q    So you observed Kasimov at the end of that clip meeting

20   with Saidakhmetov and the co-traveler?

21   A    Yes, I did.

22   Q    Agent Canin, directing your attention to Government

23   Exhibit 15J -- before I get there.

24             Agent Canin, are you aware of whether or not there

25   is any video footage from the second meeting that you observed

Canin - Direct/Pravda

1   between Kasimov, Saidakhmetov, and the co-traveler?

2   A    I don't know if you can see anything, but there is

3   footage of me there.  I'm there.  I don't know about the time.

4   Q    I'm showing you what's in evidence as Government

5   Exhibit 15J.

6   A    Uh-huh.

7              THE COURT:  No uh-huhs.

8   A    Yes.  Yes, sir.

9              THE COURT:  I'm ruthless about that.

10             THE WITNESS:  That's okay.  Keeping me in line.

11  Q    Agent Canin, what scene does this camera depict?

12  A    It depicts the -- to the right you see the security, TSA

13  security check point; and to the left is where the ticket

14  counter is located.

15  Q    The TSA security check point is toward the right of the

16  image?

17  A    Yes.

18  Q    And then the Ukrainian Airline ticket counter is back

19  this way?

20  A    Yes.

21             MR. PRAVDA:  I'm going to play Government

22  Exhibit 15J, which is approximately a 22-second clip.

23             (Recording played.)

24  Q    Agent Canin, what did you see in Government Exhibit 15J?

25  A    I saw Saidakhmetov and the co-traveler head in the

Canin - Direct/Pravda

1    direction of the TSA security check point.

2    Q    What was the time stamp?  Let me open that up for you

3    again.

4    A    12:05 a.m. -- I'm sorry, 12:00 -- well, 12:04 a.m.

5    Q    Is that after the conclusion of the second meeting

6    between Kasimov and Saidakhmetov and the co-traveler?

7    A    Yes.

8    Q    Again, how long after Kasimov left, did Saidakhmetov and

9    the co-traveler head for the TSA screening check point?

10   A    It was a very short time, almost immediately.  Probably

11   within a minute after the meeting concluded they headed

12   towards the TSA check point.

13              MR. PRAVDA:  One moment, Your Honor?

14              THE COURT:  Yes, of course.

15              (Pause.)

16              MR. PRAVDA:  No further questions, Your Honor.

17              THE COURT:  Thank you.

18              You may cross-examine the witness.

19   CROSS-EXAMINATION

20   BY MR. RUBERT-SCHEWEL:

21   Q    Good afternoon, Agent Canin.

22   A    Good afternoon.

23   Q    You testified on direct examination that on February 24,

24   2015 you were part of a team conducting surveillance at JFK

25   Airport?

Canin – Cross/Rubert-Schewel

1  A    That's correct.

2  Q    At Terminal 7?

3  A    Yes.

4  Q    And you were present inside of the terminal?

5  A    Yes.

6  Q    And at approximately 9:48 p.m. you observed the target,

7  Mr. Saidakhmetov?

8  A    Yes.

9  Q    And you stated on direct examination that he was

10 traveling with a co-traveler?

11 A    Yes.

12 Q    But the co-traveler, you stated, was not a subject of

13 the -- of your surveillance?

14 A    I don't remember him being, you know, as part of -- it

15 was a while ago.  It was really more -- I was focused on

16 Saidakhmetov.

17 Q    Do you recall that the reason why he was not a subject of

18 your surveillance was because he was an FBI informant?

19 A    Yeah.  At some point I was advised of that.

20 Q    So your testimony is that the co-traveler was actually an

21 FBI informant?

22 A    Yes.

23 Q    And together Mr. Saidakhmetov and the FBI informant

24 approached the Ukrainian international ticket counter?

25 A    Yeah.

Canin – Cross/Rubert-Schewel

1   Q    And at this time, when you were surveilling them, you

2   were actually seated directly across from the ticket counter?

3   A    Yes.

4   Q    And at approximately 11:44 p.m. a third individual

5   approached?

6   A    Yes.

7   Q    And this was Mr. Kasimov?

8   A    Yes.

9   Q    And when he approached and met Saidakhmetov and the FBI

10  informant they were actually standing directly in front of the

11  Ukrainian Airlines ticket counter?

12  A    Yes.

13  Q    And you testified on direct examination that they shook

14  hands?

15  A    Yes.

16  Q    Directly in front of the ticket counter?

17  A    Well, the ticket counter is very long.  So here I am;

18  and, if you look at the first picture, they are more skewed to

19  the left.  So, yes, but in front of the ticket counter, for

20  all intents and purposes.

21          MR. RUBERT-SCHEWEL:  No further questions, Your

22  Honor.

23          THE COURT:  Any redirect?

24          MR. PRAVDA:  No redirect, Your Honor.

25          THE COURT:  Thank you.  You may step down, agent.

Canin – Cross/Rubert–Schewel

1          THE WITNESS:  Thank you, everyone.

2          THE COURT:  Please call your next witness.

3          MR. KESSLER:  Your Honor, before we call the next

4    witness may we have a very brief sidebar?

5          THE COURT:  We may most certainly have a brief

6    sidebar.  Put on the white noise machine.

7          If it turns into a longer sidebar, ladies and

8    gentlemen, we will ask you to be returned to the jury room;

9    but at the moment it's called brief sidebar.

10          (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar

1              (Sidebar conference.)

2              MR. KESSLER:  Your Honor, the next witness is

3     Special Agent Ryan Singer.  As the court may remember, there

4     was a question about the extent of his 3500, and we explained

5     that the subject of his testimony would be extremely narrow,

6     just the arrest of Mr. Saidakhmetov.  That is our intention.

7              However, we wanted to make the court aware, as we

8     have made defense counsel previously aware, that Special Agent

9     Singer was present at all of the defendant's proffers.  So he

10    has heard the proffer statements that were the subject of our

11    prior litigation.  We obviously are not going to ask him about

12    that.  We have instructed him not to talk about it.

13             But we just wanted to be clear that on

14    cross-examination it is possible questions might implicate

15    those statements, and we wanted everyone to be aware of that

16    in advance.

17             THE COURT:  I hear your statement.  Is there any

18    response to the statement you just heard from the Assistant

19    United States Attorney?

20             MS. MACEDONIO:  I do not intend to elicit from this

21    witness his participation in any proffers with regard to

22    Mr. Kasimov.  So I do not think that we will open the door in

23    any way.

24             THE COURT:  Is there any response to the statement

25    which you heard from defense counsel?

Sidebar

1          MR. KESSLER:  No.

2          MS. MACEDONIO:  I do --

3          THE COURT:  Go ahead.

4          MS. MACEDONIO:  I do, however, want to point out,

5    Your Honor, that although they are calling him for the arrest

6    of Saidakhmetov, there is a backdrop to that that I will go

7    into.  So while I do not intend to elicit any information from

8    him regarding my client's proffers, there is other information

9    that I may go into with regard to his knowledge of the

10   investigation.

11         THE COURT:  Is there any response to that

12   observation?

13         MR. KESSLER:  You know, I would assume, as he is

14   instructed, Special Agent Singer is going to answer the

15   questions as long as the cross is within the scope of the

16   direct.

17         The point of the sidebar was just to say depending

18   on what questions are asked, if they implicate his knowledge

19   broadly of the case, they might introduce something that

20   implicate something that was said in a proffer.  I just -- I

21   want to make sure we have talked about this in advance.

22   That's all.

23         THE COURT:  Is there any response to what you have

24   just heard?

25         MS. MACEDONIO:  Thank you.

Sidebar

1          MR. KESSLER:  I'm sorry, Your Honor.  One moment.

2    May I confer with Mr. Pravda?

3          (Pause.)

4          MR. PRAVDA:  Your Honor, we may object to questions.

5          THE COURT:  I can't hear what you are saying.  The

6    court reporter has to hear it and I have to hear it and

7    opposing --

8          MR. PRAVDA:  Your Honor, it's difficult for me to

9    understand how to moderate my voice so I'm not being heard

10   over the white noise.  So that's why, because I speak too

11   softly.

12         I was merely saying that to the extent that

13   Ms. Macedonio asks questions that are outside the scope of the

14   direct we may be objecting to those questions.

15         THE COURT:  If there are objections to a question

16   being beyond the scope of the direct, I will rule.  I will

17   either sustain the objection or I will overrule the objection.

18         MS. SHARKEY:  This sounds like a trial.

19         MR. KESSLER:  Sounds good.

20         THE COURT:  That's why they pay me the big bucks.

21         MR. KESSLER:  Thank you very much.

22         (End of sidebar conference.)

23         (Continued on the next page.)

24

25

*MICHELE NARDONE, CSR -- Official Court Reporter*

Sidebar

1          (In open court.)

2          THE COURT:  That was pushing the envelope for a

3    short sidebar.  In another minute you would have been back in

4    the jury room, but there you go.  So you are getting a sense

5    of my strike zone for short sidebars.  So are the lawyers, by

6    the way.  Okay.

7          Please call your next witness.

8          MR. KESSLER:  Thank you.  Your Honor, the government

9    calls Special Agent Ryan Singer.

10         THE COURT:  Please have the special agent be brought

11   forward and be sworn.

12         THE CLERK:  Good afternoon.  Please raise your right

13   hand.

14         RYAN SINGER, called as a witness, having been first

15   duly sworn/affirmed, was examined and proceeded to testify as

16   follows:

17         THE COURT:  Thank you, sir.  Please be seated.  I'm

18   going to ask you to state and spell your name.

19         Pull this microphone towards you.  It will swivel,

20   and tilt it up like this and you will be heard like this, and

21   if you move away from it you will be heard like this.

22         THE WITNESS:  Understood.

23         THE COURT:  State your name and spell it.

24         THE WITNESS:  Ryan Singer, R-Y-A-N S-I-N-G-E-R.

25         THE COURT:  Thank you.  You may inquire, counsel.

Singer – Direct/Kessler

1    DIRECT EXAMINATION

2    BY MR. KESSLER:

3    Q    Good afternoon.

4             Where do you work?

5    A    I work for the Federal Bureau of Investigation.

6             (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*MICHELE NARDONE, CSR -- Official Court Reporter*

SINGER - DIRECT - KESSLER

1    DIRECT EXAMINATION(Continued)

2    BY MR. KESSLER:

3    Q    What's your current position at the Federal Bureau of

4    Investigation?

5    A    My current title is supervisory special agent.

6    Q    Where are you located as a supervisory special agent?

7    A    I currently assigned to the counterterrorism division at

8    FBI headquarters.

9    Q    Where is that?

10   A    That's Washington, D.C., northern Virginia.

11            THE COURT REPORTER:  Could you please slow down.

12            THE COURT:  What I usually say to people is channel

13   your inner Lord Vader speech pattern rather than your inner

14   Woody Allen, Chris Rock, Wanda Sykes speech pattern.  Slow it

15   down.  Go ahead.

16            THE WITNESS:  Understood.  Thank you, Your Honor.

17   BY MR. KESSLER:

18   Q    Before you were a supervisory special agent at the FBI in

19   Washington, where did you work?

20   A    I worked for the New York field office as a special

21   agent.

22   Q    And in what part of the New York field office did you

23   work as a special agent?

24   A    Right before headquarters I was in the criminal division

25   of the New York field office.

SINGER - DIRECT - KESSLER

1   Q    Did you work in any other parts of the New York field

2   office?

3   A    Yes.  Immediately prior to that I was on the New York

4   Joint Terrorism Task Force.

5   Q    For how long did you work on the Joint Terrorism Task

6   Force?

7   A    From August 2013 to March 2017.

8   Q    As a special agent on the Joint Terrorism Task Force,

9   what kinds of crimes did you investigate?

10  A    We investigated matters related to international

11  terrorism.

12  Q    I want to direct your attention to February 24th, 2015.

13  Were you at JFK Airport on the evening of February 24th, 2015?

14  A    Yes.

15  Q    Why were you there?

16  A    I was there to arrest Akhror Saidakhmetov.

17  Q    Would you mind spelling that for the record.

18  A    A-K-H-R-O-R.  Last name S-A-I-D-A-K-H-M-E-T-O-V.

19          MR. KESSLER:  Your Honor, with the Court's

20  permission, could I show the witness a document from the

21  laptop feed.  It's been marked as Government Exhibit 2.

22          THE COURT:  Yes, you may publish it to the witness

23  not to the jury.  And opposing counsel has access to it, yes?

24          MS. MACEDONIO:  Yes, Your Honor.

25          THE COURT:  Go ahead.

SINGER – DIRECT – KESSLER

1    BY MR. KESSLER:

2    Q    Special Agent Singer, do you see Government Exhibit 2 in

3    front of you?

4    A    I do.

5    Q    What is shown in Government Exhibit 2?

6    A    That's a photograph of Akhror Saidakhmetov.

7             MR. KESSLER:  Your Honor, I offer Government

8    Exhibit 2 in evidence.

9             THE COURT:  Any objection?

10            MS. MACEDONIO:  No, Your Honor.

11            THE COURT:  It's admitted.  You may publish.

12            (Government Exhibit 2, was received in evidence.)

13            (Exhibit published.)

14   Q    Special Agent Singer, what is Mr. Saidakhmetov wearing in

15   this photograph?

16   A    He is wearing a green hooded sweatshirt.

17   Q    So on the evening of February 24th, 2015, when did you

18   arrive at JFK Airport?

19   A    I arrived at JFK early evening, I'd say approximately six

20   or 7 p.m., to the best of my recollection.

21   Q    Now what was your specific assignment that night at JFK

22   Airport?

23   A    To arrest Mr. Saidakhmetov.

24   Q    Were you part of a team that night?

25   A    Yes.  We had an arrest team.

SINGER – DIRECT – KESSLER

1   Q     What's an arrest team?

2   A     An arrest team is essentially when an individual is being

3   taken into custody we have a number of individuals to affect

4   the arrest, usually about six individuals or more depending on

5   the circumstances.

6   Q     Were there any other teams in addition to the arrest team

7   at JFK Airport that night?

8   A     Yes.

9   Q     What were they?

10  A     There was a surveillance team that staged in the airport

11  and conducted surveillance on foot of Mr. Saidakhmetov as he

12  progressed through the airport and headed towards boarding his

13  scheduled flight.  And there was also a mobile surveillance

14  team that had trailed Mr. Saidakhmetov from his residence in

15  Brooklyn to the airport and maintained a presence outside or

16  at the terminal entrance.

17  Q     Where was the arrest team located at the start of the

18  evening on February 24th?

19  A     At the start of the evening the arrest team was located

20  at the FBI space in JFK International Airport.

21  Q     At some point did you move from that location?

22  A     Yes.

23  Q     Where did the arrest team move?

24  A     We ultimately -- we essentially staged on the tarmac just

25  underneath the jetway to the plane.  The jetway is the bridge

SINGER – DIRECT – KESSLER

1   from the terminal area to the plane.

2   Q    What's the tarmac?

3   A    The tarmac is just the road or -- the road kind of

4   leading up to the airport, to the runways.

5   Q    It's the road that airplane actually sits on outside the

6   terminal?

7   A    Correct.

8   Q    Now at some point as you were staged on the tarmac

9   outside the terminal, did you receive notification that Akhror

10  Saidakhmetov was close to boarding a flight?

11  A    Yes.  We received periodic notices as to

12  Mr. Saidakhmetov's progress throughout the terminal.

13  Q    After you received that notification, what happened next?

14  A    As soon as we were advised that boarding was imminent, we

15  went up into the jetway and awaited Mr. Saidakhmetov.

16  Q    Is it fair to say the jetway is basically a hallway?

17  A    Yes.

18  Q    So how were you set up in the hallway?

19  A    We were essentially staged in a single file.

20  Q    Who was located closest to the airport furthest from at

21  the airplane in the hallway?

22  A    I would have been the first in line.

23  Q    At some point as you were waiting in the jetway, did you

24  see Akhror Saidakhmetov?

25  A    Yes.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SINGER - DIRECT - KESSLER

1    Q    What was he wearing?

2    A    He was wearing the green hooded sweatshirt, the same one

3    that's contained in the photograph.

4    Q    After you saw Saidakhmetov, what happened next?

5    A    Once we saw Mr. Saidakhmetov we walked towards him and

6    attempted to place him under arrest.

7    Q    Was he handcuffed?

8    A    Yes.

9    Q    Was he arrested?

10   A    Yes.

11   Q    After he was arrested, was he searched?

12   A    Yes.

13   Q    Where was he searched?

14   A    He was searched in the immediate vicinity.  As soon as he

15   was handcuffed there was a quick search of his person.

16   Q    Were you one of the people who conducted that search?

17   A    Yes.

18   Q    What did you recover from Saidakhmetov?

19   A    Recovered a large wad of cash which was about -- which

20   was I believe $1600 -- $1602, recovered several travel

21   documents, a boarding pass.

22   Q    Are you aware of whether additional cash was recovered

23   that night from Saidakhmetov's luggage?

24   A    Yes.

25   Q    Do you recall how much cash was in the luggage?

SINGER - DIRECT - KESSLER

1    A    I believe it was $540.

2              MR. KESSLER:  Your Honor, I'm going to mark a

3    physical exhibit as Government Exhibit 34.  I have previously

4    shown this exhibit to defense counsel.

5              THE COURT:  What's the number again, sir?

6              MR. KESSLER:  3-4.

7              THE COURT:  Any objection to 34 coming into

8    evidence?

9              MS. MACEDONIO:  May I have -- may I just approach,

10   Your Honor?

11             THE COURT:  Yes, you can go over the podium and look

12   at it.

13             MS. MACEDONIO:  No objection, Your Honor.

14             THE COURT:  It's admitted.  You may publish to the

15   jury.

16             (Government Exhibit 34, was received in evidence.)

17             MR. KESSLER:  All right.  Mr. Jackson, if I could

18   have the Elmo.

19   Q    Special Agent Singer, I'm showing you what's been --

20             THE COURT:  Move the microphone towards you so they

21   can hear you.

22   Q    Special Agent Singer, I'm showing you what's in evidence

23   as Government Exhibit 34.  Do you recognize it?

24   A    Yes.

25   Q    What is it?

SINGER – DIRECT – KESSLER

1  A     That is the cash that was taken from Mr. Saidakhmetov

2  upon his arrest.

3  Q     Is it just the cash that was taken from his person, or

4  does it in include both the $1602 that were taken from his

5  person and also the $540 that were taken from his luggage?

6  A     I believe that is the total amount.

7  Q     So it's a total of $2,142 in this bag?

8  A     I believe so, yes.

9  Q     And there is a label on the bag.  Do you recognize what

10  kind of label this is?

11  A     Yes, I do.

12  Q     What is it?

13  A     It's an evidence label essentially identifying what this

14  is from, when the evidence was taken, and one of the

15  collecting agent's and witnessing supervisor.

16  Q     So there is, I think as you mentioned, there is a field

17  that says date of seizure or collection.  Do you see that?

18  A     I do, yes.

19  Q     What's the date?

20  A     The date is February 25th, 2015.

21  Q     So does that reflect that Mr. Saidakhmetov was searched

22  very early on February 25th running over from February 24th?

23  A     That is correct.

24  Q     And there is a field for sealing official's printed name.

25         Do you see that?

SINGER – DIRECT – KESSLER

1    A    I do.

2    Q    Which name is there?

3    A    It says, Carl A. Steinfurth.

4    Q    Was he another FBI employee?

5    A    Yes.

6    Q    Did you hand the cash you recovered from Saidakhmetov to

7    him?

8    A    I did, yes.

9           THE COURT:  Why the delay in the date of sealing

10   from the 2/25/2015 seizure to looks like 3/18/2015 for the

11   date of sealing?  Do you understand why there was that gap in

12   time?

13          THE WITNESS:  I do, Your Honor.

14          THE COURT:  Why?

15          THE WITNESS:  I believe people on the case team were

16   still looking at and reviewing some of the evidence at the

17   time and then it was ultimately brought over for sealing.

18          THE COURT:  So the money that was seized on 2/25/15

19   was not put into this FBI evidence bag until 3/18/2015, is

20   that what that indicates?

21          I'm just looking at the dates on the document, is

22   that what that indicates?

23          THE WITNESS:  Yes, Your Honor, it --

24          THE COURT:  Okay, that's fine.  Go ahead.

25          The jury will probably wonder why the delay, now you

SINGER − DIRECT − KESSLER

1  told us.  Go ahead.

2  BY MR. KESSLER:

3  Q    Special Agent Singer, is there anything else you wanted

4  to explain about the time lag there between the seizure and

5  the sealing?

6  A    The only thing I would mention is that we have a separate

7  form of chain of custody which shows when the item was

8  collected, to whom it passed, and then ultimately it would be

9  sealed and relinquished into evidence.

10  Q    The final question I want to ask you about this evidence

11  label, do you see there is a field that says, Estimated Dollar

12  Value?

13  A    Yes.

14  Q    What's the amount listed there?

15  A    It says 2142.

16  Q    Thank you.

17          MR. KESSLER:  Thank you.  I'm going to take

18  Government Exhibit 34 off the Elmo.

19          I'm now going to mark a separate physical exhibit.

20  It's a bag containing various pieces of paper as Government

21  Exhibit 30.  I have previously shown this to defense counsel.

22          THE COURT:  Any objection to Government 30 being

23  admitted?

24          MS. MACEDONIO:  No, Your Honor.

25          THE COURT:  It's admitted.  You may publish it to

SINGER - DIRECT - KESSLER

1    the jury.

2              (Government Exhibit 30, was received in evidence.)

3              (Exhibit published.)

4    BY MR. KESSLER:

5    Q    Special Agent Singer, do you recognize Government

6    Exhibit 30?

7    A    Yes, I do.

8    Q    What is it?

9    A    Those are the travel documents that were recovered from

10   Mr. Saidakhmetov's person at the point of arrest.

11             MR. KESSLER:  Your Honor, I apologize.  I'm going to

12   take Government Exhibit 30 off the Elmo.  I have one more

13   exhibit I wanted to show Special Agent Singer just for him

14   before we move on.

15             So with the Court's permission I'll show Government

16   Exhibit 34A.

17             THE COURT:  Any objection to 34A coming into

18   evidence?  Show it to your adversary, see if they have an

19   objection.

20             MS. MACEDONIO:  No objection.

21             THE COURT:  It's admitted.  You may publish 34A.

22   It's admitted.

23             You may see it, ladies and gentlemen of the jury.

24             (Government Exhibit 34A, was received in evidence.)

25             (Exhibit published.)

SINGER - DIRECT - KESSLER

1          THE COURT:  Could you dim lights a little bit,

2    Mr. Jackson, it's a little hard to see on that screen.

3          Please proceed, counsel.

4          MR. KESSLER:  Thank you.

5    Q    Special Agent Singer, is Government Exhibit 34A a picture

6    of Government Exhibit 34?

7    A    Yes.

8    Q    It's a picture of all the cash that was recovered from

9    Saidakhmetov's person and suitcase?

10   A    Yes.

11         MR. KESSLER:  Thank you.

12   Q    So I'm now putting Government Exhibit 30, which is in

13   evidence back on the Elmo.  And I'm going to open it up and

14   ask you about some of the documents inside, Special Agent

15   Singer.

16         So the first thing, there is a bluish-green book

17   that says Travel Document on the front.  Do you see that?

18   A    I do.

19   Q    What is that?

20   A    That is a travel document for individuals who aren't able

21   to get a passport and essentially functions as a passport for

22   purposes of international travel.

23         MR. KESSLER:  I'm going to open the travel document

24   that was inside Government Exhibit 30 to approximately the

25   second page.

SINGER - DIRECT - KESSLER

1  Q    Could you just read for the jury the name of the person

2  associated with this travel document.

3  A    Yes, it says last name, Saidakhmetov, first name, Akhror.

4  Forgive me it's a little hard with the hologram.

5        Shall I keep going down the line?

6  Q    No, that's fine.

7        Is there also a photograph of Mr. Saidakhmetov?

8  A    Yes.

9  Q    I'm going to put that blue book aside.

10       Next there appears to be plastic envelope containing

11 two cards.  Do you see that?

12 A    I do, yes.

13 Q    So what are these two cards that are inside the plastic

14 envelope?

15 A    That's Mr. Saidakhmetov's permanent resident card and

16 that's Mr. Saidakhmetov's social security card.

17 Q    I'll set these aside.

18       Next there is a couple of white sheets of paper that

19 are folded up and inside there's another document, so I will

20 ask you about this small, loose document first.

21 A    The small document appears to be a portion of

22 Mr. Saidakhmetov's boarding pass for his flight.

23 Q    What's the name listed on the boarding pass?

24 A    Last name Saidakhmetov, first name Akhror.

25 Q    What's the destination departure and destination listed

SINGER – DIRECT – KESSLER

1   on the boarding pass?

2   A    Departure Kennedy, New York JFK.  Destination Borispol,

3   Kiev.

4        THE COURT:  Would you spell Borispol for the

5   reporter.

6        THE WITNESS:  Yes, Your Honor, B-O-R-I-S-P-O-L.

7        THE COURT:  Thank you.

8   BY MR. KESSLER:

9   Q    Is the date February 24th, 2015?

10  A    No, it's February 25th, 2015.

11  Q    My mistake, thank you.

12       Finally, there is a two-page document.  What is this

13  document?

14  A    That is Mr. Saidakhmetov's travel reservation document.

15  Q    Is there a travel agency identified in the upper left?

16  A    Yes.  It is Tursan Travel.  I'll spell it.  T-U-R-S-A-N

17  Travel.

18  Q    Is there an address in Coney Island -- or on Coney Island

19  Avenue in Brooklyn, New York?

20  A    Yes.

21  Q    Now what is the first flight listed on the travel

22  itinerary?

23  A    The first flight is departing the JFK International

24  Airport and arriving at Kiev, Borispol airport in Ukraine.

25  Q    Is that set to depart on February 25th, 2015?

SINGER – DIRECT – KESSLER

1   A    Yes.

2   Q    Is there a second leg or part of that trip?

3   A    Yes.

4   Q    What's the second leg or part of the trip?

5   A    The second leg is from Kiev to Istanbul, Turkey.

6   Q    Is that also on February 25th, 2015?

7   A    Yes.

8   Q    So does this reflect an itinerary to travel from JFK to

9   Istanbul, Turkey?

10  A    Yes.

11  Q    Now, is there also a return flight indicated in the

12  itinerary?

13  A    I'm not -- yes.

14  Q    When is that supposed to take off?

15  A    It says Tuesday, March 31st, 2015.

16  Q    And is that flight supposed to go from Istanbul to Kiev

17  back to JFK?

18  A    Yes.

19  Q    Finally, can you read the date on which this itinerary

20  was printed for us?

21  A    Yes, it was printed on February 19th, 2015.

22          MR. KESSLER:  One moment, Your Honor.

23          THE COURT:  Of course.

24          MR. KESSLER:  One moment, Your Honor, I'm just going

25  to get a couple of sheets of paper all at once.

SINGER – DIRECT – KESSLER

1          Your Honor, with the Court's permission, I'd like to

2   show the witness four documents in sequence just for him and

3   for counsel.

4          THE COURT:  How have they been marked?

5          MR. KESSLER:  They've been marked as Government

6   Exhibits 31, 32, 33, and 35.

7          THE COURT:  Any objection to 31?

8          MS. MACEDONIO:  I'm sorry, Your Honor.

9          THE COURT:  Why don't you show them to your

10  adversary, then we'll see if we have any objections.  If there

11  are no objections, we'll publish them to the jury since the

12  jurors are the finders of the fact and they can see the

13  exhibits.

14         MS. MACEDONIO:  No objection, Your Honor.

15         THE COURT:  To any of them or just 31?

16         MS. MACEDONIO:  To any of them.

17         THE COURT:  They're all admitted.

18         Call out the numbers so the record is clear and you

19  may publish them to the jury.  What are the numbers, sir?

20         MR. KESSLER:  Thank you, Your Honor.  Let me do this

21  in order.  The first one was Government's Exhibit 31.

22         THE COURT:  It's admitted.

23         (Government Exhibits 31, 32, 33, and 35, were

24  received in evidence.)

25  BY MR. KESSLER:

SINGER – DIRECT – KESSLER

1  Q    Special Agent Singer, is Government Exhibit 31 -- I'm

2  sorry, Mr. Jackson, can I have the Elmo again.

3        THE COURT:  It's in evidence.  Have you marked it,

4  sir?

5        MR. KESSLER:  Yes.

6        THE COURT:  The marking doesn't show up.  There you

7  go.  Okay.  Fine.

8        MR. KESSLER:  It's a big piece of paper with a small

9  thing on it.

10 Q    Special Agent Singer, is Government Exhibit 31 a copy of

11 the boarding pass you previously showed us from Government

12 Exhibit 30?

13 A    Yes.

14 Q    Now I'm going to show you what's in evidence as

15 Government Exhibit 32.

16        Is Government Exhibit 32 a copy of the travel

17 document that you previously discussed from Government

18 Exhibit 30?

19 A    Yes.

20 Q    Now showing you what's in evidence as Government

21 Exhibit 33.

22        Is Government Exhibit 33 a copy of the

23 identification card and social security card you previously

24 discussed as coming from Government Exhibit 30?

25 A    Yes.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SINGER – CROSS – MACEDONIO

1  Q    Finally, I'm going to show you Government Exhibit 35 in

2  evidence.

3        Is that a copy of the two-page travel itinerary you

4  also discussed as coming from Government Exhibit 30?

5  A    Yes.

6        MR. KESSLER:  No further questions.

7        THE COURT:  Your witness.

8        MS. MACEDONIO:  Your Honor, may I hand something up

9  to Mr. Jackson?

10       THE COURT:  Yes, you may, of course.

11       MS. MACEDONIO:  Thank you.

12  CROSS-EXAMINATION

13  BY MS. MACEDONIO:

14  Q    Good afternoon, Special Agent Singer.

15  A    Good afternoon.

16  Q    You testified on direct examination about your

17  involvement in the arrest of Mr. Saidakhmetov, correct?

18  A    Yes.

19  Q    And you said that that arrest occurred at John F. Kennedy

20  International Airport; is that right?

21  A    That's correct.

22  Q    You were there with a group of people to effectuate that

23  arrest, correct?

24  A    That is correct.

25  Q    And in fact, you were part of a team of people present at

**SINGER - CROSS - MACEDONIO**

1    JFK, correct?

2    A      Yes.

3    Q      And I believe you testified on direct examination that

4    there were different components to the team, fair to say?

5    A      Yes.

6    Q      And before you and your team members traveled to John F.

7    Kennedy International Airport on February 24th, 2015, there

8    was a team meeting that took place, right?

9    A      Yes.

10   Q      So all of the team players understood what their roles

11   were going to be that evening, correct?

12   A      Yes.

13   Q      Now the meeting with respect to the arrest came at the

14   end of an investigation, correct?

15   A      I don't know if it would be considered the end of an

16   investigation.

17   Q      Okay.  But at least part of an investigation, correct?

18   A      Yes.

19   Q      And you were a member of an FBI squad that participated

20   in that investigation, fair to say?

21   A      Yes.

22   Q      And that investigation had gone on for some period of

23   time, fair to say?

24   A      Some period of time, yes.

25   Q      Several months?

**SINGER – CROSS – MACEDONIO**

1  A     Yes.

2  Q     It didn't start and end on February 24th, 2015, fair to

3  say?

4  A     Yes.

5  Q     So your involvement in this case wasn't just on

6  February 24th and February 25th of 2015, correct?

7  A     Correct.

8  Q     Okay.  When did your involvement in this investigation

9  begin?

10  A     As far as Mr. Saidakhmetov, my involvement would have

11  began in late summer of 2014.

12  Q     And as part of your involvement in this investigation,

13  Special Agent Singer, you knew that the FBI was employing the

14  use of a confidential human source, correct?

15  A     Correct.

16  Q     And you also knew that that confidential human source was

17  present at John F. Kennedy International Airport on February

18  24th 2015, correct?

19  A     That's correct.

20  Q     And that individual, the confidential human source, was

21  posing to be a traveler with Mr. Saidakhmetov, correct?

22  A     Correct.

23  Q     But the FBI knew who the confidential human source was,

24  correct?

25  A     Correct.

**SINGER – CROSS – MACEDONIO**

1   Q    And it was never -- it was never the intention that the

2   source would actually get on the plane; is that correct?

3   A    That is correct.

4   Q    And during the course of this investigation you debriefed

5   that source, fair to say?

6   A    Yes.

7   Q    In fact, you spoke to him over the course of several

8   months, correct?

9   A    Correct.

10  Q    Okay.  And during the course of this investigation, did

11  this confidential human source do things with regard to the

12  investigation at the direction of the FBI?

13  A    Yes.

14  Q    So, for example, you testified on direct examination

15  about this document, this document -- may we publish it, it's

16  in evidence?

17            THE COURT:  What is the number?

18            MS. MACEDONIO:  It's government's Exhibit 32.

19            THE COURT:  Yes, of course.

20            (Exhibit published.)

21  Q    Do you remember testifying about this document on direct

22  examination?

23  A    I do, yes.

24  Q    What is this document?

25  A    That's a travel document.

**SINGER – CROSS – MACEDONIO**

1    Q    Who is that travel document issued to?

2    A    That's issued to Akhror Saidakhmetov.

3    Q    Now during the course of the investigation, Special Agent

4    Singer, did the confidential human source assist

5    Mr. Saidakhmetov in getting this document?

6                MR. KESSLER:  Objection.

7                THE COURT:  Overruled.

8    A    Yes.

9    Q    In fact, didn't the confidential human source assist

10   Mr. Saidakhmetov in getting this document by giving him other

11   documents that the FBI had given the confidential human

12   source?

13   A    I'm sorry, can you repeat that.

14   Q    Yes, it wasn't a very well-worded question.

15               The confidential human source, at the direction of

16   the FBI, assisted Mr. Saidakhmetov in getting this travel

17   document, correct?

18   A    To the best of my recollection, yes.

19   Q    And do you recall, Special Agent Singer, that the FBI

20   gave the confidential human source a sealed document from

21   immigration and advised him to give it to Saidakhmetov in an

22   effort to get this document?

23               MR. KESSLER:  Objection to this.

24               THE COURT:  Overruled.

25   A    I don't know if it was sealed.

**SINGER - CROSS - MACEDONIO**

1   Q    Okay, but you remember giving the confidential human

2   source documents in furtherance of Mr. Saidakhmetov getting

3   this travel document, correct?

4   A    We gave the CHS this document to give to

5   Mr. Saidakhmetov.

6   Q    So the FBI assisted Mr. Saidakhmetov in getting travel

7   documents so that he could get a ticket and travel, correct?

8              MR. KESSLER:  Objection to the form.

9              THE COURT:  Overruled.

10  A    I would say we didn't obstruct it, it was a document he

11  was entitled to by law.

12  Q    Well, didn't the confidential human source help him fill

13  out documents to get this document?

14  A    Yes, at Mr. Saidakhmetov's request.

15  Q    Right.  And then the FBI further assisted by giving the

16  CHS the actual travel document, correct?

17  A    Correct.

18  Q    And then the CHS gave it to Mr. Saidakhmetov, correct?

19  A    Correct.

20  Q    And isn't it a fact, Special Agent Singer, that as part

21  of the investigation, the confidential human source was told

22  to make sure that he got the mail so that Saidakhmetov's

23  mother wouldn't intervene and take this document?

24  A    I don't recall if the direction was to -- it had anything

25  to do with Mr. Saidakhmetov's mother's intervention but I know

SINGER - CROSS - MACEDONIO

1    we did give it to the CHS with the expectation that it would

2    get to Mr. Saidakhmetov.

3    Q    Do you recall directing the confidential human source to

4    monitor the mail so that Mr. Saidakhmetov's mother wouldn't

5    intervene with getting documents that would prohibit -- and

6    thus prohibit Mr. Saidakhmetov from traveling?

7    A    I believe we did instruct the CHS to be on top of the

8    mail just so that he could essentially say this is the stuff I

9    got and not have a set of documents where -- with another

10   individual coming in with the actual mail.

11         MS. MACEDONIO:  I'm sorry, can you repeat the

12   answer.

13         THE COURT:  Read the question and the answer back to

14   the witness, please.

15         (Record read.)

16   BY MS. MACEDONIO:

17   Q    Do you recall, Special Agent Singer, when the

18   confidential human source first met Mr. Saidakhmetov?

19   A    Yes, I believe it was approximately September, I want to

20   say 17th, 2014 or thereabouts.  I could be wrong with the

21   exact date.

22   Q    And do you recall that within days after meeting

23   Mr. Saidakhmetov, the confidential human source moved in to an

24   apartment with Mr. Saidakhmetov?

25   A    Yes.

**SINGER — CROSS — MACEDONIO**

1   Q    And was that at the direction of the FBI?

2   A    The direction of the FBI I believe was to introduce him

3   and meet Mr. Saidakhmetov.  I don't think he was specifically

4   directed to move in.  But when he was invited in, we -- that

5   was considered a positive development.

6   Q    So he told you he was going -- he told members of your

7   team that he was going to move in, correct?

8   A    Correct.

9   Q    And you didn't tell him don't do that, right?

10  A    Correct.

11  Q    So you understood at this point you had a confidential

12  human source moving in with Mr. Saidakhmetov, right?

13  A    Yes.

14  Q    How old was Mr. Saidakhmetov?

15  A    I believe he was 19 at the time.

16  Q    How old was the confidential human source?

17  A    I don't recall the exact age.

18  Q    He was a decade older than him?

19  A    That sounds about right.

20  Q    And as part of this operation, did the FBI give the

21  confidential human source the money to pay the rent when he

22  lived with Mr. Saidakhmetov?

23  A    Correct.

24  Q    And the apartment that they were living in, that

25  apartment was actually under Mr. Saidakhmetov's mother's name;

### SINGER — CROSS — MACEDONIO

1    is that correct?

2    A     That's correct.

3    Q     Do you recall, Special Agent Singer, that the

4    confidential human source in addition to helping

5    Mr. Saidakhmetov get this travel document, that he researched

6    the prices of tickets to be able to travel to Turkey?

7    A     Yes, I do recall that.

8    Q     Do you recall, Special Agent Singer, that when they

9    discussed the rent for the apartment Mr. Saidakhmetov told the

10   confidential human source that the rent would be $350 but the

11   source gave him $400 instead?

12   A     I don't have a specific recollection of that, no.

13   Q     Do you recall that he gave him more than Mr. Saidakhmetov

14   asked for?

15   A     I don't recall that.

16        MS. MACEDONIO:  Your Honor, may I ask Mr. Jackson to

17   hand the documents to the witness that I had previously given

18   to him?

19        THE COURT:  Have these documents been marked in some

20   composite way that we can know what it is that's being placed

21   before the witness?

22        MS. MACEDONIO:  Yes, they are all marked, Your

23   Honor.

24        THE COURT:  But can you give a hand as to how they

25   are marked.

**SINGER - CROSS - MACEDONIO**

1    MS. MACEDONIO:  So they are marked as 3500 material.

2    3500-RS-1, 2 and 3.  And then DK/AR from 80 to 120.

3    THE COURT:  Any objection to those documents being

4    placed in front of the witness?

5    MR. KESSLER:  Your Honor, not as to the 3500

6    documents.  I have not had a chance to examine the other set

7    of documents.

8    THE COURT:  Why don't you show them to the other --

9    show counsel the other set of documents, see if there is any

10   objection to those being placed before the witness.

11   Again, they are not in evidence yet and may not come

12   into evidence but they are being placed before the witness if

13   there is no objection.

14   MS. MACEDONIO:  Your Honor, no objection to the

15   documents being placed in front of the witness.  We were not

16   given a copy so there may be additional questions where I will

17   again need to consult with Ms. Macedonio.

18   THE COURT:  Do you have another set of these

19   documents to provide the government so we don't have any

20   delays?  If you don't, you don't.  If you do, you do.  Do you

21   have another set to give them, yes or no?

22   MS. MACEDONIO:  We don't have another set, Your

23   Honor --

24   THE COURT:  Okay.  That's all right, they've agreed

25   documents to be placed in front of the witness.

SINGER – CROSS – MACEDONIO

1          Mr. Jackson, please place the documents that have

2     been identified by 3500 and production number in front of the

3     witness and Ms. Macedonio, please continue your examination.

4     BY MS. MACEDONIO:

5     Q     Special Agent Singer, I would ask you to please look at

6     what has been marked as DK/AR82.

7     A     Yes.

8     Q     Does that refresh your recollection that Mr. Saidakhmetov

9     told the confidential human source that the rent would be $350

10    and instead he gave him $400?

11    A     Yes, it does.

12          MS. MACEDONIO:  Thank you.

13    Q     Special Agent Singer, do you recall the confidential

14    human source telling you at various times during the

15    investigation that Mr. Saidakhmetov was suicidal and

16    depressed?

17          MR. KESSLER:  Objection.

18          THE COURT:  Overruled.

19    A     That does sound familiar, yes.

20    Q     Directing your attention to DK/AR97, which is in front of

21    you, does that -- I'm sorry, have you had a chance to review

22    it?

23    A     I'm currently reviewing it.

24          (Witness reviewing document.)

25    A     I've reviewed the document.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SINGER – CROSS – MACEDONIO

1   Q    Does that refresh your recollection that the confidential

2   human source reported that Mr. Saidakhmetov was at times

3   suicidal and depressed?

4   A    Yes, it says that.

5            THE COURT:  Never mind what it says, does it refresh

6   your recollection?

7            THE WITNESS:  Yes.

8            THE COURT:  Next question.

9   BY MS. MACEDONIO:

10  Q    Special Agent Singer, do you recall that between --

11  withdrawn.  You said that Mr. Saidakhmetov met the

12  confidential human source in September of 2014, correct?

13  A    That is correct.

14  Q    And the arrest of Mr. Saidakhmetov occurred in February

15  of 2015, correct?

16  A    Correct.

17  Q    And do you recall from your debriefing of the

18  confidential human source, that during the time period between

19  September of 2014 and February of 2015 that Mr. Saidakhmetov

20  moved out of the New York area?

21  A    Yes.

22  Q    And did he move to Savannah, Georgia?

23  A    For a time, yes.

24  Q    And did he also move for a period of time to Virginia?

25  A    Yes.

**SINGER – CROSS – MACEDONIO**

1   Q    Okay.  During the course of your investigation, Special

2   Agent Singer, did you learn that there was another individual

3   living in the apartment with the confidential human source and

4   with Mr. Saidakhmetov?

5   A    Yes.

6   Q    Who was that individual?

7   A    Abdurasul Juraboev.

8   Q    Okay.  And do you recall the confidential human source

9   relating that Mr. Juraboev, Juraboev, I think --

10  A    Juraboev.

11  Q    Juraboev, thank you.

12          -- believed that it would be contrary to the Koran

13  for Mr. Saidakhmetov to travel to perform a Jihad because he

14  was the only one who could take care of his mother?

15          Do you recall that?

16  A    Yes.

17  Q    Do you recall, Special Agent Singer, that there was a

18  point in time when Mr. Saidakhmetov was not living in the

19  apartment, that the confidential human source and Mr. Juraboev

20  were living there without him?

21  A    Yes.

22  Q    Do you recall that during that period of time

23  Mr. Saidakhmetov's mother threatened to evict them?

24  A    I don't specifically recall a threat of eviction.

25  Q    I'd ask you to look at what's been marked DK/AR111.

## SINGER – CROSS – MACEDONIO

1      (Witness reviewing document.)

2   A   I've reviewed the document.

3   Q   Do you recall, Special Agent Singer, that

4   Mr. Saidakhmetov's mother was talking about evicting them

5   because her son was no longer living there?

6   A   Is this in 111?

7   Q   Yes.

8      (Witness reviewing document.)

9   A   Forgive me, I'm not seeing anything.

10      THE COURT:  The question is:  Does it refresh your

11   recollection with respect to the question counsel asked?

12   A   No.  My apologies.

13      THE COURT:  Next question.

14   Q   Do you have any independent recollection of that?

15   A   I have some independent recollection that

16   Mr. Saidakhmetov's mother was exploring possibly renting the

17   apartment out to some individuals, some other individuals, but

18   I don't recall a specific threat of eviction.

19   Q   Okay.  And do you recall that when Mr. Saidakhmetov was

20   not living in the apartment that his mother came over to

21   collect some of his belongings like his laptop?

22   A   Yes.

23      MR. KESSLER:  Objection.

24      THE COURT:  Overruled.  Go ahead.

25   Q   And do you recall, Special Agent Singer, that when

**SINGER – CROSS – MACEDONIO**

1   Mr. Saidakhmetov's mother was there, Mr. Juraboev hid

2   Saidakhmetov's travel documents so that his mother would be

3   unable to take them?

4   A    I don't have a specific recollection of that.

5   Q    All right.  I am going to ask you to look again at 111,

6   please.

7   A    Yes, I -- I can see that there is a directive for --

8        THE COURT:  Without referring to the document, do

9   you now recall, you're being asked what you recall, is your

10  recollection refreshed?

11       THE WITNESS:  I don't recall that specific.

12       THE COURT:  Do you recall it generally?

13       THE WITNESS:  Generally, I recall a request to hide

14  the travel document from Mr. Saidakhmetov's mother.  I don't

15  recall whether that was carried out.

16  BY MS. MACEDONIO:

17  Q    Now on the night of the arrest, did you also interview

18  the confidential human source?

19  A    No.

20  Q    Did you later learn during the course of this

21  investigation that prior to February 24th, 2015, that

22  Mr. Saidakhmetov had never met Mr. Kasimov?

23       MR. KESSLER:  Objection.

24       THE COURT:  Overruled.

25  A    Can you repeat the question, I'm sorry.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SINGER - CROSS - MACEDONIO

1          MS. MACEDONIO:  Sure.

2          THE COURT:  Read it back keep your voice up.

3          (Record read.)

4    A    I was unaware of them having met at any point prior to

5    that day.

6    Q    Okay.  And are you -- and is that the same as now, right?

7    You're still unaware that they had not met prior to that day?

8    A    Correct.

9          THE COURT:  Still unaware that they had not met and

10   I don't understand that question.  Could you put it so it's

11   clear what you're asking him?

12         MS. MACEDONIO:  I'll try.

13         THE COURT:  Go ahead.

14   Q    And that remains the same, correct?

15   A    Yes.  My understanding is that -- I don't have any

16   information that would suggest that they knew each other or

17   they had met prior to this day.

18         MS. MACEDONIO:  May I have one moment, Your Honor?

19         THE COURT:  You may.

20         MS. MACEDONIO:  I have nothing further.  Thank you.

21         THE COURT:  Your witness on redirect.

22         MR. KESSLER:  Thank you, Your Honor.

23         THE COURT:  Would you like a break?

24         THE JURY:  No.

25         THE COURT:  I'm sorry, why don't you give us one

**SINGER - CROSS - MACEDONIO**

1    moment.

2              THE COURT SECURITY OFFICER:  Your Honor.

3              (Discussion off the record.)

4              THE COURT:  I'm going to say again for the purposes

5    of all present that cell phones are not allowed in this court.

6    Cameras are not allowed in this court.  The agents, obviously,

7    the CSOs and marshals, for communication purposes to protect

8    everyone here, have access to them, but other members do not.

9              So you don't have to worry about anyone other than

10   the people who are authorized by this Court to having such

11   items.  As I said before, I will make Lord Vader look like a

12   wuss if I find out that anyone has violated my directives with

13   respect to that.  So no concerns, okay?

14             Every now and then there is a question that comes up

15   and I assure you that that is not a problem.  The only people

16   who have cell phones are those the Court has specifically

17   authorized to have them.  So no one needs to be concerned

18   about it.

19             As I said previously, I'm often confused with Denzel

20   Washington when people see me.

21             You don't have to worry about that, okay?  Are we

22   cool?

23             Good, that's fine.

24             MR. KESSLER:  May I proceed, Your Honor?

25             THE COURT:  You may.

SINGER – REDIRECT – KESSLER

1          MR. KESSLER:  Thank you.

2    REDIRECT EXAMINATION

3    BY MR. KESSLER:

4    Q    Special Agent Singer, a couple of questions.

5          You were asked a lot of questions about a CHS who

6    was introduced into the life of Mr. Saidakhmetov?

7    A    Yes.

8    Q    Why was --

9          MS. MACEDONIO:  Objection to the form of the

10   question.

11         THE COURT:  Overruled.  You can have a recross.  We

12   have redirect and recrosses and re-redirects, re-recrosses.

13   So you'll get a chance to come back at him.

14         Go ahead.

15   Q    Was the FBI investigating Saidakhmetov and his roommate

16   Juraboev before the CHS was introduced?

17   A    Yes.

18   Q    Why?

19         MS. MACEDONIO:  Objection.

20         THE COURT:  Overruled.

21   A    The investigation into Mr. Juraboev started approximately

22   August 15th.  I believe it was August 15th, 2014, after

23   Mr. Juraboev had posted to an ISIS-affiliated Uzbek language

24   website stating that he resided in the U.S., wanted to pledge

25   bayat, which is loosely put, allegiance to ISIS, and wanted to

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SINGER - REDIRECT - KESSLER

1  travel but couldn't at the moment and offered services in some

2  way, shape or form, such as -- I forget the direct quote, but

3  something to the effect of, Could we shoot Obama or get blown

4  up.

5  Q    So it was after Mr. Juraboev threatened the President of

6  the United States that the confidential human source was

7  introduced to the investigation?

8  A    Yes, it was approximately a month after that.

9  Q    Had Mr. Saidakhmetov made any posts about ISIS before the

10  confidential human source was introduced?

11  A    Yes.

12  Q    What were the posts?

13  A    On the same website Mr. Saidakhmetov had made some

14  comments reacting favorably to various ISIS videos showing

15  ISIS's conquest throughout Iraq and engaging in executions.

16  Basically saying -- I forget the exact words -- but in words

17  of encouragement saying "Allhu Akbar," this fills me with joy,

18  so much victory, something to that effect.  That was on the

19  same website.

20        He also had some other social media profiles which

21  also showed he was -- expressed a great approval in support of

22  ISIS.

23  Q    That was all before the confidential human source was

24  part of the investigation?

25  A    Yes.

Singer – Redirect/Kessler

1   REDIRECT EXAMINATION

2   BY MR. KESSLER:

3   Q    Now, defense counsel also asked you some questions about

4   things the source -- or related to you about what

5   Mr. Saidakhmetov had said to the source.

6         Do you remember that?

7   A    Yes.

8   Q    Did the source relay anything about Mr. Saidakhmetov's

9   statements about support for ISIS?

10  A    Yes.  There were frequent reports about his desire to

11  travel overseas to join ISIS and/or to engage in an act of

12  violence in the United States on behalf of ISIS.

13  Q    Mr. Saidakhmetov was talking about that openly among his

14  friends, right?

15  A    Yes.

16  Q    You were also asked some questions about Mr. Saidakhmetov

17  moving to Virginia for some time.

18        Do you remember that?

19  A    I do.

20  Q    What was he doing when he was in Virginia?

21  A    He was working for an individual named Abror Habibov, who

22  was engaged in various mall kiosks having to do with cell

23  phone repairs, also some selling of merchandise.

24  Q    You were also asked some questions about the CHS

25  assisting Mr. Saidakhmetov with various things.

Singer – Redirect/Kessler

1    A    Yes.

2    Q    Like getting a travel document?

3    A    Yes.

4         MR. KESSLER:  One second.

5         (Pause.)

6    Q    My colleague reminds me I had one other question before

7    we get to the CHS's assistance.

8         You mentioned that Saidakhmetov moved to Virginia to

9    work for Mr. Habibov?

10   A    Various locations, yes.

11   Q    Was Mr. Saidakhmetov working to raise money?

12   A    Yes.

13   Q    Why was he raising money?

14        MS. MACEDONIO:  Objection.

15        THE COURT:  Do you know?  Yes or no, do you know?

16        THE WITNESS:  Yes.

17        THE COURT:  Okay.  Why was he raising money?

18        Overrule the objection.

19   A    He wanted to generate income and he also wanted to travel

20   overseas to join ISIS.

21   Q    Now, I asked you about you being asked questions about

22   the CHS assisting Mr. Saidakhmetov.

23   A    Yes.

24   Q    Do you remember that?

25        Did the CHS assist Mr. Kasimov in driving to JFK

Singer – Redirect/Kessler

1   Airport on February 24?

2               MS. MACEDONIO:  Objection.

3               THE COURT:  Overruled.

4   A     No.

5   Q     Did CHS assist Mr. Kasimov in giving his own money to

6   Mr. Saidakhmetov that night?

7               MS. MACEDONIO:  Objection.

8   A     No.

9               THE COURT:  Overruled.

10  Q     Did the CHS assist Mr. Kasimov in agreeing to bring

11  additional money to Mr. Saidakhmetov that night?

12  A     No.

13  Q     Did the CHS assist Mr. Kasimov in handing money to

14  Mr. Saidakhmetov that night?

15  A     No.

16              MR. KESSLER:  No further questions.

17              THE COURT:  Your witness.

18              MS. MACEDONIO:  I have no questions at this time.

19              THE COURT:  You may stand down.  It's about almost

20  quarter to 4:00.  We will take our 3:15 break.  Time is

21  flexible, but we will stop at 5 o'clock.

22              So why don't we take our 15-minute break, and we

23  will see you at 4 o'clock.  Stand for the jury.

24              Again, don't talk about the case.

25              (Jury exits.)

USA v. Kasimov

```
 1              THE COURT:  The jury has left the room.  Do we have

 2    any procedural issues to address?

 3              MS. MACEDONIO:  No, Your Honor.

 4              MR. KESSLER:  Not from the government.

 5              THE COURT:  Okay.  We will see you in 15 minutes.

 6              (Recess.)

 7              THE CLERK:  All rise.  Judge Kuntz presiding.

 8              THE COURT:  Thank you.  We have our appearances.

 9              You may be seated.  Are there any issues we need to

10    address before we bring the jury in?

11              MS. MACEDONIO:  No.  Thank you, Your Honor.

12              MR. PRAVDA:  No, Your Honor.

13              THE COURT:  All right.  Let's wait for the defendant

14    to be produced.  He is being produced.  Welcome back.

15              (Defendant present.)

16              THE COURT:  There are no issues.  I will ask:  How

17    many more witnesses do you anticipate today?

18              MR. HAGGANS:  One, Your Honor, and I expect he will

19    spill over to tomorrow morning.

20              THE COURT:  Okay.  That's fine.  So why don't we get

21    the jury in and you can call the next witness.

22              Off the record.

23              (Discussion.)

24              (Jury enters courtroom.)

25
```

PROCEEDINGS

1          THE COURT:  Thank you, ladies and gentlemen of the

2    jury.  You'll get to hold me to that 5 o'clock stop time.

3    That watch is up there, and keep your eye on that clock and

4    come 5 o'clock you'll see if I keep my promise.

5          Thank you.  Please be seated.

6          Counsel, would you please call your next witness.

7          MR. HAGGANS:  The government calls Lorenzo Vidino.

8          THE COURT:  Please get the witness.

9          THE COURTROOM DEPUTY:  Come forward, sir.  I'll

10   swear you in.

11         (Witness sworn.)

12   **LORENZO VIDINO**, called as a witness, having been first duly

13   sworn/affirmed, was examined and testified as follows:

14         THE COURT:  Thank you, sir.  Please be seated.

15   We're going to ask you to state your name and to spell it, and

16   to move this microphone towards you.  When the little green

17   light is on, you'll be heard like this.  If you move away from

18   it, you'll be heard like this.

19         So state your name, spell it, and then counsel will

20   inquire.

21         THE WITNESS:  Lorenzo Vidino.  That's L-O-R-E-N-Z-O

22   V-I-D-I-N-O.

23         THE COURT:  Thank you.

24         Counsel, you may inquire.

25   DIRECT EXAMINATION

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

VIDINO – DIRECT – HAGGANS

1  BY MR. HAGGANS:

2  Q    Good afternoon, Dr. Vidino.

3  A    Good afternoon.

4  Q    What do you do for a living?

5  A    I am the director of the program of extremism at the

6  George Washington University.

7  Q    Where is of George Washington University?

8  A    In Washington, D.C.

9  Q    What is your educational background?

10  A    I have a law degree from the University of Milan in

11  Italy.  I have master's degree and a doctorate from Tufts

12  University, in Boston, and that's in international relations

13  with a focus on security status in the Middle East.

14  Q    What is the program that you identified at George

15  Washington?  What does it do?  What's its focus?

16  A    It's a research center.  We have around 12 employees, and

17  we basically research everything extremism related, with a

18  particular focus on religious extremism, groups like ISIS and

19  al-Qaeda, in the west.

20  Q    How long has that program been around?

21  A    Five years.

22  Q    How long have you been a director?

23  A    I was the founder and first director.

24  Q    You mentioned, I think, it was 12 employees.

25  A    Correct.

VIDINO - DIRECT - HAGGANS

1   Q    In the course of your duties as director do you supervise

2   their work?

3   A    Yes.  That's my job.

4   Q    Can you describe some of the functions you do in

5   supervising their work?

6   A    Sure.  Coordinate their research.  We're a small team.

7   Everybody, of course, is a fairly experienced researcher and

8   looks at different aspects of terrorism and extremism.  I make

9   sure everybody works together as a team and coordinate what

10  everybody does; and then, at the end of the day, the

11  responsibility for every product we put out for all the

12  research is on me as a director.  I edit their work, and I

13  just constantly communicate with them so that the work is of a

14  certain quality.

15  Q    Does the program issue or publish any publications?

16  A    Regularly disseminations is one of our main focuses.

17  Q    Can you give us a sense of the sorts of publications the

18  program issues?

19  A    Sure.  We publish reports.  I would say around six, seven

20  a year.  Those range from very big reports, 200, 300 pages, to

21  shorter ones, 20, 30 pages.

22       We publish a monthly tracker of ISIS-related

23  activities in the U.S., which we send out to our email list.

24       We publish a lot also outside the program, meaning

25  we write op-eds, we publish articles in the outside

VIDINO – DIRECT – HAGGANS

1   publications.

2   Q    Who is the audience or audiences for the program

3   publications?

4   A    I would say the main audience is policy makers and

5   practitioners in the counterterrorism field.  So we constantly

6   write for, we do research for an audience of basically people

7   in Congress, people in most of the agencies that deal with

8   terrorism, specific focus on the U.S., but we also reach an

9   audience outside the U.S.

10           We also try to reach the general public, and that's

11  how we work a lot with the media.  We have a contract with The

12  New York Times.  We provide analysis to The Times.  We try to

13  have research also disseminated to people who are not in the

14  field.

15  Q    Those publications and your work with the other 12

16  employees, am I correct in understanding you don't write every

17  single publication yourself personally?

18  A    No, I don't.

19  Q    But you participate in editing the work of others; is

20  that correct?

21  A    Yes, all the time.  Some I write myself.  Everything that

22  comes out of the program is something I've checked at least.

23  Q    Prior to your founding of the program on extremism at

24  George Washington, where were you employed?

25  A    I worked in a variety of research centers and

VIDINO – DIRECT – HAGGANS

1    universities.  Right before opening the center at GW I was at

2    a place called The Center for Security Studies.  That's in

3    Switzerland, in Zurich, Switzerland.

4           Before that I was at the Rand Corporation, which is

5    a research center based out of Arlington, Virginia.  I was at

6    the Kennedy School of Harvard University, in Boston.

7           I was at the United States Institute of Peace.  So

8    I've had a variety of positions before.

9    Q    I want to talk about a couple of those.  The Center for

10   Securities Studies in Switzerland --

11   A    Correct.

12   Q    -- what do they do?

13   A    They do research on a variety of security matters.  I was

14   in charge of the terrorism side of things.  I did a lot of

15   research on different aspects of the, let's say, ISIS and

16   al Qaeda-related mobilization in -- mostly in Europe at the

17   time.

18   Q    Prior to that you said you were at the Rand Corporation?

19   A    Correct.

20   Q    What was the nature of your work there?

21   A    It's always been pretty much the same, doing analysis,

22   research and dissemination on variety of aspects related to

23   terrorism.  So I was looking in particular at comparing

24   extremism and terrorism of a religious nature in the United

25   States and Europe.

VIDINO - DIRECT - HAGGANS

1   Q    Are you familiar with the study of the term international

2   terrorism?

3   A    Yes.  That's basically my expertise.

4   Q    How long have you been active in the study of

5   international terrorism?

6   A    Almost 20 years.

7   Q    Could you please summarize some of your academic work on

8   that topic.

9   A    Sure.  A big component of that is publishing, of course,

10  as any academic would.  So I've published seven books on

11  different aspects of the topic.

12           I frequently publish in academic journals.  That

13  means peer-reviewed publications.  I have around 20 of those.

14           Published, either author or co-authored, about 20 or

15  25 reports; and a variety of op-eds.  I'm a frequent

16  contributor of a variety of publications.

17  Q    What does that phrase mean, peer-reviewed, that you used?

18  A    Peer-reviewed basically means that it's a system of

19  evaluation you undergo when you publish in academic

20  publications, where two or three fellow academics review your

21  publication; and only if you pass their scrutiny you are

22  allowed to publish.

23  Q    Are you familiar with the phrase "fieldwork"?

24  A    Yes.

25  Q    What does that phrase mean in relation to the work you

VIDINO - DIRECT - HAGGANS

1  do?

2  A    That means basically going out and conducting research in

3  specific places.  So, of course, part of the research that I

4  and colleagues do is in front of a computer and researching

5  things and reading books; but a big part of it is also going

6  out and meeting people and seeing places where some of the

7  activities we study take place, interacting with individuals

8  who have direct, firsthand knowledge of some of these

9  developments.

10 Q    What sorts of fieldwork have you conducted?

11 A    I'm on the road, I would say, half of my time.  So

12 that's -- I travel a lot.  My specialty being terrorism

13 extremism in the west, I divide my time between the United

14 States and Europe.  I basically visit a variety of European

15 countries or states within the U.S. on a regular basis.

16          I also travel fairly frequently to the Middle East,

17 and also when I'm there I do fieldwork.

18 Q    You conduct fieldwork in the Middle East?

19 A    Correct.

20 Q    Could you identify some of the countries in the Middle

21 East where you've done that?

22 A    Sure.  Turkey, Egypt, Israel, Saudi Arabia, United Arab

23 Emirates.

24 Q    Have you ever been asked to work with or consult with any

25 governments?

VIDINO - DIRECT - HAGGANS

1   A      Yes.  That happens frequently.

2   Q      Can you give us some examples.

3   A      I've consulted with a variety of agencies within the U.S.

4   government.   I have consulted with a variety of European

5   governments, the nature of the work changing from case to

6   case.

7   Q      Can you give us some examples of some of the work that

8   you've been consulting on for those government entities you

9   identified?

10  A      Sure.  I would say it falls under two macro categories:

11  Either writing a report, doing some kind of research; or

12  basically providing a briefing.

13          So the first category, generally, I get approached

14  by an agency of government, I'm asked to research a specific

15  topic that agency or government is interested in.  So I do my

16  research, I write the report, and then provide it to the

17  government.  Second line of work is basically going to give a

18  briefing, a presentation, or a workshop, seminars on a

19  specific topic.

20  Q      Can you give us some examples of those topics?

21  A      Different aspects of terrorism, from the use of the

22  Internet by different terrorist groups to the radicalization

23  process.  So that is trying to understand how people come to

24  embrace the world view of terrorist groups.  Specific research

25  might be on specific geographical areas, why certain areas are

                        VIDINO - DIRECT - HAGGANS

1   particular hot spots for terrorism, different aspects.

2   Q    Do you work with or consult with or advise any U.S.

3   government entities or agency?

4   A    I do, yes.

5   Q    Can you give us some examples of those?

6   A    I work with the Department of Justice.  I worked for the

7   Department of Homeland Security, the International Counter

8   Terrorism Center.  We work very often with Congress.

9            My center of the program functions as the research

10  arm of the congressional counterterrorism caucus.  So we

11  provide -- we regularly provide research to different members

12  of Congress who are interested in the subject.

13  Q    Have you ever testified before the U.S. Congress or

14  before a committee or subcommittee of the U.S. Congress?

15  A    I have, several times.

16  Q    And is that -- fair to say that's on similar sorts of

17  topics?

18  A    Always in different aspects of the topic, but, yes.

19  Q    Terrorism?

20  A    Terrorism.

21  Q    Have you ever been a teacher?

22  A    I have taught classes, yes.

23  Q    At high school, college?

24  A    No, graduate and undergraduate level, in different

25  universities.  I've done that at Tufts University, University

VIDINO – DIRECT – HAGGANS

1  of Maryland, the National Defense University; and when I was

2  in Switzerland at the University of Zurich.

3  Q    Again, on the topics of?

4  A    Of terrorism, always terrorism, taught a terrorism course

5  in those universities.

6  Q    Have you ever testified in U.S. Court proceedings before?

7  A    I have.

8  Q    How many times, approximately?

9  A    I think this is my tenth time.

10 Q    Have you ever been qualified as an expert witness?

11 A    Yes, each time.

12 Q    Each of those previous nine occasions?

13 A    Yes.

14 Q    On what topics in those nine instances, in summary, were

15 you qualified as an expert witness?

16 A    ISIS and/or al-Qaeda and mobilization of Americans trying

17 to support ISIS and/or al-Qaeda.

18 Q    Are you familiar with the term "extremism" as it relates

19 to your field of study?

20 A    I am.

21 Q    How does it relate to your field of study?

22 A    It's one of the main focuses of my field of study.

23 Q    What does it mean in that context?

24 A    There is no commonly accepted definition.  Most

25 colleagues would argue over everything, but I would say it's

VIDINO - DIRECT - HAGGANS

1    adopting a mindset and a world view which is severely at odds

2    with the mainstream and that includes the use of violence.

3    Q    I just want to make sure of that one phrase.

4         That was world view?

5    A    Yes, yes, world view.

6    Q    In your work do you have any particular geographic focus?

7    A    Europe and North America.

8    Q    As part of your work are you familiar with an entity

9    that's known as the Islamic State of Iraq and al-Sham?

10   A    I am.

11   Q    Is that commonly made into an acronym, ISIS?

12   A    Yes, it is.

13   Q    Can you summarize the basis of your knowledge about ISIS?

14   A    It's one of the main organizations that I've been

15   studying throughout my career.  Through its iterations, which

16   start in the late '90s, I've been studying its evolution, its

17   history, and its tactics, and drawing from a variety of

18   sources.

19   Q    So you've conducted research about ISIS?

20   A    Yes, I have.

21   Q    You've conducted fieldwork relating to ISIS?

22   A    Yes, I have.

23   Q    And you previously testified as an expert witness

24   relating to ISIS?

25   A    Yes, correct.

VIDINO – DIRECT – HAGGANS

1   Q    Have you ever authored any academic articles or books

2   that relate in whole or in part to ISIS?

3   A    Yes, several.

4   Q    Can you just give us a couple of examples?

5   A    Sure.  I wrote a book about the ISIS-related mobilization

6   arrived in western countries, how people were joining the

7   organization.  I wrote -- co-authored, together with the

8   deputy director of the center, arguably the first report ever

9   done on ISIS in America, which we published in 2015.  That was

10  sort of the first scholarly analysis of the ISIS-related

11  mobilization of the United States.  I've authored several

12  other shorter articles about the topic.

13  Q    And the means that you've identified already in your

14  testimony, fieldwork, research, et cetera, were those the

15  means that you used to collect your information about ISIS for

16  those publications?

17  A    Yes.  I always try to use different approaches, different

18  research approaches, to try to understand a very complex topic

19  in different ways, yes.

20  Q    In the course of your work and your studies have you come

21  to learn about ISIS's history?

22  A    Yes.

23  Q    And its leadership?

24  A    Yes.

25  Q    And its activities?

VIDINO - DIRECT - HAGGANS

1   A    Yes.

2   Q    Its objectives?

3   A    Yes.

4   Q    Are you familiar with the term, quote, foreign fighter --

5   A    Yes.

6   Q    Let me finish the question.

7           Are you familiar with the term "foreign fighter" as

8   that relates to ISIS?

9   A    Yes.

10  Q    What does that term mean in that context?

11  A    It's a term used to describe individuals who are not from

12  Syria and Iraq, the two countries where ISIS was based, but

13  traveled from abroad and joined the organizations in Syria and

14  Iraq.

15  Q    Are you familiar with the means and methods and manners

16  in which foreign fighters made their way from whatever their

17  point of origin might have been into ISIS-controlled

18  territory?

19  A    It's one of the main focuses I've researched.

20  Q    You have studied foreign fighters as part of your work?

21  A    Yes.

22  Q    Has the program published or issued any publications that

23  relate to or focus on the phenomenon of foreign fighters?

24  A    Several.  The main one being a very large report on

25  American foreign fighters, called The Travelers; and what we

VIDINO - DIRECT - HAGGANS

1   did is we identified and analyzed several dozens individuals

2   who left the United States and joined ISIS over the last few

3   years.

4   Q    In connection with your work with the specific focus on

5   ISIS, have you traveled within the Middle East in connection

6   with that work?

7   A    Yes, I have.

8   Q    Have you -- apart from your work with the program, have

9   you edited any other publication about terrorism or extremism

10  or book chapters on those topics?

11  A    Yes, of course, several.

12  Q    Are you authored individual book chapters on those topics

13  for inclusion in other volumes?

14  A    Yes, I have.

15  Q    I think you previously testified that you've authored

16  academic articles, peer-reviewed articles, on these topics as

17  well?

18  A    Correct.

19        MR. HAGGANS:  Your Honor, at this time the

20  government moves to qualify Dr. Vidino as an expert witness

21  concerning ISIS, specifically its history, leadership, and

22  activities, the role of foreign fighters within ISIS, and the

23  means and methods by which foreign fighters travel to

24  ISIS-controlled territory.

25        THE COURT:  Any objection to the motion?

VIDINO – DIRECT – HAGGANS

1          MS. MACEDONIO:  We note our previous objection, Your

2     Honor.

3          THE COURT:  Any objection today?

4          MS. MACEDONIO:  No, nothing further.

5          THE COURT:  Nothing further.  Okay.

6          You are accepted as an expert.  Congratulations.

7          THE WITNESS:  Thank you, Your Honor.

8     BY MR. HAGGANS:

9     Q    Dr. Vidino, are you being compensated for your work on

10    this case?

11    A    Yes, I am.

12    Q    What is your hourly fee?

13    A    Two hundred seventy-five.

14    Q    Do you have a sense, sitting here today, of what your

15    approximate total billings will be, once you've completed your

16    work in this case?

17    A    No.  I haven't done the math.  I would say north of

18    10,000.

19    Q    $10,000?

20    A    Yes, I would say so.

21    Q    What is ISIS?

22    A    ISIS is a designated terrorist organization, one that has

23    been active in different forms and different iterations over

24    the last 20 years and arguably one of the most powerful and

25    dangerous terrorist organizations over the last few decades.

VIDINO – DIRECT – HAGGANS

1   Q    When, approximately, was the entity that is now referred

2   to as ISIS first founded?

3   A    1999, operating under a different name, but the first

4   group, sort of the roots of what is today ISIS, was created in

5   1999.

6   Q    And in 1999, was there any particular founder or group of

7   founders?

8   A    It was one Jordanian man named Abu Musab al-Zarqawi.

9   Q    I think you'll need to spell it.

10  A    Yes.  Z-A-R-Q-A-W-I.  He was the founder of the

11  organization and its leader for the first seven years of the

12  organization.

13  Q    At that time, from '99 and the few years after that, was

14  that organization then known as ISIS?

15  A    It was not at the beginning.

16  Q    Has it been known, the organization -- again, the

17  organization we now refer to as ISIS, apart from that first

18  early period, has it been known by other names during its

19  history?

20  A    Several names.

21  Q    Can you give us some examples of those names?

22  A    Sure.  At the beginning it was called Tawhid wal-Jihad.

23  T-A-W-H-I-D W-A-L J-I-H-A-D.  Once it started operating in

24  Iraq and after the U.S. invasion of Iraq, 2003, 2004, it had

25  different names.  It came to be known as al-Qaeda in Iraq for

VIDINO - DIRECT - HAGGANS

1    sometime.

2           It merged -- or it absorbed other groups, and it

3    became known as the Mujahideen Shura Council.

4    M-U-J-A-H-I-D-E-E-N, then Shura will be S-H-U-R-A, Council.

5    It then, by 2006, it started to operate as the Islamic State

6    in Iraq, so I-S-I.  And that is closer it gets to then

7    becoming ISIS.

8    Q    Let's pause.  I want to unpack some of those terms that

9    you used in the earlier names.

10          You used the term "Tawhid."

11   A    Yes.

12   Q    What does that mean?

13   A    It's an Arabic word.  It means unity, unity of God.

14   Q    You also used the term "Jihad."

15   A    Correct.

16   Q    What does that term mean?

17   A    Jihad is an Arabic word that has a variety of meanings.

18   I would say it means to struggle.  Basically, in mainstream

19   Islam it is any struggle that one engages in to please God.

20   So let's say if I started being nice to a neighbor I don't

21   like or I quit smoking, that would be a Jihad, something that

22   is difficult to do but good to please God.

23          Now, groups like ISIS and similar groups, like

24   al-Qaeda, use those mainstream Arabic words and twist them and

25   use them in a different way, with different meaning.  So Jihad

VIDINO - DIRECT - HAGGANS

1  also means -- could mean, as used by groups like ISIS, to mean

2  holy war, physical, military fight.  It's something that, from

3  their point of view, pleases God, to fight against the

4  perceived enemies of Islam.

5  Q    Is it fair to say that a term like Jihad has, shall we

6  say, a benign meaning but also an ISIS-specific meaning?

7  A    Correct.

8  Q    Are you familiar with the acronym I-S-I-L, ISIL?

9  A    Yes.

10  Q    What does that acronym mean?

11  A    Islamic State in Iraq and the Levant.

12  Q    Does that have any relation to ISIS?

13  A    It's basically identical.  It's the identical acronym.

14  It just depends whether we want to use the Arabic word for the

15  Levant.

16           The Levant is a region that encompasses today's

17  Syria, Lebanon, parts of Jordan, and parts of Palestine.  It's

18  basically a historical name of the region.  In English, it's

19  known as the Levant.  In Arabic, it's known as "Sham".  So

20  ISIL would be the acronym we call that region of Levant.  ISIS

21  is -- we use the word in Arabic, Sham, but it's ISIS and ISIL

22  is the one and the same thing.

23  Q    Would it be fair to say it is similar how Brooklyn and

24  Kings County are kind of the same thing?

25  A    You put me on the spot of New York geography, but I would

VIDINO - DIRECT - HAGGANS

1  say, yes.  I'm not from here if you haven't noticed.

2  Q    You also used the term "mujahideen," what does that term

3  mean?

4  A    In Arabic it means those who fight Jihad.  So groups like

5  ISIS would call mujahideen those that are engaged in the

6  struggle with them against the perceived enemies of Islam.  It

7  means fighters basically.

8  Q    Are you familiar with the term Fard Ayn?

9  A    Yes.

10  Q    F-A-R-D A-Y-N.

11  A    I am.

12  Q    You are familiar with that term?

13  A    I am.

14  Q    What does that mean in general?

15  A    It means individual duty.  Here in Jihadist groups like

16  ISIS use the expression to basically mean if that is an

17  individual duty for all Muslims to join the group or at least

18  help the group.  They frame their message in a way that

19  basically becomes -- if you buy their message of course -- a

20  religious obligation to join them or to support them.

21  Q    Are you familiar with the term "Bayat," that's B-A-Y-A-T?

22  A    I am.

23  Q    What does that term mean -- I'm sorry, withdrawn.

24        What does that term mean in relation to ISIS?

25  A    It means pledge of allegiance, an oath of allegiance.

VIDINO - DIRECT - HAGGANS

1   Q    Are you familiar with the term "foreign terrorist

2   organization?"

3   A    Yes, I am.

4   Q    Is that commonly an acronymized, abbreviated as FTO?

5   A    Yes.

6   Q    What is an FTO?

7   A    It's how the U.S. Government designates specific

8   organizations as terrorists when it proscribes an

9   organization, puts them on a list and becomes an FTO, a

10  foreign terrorist organization.

11  Q    Are you aware of whether or not the U.S. Government

12  publishes that list?

13  A    It does.

14  Q    Are you aware of the source in which that list is

15  published?

16  A    Yes, it's the Federal Register.

17  Q    Has ISIS been designated as an FTO?

18  A    Yes, it has.  In its first iterations and then later as

19  the name changes -- changed over time the Federal Register,

20  the U.S. Government sort of kept up with the name changes of

21  the organization and over time redesignated under -- the

22  organization under its new names.

23          THE COURT:  What is the Federal Register?

24          THE WITNESS:  It is basically where the rules and

25  regulations of the U.S. Government are collected and

155

VIDINO - DIRECT - HAGGANS

1    periodically published.

2              THE COURT:  It's published by the United States

3    Government?

4              THE WITNESS:  Correct.

5              THE COURT:  On an ongoing basis?

6              THE WITNESS:  Correct.

7              THE COURT:  And it's available to the public?

8              THE WITNESS:  Yes, it is.

9              THE COURT:  Okay.  Go ahead.

10             MR. HAGGANS:  Your Honor, with the Court's

11   permission, I'd like to show you a document just to the

12   witness via the Elmo --

13             THE COURT:  You may do that.

14             MR. HAGGANS:  -- and to opposing counsel of course.

15             I'm sorry, this is a document marked for

16   identification as Government Exhibit 38A.

17             THE COURT:  Thank you.  Any objection to 38A being

18   admitted into evidence?

19             Why don't you show it on the Elmo and they'll see

20   what it is and if they've already got it, we'll see whether

21   there's an objection.

22             MR. HAGGANS:  I believe they already have it.

23             With the Court's permission I'll show it to them.

24             THE COURT:  Okay.

25             Any objection to 38A?

VIDINO – DIRECT – HAGGANS

1          MS. MACEDONIO:  No, Your Honor.

2          THE COURT:  It's admitted.

3          You may publish it to the jury.

4          (Government Exhibit 38A, was received in evidence.)

5          (Exhibit published.)

6          MR. HAGGANS:  Thank you, Your Honor, as long as

7    we're on it, I would move then the admission of 38B --

8          THE COURT:  Hang on.  Any objection to 38B?

9          MS. MACEDONIO:  No.

10         THE COURT:  Admitted.

11         MR. HAGGANS:  38C.

12         THE COURT:  Any objection to 38C?

13         MS. MACEDONIO:  No, Your Honor.

14         THE COURT:  Admitted.

15         MR. HAGGANS:  And 38D.

16         THE COURT:  Any objection to 38D?

17         MS. MACEDONIO:  No, Your Honor.

18         THE COURT:  Admitted.  You may publish them to the

19   jury.

20         (Government Exhibits 38B, 38C and 38D, were received

21   in evidence.)

22         MR. HAGGANS:  This is 38A.

23         (Exhibit published.)

24   Q    Dr. Vidino, have you seen this document before?

25   A    I have.

157

VIDINO - DIRECT - HAGGANS

1   Q    What do you recognize it to be, in summary?

2   A    It's the designation, the first incarnation of ISIS, the

3   group we mentioned earlier Tawhid wal-Jihad, that's the first

4   time it was designated.  I don't see the date now, but I know

5   it's 2004 the first time it was designated.

6   Q    The text that's displayed on the screen, is that the

7   designation you referred to in your testimony earlier?

8   A    Correct.

9   Q    I'll just move --

10           THE COURT:  Pull that microphone towards you.

11           MR. HAGGANS:  I apologize, Your Honor.

12           THE COURT:  Okay.

13           MR. HAGGANS:  I'll just move to show the top of the

14   document.

15   Q    Does that state a date?

16   A    October 15th, 2004.

17   Q    Moving on to 38B also in evidence.  I'll just start with

18   the designation portion.

19           The entity that's designated there, is that an

20   entity by which ISIS has been known in the past?

21   A    Yes, it's again sort of the first name under which it was

22   known.

23   Q    I won't ask you to read all of them, but these listings

24   of titles here, these are other names by which ISIS has been

25   known?

VIDINO - DIRECT - HAGGANS

1    A    Correct.

2    Q    And I'll direct your attention to the top of the

3    document, what's the date stated there?

4         This is again 38B as in boy.

5    A    December 17, 2004.

6    Q    Moving on now to 38C.  I'll start with the date on this

7    one.

8         What's the date of this publication?

9    A    May 15, 2014.

10   Q    And this designation here in bold text on the right, is

11   that another one of the designations to which you referred

12   earlier in your testimony?

13   A    Yes.

14   Q    I would direct your attention to this portion that I'm

15   indicating with the pen.

16   A    Islamic State of Iraq.

17   Q    And, finally, moving on to 38D as in David.  I'll start

18   with the date on this one.

19        What's the date of this publication?

20   A    September 30, 2015.

21   Q    This designation here that I'm pointing to, could you

22   read in the identifiers in that designation.

23   A    It basically expands the designation to the new names

24   that the group was using, so ISIS and ISIL.  So ISIL also

25   known as ISIS.

VIDINO - DIRECT - HAGGANS

1  Q    Based on your work in this field, is it your

2  understanding that these designations of these names relate

3  back to those earlier names that we saw al Qaeda in Iraq,

4  ISIS -- excuse me, Islamic State of Iraq, ISI, et cetera?

5  A    Absolutely.  That's the U.S. Government keeping up with

6  the name changes of the organization.

7  Q    I want to direct your attention now, Dr. Vidino, to the

8  year 2014, in particular the summer.

9           Did ISIS make any public statements or declarations

10 of its aims or objectives in that period?

11 A    Yes, it made several statements.  2014 was the year in

12 which ISIS really expanded the territory control

13 significantly.  The biggest statement of course came in June

14 of 2014, June 29th, 2014 when ISIS declared the caliphate, it

15 declared itself a state.

16 Q    What was the stated aim or objectives that ISIS -- based

17 on your research -- sought to achieve with that declaration of

18 a state?

19 A    They sought to recreate the caliphate.  The caliphate

20 being the authority that unites both political and religious

21 authority for Muslims.  It's a historical entity which had

22 always existed in the Muslim world, but it had not in existed

23 for the last century, and ISIS basically claimed or recreated

24 that entity and it declared its leader as a new caliph.  So

25 somebody that, in theory if recognized, is the sole authority

VIDINO – DIRECT – HAGGANS

1   for Muslims worldwide.

2   Q    Is it fair to say that a caliph -- a translation of that

3   might be global leader?

4   A    Yes, global leader.  Somebody who has both the political

5   and the religious authority to be the leader of Muslims

6   worldwide.

7   Q    Who was pronounced as the caliph?

8   A    Abu bakr al-Baghdadi, the leader of ISIS.

9   Q    I think you may want to spell that one as well.

10  A    Okay.  A-B-U B-A-K-R A-L B-A-G-H-D-A-D-I.

11  Q    Where did that declaration occur?

12  A    In Mosul, in a large mosque in the city of Mosul in Iraq.

13  Q    Is Mosul a large city in Iraq?

14  A    Second largest.

15         MR. HAGGANS:  Your Honor, with Court's permission,

16  if I could just have the Elmo for the witness -- well, unless

17  there is not an objection from the defense to 39A and 39B.

18         THE COURT:  Any objection to 39A being admitted?

19         MS. MACEDONIO:  No, Your Honor.

20         THE COURT:  39B being admitted?

21         MS. MACEDONIO:  No, Your Honor.

22         THE COURT:  They are admitted.  You may publish

23  them.  And these will be the last two documents for the

24  afternoon.

25         (Government Exhibits 39A and 39B, were received in

VIDINO − DIRECT − HAGGANS

1    evidence.)

2              (Exhibits published.)

3    Q    Dr. Vidino, are you, in the course of your work,

4    generally familiar with this part of the world?

5    A    Yes, I am.

6    Q    I think if you touch the screen it will register.  Could

7    you just point out for us the countries of Turkey, Syria and

8    Iraq on this map?

9    A    So how do I do this?

10             MR. HAGGANS:  Maybe I have to touch it.

11             THE COURT:  Is the touch screen working.

12             THE COURTROOM DEPUTY:  It's working, Judge.

13             MR. HAGGANS:  It is working now, Your Honor, I'm

14   sorry.

15             THE COURTROOM DEPUTY:  You have to change the color.

16             THE WITNESS:  Sorry, okay.  I didn't see that.

17             So this is Turkey, largest −− one of the largest

18   countries here.  South of Turkey you have Syria here, and east

19   you have Iraq.

20             THE COURT:  Touch the screen in the upper right and

21   the squiggles will go away.

22             THE WITNESS:  All right, okay.

23             THE COURT:  Go ahead.

24   BY MR. HAGGANS:

25   Q    And moving on now to 39B as in boy.  Fair to say this is

VIDINO - DIRECT - HAGGANS

1   a more detailed, narrower-focused map of those same three

2   countries or portions thereof?

3   A    Yes.

4   Q    Could you point out the city of Mosul on this map?

5   A    Sure.  Well here.(indicating) Up north.

6            THE COURT:  Could you point out the clock over there

7   because it says 5 o'clock.

8            THE WITNESS:  Good.

9            THE COURT:  Well, there you go, I just did.

10           Ladies and gentlemen of the jury, as I promised you

11   5 o'clock.  We're adjourned for the day.

12           Do not discuss the case amongst yourselves.  I'll

13   say to the witness, do not discuss the case with anyone

14   because when you resume your testimony tomorrow at 9:30 a.m.

15   sharp I will ask you if you have discussed your testimony with

16   anyone and the truthful answer had better be no.

17           All right, thank you.

18           Have a good evening, ladies and gentlemen of the

19   jury.  We'll see you tomorrow morning.

20           (Jury exits courtroom.)

21           THE COURT:  Sir, just remain seated while the jury

22   exits.  Thank you.

23           You may step down.

24           THE WITNESS:  Thank you, Your Honor.

25           (Whereupon, the witness was excused.)

VIDINO – DIRECT – HAGGANS

1          THE COURT:  Thank you.

2          The jury has left the courtroom.  Do we have any

3   procedural issues we need to discuss before adjourning for the

4   evening?

5          MR. PRAVDA:  Just one, Your Honor.

6          THE COURT:  Why don't you sit down, everyone use the

7   microphones and keep your voices up.  Go ahead.

8          The microphone, use the microphone.  Pull it to you.

9   There you go.

10          MR. PRAVDA:  Your Honor, the government anticipates

11   that one of its witnesses tomorrow will be an individual who

12   is presently in BOP's custody.  What is the Court's practice

13   with respect to having that individual brought in the

14   courtroom by the U.S. Marshals, is it your preference that the

15   jury be excused while the individual is brought in and then

16   the jury comes back out?

17          THE COURT:  Yes.

18          MR. PRAVDA:  Perfect.  Thank you.  We'll do that.

19          THE COURT:  Good any.  Other questions?

20          MR. PRAVDA:  No, Your Honor.

21          THE COURT:  Okay.  Anything from the defense

22   counsel?

23          MS. MACEDONIO:  No, thank you, Your Honor.

24          THE COURT:  Thank you, everyone.  Have a good

25   evening.

VIDINO – DIRECT – HAGGANS

1              MR. PRAVDA:  Thank you.

2              MR. HAGGANS:  You too, Your Honor.

3              THE COURT:  Thank you.

4              (Whereupon, the trial adjourned at 5:00 p.m. to

5     resume Wednesday, September 18, 2019 at 9:30 a.m.)

1                              I N D E X

2      WITNESS                              PAGE

3
       OPENING STATEMENT   BY MR. HAGGANS          8
4
       OPENING STATEMENT   BY MR. RUBERT-SCHEWEL   12
5

6      MICHAEL DICAPRIO

7      DIRECT EXAMINATION BY MR. PRAVDA           16

8      CROSS-EXAMINATION   BY MR. RUBERT-SCHEWEL   64

9

10     THAIS CANIN

11     DIRECT EXAMINATION BY MR. PRAVDA           67

12     CROSS-EXAMINATION   BY MR. RUBERT-SCHEWEL   86

13

14     RYAN SINGER
       BY MR. KESSLER
15
       CROSS-EXAMINATION   BY MS. MACEDONIO       112
16

17     REDIRECT EXAMINATION

18                       BY MR. KESSLER           129

19

20     LORENZO VIDINO

21     DIRECT EXAMINATION   BY MR. HAGGANS        135

22

23

24

25

E X H I B I T S

```
GOVERNMENT                      PAGE
12                               24
9                                27
14A, 14B and 14C                 33
201                              34
15A, 15B, 15C, 15D, 15E,         35
15F, 15G, 15H, 15I, 15J,         35
15K, 15L and 19                  35
17                               74
10                               79
11                               81
2                                98
34                              102
30                              106
34A                             106
31, 32, 33, and 35              111
38A                             158
38B, 38C and 38D                158
39A and 39B                     163
```