1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------x
                                        15-CR-95(WFK)
3   UNITED STATES OF AMERICA,
                                        United States Courthouse
4            Plaintiff,                 Brooklyn, New York

5            -against-                  September 18, 2019
                                        9:30 a.m.
6   DILKHAYOT KASIMOV,

7            Defendant.
    ------------------------------x
8

9            TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
          BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
10              UNITED STATES DISTRICT JUDGE
                     BEFORE A JURY
11

12  APPEARANCES

13  For the Government:       UNITED STATES ATTORNEY'S OFFICE
                              Eastern District of New York
14                            271 Cadman Plaza East
                              Brooklyn, New York 11201
15                            BY:  DOUGLAS M. PRAVDA, AUSA
                                   DAVID K. KESSLER, AUSA
16                                 MATTHEW HAGGANS, AUSA

17

18  For the Defendant:        ELIZABETH E. MACEDONIO, P.C.
                              40 Fulton Street - 23rd Floor
19                            New York, New York 10038
                              BY:  ELIZABETH E. MACEDONIO, ESQ.
20
                              KELLEY J. SHARKEY
21                            26 Court Street - Suite 2805
                              Brooklyn, New York 11242
22                            BY:  KELLEY J. SHARKEY, ESQ.

23                            LORD & SCHEWEL
                              233 Broadway - Suite 2220
24                            New York, New York 10279
                              BY:  ABRAHAM RUBERT-SCHEWEL, ESQ.
25

1    APPEARANCES(Continued)

2

3    Also Present:              ERIKA LOPEZ, PARALEGAL SPECIALIST
                                SPECIAL AGENT MEGAN DOLAN
4
                                SHANOVA RAHMANOVA, INTERPRETER
5                               NODIRA MATYAKUBOVA, INTERPRETER
                                NODIRA ISAMIDDIMOVA, INTERPRETER
6

7

8

9

10

11

12

13

14

15

16

17

18

19
     Court Reporter:           GEORGETTE K. BETTS, RPR, FCRR, CCR
20                             Phone:  718-804-2777
                               Email:  Georgetteb25@gmail.com
21

22

23   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
24

25

PROCEEDINGS

1              (In open court; jury not present.)

2              THE COURTROOM DEPUTY:  All rise.  The Honorable

3    William F. Kuntz, II now presiding.

4              Criminal cause for trial, U.S.A. V. Kasimov,

5    15-CR-95.

6              Counsel, please state your appearances.

7              MR. PRAVDA:  Good morning, Your Honor.  Doug Pravda,

8    David Kessler, Matthew Haggans, Erica Lopez and Megan Dolan

9    for the United States.

10             THE COURT:  Good morning.  I think we've got the

11   spellings.  Good morning.

12             MS. MACEDONIO:  Good morning, Your Honor.  Elizabeth

13   Macedonio Abraham Rubert-Schewel and Kelley Sharkey for

14   Mr. Kasimov.  Mr. Rubert-Schewel will be back shortly.

15             THE COURT:  I think they're going to bring

16   Mr. Kasimov out in a moment.  You may be seated.

17             You may be seated, ladies and gentlemen of the

18   public as well.  Thank you.

19             MS. SHARKEY:  Your Honor, one the interpreters

20   wasn't present yesterday so you might want to put her name on

21   the record.

22             THE COURT:  I appreciate that.  Would you state --

23   you can sit down.  State and spell your name loudly for the

24   court reporter, ma'am.

25             THE INTERPRETER:  Shahnoza Rahmnova.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS

1          THE COURT:  Use the microphone, I'm having trouble

2   hearing you.

3          THE DEFENDANT:  Good morning, Your Honor.

4          THE COURT:  Good morning, Mr. Kasimov.

5          Would you spell that, please.

6          THE INTERPRETER:  S-H-A-H-N-O-Z-A.  And the last

7   name R-A-H-M-N-O-V-A.

8          THE COURT:  Thank you.  Would you please raise your

9   right hand.  Do you solemnly swear or affirm that you will

10  interpret correctly and accurately and truthfully from the

11  English language to the Uzbek language and the Uzbek language

12  to the English language for the defendant, so help you God.

13          THE INTERPRETER:  I swear.

14          THE COURT:  Thank you.  You may be seated.

15          You swear yes?

16          THE INTERPRETER:  Yes.

17          THE COURT:  Because there is actually a reported

18  case where someone said I swear and the Appellate Court said

19  that's not good enough.  I know, you thinking I'm making it

20  up, it's true, not in this courthouse another courthouse.

21          Do we have a preliminary issues to address before we

22  bring the jury out.

23          MR. PRAVDA:  Yes, Your Honor.

24          THE COURT:  I will sit down and be schooled.

25          MR. PRAVDA:  So briefly, Your Honor, I just wanted

PROCEEDINGS

1   to run through with the Court a preview of what the government

2   plans to do this morning and to make two applications to the

3   Court.

4                THE COURT:  Yes.

5                MR. PRAVDA:  Right now we have Dr. Vidino, the

6   expert, on the stand.

7                THE COURT:  Yes.

8                MR. PRAVDA:  Once his testimony is complete,

9   Mr. Haggans and I would like to introduce evidence through a

10  certification to which the defense has advised they have no

11  objection.

12               THE COURT:  Okay.

13               MR. PRAVDA:  And to read four stipulations to the

14  jury.

15               THE COURT:  Okay.

16               MR. PRAVDA:  At that time we will call Abror Habibov

17  as our next witness.  He is in custody.

18               THE COURT:  Right.  So we'll have an adjournment at

19  that point so that he can be brought into the courtroom

20  properly, as we discussed yesterday, without any folderol.

21               MR. PRAVDA:  Sure, that was one of the

22  applications --

23               THE COURT:  Is that acceptable to defense counsel as

24  a way to proceed?

25               MS. MACEDONIO:  Yes, Your Honor.

PROCEEDINGS

1          MS. SHARKEY:  Yes, Your Honor.

2          THE COURT:  Thank you.  Go ahead, sir.

3          MR. PRAVDA:  Mr. Habibov will be using the

4   assistance of a Uzbek interpreter as well.  While he speaks

5   and understand English, given the gravity and the technical

6   terms that come up in a proceeding like this, he will be

7   listening to the question in Uzbek and answering them in

8   English.

9          THE COURT:  So he'll listen to the question as the

10  interpreter interprets it for him from English to Uzbek and

11  then he will respond directly to the Court and jury in

12  English, is that what you're telling me?

13         MR. PRAVDA:  That's correct.

14         THE COURT:  Is that acceptable to the defense, or do

15  you have a problem with that?

16         MS. SHARKEY:  Well --

17         THE COURT:  Please remain seated.

18         MS. SHARKEY:  Sorry, Judge.

19         THE COURT:  Pull the microphone to you, turn it on.

20         MS. SHARKEY:  I think the better practice is to see

21  how that plays out.  I spoke to one of the supervisors in the

22  interpreter unit or the interpreter program saying that I

23  hadn't seen that method used before.

24         THE COURT:  So what would you -- hang on.  What

25  would you propose in the alternative?

PROCEEDINGS

1          MS. SHARKEY:  Well, I think the witness should speak

2    in English unless he has an issue with a particular question.

3          THE COURT:  See, I'm more comfortable with either

4    saying the witness will speak in English because he can speak

5    in English and there's no problem, or the witness will speak,

6    in the first instance, in the Uzbek language, have it

7    translated and then we will have a cleaner transcript.

8          My concern, quite candidly, is that if a given

9    series of questions are responded to comfortably in the

10   English language and then when other questions are fired out,

11   not necessarily on cross but perhaps on cross, that the

12   implication to the jury might be you didn't have a problem

13   with the government asking you X, Y and Z and now that you're

14   on cross suddenly you've got to have everything translated.  I

15   want to have a level playing field.  If he's going to answer

16   in English, he's going to answer in English and I don't want

17   the jury to say, well, that pause or that sudden need to

18   revert to the interpreter shows a need for delay.

19         On the other hand, if you're telling me up front you

20   think there may be some issues that he will need the

21   additional comfort of the Uzbek language, I'm prepared to

22   direct that he simply wait for the questions to be translated

23   from the English to the Uzbek, that he responds to the Uzbek

24   interpreter and we have that level playing field.  I'm very

25   concerned about the sort of stop and go you can get when you

PROCEEDINGS

1   modify the nature of your response.  That's my concern.

2            So let me put it back to you, Mr. Pravda, what's

3   your response to my concern.

4            Is this fellow able, bottom line, to go Full Monty

5   English or if you really think he's going to need to flip back

6   to Uzbek then we'll do it in Uzbek.  But I'm not going to have

7   a battle back and forth because then the problem will be the

8   jurors will say, perhaps, that he's just a lot better when

9   he's responding to the government's questions and then he gets

10  a little bollocksed up when he's being subjected to a

11  appropriately focused cross-examination.

12           MR. PRAVDA:  Your Honor, I think that the point for

13  the government is we just want to make sure that he

14  understands the question precisely.

15           THE COURT:  Okay, then I'm going to cut it off at

16  this point.  He's going to respond, in the first instance, to

17  any questions to the Uzbek interpreter, the Uzbek interpreter

18  will then state the response in English and then the next

19  question will be put in English through the Uzbek interpreter

20  I know it's going to lengthen it, but I'm not going to have

21  him selectively flipping back and forth, suddenly he needs to

22  go Uzbek when he's being subjected to cross.  We're going to

23  just keep the playing field level with respect to the

24  questions and the answers.  It's too -- as a trial matter,

25  it's too ripe with problems so that's my ruling on that.

PROCEEDINGS

1    Unless you tell me that he's prepared to go straight English.

2              MR. PRAVDA:  I think the preference, Your Honor,

3    would be to speak and answer the question in English and so if

4    that means that you don't want the Uzbek interpreter to

5    translate the question, then we can proceed that way.  But he

6    may ask for clarification from the attorneys if he doesn't

7    understand the question.

8              THE COURT:  But you understand the risk.  You

9    understand the jury might say, that's funny, he understood

10   what a clementine was when the government was asking him but

11   when he's on cross he doesn't understand what a clementine is

12   and suddenly he needs to have a translation.  I don't want to

13   hear anything about, gee, that's not fair.  So I've put it out

14   there up front, he's your witness, you want him to go in

15   English he goes in English and then if suddenly he doesn't

16   know what a clementine is when he hears the question from the

17   defense and the jury draws an adverse inference, oh well.

18   Okay.

19             MR. PRAVDA:  We understand, Your Honor.

20             THE COURT:  All right.  So there you have.  It is

21   English.

22             MR. PRAVDA:  Your Honor, we have another

23   application --

24             THE COURT:  Yes, sir.

25             MR. PRAVDA:  -- which is we're going to be playing

PROCEEDINGS

176

1    some audio with the witness.  The audio is in Uzbek.  We have

2    prepared English language translations which have been agreed

3    to by the parties.  At the time that the witness takes the

4    stand the translation will be in evidence.

5           We have prepared transcript binders which we've

6    already provided to defense counsel, we have copies for the

7    Court.  We would like to pass them out to the members of the

8    jury at the outset of the witness' testimony and then during

9    the examination when audio is being played for the witness,

10   the government would direct the jury to the appropriate

11   transcript.

12          THE COURT:  Now, have you marked the transcripts

13   with an exhibit number?

14          MR. PRAVDA:  Yes, we have.

15          THE COURT:  And what might that number be.

16          MR. PRAVDA:  101T for transcript through 124T.  And

17   130T through 132T.

18          THE COURT:  Very good.

19          Any objection to those transcripts being admitted

20   into evidence?

21          MS. MACEDONIO:  No, Your Honor.

22          THE COURT:  All right.  So they will be admitted in

23   evidence, you'll make a motion to have them admitted in front

24   of the jury, I'll ask if there are any objections, the defense

25   counsel will say there are no objections and then the

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

177

PROCEEDINGS

1  transcripts will be distributed by Mr. Jackson to the members

2  of the jury.  You have 16 copies for all the jurors, yes?

3          MR. HAGGANS:  We do, Your Honor.

4          THE COURT:  And you have one little old copy for

5  your little old Judge up here?

6          MR. KESSLER:  Yes.

7          THE COURT:  And defense counsel you have your

8  copies?

9          MS. MACEDONIO:  Yes, we do.

10          THE COURT:  Is there anyone else who needs a copy?

11          MR. HAGGANS:  I believe we provided the Court with

12  two copies, Your Honor.

13          THE COURT:  Well, that's good because little old

14  Judge needs one and the really smart law clerks will also need

15  one.

16          What else do we have?

17          MR. PRAVDA:  Nothing else for the government this

18  morning, Your Honor.

19          THE COURT:  What else do we have from defense

20  counsel?

21          MS. SHARKEY:  One issue is, Your Honor, is I just

22  wanted to alert the Court that between the -- I don't know

23  what Your Honor's practice is between the conclusion of direct

24  and the beginning of cross, there are a number -- I would

25  request a brief break so I can set up and --

PROCEEDINGS

1          THE COURT:  Of course.

2          MS. SHARKEY:  Okay.

3          THE COURT:  That's -- I used to try cases so, yes,

4   that makes a lot of sense.  If you need to time to set up

5   obviously you'll have that and we'll take, you know, a comfort

6   break at that point or whatever is appropriate.  We'll

7   obviously -- I take you're talking about something that will

8   take a few minutes so it will make sense perhaps to take a

9   break with the jury rather than have you schlep your stuff up

10   there while the jury is here.  It's more than 30 seconds.

11          MS. SHARKEY:  Yes.

12          THE COURT:  Okay.  So we'll take a little break at

13   that point.

14          MS. SHARKEY:  Judge, one other thing that I --

15          THE COURT:  Yes.  Use the microphone, if you

16   wouldn't mind.

17          MS. SHARKEY:  I'm sorry, Judge.

18          THE COURT:  That's okay.

19          MS. SHARKEY:  One other thing is, I know the Court

20   does not like counsel to be near the jury box --

21          THE COURT:  Right.

22          MS. SHARKEY:  -- the 3500 material that may be

23   called upon to refresh the witness' recollection, if

24   appropriate, is really quite large.  It contains two full

25   black binders which would be too cumbersome to give the

PROCEEDINGS

1    witness --

2             THE COURT:  I don't think so.  That area up there

3    will accommodate two black binders.  Why don't we just have

4    the two black binders up here for the witness and then from

5    the podium you can call the attention to the witness to the

6    particular pages, and if you know what pages in advance you'll

7    be using I don't have a problem with you putting either a

8    paper clip or a yellow sticky marker or anything else to

9    facilitate going through the thousand pages.  If you know

10   you're going to question about 30, you can have them clipped

11   or otherwise indicated and that can be on the volume for the

12   witness rather than having the witness have to flip through

13   and figure out Bates numbers versus 3500 numbers versus page

14   numbers.

15            So whatever works for you in terms of having it, but

16   I'm old school.  There were no ELMOs when I started, there was

17   barely electricity.  So when you examined a witness you had

18   the bound volumes and you had them in front of the witness and

19   you still had the Mother-may-I rules about not approaching,

20   but the 3500 materials can certainly be there in the bound

21   volume.  That's how I would suggest you proceed.

22            MS. SHARKEY:  I have a question on process.  Not to

23   burden the Court with it, but I have certain documents that I

24   anticipate that may arrive that I would like to use the ELMO,

25   but I would like to have both opportunities --

PROCEEDINGS

1          THE COURT:  Of course.

2          MS. SHARKEY:  -- the books and the ELMO.

3          THE COURT:  What I'm suggesting is you should have a

4    complete set, if you've got a complete set for the witness

5    that's there in advance and then you do your thing with your

6    flexibility with the ELMO and you make your decisions as to

7    what you're going to use or not use from the stand.  I think

8    that works.

9          MS. SHARKEY:  I think so too.  Thank you.

10          THE COURT:  Does that work logistically for you?

11          MS. SHARKEY:  Yes.

12          THE COURT:  Do you have that set of documents

13    available now?

14          MS. SHARKEY:  Yes.

15          THE COURT:  Why don't you bring them up now.

16          MS. SHARKEY:  Well, he's not on for a while.

17          THE COURT:  I understand, bring them up here now

18    somewhere, give them to my law clerks.  They won't show them

19    to anybody, don't worry.

20          MS. SHARKEY:  Thank you.

21          THE COURT:  They're all powerful lifters.  The other

22    two are a lot stronger than he is and they are all stronger

23    than I am.

24          At the appropriate time those binders will be placed

25    in front of the witness and we'll be good to go.  You can work

PROCEEDINGS

1   from the podium with the ELMO or your computer as is

2   appropriate.

3           Does that work on that issue?

4           MS. SHARKEY:  Yes.

5           THE COURT:  Any other issues?

6           MS. MACEDONIO:  No, Your Honor.

7           THE COURT:  Any other issues?

8           MR. PRAVDA:  We're ready for the witness, Your

9   Honor.

10          THE COURT:  All right.  Mr. Jackson, would you let

11  the CSO know that we are ready to proceed.

12          Why don't we have the witness come back.  He's still

13  under oath on direct and take the stand and then the jury will

14  be brought in.

15          Have a seat, doctor.  We're going to bring in the

16  jury.  Good morning, sir.

17          THE WITNESS:  Good morning.

18          (Jury enters courtroom.)

19          THE COURT:  Good morning, ladies and gentlemen of

20  the jury, welcome back.  Thank you again for your prompt

21  attention.  Please be seated.

22          We've been doing a little work with the lawyers

23  here.  We have the doctor who is still under oath, still

24  direct examination.

25          Doctor, let me ask you, as I said I would have, you

VIDINO - DIRECT - HAGGANS

1    discussed your testimony with anyone since leaving that

2    witness stand yesterday?

3              THE WITNESS:  I have not.

4              THE COURT:  All right, sir, please continue with

5    your direct examination.

6    **LORENZO VIDINO**, called as a witness, having been previously

7    duly sworn/affirmed, was examined and testified further as

8    follows:

9              MR. HAGGANS:  Thank you, Your Honor.

10   DIRECT EXAMINATION

11   BY MR. HAGGANS:

12   Q    Good morning again, Dr. Vidino.

13   A    Good morning.

14   Q    I'm putting back on the ELMO in evidence 39B.

15             Dr. Vidino, just to pick up where we left off

16   yesterday, I believe we are on this exhibit.  Could you point

17   out for us on this map the city of Istanbul, Turkey?

18   A    Sure, top left.  Here.(indicating)

19   Q    And could you please identify the frontier or the border

20   between Turkey and Syria?

21   A    Sure.  That's here physically.

22   Q    Do you have a sense of how long that border is?

23   A    A few miles.  It's a very long border.

24   Q    Returning back to the period of, I believe it was

25   June 2014, specifically the declaration that ISIS made.  Can

VIDINO - DIRECT - HAGGANS

1    you remind us the substance of that declaration.

2    A    June 29, 2014 the leader of ISIS, Abu bakr al-Baghdadi

3    declared territory that ISIS had conquered between Syria and

4    Iraq as a state, an Islamic state that was also caliphate.

5    The caliphate being the entity that encompasses all the

6    political and religious authority for all Muslims.  In the

7    speech Baghdadi also declared himself to be the caliph, so the

8    rulers for Muslims and basically asking for allegiance from

9    the citizens.

10   Q    With reference to this map, 39B, can you give us a

11   general sense of the territory that ISIS claimed to control at

12   that time?

13   A    Sure.  It would be large parts of what is eastern Syria,

14   a bit broader than that, and some pockets of the western parts

15   of Syria and large parts of -- sorry, it's not easy to draw.

16   Large parts of western Iraq too.  Also going down here,

17   actually further down here, western Iraq.

18        So basically the border between Syria and Iraq in

19   this northern parts no longer existed as neither the Iraqi nor

20   the Syrian government controlled and ISIS has conquered this

21   land mass which was basically the size of France more or less.

22   Q    At that time as of the declaration, did their territory

23   include a claim to the city of Mosul, Iraq?

24   A    Yes, it did.

25   Q    ISIS was previously known prior to the declaration as --

VIDINO - DIRECT - HAGGANS

1    by many names.  We talked yesterday about the Islamic State of

2    Iraq?

3    A    Correct.

4    Q    And the Islamic State of Iraq and al-Sham?

5    A    Yes.

6    Q    And the Islamic State of Iraq and Levant.

7    A    Yes.

8    Q    Are you familiar with the term "Dawla," that's D-A-W-L-A?

9    A    Yes.

10   Q    What does that term mean?

11   A    That means state in Arabic.  Like, we say Islamic State

12   in Arabic would be Dawla Islamiya, instead of saying the word

13   "state" in Arabic.

14   Q    During the declaration, if I understood you correctly,

15   the declaration was that it was now the Islamic State?

16   A    Correct.

17   Q    Was there any particular significance to ISIS in dropping

18   the geographical terms that had been used earlier such as Iraq

19   and Syria, the Levant, Sham and so forth?

20   A    Absolutely.  It implied that it was no longer something

21   that was geographically limited to the territories here in

22   Iraq, that was just a starting point.  The ambition of the

23   declaration of the caliphate and the fact of dropping of the

24   last two letters of the name was that the ambition was global.

25   That this state they claimed to have created was supposed to

VIDINO - DIRECT - HAGGANS

1    eventually conquer the entire Muslim world from Morocco to

2    Indonesia, so well beyond what was Iraq and Syria.  So the

3    group that starts off as the Islamic State of Iraq, then

4    becomes the Islamic State of Iraq and Sham, the Levant, and it

5    eventually in June 2014 drops those two geographical

6    limitations and it becomes the Islamic State with at least a

7    claim of global ambition.

8    Q    The declaration in June 2014 of the caliphate, was that

9    declaration publicized?

10   A    Very much so.

11   Q    Can you give us a summary of how it was publicized.

12   A    ISIS also had a very effective propaganda machine, it

13   disseminated its message worldwide mostly through the web,

14   through social media and had a very, very sophisticated

15   apparatus to do so.  So that that claim of course being a very

16   important one was disseminated through those channels, but at

17   the same time given the very important geopolitical

18   implications, mainstream media all over the world picked it

19   up.  It was in the news in Europe, it was in the news in the

20   west, it was a front page story in The New York Times and

21   papers throughout the west.

22        MR. HAGGANS:  Your Honor, with the Court's

23   permission, just so the record is clear, I would like to ask

24   Mr. Jackson to bring Dr. Vidino a paper copy of Exhibit 39B so

25   that he can document the markings that he's made on the ELMO

VIDINO – DIRECT – HAGGANS

1    screen which will not be preserved otherwise.

2              THE COURT:  Yes, I don't have a problem with that.

3              Mr. Jackson, would you take 39B -- what we're doing,

4    ladies and gentlemen of the jury, is that the witness is now

5    going to mark physically on a piece of paper that will be in

6    evidence if you wish to see it when you go into the jury room

7    you can see for 39B to see what he has marked.

8              I have a pen you can use if you don't have one.

9              THE WITNESS:  Yes.

10             THE COURT:  Never known a professor not to have a

11   pen for his students.  I'm going to ask the professor after he

12   marks, pursuant to your directions, to initial the document

13   39B and to put the date so that that will make it clear also

14   that this is the version that the professor, the doctor marked

15   and was used in testimony.

16             So go ahead.  You want to have it back up on the

17   ELMO.

18             MR. HAGGANS:  I just want to give the professor time

19   to complete his markings.

20             THE COURT:  Okay.

21             THE WITNESS:  It's slightly better.

22             THE COURT:  Would you give it back to -- are you

23   done with the document, sir, would you like it in front of

24   him.

25             MR. HAGGANS:  I would like to put it back up on the

VIDINO - DIRECT - HAGGANS

1    screen if that's acceptable.

2              THE COURT:  Okay.  That's fine.

3              MR. HAGGANS:  Thank you, Your Honor.

4              THE COURT:  So you've marked it, sir, and you've

5    initialed it and you've dated it?

6              THE WITNESS:  Oh, I didn't date it, sorry.

7              THE COURT:  Come on, you have to listen to your

8    student here.  Okay.

9              THE WITNESS:  Thank you.

10             THE COURT:  Thank you.  You can hang on to the pen

11   for now, just leave it up there.

12             Thank you, Mr. Jackson.

13             MR. HAGGANS:  Again, perhaps Mr. Jackson --

14             THE COURT:  All you have to do, sir, is tap the

15   screen on the top right, doctor, then the squiggles will go

16   away so it won't be confusing.

17             Is that what you want him to do.

18             MR. HAGGANS:  Yes, Your Honor.

19             THE COURT:  Just tap the screen, top right.

20             THE WITNESS:  Yes.

21             THE COURT:  No more squiggles.

22             MR. HAGGANS:  Again, just for the record, Your

23   Honor, perhaps I would move that we identify this specific

24   item now marked by the witness as Exhibit 39C for

25   identification.

VIDINO - DIRECT - HAGGANS

1      THE COURT:  Well, then I don't have an objection to

2  that but why don't we have it tabbed.  Do you have a little

3  tab, we can mark it and give it to Mr. Jackson.

4      Mr. Jackson, would you go and get the tab please for

5  39C.

6      You've got it now marked as Exhibit 39C.  Any

7  objection to 39C coming into evidence?

8      MS. MACEDONIO:  No, Your Honor.

9      THE COURT:  It's admitted.

10     (Government Exhibit 39C, was received in evidence.)

11     THE COURT:  Now, ladies and gentlemen of the jury,

12  39C is what you will ask for if you want to see this in the

13  jury room as opposed to 39B, which is the one without the

14  squiggles, okay.

15     MR. HAGGANS:  Thank you, Your Honor.

16  Q    Dr. Vidino, during this period summer 2014, to your

17  knowledge had any other entity or group declared a caliphate?

18  A    No, absolutely not.

19  Q    Are you familiar with the term "hilofat?"  That's

20  H-I-L-O-F-A-T.

21  A    Yes.  That's basically a transliteration of English of

22  the word caliphate in Arabic, so it's caliphate in Arabic.

23  Q    They mean the same thing?

24  A    Absolutely, the same thing.

25  Q    At the time of the declaration, did ISIS have a legal

VIDINO – DIRECT – HAGGANS

1   system?

2   A    Yes, it did.

3   Q    What was that legal system?

4   A    It's their interpretation of sharia, sharia is Islamic

5   law and of course there are different interpretations of it.

6   ISIS had a very literalist, very extreme interpretation of

7   sharia, which implemented the system of courts, of police in a

8   fairly sophisticated way actually.

9   Q    Are you familiar with the term "Kafir?"  That's

10  K-A-F-I-R.

11  A    Yes, sir.

12  Q    What does that term mean as it relates to ISIS?

13  A    Infidel, unbeliever, somebody who does not believe in

14  Islam.

15  Q    That term has a meaning outside of ISIS's use of the

16  term; is that correct?

17  A    Yes.  It is always derogatory.  It always has a negative

18  connotation.  And it's used in mainstream parlance, but of

19  course ISIS uses it with much more intensity than the

20  mainstream of course.

21  Q    Is it fair to say that ISIS regards anyone who is not

22  ISIS as Kafir?

23  A    Correct.

24  Q    Are you familiar with the term "Fard al-Dayn?"  That's

25  F-A-R-D A-L D-A-Y-N?

VIDINO – DIRECT – HAGGANS

1  A    Yes, I am.

2  Q    What does that mean -- again I'm sorry, as it relates to

3  ISIS?

4  A    Yes.  It means individual obligation.  We discussed it

5  very briefly yesterday.  Basically ISIS argues that all

6  Muslims have an individual obligation to pledge allegiance to

7  ISIS, to caliph, to the leader of ISIS and to fight or in any

8  way support the Islamic State.

9  Q    I believe during your testimony you've used the term

10 "Jihad" and "Jihadist."

11 A    Yes.

12 Q    Could you please remind us the definition of those terms.

13 A    Jihad means -- it's an Arabic word that means to struggle

14 and it has different meanings.  It's used in -- with different

15 meanings by Muslims.  We briefly said that yesterday, sort of

16 the mainstream, more benign meaning Jihad is everything that a

17 Muslim does that is difficult and that he or she does to

18 please God.  So as I said, being nice to a neighbor you don't

19 really like, quitting smoking things, like that.  Difficult to

20 do but you do it to please God.

21       The way ISIS uses it it is to mean fight to please

22 God.  And that means military fighting.

23 Q    Do the terms Fard al-Dayn and Jihad have any relationship

24 with each other in the context of ISIS?

25 A    ISIS argues that fighting Jihad is a Fard Dayn, is an

VIDINO - DIRECT - HAGGANS

1   individual duty for Muslims.  All Muslims are supposed to

2   fight Jihad to please God.

3   Q    With reference to Exhibit 39C, how was it that ISIS came

4   to control the approximate territory reflected on this

5   exhibit?

6   A    By displaying very good military skills.  Both countries

7   Iraq and Syria had severe problems.  There were -- in Syria

8   there was and still there is a civil war and ISIS proved to be

9   one of the -- different factions, different groups are

10  fighting there but ISIS proved to be arguably, from a military

11  point of view, one of the strongest groups there, so it

12  managed to control large parts of Syrian territory.  And in

13  Iraq it also managed to defeat a very weak Iraqi military.  So

14  between 2013 and 2014 it managed to take advantage of the

15  political situations in both countries and conquer that

16  territory.

17          THE COURT:  I'm going to say before the court

18  reporter makes me say it, Vader, not Chris Rock, Woody Hall --

19  Annie Hall, Woody Allen, slow it down.  All right.  Because I

20  can see her getting ready to tell you to slow down.  So next

21  time she'll be the one to tell you.

22          THE WITNESS:  I apologize.

23          THE COURT:  Go ahead.

24  BY MR. HAGGANS:

25  Q    In addition to military conquests, did ISIS use any other

VIDINO – DIRECT – HAGGANS

1   means in order to gain control of territory during this

2   period?

3   A    Sure.  It used its ability to co-op some of the tribes in

4   the region.  It also used terrorist methods, so not pure

5   military tactics but attacks against civilians which are

6   considered terrorism.

7   Q    During this period, June 2014 and forward, was ISIS

8   gaining or losing territory at that time?

9   A    Gaining.

10   Q    Would you be able to characterize how rapid it was

11   gaining territory?

12   A    Extremely rapidly in a way, particularly in Iraq, in a

13   way that surprised everybody, from the Iraqi government to the

14   international community.  It managed to basically conquer I

15   would say almost half of the country in the span of a few

16   months.

17   Q    Do you have a sense of perhaps with reference to another

18   country approximately how large this territory might reflect?

19   A    Well, we said the territory ended up controlling, at the

20   end, was the size of France, more or less half of it was in

21   the Syrian side of the border, the other half on the Iraqi

22   side of the border, so fairly large.

23   Q    During this period, did ISIS conduct any attacks against

24   cities with civilian populations?

25   A    All the time.  It was one of the main tactics it used.

VIDINO – DIRECT – HAGGANS

1  Q    For example, you previously identified Mosul as a city

2  that they conquered during this period?

3  A    Yes, and before the military siege and the military

4  conquest of Mosul, they attacked the city through terrorist

5  tactics.  That means car bombings, suicide bombings, other

6  attacks against civilians.  So the terrorist tactics go with,

7  sort of used hand-in-hand with the military tactics.

8  Q    Are you familiar with a city or town by the name of

9  Sinjar?  That's S-I-N-J-A-R.

10  A    I am.

11  Q    Where is that located?

12  A    It's close to Mosul, it's a few kilometers outside of

13  Mosul.

14  Q    Did ISIS conduct any attacks in and around the town of

15  Sinjar?

16  A    Yes.  In August 2013.

17  Q    Can you describe the circumstances of that attack.

18  A    As it sought to expand its control of territory outside

19  of Mosul, it breached the area of the -- the Mount Sinjar,

20  there is a mount and a town called Sinjar and it conquered it

21  in the first couple of weeks of August for a very, very brutal

22  military campaign.

23  Q    Were the attacks on Mosul and Sinjar publicized?

24  A    Very much so.

25  Q    Is it fair to say that like the declaration they were

VIDINO - DIRECT - HAGGANS

1  essentially front page news?

2  A    ISIS made a big deal out of them.  They were major

3  conquests on their part so they disseminated them and of

4  course the international community was equally interested in

5  the fact that it was something that was disseminated

6  worldwide.  It was front page on I would say on all newspapers

7  worldwide.

8  Q    Including non-English language sources?

9  A    Absolutely.

10 Q    You've used the terms "terrorist" and "terrorist attack"

11 in your testimony, could you give us a brief summary of what

12 you mean by those terms in your field of study?

13 A    Sure.  Generally, what that means is violence against

14 civilians, so no military, perpetrated for political reasons

15 by a non-state actor.

16 Q    And when you say that do you mean non, N-O-N, state actor

17 or known K-N-O-W-N?

18 A    N-O-N.

19 Q    Referring back to the pollicization of the declaration

20 and the attacks that we just referenced, were those front-page

21 news in the United States?

22 A    Yes.

23 Q    Again in this period, 2014 and up until early 2015, did

24 ISIS carry out or claim credit for any terrorist actions in

25 that period?

VIDINO - DIRECT - HAGGANS

1    A    Many.

2    Q    Can you give us -- withdrawn.  Directing your attention

3    back to the town of Sinjar, can you give us some more detail

4    about the nature of ISIS's campaign in that area?

5    A    The area, the town of Sinjar and the area around it has a

6    majority of Yazidi population, that's Y-A-Z-I-D-I.  The Yazidi

7    are a religious minority in the region and they were

8    considered by ISIS to be infidels but with a particular, let's

9    say, emphasis on the fact of them being infidels.  So what

10   ISIS did is basically killed several thousands Yazidis and

11   mostly men and then enslaved many women and children from the

12   Yazidi population.  It carried out what the United Nations has

13   called a genocide.

14   Q    Was that publicized?

15   A    Very much so.

16   Q    Can you remind us the approximate time period of those

17   actions?

18   A    August 2014.

19   Q    During this same period did ISIS conduct any executions?

20   A    Yes, many.

21   Q    Were any of those executions videotape?

22   A    Some of them very much, yes, videotape and then

23   broadcast.

24   Q    Can you give us an example of what you mean by

25   broadcasts?  I'm sorry, withdrawn.  Can you please define what

Case 1:15-cr-00095-WFK   Document 434   Filed 12/05/19   Page 30 of 160 PageID #: 2883

1   you mean by broadcast?

2   A    ISIS would tape these executions and then disseminate

3   them through their very sophisticated and extensive networks

4   online and then mainstream media, whether in the west or in

5   the Arab world or globally, would then pick up these

6   executions which anybody would have seen on their TV screen.

7   Q    Some of them would get published to sources like YouTube;

8   is that correct?

9   A    Yes.

10  Q    Can you give us examples of some of the more widely

11  publicized or widely notable executions by ISIS during this

12  period?

13  A    Yeah.  In the summer of 2014 there were a few executions

14  of western hostages, British, Americans, who were decapitated

15  beheaded in a very ritualistic way in front of the camera.

16  Generally, the dynamic is that the executioner or more than

17  one executioner wearing a mask, would read a statement,

18  explain why ISIS considered that person that was about to be

19  beheaded to be an enemy of Islam or an enemy of ISIS and then

20  would behead that person.  So there were a few videos like

21  that in the summer of 2014.

22          Another video that became very sort of mainstream

23  that was seen around the world was the burning alive of a

24  Jordanian pilot.  This was a pilot who was being on the

25  anti-ISIS coalition whose plane was downed in Syria and he was

VIDINO – DIRECT – HAGGANS

1   put in a cage and burned alive.  And that was again done in a

2   very theoretical way.  It was taped in a very theoretical way

3   by ISIS and then the video was disseminated broadly.

4   Q    In those videos, did one or more of the executioners

5   claim to be conducting themselves in that execution on behalf

6   of ISIS?

7   A    Yes, there was a statement that they would read that they

8   was basically a verdict in a Court of law more or less, the

9   individual would claim to be acting on behalf of ISIS,

10  absolutely.  The fact that this was an ISIS execution was made

11  crystal clear.

12  Q    In those videotapes or video files, is probably the more

13  current term, in those video files or by other media, did ISIS

14  make any statements about what it hoped the effect of that

15  media would be on the audience?

16  A    Yes.  The -- the desires to influence two main target

17  audiences.  One is supporters in a way to project strength and

18  tell their supporters that ISIS is strong, that all enemies of

19  ISIS will -- are and will be punished, so it's a call to arms

20  for people who are ISIS supporters or potential ISIS

21  supporters.

22       The second target audience is enemies of ISIS,

23  people in the west or in other parts of the world that ISIS

24  saw as enemy and obvious aim there is to terrorize, to show

25  that ISIS is a force to be reckoned and a very mighty one.

VIDINO - DIRECT - HAGGANS

1    Q    A force to be feared, is that fair to say?

2    A    Correct.

3    Q    You've used the term earlier today propaganda.  Could you

4    please define for us what that term means as it relates to

5    ISIS.

6    A    I would say messaging would be a good synonym.  It's

7    messages in various forms that go from media files to

8    magazines, all kind of media products that ISIS puts out to

9    send this message across to its many target audiences.

10   Q    Are you familiar with the term "branding?"

11   A    Yes.

12   Q    Is branding a synonym that would apply to this?

13   A    I think that's a fair way of putting it.

14   Q    Could you remind us the definition of the term "foreign

15   fighter?"

16   A    Foreign fighter is an individual who joined -- in this

17   specific case of course is an individual who joined ISIS from

18   countries other than Syria and Iraq.  So in the years that

19   ISIS was most active and controlling territory, some 50 to

20   60,000 individuals from all over the world traveled to Syria

21   and Iraq and joined the organization.

22   Q    And just so the record is clear, when you said in this

23   specific case, were you referring to in relation to ISIS?

24   A    Yes.

25   Q    In this period 2014 early 2015, did ISIS make any efforts

VIDINO - DIRECT - HAGGANS

1   to recruit foreign fighters?

2   A    It was definitely one of the main emphasis of its actions

3   and of its propaganda.

4   Q    What were the means that ISIS used to try to achieve

5   that?

6   A    Well, different means.  One would be propaganda itself.

7   Sending out messaging, many of its videos and messages online

8   and -- were in languages other than Arabic, were in English,

9   in French, in German.  It was to attract people from all over

10  the world.  The message was we're building a state, this is

11  the state where Islam is practiced in the correct way, so

12  there was the idea was to attract Muslims from all over the

13  world.

14       At the same time ISIS conducted recruitment in the

15  physical space.  So there was messaging in the online space to

16  try to attract people to their messages.  In the physical

17  space people would try to recruit individuals to go and

18  travel.

19  Q    Are you familiar with the term "hijrah?"  That's

20  H-I-J-R-A-H.

21  A    I am.

22  Q    What does that term mean with specific reference to ISIS?

23  A    Yeah, again it is a mainstream term in Islam that ISIS

24  uses to fit its own agenda.  Hijrah means migration.  In the

25  way ISIS uses it means the passage, the migration that people

VIDINO - DIRECT - HAGGANS

1  have to do, traveling from lands all over the world to the

2  land where ISIS grows the Islamic State.

3  Q    Am I correct in understanding, based on your earlier

4  testimony, that during this period many tens of thousands of

5  foreign fighters made hijrah to ISIS territory?

6  A    According to the United Nations, between 50 to 60,000.

7  Q    Are you familiar with the means and methods that they

8  used to make that journey from their countries of origin?

9  A    Yes.

10 Q    Can you give us -- I'm sorry, withdrawn.  Can you give us

11 an example or some examples of how they made that journey?

12 A    Sure.  Of course there are different ways in when you

13 have people to join or tried to join.  The vast majority of

14 people traveled to Syria from Turkey.  Turkey was the easiest

15 place to go through, so I would say the vast, vast majority of

16 people tried to do so crossing board border from between

17 Turkey and Syria illegally.

18       People would travel to Turkey in different ways

19 depending of course where the place of origin was.  In many

20 cases people would travel to Turkey trying to conceal their

21 travel, aware that law enforcement and intelligence agencies

22 were tracking them, potentially tracking them.  The idea was

23 to make that journey as difficult to track as possible.

24 Q    Am I correct that Istanbul is the largest city by

25 population in the country of Turkey?

VIDINO - DIRECT - HAGGANS

1   A    Correct.

2   Q    And also that it has the largest international airport in

3   the country of Turkey?

4   A    Yes, one of the largest in the world actually.

5   Q    Foreign fighters from the west and foreign fighters with

6   English language skills, did such fighters have any particular

7   value to ISIS in this period?

8   A    A very big one.

9   Q    Can you give us an example of why, as it relates to ISIS?

10  A    Well, they were obviously potentially fighters, you know,

11  foreign fighters did play a role in the military efforts of

12  the group, but I would say arguably the larger role was the

13  propaganda value that they had.  They were featured

14  prominently in ISIS propaganda videos.  If the message that

15  ISIS was sending out is we're building an Islamic State, this

16  is global, it is not just in Syria and Iraq but this is a

17  global entity, having people that came from Australia, the

18  United States, the U.K. was very, very important.  And of

19  course, people who were native English speakers or at least

20  spoke good English were very important in producing

21  propaganda.

22        The second language that ISIS used the most after

23  Arabic was and still is English.  So people who could produce

24  propaganda, talk to people in English were extremely valuable.

25  Q    Or people who were familiar with western cultural norms,

VIDINO - DIRECT - HAGGANS

1    is that fair to say?

2    A    Also that's very, very important.

3    Q    In the course of your work, without reference to any

4    specific cases, have you become familiar with foreign fighters

5    who have successfully made their way to ISIS territory or

6    attempted to make their way to ISIS territory?

7    A    It's one of the main issues I study and we study at the

8    center, yes.

9    Q    If I understand your earlier testimony correctly, one of

10   the most common routes, if not the most common route, was to

11   first travel to Istanbul and then travel over land to the

12   border frontier and then cross the border illegally?

13   A    I would say that is the most common way.

14   Q    Did any foreign fighters travel directly to Syria?

15   A    Not that I'm aware of.  It would be extremely, extremely

16   unusual.

17   Q    Were there any particular reasons why you believe it

18   would be extremely unusual?

19   A    Because one would have to fly to -- to Damascus airport,

20   Damascus being the capital of Syria, and their airport was

21   very tightly controlled by the Syrian regime and its

22   intelligence agency and they would have paid very close

23   attention to anybody who would be traveling there to join

24   ISIS.

25   Q    With reference to Exhibit 39C, is Damascus identified on

VIDINO - DIRECT - HAGGANS

1   this map?

2   A    Yes, it is.

3   Q    And it's outside the region that you identified as ISIS

4   controlled in this period; is that correct?

5   A    Correct.

6   Q    In fact, it's never been controlled by ISIS?

7   A    Correct.

8   Q    Again, without reference to any specific cases, are you

9   familiar with any foreign fighters who traveled to Istanbul

10  but via an indirect route?

11  A    I would say that's a common, common pattern.

12  Q    Can you describe for us what an indirect route means in

13  this context?

14  A    It would mean traveling, let's say somebody were to leave

15  the United States and wanted to go to Turkey, there would be

16  different sort of tricks people would employ not to have their

17  travel detected by law enforcement.  Traveling to a

18  destination that would seem anything but related to going to

19  be a foreign fighter.  So traveling, for example, to Mexico,

20  looking like you're going on vacation.  So that will be the

21  first ticket you buy from the United States, you fly to

22  Acapulco, not the place you would think you're going to fight.

23  But once there, purchase a second ticket to go to maybe a

24  European capital and from there travel to Turkey.  So

25  everything -- every kind of trick, if you will, that would

VIDINO - DIRECT - HAGGANS

1   help them conceal the travel pattern.

2   Q    You testified yesterday that you travel internationally

3   quite frequently?

4   A    Yes.

5   Q    Based on that, are you aware of whether or not there are

6   direct flights to Istanbul generally available from New York

7   City area airports?

8   A    Yes, there are.

9   Q    Can you give us a rough sense of how frequent those

10  flights are?

11  A    I'd say a least a couple a day.  I mean, it was between

12  JFK and Istanbul airport was two of the top 10 airports in the

13  world, so it's a very common route.  It's very easy to get

14  from New York to Istanbul.

15  Q    Are you familiar with the term "vouching" in the context

16  of ISIS?

17  A    Yes.

18  Q    What does that term mean?

19  A    Vouching means basically when somebody guarantees that

20  another person is genuinely interested in joining ISIS that it

21  is not a spy.  ISIS was, of course, wary of being infiltrated

22  having spies from law enforcement and intelligence agencies

23  join their ranks to spy on them, so vouching -- a voucher

24  would be somebody that would guarantee a specific individual

25  was not a spy, was genuinely interested in joining the group.

VIDINO - DIRECT - HAGGANS

1    Q     During this period was it necessary to have a voucher or

2    a person who would vouch for someone's bona fides in order for

3    that person to successfully enter ISIS territory and/or join

4    ISIS?

5    A     It was not necessary, I would say it was preferable.  It

6    would have made that person's journey to ISIS easier but there

7    are cases of people who did not have anybody that vouched for

8    them and managed to join ISIS.

9    Q     So in the course of your research you're aware of

10   individuals who have essentially just showed up at the border

11   of Syria and Turkey and presented themselves to ISIS?

12   A     Several.

13   Q     Are you familiar with the term -- excuse me.  Are you

14   familiar with the terms "coded language" or "guarded

15   language?"

16   A     Yes.

17   Q     Do those terms have any specific reference -- specific

18   relevance to ISIS in the course of your research?

19   A     Yeah, of course.  People who were interested in ISIS,

20   tried to join ISIS would use coded language to, again, conceal

21   their real intentions mostly when speaking online.  Aware that

22   a lot of the online communications were, potentially at least,

23   monitored by law enforcement, they would try to make it

24   difficult for law enforcement to fully understand what they

25   were talking about.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

VIDINO - DIRECT - HAGGANS

1          MR. HAGGANS:  Your Honor, if I could have just one

2    moment, please?

3          THE COURT:  You may.

4          MR. HAGGANS:  No further questions.

5          THE COURT:  All right, ladies and gentlemen of the

6    jury, it's about 11:20, why don't we take our 15-minute

7    comfort break, if that's acceptable, then we will continue

8    with the cross-examination of the doctor.

9          Do not talk about the case amongst yourselves and,

10   as I said before, there are no cameras or computers allowed in

11   the courtroom except those authorized by the Court, the Court

12   Security Officers and lawyers who are known to the Court and

13   who are not doing anything inappropriate.  So have no concerns

14   about that.  Okay?

15         Thank you.  We'll take our 15-minute comfort break

16   and do not talk about the case.  Just remain seated.

17         Thank you, sir.

18         (Jury exits courtroom.)

19         THE COURT:  You may step down, doctor.  Again, no

20   talking to anyone about your testimony during the break.

21         (Whereupon the witness was excused.)

22         THE COURT:  You may be seated everyone.  Do we have

23   any procedural issues to go over while the jury is out?

24         MR. PRAVDA:  No, Your Honor.

25         MS. MACEDONIO:  No, Your Honor.

VIDINO - DIRECT - HAGGANS

1      THE COURT:  Okay, we'll take our 15-minute comfort

2   break too and I'll see you in 15 minutes.

3      (Recess.)

4      (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1        THE COURTROOM DEPUTY:  All Rise.

2        (Whereupon, the witness resumes the stand.)

3        THE COURT:  You may be seated.  We have the

4   appearances.  We're back.  We have the appearances.

5        Can we have the witness back on the witness stand,

6   then we'll wait for the defendant to be produced.

7        Do we have any procedural issues to discuss before

8   we bring the jury back.

9        MR. PRAVDA:  No, your Honor.

10        THE COURT:  Ms. Sharkey?

11        MS. SHARKEY:  If --

12        THE COURT:  If we do, I can ask the witness to step

13   out if that's appropriate before we discuss them.  You tell

14   me, I don't know what the issues are.

15        MS. SHARKEY:  We need the witness to step out.

16        THE COURT:  Will you step out again?

17        (Whereupon, the witness steps down.)

18        THE COURT:  You may be seated and use the

19   microphones.  Yes, you have an issue, Ms. Sharkey?

20        MS. SHARKEY:  Yes, Judge.  We've had a largely

21   successful quid pro quo with the Government concerning the

22   introduction of electronic exhibits.

23        THE COURT:  Whenever I here largely I want to hear

24   about smally (sic).

25        MS. SHARKEY:  That's next.

PROCEEDINGS

1          THE COURT:  I figured it was.

2          MS. SHARKEY:  We have no objection.  And the reason

3    this is germane now, it's what the Government intends to do at

4    the conclusion of this witness's testimony, so it's timely.

5          But we have no objection to any of their exhibits.

6    We have no objection to them putting in the cover sheet of the

7    Cellebrite report.  We have no objection to them identifying

8    the phones.

9          THE COURT:  Linden Johnson used to say nothing that

10    they say before the word but in an editorial is the problem.

11    I feel a "but" coming.

12          MS. SHARKEY:  But, the Government wants to put in

13    the entire forensic extraction, which would allow in the

14    unlikely event, the jurors to access other documents that we

15    have not been in play at all during this trial.  There are

16    many other things in those phones.  We object to that.

17          THE COURT:  Wait a minute.  I don't understand

18    access and at play.  You have to break it down for my simple

19    mind.

20          MS. SHARKEY:  The exhibits that -- not so simple.

21          THE COURT:  Small, limited, weak, whatever.  Go

22    ahead.

23          MS. SHARKEY:  We have no objection, or whatever

24    objections we've had we worked out with the Government

25    concerning their exhibits.

PROCEEDINGS

1        THE COURT:  Let me interrupt.  There are a set of

2   documents that are or might be accessible that you do object

3   to possibly being seen by the jury; is that correct?

4        MS. SHARKEY:  That's correct.

5        THE COURT:  Have you identified for the Government

6   what those documents are?

7        MS. SHARKEY:  One document.

8        THE COURT:  Or the categories?

9        MS. SHARKEY:  One document.

10       THE COURT:  One document.  Let me ask the

11  Government.  Do you know what document they are talking about?

12  I'm happy to rule on a particular document.  Somebody may be

13  unhappy with my ruling, but if you've narrowed it down to one

14  document I will be informed of what that document is, I'll

15  review it, and I'll make a ruling if it's one document.  So if

16  that's what we're talking about, I'm happy to have that

17  document provided to me and I'll make my ruling.

18       MS. SHARKEY:  It's not limited to one document.

19       THE COURT:  I didn't think so.

20       MS. SHARKEY:  There are categories of pictures,

21  other texts.  It's three terabytes of information.  Now they

22  don't want to put that in, and we don't want it in.

23       THE COURT:  Let me ask the Government, what do you

24  want to put in, and I'm happy to rule on.  What it is you want

25  to put in?

PROCEEDINGS

1       MR. PRAVDA:  Your Honor, we are admitting two into

2  evidence, two physical phones that were seized from the

3  defendant.  Those physical phones the defense has no objection

4  to.

5       THE COURT:  I wish you guys would focus on what they

6  do have objections to.

7       MR. PRAVDA:  For each phone the FBI conducted a

8  forensic examination and extracted from the phone all of the

9  contents.

10      THE COURT:  I know that.

11      MR. PRAVDA:  It is those extractions that we wish to

12 put into evidence.

13      THE COURT:  Now, I will look at those extractions

14 and I will rule with respect to whether those extractions

15 should or should not be presented to the jury.  So can you get

16 them in a form where I, as the Court, can exercise my

17 obligations to rule on evidence that you would like to have

18 introduced to the jury?  I may admit it.  I may keep it out.

19 But I got to see it before I can rule.

20      I appreciate the fact that we're in the tech world

21 and that everything is tech and you've characterized it on

22 both sides.  I realize I'm a digital immigrant, as opposed to

23 my kids who are digital natives.  Being a digital immigrant,

24 I'm old school.  I'll look at what you want to put in, as the

25 Government, and what you, as defense counsel, object to, and I

PROCEEDINGS

1    will rule.  Because that's what I'm supposed to do.

2              So you folks need to make available to me

3    electronically, paper, I don't care how you do it, that subset

4    of documents, electronically or otherwise, that you're

5    fighting about so I can do my thing and rule.

6              I understand how it comes to possibly go before the

7    jury or not, but to me that's about packaging.  I want to see

8    what is in the package.  So can you do that, both sides, yes?

9              MS. SHARKEY:  If the Government will identify what

10   documents they want to put in from that --

11             THE COURT:  They don't have to identify them.  If

12   they've got a whole passel of documents that fall into this

13   category, I'll look at them all.  I can say they all come in;

14   they all stay out; or I can say this is in and this is out.

15             Spoiler alert, I had a case two days before

16   Christmas last year.  The Government gave me 128,000 documents

17   on a disk for a trial that was supposed -- hearing -- supposed

18   to start in January.  I had a very interesting Christmas

19   holiday, but I personally read all 128,000 documents.

20             MR. PRAVDA:  Your Honor, we have actually

21   represented repeatedly to defense counsel which specific

22   documents from those extractions we would put in.

23             THE COURT:  And they objected, right?

24             MR. PRAVDA:  I don't think they do.

25             THE COURT:  Do you not object to the ones that are

PROCEEDINGS

1   going before the jury?

2          MS. SHARKEY:  No, we don't object to those.

3          THE COURT:  What do you object to?

4          MS. SHARKEY:  We object to the field of unknown.

5          THE COURT:  I want to see the field of unknown.

6   Like the Field Of Dreams, this way I channel James Earle

7   Jones.  I'm a big baseball fan.  I want to see that field of

8   unknowns because there are no knowns, there are no unknowns,

9   that being said I want to see the fields.  I want to review

10  the field, I'll rule on the field.  The who is going to make

11  the Field Of Dreams available to review?

12         MS. SHARKEY:  I think that's the Government since

13  it's the Government.

14         THE COURT:  You have them?

15         MR. KESSLER:  We are getting the copies.

16         MR. PRAVDA:  We will do that.

17         THE COURT:  Good.  Can we have the Field Of Dreams

18  marked by an exhibit number of some sort?

19         MR. HAGGANS:  They are marked, your Honor.

20         THE COURT:  This will be my recess work or do we

21  have to do it now?

22         MS. SHARKEY:  I have a feeling since the Court had

23  the rubber hit the road, that probably at the next break there

24  may be some consensus on this issue.  I don't think anybody

25  wants you tearing through three terabytes of unnecessary

214

PROCEEDINGS

1    information.

2              THE COURT:  I'll do it.  Given the way I behave,

3    old, slow, and unboring, practically means forever.  I don't

4    know about you guys, but I'm here.

5              MS. SHARKEY:  Give us to the next break.  We'll see

6    if it can be worked out over lunch.

7              THE COURT:  Is that okay with you, Mr. Pravda?

8              MR. PRAVDA:  That's fine with the Government, your

9    Honor.

10             THE COURT:  Okay.  Anything else I can help you with

11   before we continue with the cross-examination?

12             MS. MACEDONIO:  I handed up the witness as CV.  I'm

13   assuming he's familiar with it, but just in case it's up for

14   him to review.

15             THE COURT:  Have you marked it as an exhibit?

16             MS. MACEDONIO:  It is, your Honor.

17             THE COURT:  How is it marked?

18             MS. MACEDONIO:  3500LV001.

19             THE COURT:  Okay do you intend to offer it as an

20   exhibit into evidence or just to have it there to assist his

21   testimony?

22             MS. MACEDONIO:  Just to assist his testimony.

23             THE COURT:  Okay.  Any objection to -- I'll let you

24   talk amongst yourself then, I'll speak to the Government.

25             MR. KESSLER:  Sorry, your Honor.

PROCEEDINGS

1          MR. HAGGANS:  The Government has no objection to the

2     witness having a document available.

3          THE COURT:  That document again being.

4          MR. HAGGANS:  LV --

5          MS. MACEDONIO:  3500LV1.

6          THE COURT:  That is now to be placed in front of the

7     witness where the witness will be, and you may refer to it,

8     Ms. Macedonia.

9          Anything else before we bring the witness back?

10          MS. MACEDONIO:  No.

11          MR. PRAVDA:  No, your Honor.

12          THE COURT:  Let's get the witness in and seated then

13     get the jury here.

14          MS. SHARKEY:  We've reached consensus.

15          THE COURT:  I have that effect on people.

16          (Whereupon, the witness resumes the stand.)

17          (Jury enters the courtroom.)

18          THE COURT:  Welcome back, ladies and gentlemen of

19     the jury.  Thank you for your prompt attention.  Be seated.

20          We'll now have cross-examination of the witness.

21          Dr. Professor, did anyone talk to you about your

22     testimony during the break?

23          THE WITNESS:  Nobody.

24          THE COURT:  Ms. Macedonio cross-examination, you're

25     on.

LORENZO VIDINO - CROSS - MS. MACEDONIO

1        MS. MACEDONIO:  Thank you, your Honor.

2    CROSS-EXAMINATION

3    BY MS. MACEDONIO:

4    Q    Good afternoon, Dr. Vidino.

5    A    Good afternoon.

6    Q    You've been qualified to testify in this case as an

7    expert; is that correct?

8    A    Correct.

9    Q    And that's based upon your body of work in your field of

10   expertise, correct?

11   A    I believe so, yes.

12   Q    That includes research with regard to your program which

13   is called the Program On Extremism, correct?

14   A    Correct.

15   Q    As part of your body of work, you've been a teacher,

16   correct?

17   A    Yes.

18   Q    And you have extensive education; is that fair to say?

19   A    Yes, I think so.

20   Q    And you regularly brief or consult with the office of the

21   President, the Vice President of the United States; is that

22   correct?

23   A    Regularly is an over-statement.  I've briefed the Office

24   a few times.

25   Q    How about the FBI?

LORENZO VIDINO – CROSS – MS. MACEDONIO

1    A    Same, yes.

2    Q    CIA?

3    A    Less frequently but, yes.

4    Q    When you briefed these offices, do you get paid for that?

5    A    All the above you mentioned, no, I don't.

6    Q    What Governmental agencies, United States governmental

7    agencies do you associate with that you get paid for?

8    A    I don't necessarily associate with any agency.  The only

9    one that of course pays is the Department of Justice when I do

10   expert witness work.  But it's a contract based on the

11   specific testimony.

12   Q    So when you are invited to brief the Office of the Vice

13   President, you don't get paid?

14   A    No.

15   Q    But when you are contracted with the Department of

16   Justice you get paid for that work, correct?

17   A    Correct.

18   Q    To the clear, the Department of Justice is the branch of

19   the Government that has hired you in this case, correct?

20   A    Correct.

21   Q    And how many times have you, Dr. Vidino, been hired by

22   the Department of Justice?

23   A    I think around 15 times.

24   Q    Fifteen times.  And in each of those cases were you hired

25   as an expert witness?

LORENZO VIDINO - CROSS - MS. MACEDONIO

1    A    Yes.

2    Q    And in each of those cases that was by the U.S.

3    Government, correct?

4    A    Correct.

5    Q    And you were paid by the U.S. Government, correct?

6    A    Correct.

7    Q    In addition to testifying as an expert you also have

8    published several books, correct?

9    A    Yes.

10   Q    And several op-eds; is that right?

11   A    Yes.

12   Q    And those are things that you get paid for, correct?

13   A    Some yes some no.  I would say mostly no.

14   Q    How about when you testify, do you get paid for that?

15   A    Testify, what do you mean?

16   Q    In other words, you have testified in front of the United

17   States Senate; is that correct?

18   A    Yes.

19   Q    Do you get paid for that?

20   A    No.

21   Q    How about in the Italian Parliament?  Do you get paid for

22   that?

23   A    No.

24   Q    You testified in the Canadian Parliament?

25   A    Correct.

LORENZO VIDINO - CROSS - MS. MACEDONIO

1   Q    None of that stuff you get paid for, correct?

2   A    Correct.

3   Q    That's just information that you provide to Governmental

4   agencies based upon your body of work, fair to say?

5   A    Yes.

6   Q    You also, and please correct me if I'm wrong, have done

7   probably a couple hundred public presentations; is that fair

8   to say?

9   A    Probably.

10  Q    When you do those public presentations, do you get paid?

11  A    Some yes, some no.  I would say 50/50.

12  Q    But you always get paid by the United States Government

13  when you testify as an expert in one of these cases, correct?

14  A    Yes, correct.

15  Q    Now, when you testify as an expert witness, as you are

16  doing here today, a lot of the information that you give is

17  historical in nature, fair to say?

18  A    Fair, yes.

19  Q    And the basis for your expertise is because of the

20  research that you do; is that fair to say?

21  A    Yes.

22  Q    You speak with people in the field, correct?

23  A    Yes.

24  Q    You speak with prosecutors, correct?

25  A    Yes.

                    LORENZO VIDINO – CROSS – MS. MACEDONIO

1    Q    But you and I have never spoken before, right?

2    A    No.

3    Q    You have spoken to Mr. Haggans, the prosecutor who

4    presented your direct examination?

5    A    Yes.

6    Q    How many times have you spoken to him?

7    A    Six, seven.

8    Q    You did that in preparation for your testimony here

9    today, correct?

10   A    Yes.

11   Q    You've never spoken with my client Dilkhayot Kasimov,

12   have you?

13   A    No.

14   Q    You were not part of the investigation in this case,

15   correct?

16   A    No.

17          THE COURT:  You have to wait until she finishes the

18   question.

19   Q    You didn't have any hand in the investigation in this

20   case, correct?

21   A    Correct.

22   Q    And when the Government asked you to become an expert

23   witness in this case, did they provide you with any computer

24   information with regard to this case?

25   A    No.

LORENZO VIDINO – CROSS – MS. MACEDONIO

1  Q    Did they provide you with any information that had been

2  retrieved from cellular telephones?

3  A    No.

4  Q    Did they provide you with any text messages that had been

5  sent back and forth between people?

6  A    No.

7  Q    Did they ask you to review any e-mails?

8  A    No.

9  Q    But you have in other cases been asked to interpret text

10 messages and e-mails; is that fair to say?

11 A    Correct.

12 Q    And in fact, you wrote an article entitled Terrorist

13 Chatter, Understanding What Terrorists Talk About; is that

14 correct?

15 A    Yes.

16 Q    But weren't asked to do any of that in this case,

17 correct?

18 A    Correct.

19 Q    Dr. Vidino, you speak several languages, correct?

20 A    Correct.

21 Q    But you don't speak Arabic.

22 A    I don't.

23 Q    You don't speak Uzbek?

24 A    I don't.

25 Q    You testified on direct examination that you, based upon

LORENZO VIDINO - CROSS - MS. MACEDONIO

1  your body of work, you understand several key terms, fair to

2  say?

3  A    Correct.

4  Q    Terms that are used over and over within the Arabic

5  language?

6  A    Correct.

7  Q    Are you familiar with the term inshallah?

8  A    Yes.

9  Q    What does inshallah translate to?

10  A    God willing.

11  Q    Does inshalla necessarily mean when spoken by an Arabic

12  speaker that that person is committing to do something?

13  A    Not necessarily, a desire, hoping, but not commitment.

14  Q    But it could also mean -- did I interrupt your answer?

15  A    A desire.  There is a hope that a certain outcome might

16  arise, but it's not necessarily commitment.

17  Q    It's not necessarily commitment to a future course of

18  action; is that fair to say?

19  A    Depends how you define commitment; there is a hope.

20  Inshalla, God willing, it's a positive thing that I hope for

21  the future.

22  Q    You could also use it to dodge a bullet, correct.  Let me

23  give you an example.  If someone says, hey, Dr. Vidino are you

24  coming to my party on Saturday.  You could respond, inshalla,

25  when you don't want to go at all?

LORENZO VIDINO – CROSS – MS. MACEDONIO

1        MR. HAGGANS:  Objection to form.

2        THE COURT:  Overruled.  Perfectly appropriate

3   question.  Answer the question.

4   A    Probably, I would say so, yes.

5   Q    It's a term that's used with extreme regularity, fair to

6   say?

7   A    Yes.

8   Q    Based upon your body of work, Dr. Vidino, can you explain

9   for the jurors what it means to be Muslim?  What is the

10  general definition of a Muslim?

11  A    Somebody who believes in Allah and believes that Mohammed

12  was the last prophet.

13  Q    Somebody who practices Islam?

14  A    Yes.

15  Q    Is it fair to say Islam is the religion, the faith of

16  Muslims?

17  A    Yes.

18  Q    How many Muslims would you say there are in the world?

19  A    1.6 billion.

20  Q    Certainly based upon your body of work and the research

21  that you have done, not everybody who is a Muslim sympathizes

22  or participates in the activities of ISIS, correct?

23  A    The vast majority don't.

24  Q    The vast majority don't, correct?

25  A    Correct.

LORENZO VIDINO - CROSS - MS. MACEDONIO

1  Q    What percentage of Muslims do you think based upon your

2  body of work sympathize with ISIS?

3  A    Very difficult to say.  One can only make an educated

4  guesses of that, less than 1 percent.

5  Q    Less than 1 percent of practicing Muslims, correct?

6  A    Probably.

7  Q    Can you tell us what the Koran is?

8  A    The holy book of Muslim.

9  Q    The Koran, where all of the teaches and beliefs of Islam

10  are contained?

11  A    Most important ones.  There are other books.  Not all of

12  them were in the Koran.

13  Q    Fair to say the Koran is the holy scripture of Islam?

14  A    Yes.

15  Q    Your program is called the Program On Extremism, correct?

16  A    Yes.

17  Q    There are people who practice Islam in varying ways, is

18  that fair to say?

19  A    Absolutely.

20  Q    Some people practice it casually, correct?

21  A    Correct.

22  Q    Other people practice it in a much more strict fashion?

23  A    Like any other religious group, yes.

24  Q    For example, there are various ways that people would --

25  withdrawn.

LORENZO VIDINO - CROSS - MS. MACEDONIO

1          Some people who are practicing Islam may pray once a

2    week, fair to say?

3    A     True.

4    Q     Others may pray several times a day?

5    A     Yes.

6    Q     But if someone prays several times a day, that doesn't

7    make then an extreme person that you would necessarily

8    research in your program, correct?

9    A     Not at all, absolutely.

10   Q     Would it be fair to say that some Muslims are devote,

11   while others aren't?

12   A     Yes.

13   Q     Some Muslims are strict, while others aren't?

14   A     Of course.

15   Q     If a Muslim is a strict practicing Muslim, that doesn't

16   necessarily mean that he or she is committing a crime, right?

17   A     Absolutely.

18   Q     As part of your body of work, Dr. Vidino, you've traveled

19   to several countries, correct?

20   A     Yes.

21   Q     And you traveled to Turkey, correct?

22   A     Yes.

23   Q     Now you didn't travel to Turkey to become a member of

24   ISIS, did you?

25   A     I did not.

LORENZO VIDINO – CROSS – MS. MACEDONIO

1    Q     I didn't think so.

2          THE COURT:  I didn't either.

3    Q     In fact, there are many, many reasons why somebody would

4    travel to Turkey; is that fair to say?

5    A     Of course.

6    Q     Somebody could have a social reason to travel to Turkey?

7    A     Yes.

8    Q     Perhaps an educational reason to travel to Turkey?

9    A     True.

10   Q     And did you travel to Turkey to do research on your body

11   of work?

12   A     Yes.

13   Q     Is it fair to say that someone who is a practicing Muslim

14   might travel to Turkey for religious education?

15   A     Yes.

16   Q     Have you ever heard of a city in Turkey called Tuela?

17   A     Yes.

18   Q     Where is that?

19   A     Close to the border.

20   Q     In this the summer of 2014, you testified on direct

21   examination that ISIS was sort of in full swing; is that fair

22   to say, a fair characterization?

23   A     Yes.

24   Q     Was ISIS also fighting in Gaza?

25   A     No, it wasn't.

LORENZO VIDINO - CROSS - MS. MACEDONIO

1    Q    How about in Palestine?

2    A    No, it wasn't.

3    Q    You testified during your direct examination about the

4    conflict in Syria, do you recall that?

5    A    Yes.

6    Q    Can you just briefly tell the jurors what was happening

7    in the -- withdrawn.

8             Can you briefly tell the jurors about the beginning

9    of the conflict in Syria, what happened there?

10   A    It's very complicated, but to simplify things, by the

11   spring of 2011 there was uprising against the Syrian regime,

12   initially peaceful, but quickly escalated to a violent

13   confrontation between the Syrian regime and a variety of armed

14   groups of different nature.  As the conflict progressed,

15   groups like ISIS and a few others that are of terrorist nature

16   and adopt a certain radical ideology, became a most powerful

17   regime and fighting against each other.

18   Q    The Syrian regime was that the Bashar al-Assad regime?

19   A    Yes.

20   Q    The violence of the Syrian regime against the civilians

21   by the Bashar al-Assad regime was absolutely appalling; is

22   that fair to say?

23   A    Yes.

24   Q    That was not the ISIS fighters, that was the Syrian

25   regime killing and slaughtering its own people?

LORENZO VIDINO – CROSS – MS. MACEDONIO

1    A     All sides committed atrocities.

2    Q     Those atrocities in Syria were published worldwide?

3    A     Yes.

4    Q     And there was a definite inaction on the part of the

5    international community, at least initially, to respond to the

6    atrocities that were happening in Syria, correct?

7    A     Yes.

8    Q     Those atrocities were against children, right?

9    A     Yes.

10   Q     Women?

11   A     Yes.

12   Q     Regular unarmed folks were being slaughtered on a daily

13   basis, correct?

14   A     Yes.

15   Q     Those people from Syria were fleeing Syria to get any

16   place else so they could avoid being killed by their own

17   Government?

18   A     Correct.

19   Q     There were pictures and videos capturing the civilian

20   massacres that were coming out of Syria on a daily basis,

21   correct?

22   A     Yes.

23   Q     Is it fair to say, based upon your research of this area,

24   at the time that those pictures and videos rocked the

25   consciousness of all types of people, correct?

                LORENZO VIDINO — CROSS — MS. MACEDONIO

1    A    Correct.

2              MR. HAGGANS:  Objection.  Form.

3              THE COURT:  Overruled.

4    A    Correct.

5    Q    It caused many people to try and do something to help

6    others in Syria, correct?

7              MR. HAGGANS:  Objection.  Relevance.

8              THE COURT:  Overruled.

9    A    Correct.

10   Q    We talked about the fact that there would be other

11   reasons to go to Turkey than to join ISIS?

12   A    Yes.

13   Q    And certainly based upon what we just talked about, there

14   were the other reasons to go to Syria as well, right?

15   A    Yes.

16   Q    Humanitarian reasons to go to Syria?

17   A    Yes.

18   Q    There were several foundations that were formed to help

19   the Syrian people, correct?

20   A    Yes.

21   Q    They provided food, right?

22   A    Yes.

23   Q    Clothing?

24   A    Yes.

25   Q    There were medical clinics formed?

LORENZO VIDINO – CROSS – MS. MACEDONIO

1    A    Yes.

2    Q    Housing?

3    A    Yes.

4    Q    Schools?

5    A    Yes.

6    Q    As we sit here today, what is the status of ISIS in Syria

7    and Iraq?

8    A    It has lost its territory.  It has been mostly military

9    defeated.  It is still present on the ground but no longer

10   controls territory.  It operates underground.

11   Q    When did that happen?

12   A    Progressively starting the end of 2015, I would say.

13   Q    You talked during your direct examination, Dr. Vidino,

14   about the Internet, how ISIS used the Internet.  Do you recall

15   that testimony?

16   A    Yes.

17   Q    Is it fair to say that during 2014 and 2015, that ISIS

18   used the Internet in a very powerful way?

19   A    Yes.

20   Q    And they were sending out what you termed as propaganda?

21   A    Yes.

22   Q    And a lot of that was videos, correct?

23   A    Correct.

24   Q    Photographs?

25   A    Yes.

231

LORENZO VIDINO - CROSS - MS. MACEDONIO

1   Q    And it was disseminated to the world, right?

2   A    Correct.

3   Q    And there were a number of reasons for that, correct?

4   A    Yes.

5   Q    And one of the reasons would be to recruit people to join

6   ISIS right?

7   A    Absolutely.

8   Q    So if you were contemplating joining ISIS, perhaps you

9   would download some of that information, correct?

10             MR. HAGGANS:  Objection.

11             THE COURT:  Overruled.  He's an expert.  He can

12  answer that question.

13  A    Yes.

14  Q    And then you would perhaps forward that to somebody else

15  who you thought would be sympathetic to ISIS as well?

16             MR. HAGGANS:  Objection.

17             THE COURT:  Overruled.

18  A    Yes.

19  Q    So the Internet made it easier for ISIS to reach out to a

20  larger base of people, right?

21  A    Yes.

22  Q    You talked a lot about ISIS taking credit for things over

23  the Internet, right?

24  A    Yes.

25  Q    And some of those things were absolutely horrific, fair

LORENZO VIDINO - CROSS - MS. MACEDONIO

1   to say?

2   A    Yes.

3   Q    These things were also published in newspapers all over

4   the world, right?

5   A    Yes.

6   Q    For example, you testified that in fact it was on the

7   cover of the New York Times, right?

8   A    Correct.

9   Q    With regard to those specific acts that you talked about

10  here, those horrible, horrible things that happened to people,

11  nothing in your research, your writing, your interviews, your

12  body of work, led you to believe that Mr. Kasimov was

13  personally involved in any of those attacks?

14          MR. HAGGANS:  Objection.

15          THE COURT:  Overruled.

16  A    No.

17  Q    Nothing in your research, your writing, led you to

18  believe that Mr. Kasimov was present for any of those attacks,

19  right?

20          MR. HAGGANS:  Objection.

21          THE COURT:  Overruled.

22  A    No.

23  Q    Dr. Vidino, the testimony that you gave here in this

24  courtroom was almost entirely historical, correct?

25  A    Fair characterization, yes.

LORENZO VIDINO – REDIRECT – MR. HAGGANS

1   Q    You testified on direct examination that you were going

2   to be paid by the United States Government a sum of upwards or

3   north of $10,000, correct?

4   A    Correct.

5   Q    How far north do you think that figure is?

6   A    Little.

7        MS. MACEDONIO:  No further questions, your Honor.

8        THE COURT:  Your witness.

9   REDIRECT EXAMINATION

10  BY MR. HAGGANS:

11  Q    Dr. Vidino, you were asked some questions about the term

12  inshalla, do you recall that testimony?

13  A    Yes.

14  Q    If I understood your testimony to Ms. Macedonio

15  correctly, is it fair to say that inshalla could be used in a

16  benign context?

17  A    Yes.

18  Q    And that inshalla could be used in a not benign context?

19  A    Yes.

20  Q    Fair to say the use of the term depends on the context?

21  A    Absolutely.

22  Q    You were asked some questions about your compensation in

23  relation to this case and in relation to other cases, do you

24  recall that testimony?

25  A    Yes.

LORENZO VIDINO – REDIRECT – MR. HAGGANS

1   Q    Does the information you've conveyed yesterday and today

2   about ISIS depend on whether you are paid?

3   A    No.

4   Q    Would the information change?

5   A    No.  It's identical to my writings, which are public,

6   anyone can see.

7   Q    In the course of your work with the Department of

8   Justice, you were asked some questions about that as well if I

9   recall, has the Department of Justice ever directed you to

10  reach certain conclusions in the course of your research?

11  A    No, absolutely not.

12  Q    Has the Department of Justice ever directed you to reach

13  certain conclusions during the course of any of your expert

14  testimonies?

15  A    No.

16  Q    You were also asked some questions about humanitarian

17  efforts and schooling during the conflict in Syria, correct?

18  A    Yes.

19  Q    And if I recall your testimony correctly, it was that

20  those types of activities were not necessarily connected to

21  ISIS; is that accurate?

22  A    That's correct, yes.

23  Q    Did individuals, to your knowledge, who made donations to

24  those sorts exercises, humanitarian exercises in Syria, did

25  they have a pattern or practice during this period of

LORENZO VIDINO - REDIRECT - MR. HAGGANS

1    generally hiding or obscuring the fact of their support?

2    A    No.  If they were benign, no.

3    Q    Fair to say that people generally acknowledge or

4    sometimes acknowledge when they are making donations for

5    charitable causes?

6            MS. MACEDONIO:  Objection.  Outside the scope.

7            THE COURT:  Overruled.

8    A    Yes.

9    Q    You were asked questions with specific reference to the

10   defendant in this case, correct?

11   A    Yes.

12   Q    Did you testify about the defendant during the course of

13   your direct examination when I was asking you questions?

14   A    No.

15   Q    Were you asked to reach any conclusions or state any

16   opinions about the defendant during the course of your direct

17   examination?

18   A    No.

19           MR. HAGGANS:  No further questions.

20           THE COURT:  Anything else?

21           MS. MACEDONIO:  No, your Honor.

22           THE COURT:  You may step down, Doctor.

23           (Whereupon, the witness was excused.)

24           THE COURT:  I see it's 12:25, do we want to start

25   with another witness and go until 1:00 o'clock, then take an

STIPULATIONS

1    hour 15 minute lunch break?  Does that work for the jury as

2    opposed breaking now?  Okay.

3            Do we have another witness or take a break?

4            MR. PRAVDA:  Your Honor, we would like to offer in

5    some stipulations at this time.

6            THE COURT:  Is that acceptable to defense counsel to

7    offer the stipulations into evidence and have them read to the

8    jury at this time, stipulations that you've agreed to?  Is

9    that acceptable to do that now?

10           MS. MACEDONIO:  Yes, your Honor.

11           THE COURT:  Ladies and gentlemen of the jury, as I

12   said before, we've had one of these already, the parties have

13   agreed to stipulate to certain facts and they will be read to

14   you out loud.  You'll have the opportunity to have the written

15   stipulations into the jury room with you when you begin

16   deliberations, if you wish to take them in.

17           With that, by way of prelude, we'll have the

18   stipulations read to you.  They will be identified by number

19   and/or letter.  And then, as I said, you'll be able to take

20   them into the jury room.

21           This is something that moves the pace of the trial

22   along; one of the reasons we have these little delays in our

23   ten minute breaks, that end up being 25 minute breaks.

24           Stipulation, why don't you describe it by number and

25   we'll have it admitted.  What is the first stipulation, sir?

STIPULATIONS

1          MR. PRAVDA:  Your Honor, a certification first.

2          THE COURT:  Certification, has it been marked?

3          MR. PRAVDA:  It has not been.

4          THE COURT:  It will be because the jury will need to

5   know what the certification number is.  Let's mark it

6   Certification 1 or Government whatever the proper number is,

7   mark it with a sticker so everybody knows.

8          MR. PRAVDA:  We'll mark it Government's Exhibit 200.

9          THE COURT:  Any objection to Government's Exhibit

10  200 being admitted into evidence?

11         MS. MACEDONIO:  No, your Honor.

12         THE COURT:  Admitted in evidence.  You may publish

13  it to the jury.

14         (Government Exhibit 200, was received in evidence.)

15         MR. PRAVDA:  Your Honor, pursuant to the

16  certification of Jamal King, I don't think the jury needs to

17  the read the whole thing.

18         But the Government would like to introduce into

19  evidence Government's Exhibits 101 through 124.

20         THE COURT:  Stop right there.  Any objection to the

21  introduction of Government's Exhibits 101 through 124?

22         MS. MACEDONIO:  No, your Honor.

23         THE COURT:  I want to stay relevant to the trial

24  here.  Any objection to 101 through 124 coming in?

25         MS. MACEDONIO:  No.

STIPULATIONS

1          THE COURT:  Admitted into evidence.

2          (Government Exhibit 101-124, were received in

3   evidence.)

4          MR. PRAVDA:  Government's Exhibits 130 to 132

5   inclusive.

6          THE COURT:  130 to 132, any objections to those

7   being admitted?

8          MS. MACEDONIO:  No.

9          THE COURT:  Admitted.

10          (Government Exhibit 130-132, were received in

11   evidence.)

12          MR. PRAVDA:  151 through 164 inclusive.

13          THE COURT:  151 through 164 inclusive, any

14   objection?

15          MS. MACEDONIO:  No.

16          THE COURT:  Admitted.

17          (Government Exhibit 151-164, were received in

18   evidence.)

19          MR. PRAVDA:  185 through 187.

20          THE COURT:  185 through 187, any objection?

21          MS. MACEDONIO:  No.

22          THE COURT:  Admitted.

23          (Government Exhibit 185-187, were received in

24   evidence.)

25          MR. PRAVDA:  Next, your Honor, we'd like to read a

STIPULATIONS

1    stipulation that is already marked Government's Exhibit 202.

2            THE COURT:  202, any objection to 2O2 admitted into

3    evidence?

4            MS. MACEDONIO:  No, your Honor.

5            THE COURT:  Admitted.  You may publish it.

6            (Government Exhibit 202, was received in evidence.)

7            MR. PRAVDA:  If I may read it for the jury?

8            THE COURT:  You may.

9            MR. PRAVDA:  "It is hereby stipulated and agreed by

10   and between the undersigned attorneys for the Government and

11   for the defendant Dilkhayot Kasimov that:  Government's

12   Exhibit 20 is a true and accurate copy of a recording of

13   interactions between and among Dilkhayot Kasimov, Akhror

14   Saidakhmetov and others, between 7:59:41 p.m. Eastern Time on

15   February 24, 2015, and 12:38:17 a.m. Eastern Time on

16   February 25, 2015."

17           On page two, your Honor.  "Government's Exhibit 20

18   and this stipulation may be admitted as evidence at trial.

19   Dated September 16, 2019 and signed by counsel for all of the

20   parties."

21           At this time the Government moves into evidence

22   Government's Exhibit 20 and Government's Exhibit 202.

23           THE COURT:  Any objection to 20?

24           MS. MACEDONIO:  No, your Honor.

25           THE COURT:  Any objection to 202?

240

STIPULATIONS

1        MS. MACEDONIO:  No.

2        THE COURT:  Admitted.

3        (Government Exhibit 20, were received in evidence.)

4        MR. PRAVDA:  Mr. Haggans is going to do the next

5    stipulation.

6        THE COURT:  I can't wait.

7        MR. HAGGANS:  Your Honor, at this time the

8    Government would like to read a stipulation into the record.

9    It has been marked for identification as Government's Exhibit

10   204.

11       THE COURT:  Any objection to 204 being admitted?

12       MS. MACEDONIO:  No, your Honor.

13       THE COURT:  Admitted.  You may publish.

14       (Government Exhibit 204, was received in evidence.)

15       MR. HAGGANS:  Exhibit 204 reads as follows.  "It is

16   hereby stipulated and agreed by and between the undersigned

17   attorneys for the Government and for the defendant, Dilkhayot

18   Kasimov, that Government's Exhibit 44 is a Samsung Galaxy S4

19   mobile telephone seized from Abror Habibov on February 25,

20   2015.

21       "Government's Exhibit 45 contains a true and

22   accurate copy of a forensic extraction of the contents of

23   Government's Exhibit 44.

24       "Government's Exhibit 46 contains a true and

25   accurate copy of selected contact names and telephone numbers

STIPULATIONS

1    drawn from Government's Exhibit 45.

2             "Government's Exhibit 44, 45, 46 and this

3    stipulation may be admitted as evidence at trial."

4             It is dated, I believe that was Monday, it is signed

5    by counsel for both parties.

6             THE COURT:  September 16, 2019 signed by both

7    parties.  In evidence.

8             MR. HAGGANS:  The Government would move Exhibit 204

9    44, 45, 46 into evidence.

10            THE COURT:  Any objection?

11            MS. MACEDONIO:  No, your Honor.

12            THE COURT:  Admitted without objection.  You can

13   publish those.

14            (Government Exhibit 44, 45, 46, were received in

15   evidence.)

16            MR. HAGGANS:  The Government would like to read a

17   stipulation into the record marked for identification as

18   Government's Exhibit 205.

19            THE COURT:  Any objection?

20            MS. MACEDONIO:  No.

21            THE COURT:  205 is admitted.  You may publish.

22            (Government Exhibit 205, was received in evidence.)

23            MR. HAGGANS:  I will now read it into the record.

24   "It is hereby stipulated and agreed by and between the

25   undersigned attorneys for the Government and for the

STIPULATIONS

1  defendant, Dilkhayot Kasimov, that if called as a witness at

2  trial an interpreter with expertise in translating Uzbek to

3  English would testify as follows:  The Government exhibits

4  listed in Column A of attachment one to this stipulation

5  contain accurate Uzbek to English translations of the Uzbek

6  audio or written communication identified in the corresponding

7  row of Column B of attachment one.

8          "The portions of Government's Exhibit 50 containing

9  Uzbek audio are accurately translated in Government's Exhibit

10  50T.

11          "The portions of Government's Exhibit 50 containing

12  English audio are accurately transcribed in Government's

13  Exhibit 50T.

14          "Each of the exhibits listed in Column A of

15  attachment one may be admitted as evidence as trial.

16          "This stipulation, including attachment one, may be

17  admitted as evidence at trial."

18          The stipulation is dated today, September 18, 2019,

19  signed by counsel for both parties.

20          Now referring to the attachment.  "The attachment

21  identifies Government's Exhibit 20T, Government's Exhibits

22  101T through 124T inclusive, Government's Exhibit 130T, 131T,

23  132T, Government's Exhibits 150 through Government's Exhibit

24  166 inclusive, and Government's Exhibits 185, 186, 187.

25          The Government would now move admission into

PROCEEDINGS

1    evidence of Government's Exhibit 205.

2            THE COURT:  Admitted any objection?

3            MS. MACEDONIO:  No.

4            THE COURT:  Admitted.

5            MR. HAGGANS:  Government's Exhibit 50T.

6            THE COURT:  Any objection?

7            MS. MACEDONIO:  No.

8            THE COURT:  Admitted.

9            (Government Exhibit 50T, was received in evidence.)

10           MR. HAGGANS:  And the Government's Exhibits

11   referenced in attachment one to stipulation Government's

12   Exhibit 205 that I had just recited.

13           THE COURT:  Any objection?

14           MS. MACEDONIO:  No, your Honor.

15           THE COURT:  All admitted.

16           (Government Exhibit Attachment 1, was received in

17   evidence.)

18           MR. PRAVDA:  Your Honor, at this time the Government

19   recommends that we let the jury go for lunch.  Is that

20   acceptable to the Court?

21           THE COURT:  Ladies and gentlemen of the jury, you

22   have no idea how much time we just saved for you by having the

23   stipulations.

24           Yes, we'll have our lunch break now.  It's just past

25   12:30.  Let's resume quarter to two.  We'll have lunch

PROCEEDINGS

1    delivered to you, as well as the other day, and also non-dairy

2    as requested.  I take care of my jurors in all respects.  Not

3    to worry.  Have a nice lunch.

4            Don't talk about the case yet.  We'll see you

5    quarter to two.  Thank you, ladies and gentlemen.

6            (Jury exits the courtroom.)

7            THE COURT:  You may be seated.  The jury has left

8    the courtroom.

9            Do we have any additional procedural issues to

10   discuss during the break before we bring in the next witness?

11           MS. SHARKEY:  Judge, there is.  The Court had asked

12   yesterday in response to a motion filed by the Government

13   about an agreement between the parties concerning confronting

14   a witness with prior inconsistent statements.

15           THE COURT:  Yes.

16           MS. SHARKEY:  We're a little at odds.  We agree that

17   I am not going to introduce into evidence an agent's written

18   document.

19           THE COURT:  302.

20           MS. SHARKEY:  Or scratch notes through the witness.

21           THE COURT:  Right.

22           MS. SHARKEY:  That doesn't mean that one can't

23   refresh or impeach with those documents.

24           THE COURT:  Correct.

25           MS. SHARKEY:  Does the Court request a breakdown on

PROCEEDINGS

1    the actual cross-examination?

2              THE COURT:  No.

3              MS. SHARKEY:  Is that satisfactory to the Court?

4              THE COURT:  What I'm trying to make clear is that I

5    am old school.  I'm prepared, as you may notice, to rule on

6    objections as they are made.

7              My friend, the Judge on the Second Circuit, Danny

8    Chin, ruled if you get it wrong they'll let you know on the

9    circuit.

10             That being said, to the extent that you can agree on

11   the use of 3O2, scratch notes, or other items in advance, it

12   makes it easier for counsel to have agreed to the free fire

13   zone where you won't be objecting.  If you can't agree, I'm

14   perfectly prepared to rule.

15             Since the question was brought to me, by way of a

16   heads-up, my responsive heads-up was, you're the lawyers, if

17   you want to agree to a free fire zone great and you won't be

18   objecting.  On the other hand, if you agree to it and someone

19   thinks that they crossed the DMC, then I'll rule on whether

20   it's on one side or the other.  Up to you.

21             MS. SHARKEY:  We're comfortable with the Court

22   ruling from the bench.

23             MR. KESSLER:  To be clear, I don't think there is a

24   disagreement about the procedure.

25             THE COURT:  If there is, you will find out.

PROCEEDINGS

1              To use the baseball analogy, and give the jurors

2     more time to get into their space, there was a great baseball

3     player many years ago, Honus Wagner.  When Honus Wagner was up

4     at the plate, there was a young rookie, a fire ball, threw a

5     baseball 100 miles per hour.

6              He threw a pitch at the end of the strike zone.  The

7     umpire called, ball one.  The rookie shook his head.  Umpire

8     called, ball two.  He shook his head.  Threw another pitch,

9     umpire said ball three.

10             The rookie said, "Ump, I know I'm a rookie but them

11    pitches, them strikes."  The umpire said, "Young man, when you

12    throw a strike, Mr. Wagner will let you know."

13             Next pitch, 100 miles an hour, right over the plate,

14    hit 400 feet for a home run.  The umpire said, "Young man, now

15    that was a strike."

16             Anything else before our lunch break?

17             MR. KESSLER:  No, thank you.

18             MS. MACEDONIO:  No, thank you.

19             (Lunch recess.)

20             (Continued on next page.)

21

22

23

24

25

PROCEEDINGS

1              A F T E R N O O N   S E S S I O N

2                      (2:00 p.m.)

3          (In open court; jury not present.)

4          THE COURTROOM DEPUTY:  All rise.  Judge Kuntz

5    presiding.

6          THE COURT:  I believe we have the appearances.  And

7    we're going to have the next witness brought forward.

8          Are there any procedural issues we need to address

9    before the witness comes forward?

10         MS. MACEDONIO:  We have a new interpreter, Your

11   Honor.

12         THE COURT:  New interpreter, terrific.

13         Would you state and spell your name, Ma'am.

14         THE INTERPRETER:  My name is Nodira Isamiddimova.

15         THE COURT:  You know what I'm going to ask you to

16   do, sit down and speak into the microphone -- everyone can be

17   seated, thank you -- speak into the microphone and state your

18   name.

19         THE INTERPRETER:  My name is Nodira N-O-D-I-R-A,

20   I-S-A-M-I-D-D-I-M-O-V-A, Uzbek interpreter.

21         THE COURT:  Would you please stand up, ma'am, we're

22   going to give you the oath.

23         (Interpreter sworn.)

24         THE INTERPRETER:  I do.

25         THE COURT:  Thank you.  Please be seated.

PROCEEDINGS

1          Are we ready to call the next witness?

2          MR. KESSLER:  Yes, Your Honor.

3          THE COURT:  Who is the next witness.

4          MR. KESSLER:  The government calls Abror Habibov.

5          THE COURT:  All right.  Will the witness be

6    produced, please.  Everyone please be seated.  As in everyone,

7    please be seated.

8          (Witness takes the stand.)

9          THE COURT:  Please be seated, sir.  All right.

10   We're now going to bring in the jury, then we'll have the

11   witness sworn in the presence of the jury and then we will

12   begin the examination.

13         Is that acceptable to all sides?

14         MR. KESSLER:  Yes.

15         MS. MACEDONIO:  Yes.

16         THE COURT:  All right.

17         Mr. Jackson, please have the CSO bring in the jury.

18         THE COURTROOM DEPUTY:  Yes, Judge.

19         THE COURT:  And that water is for you, sir.  I just

20   poured it fresh.

21         THE WITNESS:  Thank you, Your Honor.

22         THE COURT:  You're welcome.

23         While we're waiting, are there any documents that

24   you need to have here for this witness -- that you need to

25   have here for this witness?

HABIBOV - DIRECT - KESSLER

1           MR. KESSLER:  No, Your Honor, I'm going to do

2   everything electronically.

3           THE COURT:  Okay.

4           (Jury enters courtroom.)

5           THE COURT:  Thank you, ladies and gentlemen of the

6   jury.  Hope you had a nice lunch.  Please be seated.

7           We have a new witness.  I'm going to ask my

8   courtroom deputy to ask the witness to stand up and raise your

9   right hand, sir.  Stand and raise your right hand.

10           THE COURTROOM DEPUTY:  Do you solemnly affirm that

11   the answers you're about to give to the Court to be the truth,

12   the whole truth and nothing but the truth, under the penalty

13   of perjury?

14           THE WITNESS:  I do.

15   **ABROR HABIBOV,** called as a witness, having been first duly

16   sworn/affirmed, was examined and testified as follows:

17           THE COURT:  Please be seated.  I'm going to ask you

18   to speak clearly and directly into this microphone.

19           THE WITNESS:  All right.

20           THE COURT:  It swivels to you, okay.

21           THE WITNESS:  Thank you, Your Honor.

22           THE COURT:  State your name, spell it and then

23   counsel will inquire.

24           THE WITNESS:  My name is Abror Habibov.  It's

25   A-B-R-O-R.  And last name is Habibov.  H-A-B-I-B-O-V.

HABIBOV - DIRECT - KESSLER

```
 1              THE COURT:  Thank you, you may inquire, counsel.

 2              MR. KESSLER:  Thank you.

 3    DIRECT EXAMINATION

 4    BY MR. KESSLER:

 5    Q    Mr. Habibov, do you speak and understand English?

 6    A    Yes, I do.

 7    Q    If there are any questions you don't understand, please

 8    ask me to clarify them.

 9    A    Yes.

10    Q    Are you testifying here today pursuant to a cooperation

11    agreement with the government?

12    A    Yes, I am.

13              THE COURT:  Would you turn your microphone on

14    counsel or at least pull it towards you.

15              MR. KESSLER:  Is that better?

16              THE COURT:  You hear the difference?

17              MR. KESSLER:  Yes.

18              THE COURT:  So do we.  Go ahead.

19    Q    So you're testifying here today pursuant to a cooperation

20    agreement; is that right?

21    A    Yes, I am.

22    Q    Is that because you've pleaded guilty to -- sorry

23    withdrawn.  Have you pleaded guilty to any crimes?

24    A    Yes, I have.

25    Q    What crimes have you pleaded guilty to?
```

HABIBOV - DIRECT - KESSLER

1    A    I have pled guilty to conspiracy of providing material

2    support to ISIS and also conspiracy using firearm and related

3    to that crime.

4    Q    So two different crimes?

5    A    Two different crimes.

6    Q    Can you describe generally what you did that made you

7    guilty of conspiracy to provide material support to ISIS and

8    conspiracy to use a firearm in connection with that first

9    crime?

10   A    I have raised some funds with other individuals in order

11   to support individual Saidakhmatov, Akhror Saidakhmatov's

12   travel to Turkey and from Turkey to Syria in order to join

13   ISIS.

14   Q    You also mentioned a conspiracy related to firearms, what

15   did you do to be guilty of that crime?

16   A    I also agreed with that individual to raise fund further

17   on to purchase for him gun.

18   Q    To purchase a firearm?

19   A    To purchase a firearm.

20          MR. KESSLER:  Your Honor, if I could ask Mr. Jackson

21   to publish Government Exhibit 2 in evidence.

22          THE COURT:  Any objection?

23          MS. MACEDONIO:  No.

24          THE COURT:  It's in evidence.  You may publish.

25          Again, counsel, please keep your voice up and move

HABIBOV - DIRECT - KESSLER

1    that microphone so we can hear you.  All right.  It will

2    swivel.  Go ahead.

3    BY MR. KESSLER:

4    Q    Do you see Government Exhibit 2?

5    A    Yes.

6    Q    Who is that?

7    A    This is Akhror Saidakhmetov.

8    Q    So is that the individual you were --

9    A    It is individual who wanted to go to Syria.

10            THE COURT:  Sir, keep your voice up please and speak

11   into that microphone.  Okay.

12            THE WITNESS:  All right.

13   Q    When did you commit the crimes that you pleaded guilty

14   to?

15   A    Around 2014 and 2015, early 2015.

16   Q    With respect to the first crime, the conspiracy to

17   provide material support to ISIS, do you see anyone in the

18   courtroom today that you committed that crime with?

19   A    Yes, I do.

20   Q    Can you describe that person by an item of clothing he or

21   she is wearing?

22   A    The person is -- has a white shirt and has squares on it.

23   Q    A white shirt with squares on it?

24   A    Yes.

25            MR. KESSLER:  Your Honor, can the record reflect

253

HABIBOV – DIRECT – KESSLER

1    that the witness has identified the defendant?

2              THE COURT:  The reflect will so reflect.

3    Q    What's the name of person with whom you conspired?

4    A    Kasimov, first name is Dilkhayot.

5    Q    Mr. Habibov, how old are you?

6    A    I'm 34 years old.

7    Q    Where were you born?

8    A    I was born in Uzbekistan.

9    Q    Where did you grow up?

10   A    Same country, in Uzbekistan.

11   Q    Did you go to school in Uzbekistan?

12   A    Yes, I went to Uzbekistan State World Languages

13   University in Tashkent in Uzbekistan.

14   Q    When did you come to the United States from Uzbekistan?

15   A    2006.

16   Q    Now when you came to the United States, did you enter

17   legally?

18   A    I have entered United States with student visa.  It's

19   called work and travel under J1 visa.

20   Q    Did you maintain legal status the whole time you were in

21   the United States?

22   A    No, later on I become illegal.

23   Q    And today you're here illegally; is that right?

24   A    In the United States today I'm illegal.

25   Q    When you came to the United States, where did you live?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

HABIBOV - DIRECT - KESSLER

1   A    I lived in -- initially I lived in Florida, then I moved

2   to New York, then moved to Delaware, and also part time I

3   lived in Philadelphia, Pennsylvania.

4   Q    As of 2014, were you living in Brooklyn?

5   A    I was living in Brooklyn in 2014, yes.

6   Q    Why did you live in that number of different places in

7   the United States?

8   A    Because my business was in different states, then I had

9   to move from state to state in order to operate my business.

10  Q    And what was the business that you were operating?

11  A    I used to print kiosk or small shops in the malls in the

12  United States and -- and sell and buy used electronics and

13  repair them.  And also I used to sell sporting goods during

14  the Christmastime.

15  Q    Are you currently married?

16  A    I am currently divorced.  I was married.

17  Q    What religion are you?

18  A    I am Muslim, religion is Islam.

19  Q    What languages do you speak?

20  A    I speak Uzbek and English, a little bit of Russian and

21  Tajik as well.

22  Q    Are you currently incarcerated?

23  A    I am currently incarcerated, yes.

24  Q    How long have you been incarcerated?

25  A    Since 2015, since my arrest, yeah.

HABIBOV – DIRECT – KESSLER

1    Q    Was that in February 2015?

2    A    February 2015.

3    Q    And was that an arrest in relationship to the crimes to

4    which you later pleaded guilty?

5    A    Yes.

6    Q    You mentioned that you pleaded guilty, did you plead

7    guilty pursuant to the cooperation agreement you mentioned

8    before?

9    A    Yes, I did.

10   Q    Was that in approximately August 2017?

11   A    I recall it was approximately August 2017, yeah.

12   Q    Before you pleaded guilty to that cooperation agreement,

13   did you meet with members of the government multiple times?

14   A    I have.

15   Q    When you first met with the government, were there

16   certain topics that you indicated you didn't want to discuss?

17   A    Yes.

18   Q    Did you later discuss those topics as well?

19   A    Yes, I did.

20   Q    And that was all before you pleaded guilty pursuant to

21   your cooperation agreement?

22   A    Yes.

23   Q    As a result of pleading guilty to both of those crimes,

24   what is the total maximum sentence that you face in prison?

25   A    I'm facing, in my knowledge, up to 430 months, which is

HABIBOV – DIRECT – KESSLER

1    up to 35 years.

2    Q    So let's talk about that cooperation agreement.  What is

3    your understanding of what you agreed to do in your

4    cooperation agreement?

5    A    In my understanding, according to cooperation agreement I

6    signed, I have to be truthful and honest and during the

7    proffers and testify and during the Court and if there's a

8    need for further on cooperation with the government after

9    incarceration ends.

10   Q    Did you agree to testify at any trial the government

11   asked you to testify in?

12   A    Yes.  I have.

13   Q    Did the government ask you to testify today?

14   A    Yes, they did.

15   Q    Before you pleaded guilty pursuant to the cooperation

16   agreement, did you have to tell the government about other

17   crimes or bad acts that you committed?

18   A    Yes, I have.

19   Q    And did you do that?

20   A    I did, I did tell them.

21   Q    We'll come back to that.

22        Now, what is your understanding of what the

23   government agreed to do in the cooperation agreement?

24   A    If they believed -- during the cooperation if they

25   believed that I was honest and truthful all the time, then

HABIBOV - DIRECT - KESSLER

1  they would on my behalf ask the Court and Judge, file a motion

2  to ask for lower sentences.

3  Q     So the government agreed that if you provided certain

4  kinds of assistance it would file a motion?

5  A     Yes.

6  Q     Is that called a 5K motion?

7  A     Yes, I believe so.

8  Q     What is your understanding of what the 5K motion might

9  say if the government filed one?

10 A     It would allow -- if Judge considers it, if it would

11 allow to sentence me outside the guideline.

12 Q     So you might get a lower sentence because of the 5K

13 letter?

14 A     Yes.

15 Q     Now, who will decide what your sentence actually is?

16 A     Judge Kuntz.  This Judge, Honorable Judge Kuntz, yeah.

17 Q     Does the Court have to give you a lower sentence because

18 the government submits a 5K letter?

19 A     No, they don't have to.

20 Q     Do you believe the Court will make its own evaluation of

21 whether you're being truthful today?

22 A     Can you say it again, please.

23 Q     Do you believe --

24       THE COURT:  Do you believe this Court will make its

25 own evaluation about whether you're telling the truth?

HABIBOV – DIRECT – KESSLER

1          THE WITNESS:  The question I didn't understand quite

2   well.  Can I have a translation for it?

3          MR. KESSLER:  Let me just try it again.

4   Q    Do you think the Court is just going to listen to

5   whatever the government says or will the Court make its own

6   judgment?

7   A    The Court makes their own judgment, yeah.

8          THE COURT:  Believe that.  Go ahead.

9          THE WITNESS:  Yeah.

10          THE COURT:  Because it's true.

11          THE WITNESS:  Yes.

12   BY MR. KESSLER:

13   Q    In the cooperation agreement did the government agree to

14   request any particular sentence for you?

15   A    No, they don't have any promises.

16   Q    Sitting here today, do you have any idea what your

17   sentence will be?

18   A    Up to 35 years.

19   Q    But you don't know where?

20   A    I don't know where it falls.

21   Q    Does your cooperation agreement say anything about the

22   immigration consequences of pleading guilty?

23   A    My cooperation agreement states that my deportation will

24   be presumptively mandatory.

25   Q    So do you expect to be deported after serving whatever

HABIBOV - DIRECT - KESSLER

1  your ultimate sentence is?

2  A    I do expect that.

3  Q    If you violate the cooperation agreement, do you get to

4  take back your guilty plea?

5  A    I do not.

6  Q    So if you violate the cooperation agreement, you will

7  still be guilty?

8  A    Yes, I do.

9  Q    If you violate the cooperation agreement, is the

10 government still obligated to consider submitting a 5K letter

11 for you?

12 A    No, they don't have any obligation.

13 Q    Does lying to the government violate your cooperation

14 agreement?

15 A    Yes.

16 Q    Does lying under oath here today violate your cooperation

17 agreement?

18 A    Yes, it does.

19 Q    Does your sentence depend on whether the defendant gets

20 convicted or not?

21 A    No, it doesn't.

22 Q    Since your guilty plea in August 2017, have you continued

23 meeting with the government?

24 A    Yes, I have.

25 Q    Have you met with the government a number of times?

HABIBOV – DIRECT – KESSLER

1    A    A number of times, yeah.

2    Q    Approximately how many times?

3    A    About 10 or more.

4    Q    Ten or more times?

5    A    Yes.

6    Q    Since August of 2017?

7    A    Yes.

8    Q    In those meetings, were there many different attorneys

9    over time?

10   A    From United States Government?

11   Q    Yes.

12   A    Yes.

13   Q    Were there many different agents from different law

14   enforcement agencies?

15   A    Yes.

16   Q    Did they all ask you questions?

17   A    Yes, they did.

18   Q    Generally speaking, were those questions about

19   individuals who might have been providing support to ISIS?

20   A    Yes.

21   Q    Did you answer the questions?

22   A    I have answered the question.

23   Q    Were you also shown photographs of individuals who might

24   have been providing material support to ISIS?

25   A    Yes.

HABIBOV - DIRECT - KESSLER

1   Q    Do you have a sense of how many photographs you were

2   shown?

3   A    A few, I don't remember how many it was, but few.

4   Q    Did you answer questions about the individuals in the

5   photographs as well?

6   A    Yes.

7   Q    You mentioned that before you pleaded guilty you told the

8   government about other crimes and bad acts you'd committed.

9   Do you remember that?

10  A    Yes, I do remember.

11  Q    So what were some of the other crimes and bad acts you

12  told the government about?

13  A    I have lied in my marriage, in my marriage and I filed to

14  immigration some false documents.  Then I have also involved

15  in different crime which is involved of raising funds to Syria

16  for fighters.

17  Q    Let me stop you there.  Let's take the second one first.

18        Did you tell the government about actions you took

19  to support other individuals who were fighting in Syria in

20  addition to Mr. Saidakhmetov?

21  A    Yes, I have.

22  Q    So with respect to marriage fraud you called it, what did

23  you do that constituted marriage fraud?

24  A    I registered my marriage based on an agreement I married

25  to United States citizen paying money.

HABIBOV - DIRECT - KESSLER

1    Q    So you paid a United States citizen --

2    A    Citizen to marry me --

3    Q    -- to marry?

4    A    -- in order to get a green card, yes.

5    Q    When was that?

6    A    That was 2008, 2009.

7    Q    Then you said you lied to immigration; is that right?

8    A    Yes, I have.

9    Q    How did you lie to immigration?

10   A    There was a marriage interview, it was taking place in an

11   office by an immigration officer so I lied to the officer so

12   my marriage was based on love and compassion.

13   Q    Did you also submit documents with false statements in

14   them to the government in connection with your immigration

15   status?

16   A    Yes.  I have falsified utility bills.

17   Q    Did you submit any other documents that were false?

18   A    I have also later on when I needed to get my green card I

19   falsified -- I sent a letter to immigration that I was abused

20   husband and there was a chance from immigration they would

21   consider -- if you were abused husband or wife they would

22   consider it to give you a green card as well.  That I

23   falsified that statement as well.

24   Q    You were not actually abused?

25   A    No, I wasn't.

HABIBOV – DIRECT – KESSLER

1  Q    In fact, you submitted a long letter that was largely

2  made up, correct?

3  A    Yes.

4  Q    Did you submit any other documents that were not true?

5  A    I have also wrote some letters on behalf of others in

6  order to be a witness for that abusive relationship.

7  Q    Those letters were also not true?

8  A    Yes, they were not.

9  Q    Did you tell the government about anything you had done

10 related to being a student at a university?

11 A    Yes.  I have submitted -- I send my application to

12 university, ESL language school which is located in California

13 and in order not to go to school and get more time in order to

14 work.

15 Q    Basically pretended to be a student at university?

16 A    Pretended to be a student and be free.

17 Q    Why were you telling all these lies to immigration over

18 time about your marriage and about being abused and about

19 being a student?

20 A    I didn't understand the question quite well.

21       THE COURT:  Why did you lie?

22       THE WITNESS:  I wanted to stay in America and to get

23 a green card.

24 Q    So you mentioned at the beginning of your testimony that

25 you pleaded guilty to providing material support to ISIS --

HABIBOV - DIRECT - KESSLER

1    A    Yes.

2    Q    -- conspiring to do that.

3              And the person you were trying to help travel to

4    Syria to fight for ISIS was Akhror Saidakhmetov?

5    A    Yes.

6    Q    When did you meet Mr. Saidakhmetov?

7    A    It was 2014, around September.

8    Q    Where did you meet him?

9    A    I met him in Delaware state, which is in -- there was a

10   Christiana Mall, it's located in Delaware.  I was waiting to

11   purchase electronics, which is iPhone was released that day,

12   and I met him on the waiting on the line.

13   Q    You were on the same line to buy iPhones?

14   A    Yes.

15   Q    Why were you buying iPhones?

16   A    In order to resell it.

17   Q    After you met -- when was that?

18   A    That was 2014 September.

19   Q    After you met him at the mall in the iPhone line, did you

20   continue to interact with Saidakhmetov?

21   A    Yes, I have.

22   Q    How did you do that?

23   A    I hired him to my business as a salesperson.

24   Q    You hired him to work at your kiosks?

25   A    Yes.

HABIBOV - DIRECT - KESSLER

1  Q    Did you have any partners in that business of running

2  kiosks?

3  A    Yes, I have.

4  Q    Who were your partners?

5  A    By name it's Akmal Zakirov and there was another partner

6  I had, his name was Jamshid Bekhmatov.

7          MR. KESSLER:  Your Honor, if I could ask Mr. Jackson

8  the witness to show the laptop for the witness only, I'm going

9  to show Government Exhibit 5.

10         THE COURT:  Any objection to Government 5 coming

11 into evidence, counsel?

12         MS. SHARKEY:  No.

13         THE COURT:  Any objection?

14         MS. SHARKEY:  No.

15         THE COURT:  It's admitted.  You may publish it to

16 the jury and show it to the witness.

17         (Government Exhibit 5, was received in evidence.)

18         (Exhibit published.)

19 Q    Who is this in Government Exhibit 5?

20 A    Zakirov.

21 Q    That's your business partner?

22 A    That's my business partner.

23 Q    Did Saidakhmetov agree to work for you at your mall

24 kiosk?

25 A    Yes, he did.

HABIBOV - DIRECT - KESSLER

1  Q    Did he continue to work for you through February of 2015?

2  A    Yes, he did.

3  Q    How frequently did you interact with him once he started

4  working for you?

5  A    A few times a week.

6  Q    Did he ever tell you why he was working for you?

7  A    There was a time and he told me he needs to save some

8  money in order to spend for his travel expenses to go to

9  Syria.

10 Q    So turning to the conversation you had with him about

11 wanting to go to Syria, what did he tell you about why he

12 wanted to go to Syria?

13 A    He was very -- he wanted to -- after Islamic State is

14 established and he had a knowledge and he told me that he felt

15 like to go to Syria and to join Islamic State.

16 Q    You mentioned Islamic State, what is that?

17 A    That was ISIS established the Islamic State is that a

18 certain territory and certain people and they operate their

19 state according to sharia law.

20 Q    Is the Islamic State sometimes also called the caliphate?

21 A    Yes.

22 Q    Now at the time Mr. Saidakhmetov told you he wanted to go

23 to Syria, did he tell you what he wanted to do in Syria?

24 A    Yes.

25 Q    What did he want to do there?

HABIBOV - DIRECT - KESSLER

1   A    He wanted to go and join the fight.

2   Q    The fight?

3   A    Yeah.

4   Q    At the time he was talking about this, were you familiar

5   with ISIS and the Islamic State?

6   A    Yes.

7   Q    Did you know that ISIS was engaging in acts of violence

8   in Syria and elsewhere at the time?

9   A    Yes.

10  Q    Did you support ISIS at the time?

11  A    At that time I supported ISIS.

12  Q    Did you know at the time that the United States

13  Government had designated ISIS as a terrorist organization?

14  A    Yes, I have knowledge of.

15  Q    When Saidakhmetov first told you he wanted to go to Syria

16  to fight for ISIS, what was your reaction?

17  A    Initially I didn't have any reaction.  Later on after he

18  revealed about his family status I tried to discourage him to

19  go to Syria.

20  Q    Why did you try to discourage him?

21  A    Because he was an only child and also he had a single

22  mother and then I believed that his responsibility should be

23  taking care of his mother, that's the only parent he had.

24  Q    At the time in -- sorry, withdrawn.  When were these

25  initial conversations about Saidakhmetov wanting to go to

HABIBOV - DIRECT - KESSLER

1    Syria to fight for ISIS taking place, what time?

2    A    It was late 2014.

3    Q    So in late 2014, did you do anything to help Saidakhmetov

4    travel to Syria to fight for ISIS?

5    A    At that time I didn't do anything.

6    Q    Did you try to raise any money for him at that point?

7    A    At that point, no.

8    Q    Did Mr. Saidakhmetov continue to express his interest in

9    going to Syria to fight for ISIS?

10   A    Yes, he did.

11   Q    Did he ever discuss a caliphate with you?

12   A    Yes, in several times.

13   Q    What did he say about a caliphate?

14   A    He said that caliphate is -- that's -- should be

15   supported in no matter what for any cause.

16   Q    At the time were you aware of any group other than ISIS

17   that had declared a caliphate?

18   A    No.

19   Q    Did Saidakhmetov ever discuss wanting a weapon in Syria?

20   A    Yes, he told me in one of our conversation and they were

21   shortage of the weapons when they go to join ISIS and he said

22   he may need a fund in order to purchase his own weapon.

23   Q    Did he tell you what kind of weapon he wanted to

24   purchase?

25   A    That was AK-47.

HABIBOV - DIRECT - KESSLER

1    Q    An AK-47?

2    A    Yes.  That stands for Kalashikova, a Russian weapon.

3    Q    It's an assault rifle?

4    A    Assault rifle, yes.

5    Q    Did Saidakhmetov ever discuss how he planned to get to

6    ISIS territory in Syria?

7    A    Yes.  Initially he told me he wanted to go to Turkey,

8    from Turkey he wanted to find a person in order to help him to

9    cross the border to Syria.

10   Q    As of January 2015, had Saidakhmetov gone to Syria to

11   fight for ISIS?

12   A    January 2015, no, he hasn't.

13   Q    Did he tell you why he hadn't traveled yet?

14   A    Yes, he told me.

15   Q    What did he say?

16   A    He said he was having difficulty with his passport

17   because he told me his mother had taken away his original

18   passport and he told me also he applied for travel passport

19   and then he was waiting for it to receive in order to travel.

20   Q    At some point after that did he indicate to you that he

21   was in fact ready to travel to Syria?

22   A    Yes.  He said I have to travel no matter what.

23   Q    Do you remember approximately when that was?

24   A    That was late 2000 -- that was late January and February,

25   early February 2015.

HABIBOV - DIRECT - KESSLER

1   Q    At that point did you decide to help Saidakhmetov with

2   his trip to Syria to fight for ISIS?

3   A    Yes, I did.

4   Q    Why did you decide to help him when you previously

5   discouraged him for going?

6   A    I wanted to help him financially because I wanted him not

7   to be dependent on anybody else but himself.

8   Q    What was your plan to help him?

9   A    Initially my plan was to give some money and also to

10  raise some fund if it was necessary in order to give him for

11  his travel expenses.

12  Q    Did you plan to ask anyone other than yourself to

13  contribute money?

14  A    Yes, I have.

15  Q    At that time were you a member of a group of people who

16  were raising money to help fighters in Syria?

17  A    Yes, at that time I was.

18  Q    Did that group have a name?

19  A    It had name in Uzbek it was called choyxona because we

20  can translate to English tea party or tea house.

21  Q    What was your role in the tea party?

22  A    Reminding the individuals and members of tea party to pay

23  their due on time.

24  Q    How many people were in this group who were contributing

25  funds to help fighters in Syria?

HABIBOV - DIRECT - KESSLER

1    A    About like 20 or more.

2    Q    Had any members of that group gone to Syria to fight?

3    A    Yes, they had.

4    Q    Do you recall how many?

5    A    About four and more.

6    Q    So the group was both raising money and individuals were

7    going themselves?

8    A    Yes.

9    Q    Within this group of people raising money, did you talk

10   openly about supporting ISIS?

11   A    In person, yes, we have openly talked about it several

12   times, most of the time --

13   Q    When --

14   A    -- supporting.

15   Q    Did you sometimes use Islamic State or caliphate instead

16   of ISIS?

17   A    We have used many terms.  We used brothers, Islamic

18   State, caliphate, Sham and that would be -- that stands for

19   Syria and several of the areas.

20   Q    Could you spell Sham for the court reporter?

21   A    Shom is S-H-O-M in Uzbek and you can translate to English

22   as S-H-A-M.

23   Q    In February 2015, who did you ask to help contribute

24   money for Saidakhmetov's travel to Syria?

25   A    Several individuals.

HABIBOV - DIRECT - KESSLER

1    Q    So who were they?

2    A    I started with my business partner, Akmal Zakirov, and

3    Azizjon Rakhmatov, and Dilkhayot Kasimov.  Also a couple of

4    individuals Nusratella, I don't know his last name.  Yeah.

5    And indirectly other individuals as well.

6    Q    Did you say indirectly other individuals?

7    A    Indirectly, indirectly with some others.

8    Q    How did you ask others indirectly to contribute?

9    A    I asked my business partner, Akmal Zakirov, if he could

10   ask individual Dilshod Khusanov and if he would like to give

11   some fund in order to support Akhror Saidakhmetov's travel.

12            MR. KESSLER:  Your Honor, if I could ask Mr. Jackson

13   to show the laptop just to the witness.  I would like to show

14   Government Exhibit 8 for identification.

15            THE COURT:  Any objection to eight being admitted in

16   evidence?

17            MS. SHARKEY:  I would like to see it first.

18            THE COURT:  Well, why don't you publish it to --

19            MS. SHARKEY:  No objection.

20            THE COURT:  I'm sorry?

21            MS. SHARKEY:  No objection.  It just came up.

22            THE COURT:  No objection.  You may publish it to the

23   jury and to the witness as well.

24            MR. KESSLER:  Thank you.

25            (Government Exhibit 8, was received in evidence.)

HABIBOV – DIRECT – KESSLER

1          THE COURT:  Why don't you dim the lights slightly,

2    Mr. Jackson --

3          THE COURTROOM DEPUTY:  Yes, Judge.

4          THE COURT:  -- so the jurors in the back row can see

5    it.  Can you see it more clearly, ladies and gentlemen of the

6    jury.  Okay.  Fine.  Go ahead.

7          (Exhibit published.)

8    BY MR. KESSLER:

9    Q    This is Government Exhibit 8.  Who is shown in this

10   photograph?

11   A    This individual is Dilshod Khusanov.

12         THE COURT REPORTER:  I'm sorry, say it again.

13         THE WITNESS:  If you want me to spell it.

14   D-I-L-S-H-O-D K-H-U-S-A-N-O-V.

15         THE COURT:  Go ahead.

16   BY MR. KESSLER:

17   Q    Is this the individual you said you asked indirectly --

18   A    Indirectly.

19   Q    -- to contribute?

20         THE COURT:  You have to wait for him to finish the

21   question before you respond, sir.

22         THE WITNESS:  Sorry, Your Honor.

23         THE COURT:  It's okay.  Go ahead.

24         MR. KESSLER:  Your Honor, I'd also like to show

25   Government Exhibits 6 and 7 to the witness.

HABIBOV – DIRECT – KESSLER

1          THE COURT:  Any objection to six?

2          THE COURTROOM DEPUTY:  Hold on.

3          MS. SHARKEY:  No.

4          THE COURT:  It's admitted.

5          (Government Exhibit 6, was received in evidence.)

6          THE COURT:  Any objection to seven?

7          MS. SHARKEY:  No.

8          THE COURT:  It's admitted.  You may publish them to

9     the jury.

10          (Government Exhibit 7, was received in evidence.)

11          (Exhibit published.)

12     BY MR. KESSLER:

13     Q    Who is shown in Government Exhibit 6?

14     A    Individual named Azizjon Rakhmatov.

15     Q    Was this one of the people that you asked to consider to

16     contribute money for Saidakhmetov to travel to Syria to fight

17     for ISIS?

18     A    Yes, I did.

19     Q    Now showing you Government Exhibit 7, who is this?

20          (Exhibit published.)

21     A    This individual named is Nusratella.

22     Q    Could you spell that?

23     A    N-U-S-R-A-T-I-L-L-A.[sic]

24     Q    While we're doing photographs, I guess I'll offer

25     Government Exhibit 4.

HABIBOV - DIRECT - KESSLER

1      THE COURT:  Any objection to four?

2      MS. SHARKEY:  May I see it?

3      THE COURT:  I'm sorry, any objection?

4      MS. SHARKEY:  I just asked to see it.

5      No objection.

6      THE COURT:  It's admitted.

7      (Government Exhibit 4, was received in evidence.)

8      THE COURT:  You want to do a series now, so we don't

9  have to keep stopping like that.

10      MR. KESSLER:  Yes.  I'm making sure there aren't any

11  others.  I'll also do Government Exhibit 1.

12      THE COURT:  Any objection to Government Exhibit 1?

13      MS. SHARKEY:  May I see it?

14      No objection.

15      THE COURT:  It's admitted.  You may publish.

16      (Government Exhibit 1, was received in evidence.)

17      THE COURT:  Any other photographs?

18      MR. KESSLER:  That's it for now.

19      THE COURT:  Okay.

20      (Exhibit published.)

21  BY MR. KESSLER:

22  Q    I'm showing you Government Exhibit 4, who is that?

23  A    That's me.

24      MR. KESSLER:  And then, Mr. Jackson, if I could have

25  the ELMO.

HABIBOV - DIRECT - KESSLER

1  Q    Showing you Government Exhibit 1.

2  A    That's Dilkhayot Kasimov.

3  Q    You mentioned that the defendant was one of the people

4  that you asked to contribute money, do you recall that?

5  A    Yes.

6  Q    Had he been a member of this tea party?

7  A    I do not have knowledge of it.

8  Q    Is it fair to say he was friendly with some of the

9  members of the tea party?

10  A    Yes, I do have knowledge.

11  Q    Do you know whether the defendant had given money

12  previously to help other individuals who were fighting in

13  Syria?

14  A    I do not know about that.

15  Q    If you didn't know whether the defendant had previously

16  contributed money to help individuals to go to Syria to fight

17  for ISIS, why did you ask him to contribute money in this case

18  for Mr. Saidakhmetov?

19          MS. SHARKEY:  Objection to form.

20          THE COURT:  Overruled.  If you know.

21  A    I had several conversations with the individual, with

22  Kasimov, and I came to conclusion that he would, if I ask, he

23  doesn't mind to support Saidakhmetov's plan.

24  Q    How did you meet Mr. Kasimov?

25  A    First time I met him during 2013 the same way I met

HABIBOV – DIRECT – KESSLER

1    Akhror Saidakhmetov while I was waiting for to buy, to

2    purchase iPhone from Delaware.

3    Q    Where did he live when you met him?

4    A    At that time he was living in Philadelphia, Pennsylvania.

5    Q    At some point after that did the place where he lived

6    change?

7    A    Yes.  He moved to New York.

8    Q    Where did he move in New York?

9    A    He moved to -- he ask me if I can help him to relocate

10   him to New York and I offered him an apartment which was under

11   my business partner's name, Zakirov.  That was an apartment

12   that was located at around 86 and Bay Parkway area in

13   Brooklyn.

14   Q    Did he continue living in that apartment until

15   February 2015?

16   A    No.  At that time he was living in different place.

17   Q    Where was the second apartment where he was living?

18   A    That was Cropsey Avenue which that was Home Depot also

19   located on that avenue and he was living near to that

20   location.

21   Q    Do you know what kind of business the defendant was in?

22   A    Yes.  I knew he was -- also had a business which is

23   self-employed.  He was buying and selling electronics in U.S.

24   and to Uzbekistan as well.

25   Q    Once you met him, how frequently did you talk with him?

HABIBOV – DIRECT – KESSLER

1   A    A few times here and there in a month and later on when I

2   needed him in person to help me to my business I interacted

3   with him several times a week in late 2000 -- I mean early

4   2015.

5            (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HABIBOV - DIRECT - KESSLER

1  BY MR. KESSLER:

2  Q    Did you interact with him in person?

3  A    In person.

4  Q    Did you also call and text with him?

5  A    Yes.

6       MR. KESSLER:  Your Honor, at this point I would like

7  to read a stipulation into evidence that's been agreed upon by

8  the parties.

9       THE COURT:  What is the number of the stipulation?

10      MR. KESSLER:  Marked Government's Exhibit 203.

11      THE COURT:  Any objection to 203 being admitted?

12      MS. SHARKEY:  No.

13      THE COURT:  Admitted.  You may publish to the jury.

14      (Government Exhibit 203, was received in evidence.)

15      MR. KESSLER:  Thank you.  It says:  "It is hereby

16  stipulate and agreed by and between the undersigned attorneys

17  for the Government and the for the defendant, Dilkhayot

18  Kasimov, that Government's Exhibit 40 is an LG Flex mobile

19  telephone seized from the defendant in connection with his

20  arrest.

21      "Government's Exhibit 41 contains a true and

22  accurate copy of the forensic extraction of the contents of

23  Government's Exhibit 40.

24      "Government's Exhibit 41 contains a true and

25  accurate copy of a portion of Government's Exhibit 41.

HABIBOV – DIRECT – KESSLER

1          "Government's Exhibit --

2          THE COURT:  Government's Exhibit 41A.

3          MR. KESSLER:  That is correct, I'm sorry, your

4     Honor.

5          THE COURT:  Read it again.

6          MR. KESSLER:  "Government's Exhibit 41A contains a

7     true and accurate copy of a portion of Government's Exhibit

8     41.

9          "Government's Exhibit 42 is a Samsung Galaxy Note

10    mobile telephone seized from the defendant in connection with

11    his arrest.

12         "Government's Exhibit 43 contains a true and

13    accurate copy of the forensic extraction of the contents of

14    Government's Exhibit 42."

15         I'm going to the second page.  Government's Exhibit

16    56 contains a true and accurate copy of the text messages

17    contained within Government's Exhibit 41.

18         "Government's Exhibit 57 contains selected text

19    messages, accompanied by accurate Uzbek to English

20    translations, where relevant, from Government's Exhibit 56.

21         "Government's Exhibits 40, 41A, 42, and 57 and this

22    stipulation may be admitted as evidence at trial."

23         Your Honor, at this point I offer Government's

24    Exhibits 40, 41A, 42, 57, and the stipulation that is

25    Government's Exhibit 203 in evidence.

HABIBOV – DIRECT – KESSLER

1        THE COURT:  Any objection to 40?

2        MS. SHARKEY:  No objection.

3        THE COURT:  Any objection to 41A?

4        MS. SHARKEY:  No.

5        THE COURT:  Any objection to 42?

6        MS. SHARKEY:  No, your Honor.

7        THE COURT:  Any objection to 57?

8        MS. SHARKEY:  No.

9        THE COURT:  Any objection to the stipulation, which

10   is stipulation, what is the number?

11        MR. KESSLER:  203.

12        THE COURT:  203.

13        MS. SHARKEY:  No objection.

14        (Government Exhibits 40, 41A, 42, 57, 203, were

15   received in evidence.)

16        THE COURT:  They are all admitted anything else on

17   this.

18        MR. KESSLER:  No, your Honor.

19        THE COURT:  Okay.

20        MR. KESSLER:  I'm going to use the Elmo to briefly

21   publish Government's Exhibit 40, which is one of the two

22   cellphones and Government's Exhibit 42.

23   BY MR. KESSLER:

24   Q    Mr. Habibov, did you ever have any business dealings with

25   the defendant?

Rivka Teich CSR, RPR, RMR, FCRR
Official Court Reporter

HABIBOV - DIRECT - KESSLER

1   A    I don't have any business dealings, but I ask him to help

2   me, to my business.

3   Q    What did you ask him to help you do?

4   A    I needed to help on the computer to design business cards

5   for my business, and as well to design a sign for my kiosk.

6            MR. KESSLER:  Mr. Jackson, if I could have the

7   laptop, I'm going to show the defendant a page from

8   Government's Exhibit 57, which was one of those extracts from

9   one of the defendant's phones.

10            THE COURT:  It's in this evidence, right?

11            MR. KESSLER:  That's right, your Honor.

12            THE COURT:  You can show it to the jury too then.

13            MR. KESSLER:  Thank you.

14   BY MR. KESSLER:

15   Q    I've put up page 44 of Government's Exhibit 57.  I'm

16   directing your attention to the row marked 1742.  There is a

17   text from you to the defendant on January 24, 2015.  Can you

18   take a look at that text, I'm not going to read it, but it

19   begins "measurements big box," do you see that?

20   A    Yes, I do.

21   Q    What was the purpose of sending this text message?

22   A    That was the size of my kiosk and sign which I was asking

23   if it could be designed, measured to that size on the

24   computer.

25   Q    Now showing you page 47, I'm going to zoom in on the top

HABIBOV – DIRECT – KESSLER

1    row.  Do you see there is a message on January 24, 2015?

2    A    Yes, I see.

3    Q    Now this is a message from the defendant to you, correct?

4    A    Yes.

5    Q    He wrote, "We plan to complete your banner today"?

6    A    Yes, that was the sign for my business.

7    Q    So these two text messages we're looking at here, you

8    were texting about the work he was doing in your business?

9    A    Yes.

10   Q    I want to ask you about two other text messages.  Is it

11   fair to say that from time to time you discussed Mr. Kasimov's

12   personal life with him?

13   A    Yes, I have.

14   Q    I'm going to page 50 of Government's Exhibit 57.  I'm

15   going to zoom in on the row that says 1968.  This is a text on

16   January 21, 2015, from the defendant to you, correct?

17   A    Yes.

18   Q    The defendant said, "I don't think about Mahliyo."  Do

19   you see that?

20   A    Yes.

21   Q    Do you know who Mahliyo was?

22   A    A girl he intended to meet her, and if it is possible, to

23   marry her in the future.

24   Q    He didn't end up marrying her?

25   A    No, he didn't.

284

HABIBOV - DIRECT - KESSLER

1   Q    I'm going to ask you about one more text message.  Before

2   that, do you know an individual Kozim Gafurov?

3   A    Would you repeat the question?

4   Q    Do you know Kozim Gafurov?

5   A    Yes, I do.

6   Q    Who is that?

7   A    That's a person I lived with.  Yes, that's a person I

8   lived with several months.

9   Q    Did Kozim Gafurov play any role in the tea party?

10  A    He was the leader of the tea party.

11  Q    Did he speak openly from time to time about fighting in

12  Syria and ISIS?

13  A    Yes, several times.

14  Q    I'm going to show you a text on page 51 of Government's

15  Exhibit 57 and focus on the row with the label 2011.  Is this

16  a text from the defendant to you on January 21, 2015?

17  A    Yes, I see that.

18  Q    Do you see there is a multi-sentence text message, the

19  second sentence says, "Kozim said that exchanging SMS breaks

20  Sharia rules and the people say it's nonsense."  Do you see

21  that?

22  A    Yes, I do.

23  Q    Do you know which Kozim is being referred to in this text

24  message?

25  A    The same Kozim Gafurov.

HABIBOV - DIRECT - KESSLER

1  Q   Was the defendant a friend of Kozim Gafurov?

2  A   Yes, in my mind he was.

3  Q   Did you observe them together at points?

4  A   Yes, we have visited to his apartment several times with

5  Kozim, he was present those times too.

6  Q   I believe you mentioned by December 2015 you were

7  speaking with the defendant more frequently?

8  A   Yes, I have.

9  Q   Were some of those conversations in person?

10  A   Yes.

11  Q   Have you ever discussed ISIS with the defendant?

12  A   Yes, I have.

13  Q   What did you discuss?

14  A   I have discussed several topics, which is related to

15  ISIS, with defendant.

16  Q   What were the topics?

17  A   I have discussed legitimacy of Islamic State as declared

18  by ISIS.  I have also discussed the people we knew who were on

19  the battle ground with ISIS.  And also I have discussed with

20  him, there was a moment in time, discussing by defendant

21  suggesting that it would be preferrable living in the

22  territory of Islamic State.

23  Q   Let's take that conversation first.  Did you say you had

24  a conversation with the defendant about living in the Islamic

25  State?

HABIBOV - DIRECT - KESSLER

1   A    Yes.

2   Q    What happened in that conversation?

3   A    That was a conversation between me and defendant.  The

4   girl he wanted to marry in the future, her name was Mahliyo,

5   she showed interest.  She was telling the defendant she would

6   like to live in Saudi Arabia.  She wanted to --

7            MS. SHARKEY:  Objection.

8            THE COURT:  Overruled.

9   A    To practice Islam in Saudi Arabia.  Then defendant was,

10  he didn't mind to live with her if she wanted to live in Saudi

11  Arabia, but he disagreed.  It would be preferable to live in

12  Syria, which is everything you could practice Islamic.

13  Q    All of that is a conversation the defendant told to you,

14  correct?

15  A    Yes.

16  Q    When he said live in Syria, did he refer to caliphate or

17  the Islamic State or just Syria?

18  A    Islamic State.

19  Q    You mentioned you had a conversation with the defendant

20  at the -- about the legitimacy of the Islamic State, do you

21  remember?

22  A    That was a conversation.

23  Q    How did that conversation happen?

24  A    In one of my visits to his apartment there was an

25  incident, I recall.  There was a laptop that was open on his

HABIBOV - DIRECT - KESSLER

1    desk.  There was a YouTube video paused.  And there was an

2    Imam picture was paused.  I recognized the Imam, which is

3    probably famous now, giving lectures on YouTube.  I have heard

4    him say some disagreements with the Islamic State being,

5    legitimacy of Islamic State, or being established and

6    everything what was happening in Syria.  And them carrying on

7    Jihad.

8    Q    Let me stop you there.  You went to the defendant's

9    apartment?

10   A    Yes, I went to the defendant's apartment.

11   Q    Was that the Home Depot apartment or the earlier

12   apartment?

13   A    That was the Home Depot apartment.

14   Q    At the apartment near Home Depot you saw a laptop with a

15   YouTube video open?

16   A    When I entered the defendant's room, yes.

17   Q    Was the video playing or paused?

18   A    Paused.

19   Q    You said you recognized the Imam in the video?

20   A    Yes.

21   Q    What was the Imam saying about the legitimacy of ISIS?

22   A    He disagreed, highly disagreed, to ISIS ideology and what

23   they were doing in Syria.

24   Q    Did you talk to the defendant about the video?

25   A    Yes.  I told him that I kind of disappointed that Imam

HABIBOV – DIRECT – KESSLER

1  being living in the United States, just because he was living

2  in the United States making such a statement.

3  Q    Did you agree or disagree with the Imam?

4  A    I disagreed with the Imam.  And I discussed with the

5  defendant as well.

6  Q    Did he indicate whether he agreed or disagreed with the

7  Imam?

8  A    He did not show any agreeing with the Imam.

9  Q    Did you also -- you also mentioned that you had a

10 conversation with the defendant about people on the battle

11 ground, I think you said?

12 A    Yes.

13 Q    What was that conversation?

14 A    At the same day, during that conversation, since I

15 brought it up Islamic State, he, defendant mentioned his

16 ex-roommate where he lived with him in Bay Parkway apartment,

17 and him going to Syria and fighting.

18 Q    Who was the ex-roommate who had gone to Syria to fight?

19 A    I knew him by name Mirsod.

20 Q    You knew the person that the defendant was talking about?

21 A    Yes, I knew him in person as well.

22 Q    Did you discuss any other people who had fought or been

23 killed in this Syria with the defendant?

24 A    That was probably February 2015, I have discussed with

25 another individual about another individual.

HABIBOV - DIRECT - KESSLER

1  Q    Who is the other individual you discussed?

2  A    That was the individual used to live in Brooklyn and used

3  to go to mosque on Bath Avenue.  And he went to Syria.  And he

4  was fighting.  At that time when he got killed he was fighting

5  for ISIS.

6  Q    You told the defendant that?

7  A    Yes, I have.

8  Q    When you talked with the defendant about the Islamic

9  State or ISIS, did you always refer to ISIS openly?

10 A    Not necessarily.  I use different phrases Islamic State,

11 Sham, caliphate, brothers, and others terms.

12 Q    Were you using all these terms interchangeably to refer

13 to ISIS?

14 A    Yes.

15 Q    Did you tell the defendant about Saidakhmetov's interest

16 in going to Syria to fight for ISIS?

17 A    Yes, I have.  I remember talking to defendant about

18 Saidakhmetov going to Syria to fight.

19 Q    Do you remember whether you said he was going to Syria to

20 fight or going to Syria to fight for ISIS?

21 A    I do not remember.  I may have said ISIS.  But I do

22 remember saying Saidakhmetov was going to Syria to fight.

23 Q    Did there come a time when you talked to the defendant

24 about your efforts to raise money for Saidakhmetov's trip?

25 A    Yes, I have.

HABIBOV - DIRECT - KESSLER

1   Q    Before we get into that, let's step back.  Could you

2   explain the general process you followed in raising money for

3   Saidakhmetov's trip to go to Syria to fight for ISIS?

4   A    I did not understand quite well the question.

5   Q    How were you going to raise money?

6   A    I wanted to call individuals or meet them in person and

7   tell them, introduce them to Saidakhmetov.  And then telling

8   them about his plan to go to Syria, and if they can help him

9   to donate some funds so that I could put it together and give

10  it to Akhror Saidakhmetov.

11  Q    Did you have telephone conversations with a number of

12  individuals about this?

13  A    Yes, I have.

14           MR. KESSLER:  Your Honor, at this point I'd like to

15  show Government's Exhibit 46 to the witness.

16           THE COURT:  Any objection to 46 being admitted?

17           MS. SHARKEY:  May I see it?  No objection.

18           THE COURT:  Admitted.  You may publish it to the

19  jury.

20           (Government Exhibit 46, was received in evidence.)

21  BY MR. KESSLER:

22  Q    Do you see Government's Exhibit 46?

23  A    Yes, I do.

24  Q    Are these phone numbers and the associated contact name

25  from your phone?

HABIBOV – DIRECT – KESSLER

1    A    Yes, it does, yes, it is.

2    Q    The first phone number is 315 the contact is Abdul Azizz,

3    who is that?

4    A    This is Abdul Azizz, Azizjon Rakhmatov.  We call him

5    Abdul Azizz.

6    Q    The second number is 757, the contact name is Akmalnew.

7    Who is that?

8    A    This is my business partner, Akmal Zakirov, a new number,

9    he got it from Virginia.

10   Q    Next number is 718, the contact is Asqaraka.  Do you see

11   that?

12   A    Yes, I do.

13   Q    Who is that?

14   A    This is person I knew who used to live in Brooklyn, I

15   believe he still does, the person I knew.

16   Q    The next number is 757, the contact is Axrorjon.  Who is

17   that?

18   A    That's the employee of mine, Akhror Saidakhmetov.

19   Q    Next is 267 and the contact is Dilhayot, who is that?

20   A    This is Dilkhayot Kasimov.

21   Q    So that's the defendant's phone number beginning with

22   267?

23   A    Yes, it is.

24   Q    Then there is a number that begins (347)735, the contact

25   is Jamshidakanew, who is that?

HABIBOV – DIRECT – KESSLER

1   A    This is my business, another business partner, Jamshid

2   Bekhmatov.

3   Q    The last number starts (347)471, the contact name is

4   Nusrat, who is that?

5   A    This is the person, one of my, the person I knew

6   Nusratella, I mentioned earlier on in court.

7              MR. KESSLER:  Your Honor, at this point I'm going to

8   move to a section of the examination where we're going to play

9   a series of audio clips.  So with the Court's permission I'd

10  ask Mr. Jackson to distribute to the jury binders of the

11  transcripts that have already been admitted in evidence

12  through a stipulation between the Government and the defense.

13             THE COURT:  How long do you think you'll be with

14  this line of inquiry?

15             MR. KESSLER:  Forty-five minutes.

16             THE COURT:  Then I think it's appropriate to take a

17  brief break.  Then we'll come back in about 15 minutes then go

18  to 5:00 o'clock.

19             All right ladies and gentlemen of the jury, because

20  this next segment is going to be continuous, we'll take a

21  15-minute break.  Do not talk about the case.  We'll see you

22  in 15 minutes.

23             (Jury exits the courtroom.)

24             (Whereupon, the witness steps down.)

25             THE COURT:  The jury has left the courtroom.  The

PROCEEDINGS

1  witness has left the courtroom.

2          Do we have any procedural issues to address?

3          MR. PRAVDA:  Nothing from the Government.

4          THE COURT:  From defense?

5          MS. MACEDONIO:  Nothing, Judge.

6          THE COURT:  See you in 15.

7          (Brief recess.)

8          THE COURTROOM DEPUTY:  All Rise.

9          THE COURT:  Thank you.  We have the appearances.

10         Do we have any procedural issues to address before

11  we bring the jury in?  The binders have been placed on their

12  seats.  I take it everything that is in those binders is by

13  agreement, has been admitted, or is about to be admitted; is

14  that correct.

15         MR. KESSLER:  That's correct, your Honor, they are

16  all in evidence.

17         THE COURT:  All right, fine.

18         MR. KESSLER:  The only procedural matter, which will

19  take one second, we ask the Court to instruct the jury at the

20  end of the day to leave the binders.

21         THE COURT:  Yes.

22         We'll have the witness brought out as well and then

23  we'll get the jury.

24         (Whereupon, the witness resumes the stand.)

25         THE COURT:  Please be seated.  And you can remain

PROCEEDINGS

1   seated when the jury comes back.

2              (Jury enters the courtroom.)

3              THE COURT:  Welcome back, ladies and gentlemen of

4   the jury.  You'll see there is a binder on each of your seats.

5   These are the exhibits that have been admitted into evidence

6   and for your convenience we've put them in a binder.  I'm

7   going to ask you to pick the binders up now, rather than sit

8   on them, as I would probably do if I had a binder behind me.

9              You may be seated.  At the end of the day we'll ask

10  you to leave the binders here on your chairs before you exit.

11             And we will end the day probably 5:00 o'clock.  That

12  clock is still working.  I know you are too, don't worry about

13  that.

14             The lawyers will refer to the documents that are in

15  your binders.  In the old school days when I started practice

16  we didn't have electronics, we barely had electricity,

17  everything was done with the binders.  Welcome to old school.

18             It tends to move things along, which is kind of how

19  I like to do it.  That being said, please be seated ladies and

20  gentlemen of the audience.

21             Counsel, you may continue of your direct examination

22  of the witness.  You're still under oath, sir.

23             MR. KESSLER:  Thank you, your Honor.

24  DIRECT EXAMINATION (continued)

25  BY MR. KESSLER:

DIRECT - HABIBOV - MR. KESSLER

1   Q    Mr. Habibov, before the break you were discussing making

2   a number of phone calls in advance of Saidakhmetov's trip to

3   Syria.  Do you remember that?

4   A    Yes.

5   Q    I'd now like to play a series of phone calls and ask you

6   questions.

7           The first call is Government's Exhibit 101, which is

8   an audio clip that is in evidence.  The corresponding

9   transcript in the binders that the jurors and the Court and

10  counsel have is going to be behind the tab Government's

11  Exhibit 101T, for transcript.

12          THE COURT:  Okay, you may do so.

13          MR. KESSLER:  If I could have the podium laptop.

14  I'm now going to play the audio file.

15          (Audio played.)

16  Q    I stopped playing the clip at five minutes and 15 seconds

17  for the record.

18          Mr. Habibov, I'd like to ask you about this call.

19  What language was the call in?

20  A    In Uzbek.

21  Q    Who was speaking on the call?

22  A    It's me and Akror Saidakhmetov.

23  Q    I'd like to ask you some questions of the contents of

24  that call.  I'll let the record reflect that Mr. Habibov does

25  not have one of the binders in front of him.

DIRECT – HABIBOV – MR. KESSLER

1    THE COURT:  Do you understand want him to?

2    MR. KESSLER:  No.

3  Q    What was discussed on this call?

4  A    On this call in the beginning of the conversation

5  Saidakhmetov asking me, he wanted to start working in

6  Philadelphia.  And he was asking me that he cannot stay any

7  longer.  And he also ask me if that, he told me that he had to

8  come to New York.  He said, I have to go there, which is, he

9  was referring to New York, in order to take a picture for his

10  travel passport.  And he was also discussing with me about the

11  money for his trip.  And also he had to give the money he

12  borrowed from his mother to return.  And he was saying I

13  couldn't make any money for my trip.

14    MR. KESSLER:  So I'm now going to ask you some more

15  specific questions.  What I'll do is I'll refer to the line

16  numbers in the transcript, just for the jury's benefit.

17    THE COURT:  Again, the number of the transcript

18  you're working with.

19    MR. KESSLER:  This is transcript 101T, which is

20  behind the tab that I believe says Exhibit 101T in the binder.

21    THE COURT:  Okay, go ahead.

22    MR. KESSLER:  For the jury's reference I'm referring

23  to the portion of lines 51 and 52.

24    THE COURT:  On page three, right.

25    MR. KESSLER:  Yes.

DIRECT – HABIBOV – MR. KESSLER

1   Q    Mr. Habibov, did you discuss on this call a promise you

2   had made to Saidakhmetov?

3   A    Yes, I have.

4   Q    What was the promise?

5   A    The promise is to raise fund and to give him fund for his

6   trip.

7   Q    That's his trip to Syria to join ISIS?

8   A    Yes.

9   Q    Referring to lines 58 and 59 also on page three.  Did you

10  say something to the effect that you could talk to Akmal?

11  A    Yes.  I told him I want, I wanted to discuss with my

12  business partner Akmal Zakirov, and I will let you know if you

13  needed cash, so I'll deposit it in your account.  Or tell him

14  in person if you don't have, so in person I'll give it to you.

15  Q    Referring to line 62 to 63, on the same page.  Do you

16  offer to go with Mr. Saidakhmetov to buy his ticket?

17  A    Yes, I said if you want to go with me to buy your ticket,

18  we'll do that.  We'll go to buy your ticket in one of the

19  travel agencies.  I said Tursan Travel, which is a Russian

20  word.  It's where can you buy your ticket.

21  Q    Finally page four, referring to lines 72.  Do you tell

22  Mr. Saidakhmetov that he had to tell you the date of his plans

23  departure?

24  A    I said you don't have to tell me the date, and you can

25  just tell me the month.

DIRECT – HABIBOV – MR. KESSLER

1   Q    Why did you tell him that he didn't have to tell you the

2   date?

3   A    I just, I didn't want to know necessarily when exact the

4   date of his departure.

5           THE COURT:  Why not?

6           THE WITNESS:  He wanted to feel.  He was very

7   careful on his conversations.  He didn't want anyone to know.

8   He showed me concentration not revealing his.  He told me

9   about his traveling, but he always showed carefulness that I

10  didn't want him to feel uncomfortable.

11          THE COURT:  Go ahead.

12  BY MR. KESSLER:

13  Q    I'm next going to play Government's Exhibit 102, the

14  corresponding transcript is going to be behind the tab marked

15  Exhibit 102T.  For the record as reflected in the transcript,

16  the prior call was January 29, 2015.  This next call

17  Government's Exhibit 102 is on February 16.

18          (Continued on next page.)

19

20

21

22

23

24

25

DIRECT – HABIBOV – MR. KESSLER

1    (In open court.)

2    THE COURT:  Of 2015?

3    MR. KESSLER:  Yes.  Thank you.

4    (Recording played.)

5  DIRECT EXAMINATION

6  BY MR. KESSLER (continuing):

7  Q    Mr. Habibov, who was talking on that call?

8  A    On that phone conversation it's me and Akhror

9  Saidakhmetov.

10  Q    What were you discussing with him?

11  A    About updates about his traveling plans, travel

12  documents.

13    MR. KESSLER:  So, for the jury's reference, I'm

14  going to ask you a question that relates to lines 12 to 15 of

15  the transcript, on page 1, carrying over to page 2.

16  Q    Did you refer to calling from the Internet?

17  A    Yes.  But for that phone conversation, yes.

18  Q    Why were you calling from the Internet?

19  A    As I mentioned to Honorable Judge Kuntz, that Akhror

20  Saidakhmetov was very careful in his conversations.  I didn't

21  want to leave any traces, and I thought that would be a good

22  idea, to use Internet phone call to call him.

23  Q    Do you mean that he didn't want to speak openly about

24  traveling to Syria to join ISIS on the phone?

25  A    Yes.

*MICHELE NARDONE, CSR -- Official Court Reporter*

DIRECT – HABIBOV – MR. KESSLER

1  Q    Then, referring to line 31 on page 2, did you say

2  something to the effect that you did not want to make an empty

3  promise?

4  A    Yes.  It's a cultural thing.  If you promise, I didn't

5  want -- I assured him that not to think I made empty promises

6  in order to get him to support his trip.

7  Q    So you had promised him money and you didn't want to go

8  back on that promise?

9  A    Yes.

10         MS. SHARKEY:  Objection as to leading.

11         THE COURT:  Overruled.

12         MR. KESSLER:  Mr. Habibov, I would next like to play

13  you Government Exhibit 103, which is a call on February 19 at

14  1:39 p.m.  The transcript for that call is behind the tab in

15  the binder marked Exhibit 103-T.

16         (Recording played.)

17         MR. KESSLER:  So, for the record, I stopped playing

18  the call at minute 1 minute and 19 seconds.

19  Q    Mr. Habibov, in that excerpt from Government Exhibit 103,

20  who is speaking?

21  A    It's me again on the phone conversation with my business

22  partner, Akmal Zakirov.

23  Q    What are you discussing in the excerpt of Government 103

24  this we just listened to?

25  A    I was discussing with him about Akhror Saidakhmetov's

DIRECT – HABIBOV – MR. KESSLER

1    trip and how much to give him.

2            MR. KESSLER:  For the jury's reference, I'm

3    referring to lines 2 to 3 on page 1.

4    Q    Did you say when Saidakhmetov was leaving?

5    A    I said, you know, he was leaving.

6    Q    Did you say in how much time?

7    A    No, I didn't.  I do not remember on that phone call.

8    Q    Okay.  With respect to, say, lines 5 through 11, were you

9    discussing on this call an amount of money to give to

10   Mr. Saidakhmetov?

11   A    Yes.

12   Q    What did you discuss?

13   A    I said what do you think?  Do you think we should give

14   1 Som?  I used in Uzbek, but it was referring to $1,000.  And

15   he said, how much he will be needed, Zakirov asked; and I said

16   probably $4,000, which is I used there, in that phone

17   conversation, 4 Som.  That was referring to $4,000.

18   Q    When you say Som, is that S-O-U-M?

19   A    S-U-M, or S-O-M.  It's the Uzbek currency.

20   Q    It's an Uzbek word.  What does it mean?

21   A    Uzbek, in Uzbek?

22   Q    Yes.

23   A    That's Som is the currency for Uzbek money.

24   Q    So did you use it as an equivalent of a certain amount of

25   U.S. dollars?

*MICHELE NARDONE, CSR -- Official Court Reporter*

DIRECT – HABIBOV – MR. KESSLER

1   A    That was.  I was using as a reference to dollar.

2   Q    So when you said 1 Som, did you mean 1 dollar or

3   something else?

4   A    $1,000.

5   Q    Did you also refer to a bus ticket in this call?

6   A    Yes.

7   Q    Were you actually trying to help Mr. Saidakhmetov buy a

8   bus ticket?

9   A    No.

10  Q    Why did you refer to a bus ticket?

11  A    I was just recoding the airline ticket to bus ticket.

12  Q    So bus ticket was a reference for airline ticket?

13  A    Yes, it is.

14  Q    Did you say anything about collecting money from anybody

15  else?

16  A    Yes.  I said if you agree or if you do pay his ticket,

17  and also if you want I could collect from guys.  I meant the

18  people I knew.

19  Q    Had you previously talked to Mr. Zakirov about the

20  purpose of Saidakhmetov's travel?

21  A    Yes.

22       MR. KESSLER:  I'm now going to play an excerpt from

23  Government Exhibit 104.  This is a call at 1:46 p.m.  So it's

24  a few minutes later, few minutes after your call with

25  Mr. Zakirov.

DIRECT - HABIBOV - MR. KESSLER

1           For the jury's reference, the transcript is behind

2    the tab labeled Exhibit 104-T in the transcript binder.

3           (Recording played.)

4    Q    Mr. Habibov, who was speaking in that call?

5    A    In that call it's me and I'm talking to Azizjon

6    Rakhmatov.

7    Q    What are you talking about with him?

8    A    In the beginning of the phone conversation we discussed

9    about him, if he had any cars for sale, Toyota Camry, and we

10   discussed about the car; and later on, on that conversation, I

11   discussed about Saidakhmetov's trip expenses.

12          MR. KESSLER:  So, for the jury's reference, I'm

13   going to refer to some text on lines 26 through 27 of the

14   transcript.  It's on page 2.

15   Q    Do you tell Rakhmatov they are doing it on the 25th?

16   A    Yes.

17   Q    Did the 25th refer to February 25?

18   A    February 25.

19   Q    What was the "it" they were doing?

20   A    They were going to airport and going to see the

21   departure.

22   Q    Did you refer to "that thing"?

23   A    That thing, yes.

24   Q    Why were you not more explicit?

25   A    I understood Azizjon understood what I meant using that

*MICHELE NARDONE, CSR -- Official Court Reporter*

DIRECT — HABIBOV — MR. KESSLER

1    thing.

2    Q     And then, with reference to lines 34 through 37, at the

3    bottom of page 2, did you mention a number of individuals whom

4    you might ask to donate money for Saidakhmetov's travel?

5    A     Yes.

6    Q     So now turning to page 3 in the transcript, lines 38

7    through 39, did Mr. Rakhmatov say that Mr. Saidakhmetov was

8    not going there for fun?

9    A     Yes.

10   Q     What did you understand "there" to mean?

11   A     He was -- I understood there, they were not going for

12   fun.  They were going to fight.

13   Q     But where is the there?

14   A     There was Syria.

15   Q     Did Mr. Rakhmatov say he will join them?

16   A     He will join them.

17   Q     Who is "them"?

18   A     That was ISIS.

19   Q     Does join mean live in Syria, or did it mean more than

20   that?

21   A     That was more than that.  It was fighting with them, on

22   their behalf.

23   Q     Now, directing -- for the jury's reference -- them to

24   lines 40 to 41, also on page 3, did you say something to the

25   effect that they go there with their own toys?

DIRECT - HABIBOV - MR. KESSLER

1   A    Yes.

2   Q    Were you actually referring to toys?

3   A    No, I wasn't.

4   Q    What were you referring to when you said toys?

5   A    I was referring to automatic -- AK-47.  That was a gun.

6   Q    An automatic weapon?

7   A    Automatic weapon.

8   Q    All right.  I'm now going to show --

9            MR. KESSLER:  Or, I guess, Mr. Jackson, I need -- I

10  guess I'm going to publish Government Exhibit 165 for the

11  jury.  It's already in evidence.

12           THE CLERK:  ELMO or laptop?

13           MR. KESSLER:  The laptop.  Thank you.

14           Actually, before we look at that.

15  Q    Mr. Habibov, that previous call was at approximately

16  1:46 p.m. on February 19.

17           Did you go with Mr. Saidakhmetov to buy his plane

18  ticket later that day?

19  A    Yes.

20  Q    Do you remember at what time you bought the plane ticket?

21  A    That was in the afternoon.

22           MR. KESSLER:  Okay.  I'm now going to show you

23  Government Exhibit 165 in evidence.

24           (Published.)

25  Q    Mr. Habibov, is this a series of text messages between

*MICHELE NARDONE, CSR -- Official Court Reporter*

DIRECT – HABIBOV – MR. KESSLER

1    you and the defendant?

2    A    I see.

3    Q    This is a series of text messages between you and the

4    defendant?

5    A    Yes.

6    Q    On February 19, 2015?

7    A    Yes.

8    Q    So the first text message, at 4 o'clock and 25 seconds,

9    what does the defendant say?

10   A    He said greetings to you, which is assalamu alaykum.

11   When should I give -- when should we give money to the brother

12   who is leaving.  When should I give some money to the brother

13   who is leaving?  Yes, translation was right.

14   Q    Okay.  So on -- withdrawn.

15         Before February 19, 2015 had you talked with the

16   defendant about Saidakhmetov's travel?

17   A    Yes.

18   Q    Had he indicated that he would contribute to fund that

19   travel?

20   A    Yes.

21   Q    Did you text him or did he text you on February 19 about

22   giving some money to the brother who was leaving?

23   A    He texted me.

24   Q    Okay.  And after he texted you about giving money, what

25   did you respond?

DIRECT – HABIBOV – MR. KESSLER

1  A    I responded that I will let him know that I bought his

2  tickets already.

3  Q    So as of approximately 4 o'clock on February 19 you had

4  purchased the ticket?

5  A    Yes, I had.

6         THE COURT:  Just so the record is clear, when you

7  say "he texted you," who are you talking about?

8         THE WITNESS:  Kasimov.

9         THE COURT:  Go ahead.

10        MR. KESSLER:  All right.  I'm now going to play

11 Government Exhibit 106, which is a February 19 call from

12 5:04 p.m.  The transcript is behind the tab marked

13 Exhibit 106-T in the binder.

14        (Recording played.)

15 Q    Mr. Habibov, who is speaking in that call?

16 A    In that call it's me and speaking -- speaking with Akmal

17 Zakirov, my business partner.

18 Q    What are you talking to him about?

19 A    In the beginning of the phone conversation I let him know

20 that I purchased -- we purchased this ticket, and also I ask

21 him if he can call other individuals in order to raise funds

22 for Saidakhmetov's trip.

23 Q    How much was the ticket?

24 A    $570, and I mentioned giving him 500.

25 Q    Did you ask Mr. Zakirov to call someone named Dilshod?

DIRECT – HABIBOV – MR. KESSLER

1   A    Yes.

2   Q    Who is that?

3   A    That's Dilshod, the person who lived with and we have

4   common friendship between me and Akmal Zakirov.

5   Q    Did you also refer to talking to Abdulaziz?

6   A    Yes.

7   Q    Who is that.

8   A    That's Azizjon Rakhmatov.

9   Q    Did you say that's why he shouldn't be an asking hand

10   when he gets there?

11   A    Yes, I did.

12   Q    What did you mean by that?

13   A    To have his own money for Saidakhmetov.

14   Q    Okay.  I'm now going to turn to Government Exhibit 107.

15   The transcript is behind the tab marked Exhibit 107-T.  This

16   is a call on February 19 at 5:17 p.m., so a few minutes after

17   the prior call.

18            (Recording played.)

19            MR. KESSLER:  I apologize.  I was playing 106 again.

20            THE COURT:  I thought it sounded familiar.

21            MR. KESSLER:  I'm now playing 107.

22            (Recording played.)

23   Q    I stopped playing Government Exhibit 107 at 3 minutes, 15

24   seconds.

25            Mr. Habibov, who is talking on this call?

*MICHELE NARDONE, CSR -- Official Court Reporter*

DIRECT - HABIBOV - MR. KESSLER

1  A    On this call it's me talking to Nusratella.  It's the

2  person I mentioned earlier today in court.

3  Q    What are you discussing on this call?

4  A    On this call I was asking him if he recognized two

5  people, Abdura and Akhror, which is Akhror Saidakhmetov and

6  Abdurasul Juraboev.

7  Q    So the reference to Akhror is to Saidakhmetov, and the

8  reference to Abdura is to whom?

9  A    To Abdurasul Juraboev.

10        MR. KESSLER:  Your Honor, if I could show the

11  witness a document that's been marked as Government Exhibit 3

12  for identification.

13        THE COURT:  In evidence, or no?

14        MR. KESSLER:  It is not in evidence.

15        THE COURT:  Any objection to 3?

16        MS. SHARKEY:  May I see it?

17        THE CLERK:  Hold on.

18        MS. SHARKEY:  No objection.

19        THE COURT:  It's admitted.

20        You may publish it to the witness and to the jury.

21        (Government Exhibit 3, was received in evidence.)

22        MR. KESSLER:  Thank you.

23        (Published.)

24  Q    Who is in Government Exhibit 3?

25  A    This is Abdurasul Juraboev.

*MICHELE NARDONE, CSR -- Official Court Reporter*

DIRECT - HABIBOV - MR. KESSLER

1   Q   Was he Saidakhmetov's roommate at one point?

2   A   Yes, he was.

3   Q   There was a discussion of something called Ozodlik in

4   this phone call.  Do you remember that?

5   A   Yes, I do.

6   Q   What is Ozodlik?

7           THE COURT:  Can you spell that for the reporter and

8   give them a break.

9           MR. KESSLER:  O-Z-O-D-L-I-K.

10  Q   What is that?

11  A   This is radio channel in Uzbek.  It's called Ozodlik.

12  Q   Is that an Uzbek radio station?

13  A   Uzbek radio station.

14  Q   With reference to lines 18 and 19 on page 2 of the

15  transcript, does Nusratella talk about a questionnaire?

16  A   Yes, he does.

17  Q   What does he say about that?

18  A   He told me that the person, Juraboev, he recognized him

19  as him talking to also the Uzbek radio station.

20  Q   When you say talking to, do you mean calling in?

21  A   Calling in.

22  Q   And what was Juraboev talking about?

23  A   There was a questionnaire posted on that, I think on the

24  website of the radio station, and what do you think about the

25  Islamic State and calling in and stating his comments about

*MICHELE NARDONE, CSR -- Official Court Reporter*

DIRECT - HABIBOV - MR. KESSLER

1   his views.

2   Q    Did Nusratella say anything about whether Mr. Juraboev

3   was talking precautions?

4   A    Yes.  He said he wasn't -- I said is he knowing -- why he

5   is calling to radio station and talking to them openly.  He

6   said he wasn't taking precaution, just.

7   Q    What did you mean by "taking precaution"?

8   A    He wasn't taking precautions, meaning he wasn't careful,

9   like he was just blurting out what was his views on that

10  questionnaire.

11  Q    He was talking openly about it.

12  A    Openly about it.

13  Q    All right.  With reference to lines 26 through 32 or so,

14  did you tell Nusratella that Saidakhmetov was departing soon?

15  A    Yes.

16  Q    And did Nusratella ask you where?

17  A    Yes.

18            (Continued on the next page.)

19

20

21

22

23

24

25

HABIBOV − DIRECT − KESSLER

1   DIRECT EXAMINATION(Continued)

2   BY MR. KESSLER:

3   Q    What was your answer?

4   A    I said over there.

5   Q    Over there.  And then did you say anything else?

6   A    I said he's living and I told him that I paid his ticket.

7   I --

8   Q    Did you say something to the effect of, don't say it over

9   the phone?

10  A    I said don't say it over the phone because I was very

11  careful on the phone as well.

12  Q    Did Nusratella seem confused when you were talking about

13  when you said over there?

14  A    He wasn't.

15           THE COURT:  You said he was or he was not?

16           THE WITNESS:  He was not.

17           THE COURT:  Go ahead.

18  Q    Now with respect to this recording, when you were

19  arrested in February 2015, did the FBI play this recording for

20  you?

21  A    Yes, I heard.

22  Q    And did they ask you what the recording was about?

23  A    Yes.

24  Q    What did you tell them?

25  A    I do not remember what I told them, but I said that was

HABIBOV – DIRECT – KESSLER

1   me on the phone conversation.

2   Q    Well, did you explain to them that this was a

3   conversation about raising money for Saidakhmetov to go to

4   Syria to fight for ISIS?

5   A    No, I didn't tell them, no.

6   Q    Did you give them some other explanation for the phone

7   call?

8   A    Yes.

9   Q    You don't remember specifically what your explanation

10  was?

11  A    I do not remember.

12        THE COURT:  What, generally, did you tell them, if

13  you remember?

14        THE WITNESS:  Oh, I do not remember exactly.  I said

15  that was a person he used to work for me and I was just

16  raising money to give him.

17        THE COURT:  Go ahead.

18  BY MR. KESSLER:

19  Q    So you were not being truthful with the FBI at that

20  point?

21  A    Yes, I wasn't.

22        THE COURT REPORTER:  I was or wasn't?

23        THE WITNESS:  I wasn't.

24        THE COURT:  The way to ask the question is:  Were

25  you being truthful with the FBI at that time?

HABIBOV – DIRECT – KESSLER

1          THE WITNESS:  At that time I was not truthful to the

2     FBI.

3          THE COURT:  You were not truthful.  Okay, let's go

4     on.

5          MR. KESSLER:  Thank you.

6     Q    All right.  Now that was a call at 5:17.  Now I'd like to

7     play you Government Exhibit 108, which is a call at 5:23 the

8     same day about four minutes later.

9          (Audiotape played.)

10         (Audiotape stopped.)

11    Q    Who is speaking in Government Exhibit 108?

12    A    It's me and speaking to defendant.

13    Q    What are you discussing?

14    A    I was discussing if we could help Akhror Saidakhmetov to

15    find somebody in order to help him to -- help him to cross the

16    border to Syria.

17    Q    When you called or when you spoke to Mr. Kasimov, did you

18    ask him -- and now I'm referring for the jury's benefit to

19    lines 10 to 11 on page 1.

20         Did you ask him, "Is anyone around you?"

21    A    Yes.

22    Q    Why did you ask him that?

23    A    He was a taxi driver, I ask if there was anybody of his

24    client was around him.

25    Q    Referring to lines 13 through 14, did you ask Mr. Kasimov

HABIBOV - DIRECT - KESSLER

1   about connections?

2   A     Yes.

3   Q     Why were you asking about that?

4   A     I had knowledge he had a person in his knowledge he

5   mentioned me person in one of our conversations and named

6   Otabek on that phone conversation.  I couldn't remember the

7   name, then later on defendant himself remind me the name of it

8   and I believe that person has a connection, the person who

9   lived his friend who traveled to Syria and fighting in Syria.

10  Q     Why was it important to find a connection for

11  Saidakhmetov?

12  A     Because Saidakhmetov was telling me that he didn't know

13  anybody else to -- in order to help him to cross the border.

14  Q     Why did you think this person Otabek might be someone who

15  had connections?

16  A     I had knowledge he had stayed in contact with that

17  individual who was already in Syria fighting.

18  Q     Did you believe that the defendant knew Otabek?

19  A     Yes.

20  Q     Did you know Otabek?

21  A     Yes, I knew.  I knew him.

22  Q     Who did you believe knew Otabek better?

23  A     I believe Dilkhayot, the defendant, knew better.

24  Q     With respect to line 18 on page 2 for the jury's benefit,

25  did you refer to someone named Mirsad and that's spelled

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

HABIBOV – DIRECT – KESSLER

1   M-I-R-S-A-D.

2   A    Yes.

3   Q    Who is that?

4   A    That was his ex-roommate who lived with the defendant in

5   the Bay Parkway apartment.

6   Q    At the point you are making this phone call, where did

7   you believe Mirsad was?

8   A    I believe Mirsad was in Syria.

9   Q    Just so the record is clear, who was Mirsad's

10  ex-roommate?

11  A    Defendant.

12  Q    So the defendant and Mirsad lived together?

13  A    Lived together in apartment.

14  Q    I also asked you before about your question to the

15  defendant, "Is anyone around you?"  Why did you want to know

16  if there were other people around?

17  A    I wanted to be careful, I just didn't want anybody

18  overheard our conversation.

19          MR. KESSLER:  I'm now going to move ahead in time to

20  February 23rd and play Government Exhibit 109.

21          (Audiotape played.)

22          (Audiotape stopped.)

23  Q    Who was speaking in Government Exhibit 109?

24  A    It's me talking to Azizjon Rakhmatov in this

25  conversation.

HABIBOV - DIRECT - KESSLER

1    Q    Very generally, what were you talking about in this

2    conversation?

3    A    I was talking to him what was intended to be collected

4    and what happened if it was intended, how much money he was

5    donating to Saidakhmetov's trip.

6    Q    With respect to lines 23 to 24 of the transcript on

7    page 2, did you indicate where you were when you were making

8    this call?

9    A    Yes.

10   Q    Where were you?

11   A    I was in Florida.

12   Q    With respect to -- just referring to line 33, did you

13   indicate when Mr. Saidakhmetov would be leaving?

14   A    Yes.

15   Q    What did you say?

16   A    I said on the 25th, he was going leave the 25th.

17   Q    Now for the jury's reference I'm turning to lines 48 to

18   51 on page 3.  Did you explain what kind of plane ticket

19   Mr. Saidakhmetov had purchased?

20   A    Yes.

21   Q    What kind of ticket?

22   A    I -- he purchased round trip to Turkey.

23   Q    Did he tell you whether he intended to come back?

24   A    No.  His intention was to stay.

25   Q    Did you have a conversation as part of this call with

HABIBOV - DIRECT - KESSLER

1   Mr. Rakhmatov about a pencil?

2   A    Yes.

3   Q    Were you actually talking about the writing instrument?

4   A    No, it wasn't.

5   Q    What did you refer to with the word pencil?

6   A    On that conversation I was referring to weapon.

7   Q    Why didn't you just say weapon?

8   A    We had -- in different conversations we had that term

9   used for weapon as well in different conversations.

10  Q    At the end of the call -- oh, I'm sorry.  At the end of

11  the call you refer to depositing money when Saidakhmetov

12  reaches Turkey.  Do you remember that?

13  A    Yes.

14  Q    Did Mr. Rakhmatov respond?  And now I'm looking at

15  line 87 on page 5, did he respond to the effect of please

16  don't talk about that now?

17  A    Yes.  He said, please be careful on that phone

18  conversations, please don't talk about it on the phone.

19  Q    What did you understand him to mean by that?

20  A    I said -- I understood I should be very careful not

21  discussing any further.  Not in details.

22  Q    Not discussing what further?

23  A    In details about Saidakhmetov's trip.

24        MR. KESSLER:  Sorry, Your Honor, there was a noise

25  in the courtroom.

HABIBOV – DIRECT – KESSLER

1    Q    So that call was on February 23rd, I'm now going to turn

2    to February 24th.  So the first call I'm going to play is

3    Government Exhibit 124.  It's out of the sequence of the

4    numbers we've been going through, but the transcript is going

5    to be several tabs ahead in the transcript binder under the

6    tab labeled Exhibit 124T.

7              (Audiotape played.)

8              (Audiotape stopped.)

9    Q    So I stopped the recording at one minute and 41 seconds.

10             Mr. Habibov, what was being discussed in that first

11   portion of Government Exhibit 124?

12   A    Me discussing about Saidakhmetov's trip on February 25th.

13   Q    Who were you talking to?

14   A    I was talking to Akmal Zakirov, my business partner.

15   Q    Referring to lines four through five of the transcript,

16   do you refer to an urgent matter?

17   A    Urgent matter, yes.

18   Q    What was urgent?

19   A    The urgent matter because it was only a few hours and a

20   day was left for him to departure, for his departure, for

21   Akhror Saidakhmetov's departure.

22   Q    Did you ask Mr. Zakirov about collecting money for

23   Mr. Saidakhmetov?

24   A    Yes.

25   Q    There were some names mentioned in the call.  Again there

HABIBOV – DIRECT – KESSLER

1   was a reference to Dilshod.  Who is that?

2   A    Dilshod Khusanov.

3   Q    Then a reference to Abdulaziz?

4   A    That was Azizjon Rakhmatov.

5   Q    A reference to Nusrat?

6   A    That was Nusratella.

7   Q    There's a reference to Jamshid?

8   A    That was my business partner, Jamshid Bekhmatov.

9   Q    Was it your expectation that all of these people would

10  bring money to you to then give to Mr. Saidakhmetov?

11  A    Yes.

12  Q    Okay.

13       MR. KESSLER:  Your Honor, it is –– I'm cognizant of

14  the time, it is about three minutes of five.  It may not be

15  efficient to move to the next call and then break in the

16  middle of the call.

17       THE COURT:  As they say in Congress, the gentleman

18  yields the balance of his time.

19       Ladies and gentlemen, we are adjourned for the day.

20  What I'm going to do is ask you to leave your respective

21  binders on your chairs.

22       I will encourage counsel overnight to make sure the

23  court reporters have a copy of the binders so that they don't

24  have to interrupt to seek spellings of names or any of those

25  things.  I'm sure that will happen.

PROCEEDINGS

1        So again, do not talk about the case.  Have a good

2   evening.  Relax.

3        We'll see you tomorrow at 9:30 in the morning.

4   Thank you very much.

5        We're adjourned for the day.

6        (Jury exits courtroom.)

7        (The witness was excused.)

8        THE COURT:  The witness has -- you may be seated.

9   The witness has left the witness box, the jury has left the

10  courtroom.  The defendant is still present.

11       Do we have any procedural issues we need to address

12  before we adjourn for the day?

13       MR. PRAVDA:  Not from the government, Your Honor.

14       THE COURT:  I do want you to give the reporters a

15  copy of the volume that's already in evidence so they can,

16  since we're getting realtime, they've been very good about not

17  to interrupting too much to get the spellings of names, but I

18  think it would facilitate matters and lead to a cleaner

19  record, a more accurate record if you do that.  So if you're

20  willing to do that.  I never tell lawyers how to try their

21  cases I just suggest things that might be helpful.

22       Are you prepared to do that?

23       MR. HAGGANS:  If I might just make a suggestion,

24  Your Honor.  I believe we delivered two copies for the Court's

25  convenience, I propose that we give the reporters one of those

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS

 1   copies now and we'll deliver a second copy as well.

 2           THE COURT:  I have one copy in hand and I've got 20

 3   to 25.  Is that 20 to 25?

 4           THE COURTROOM DEPUTY:  The same.

 5           THE COURT:  That's the same.  So we'll do that with

 6   the permission of the government.  Is that acceptable to

 7   defense counsel?  Since all the documents are evidence we're

 8   just going to give a set of these documents to the court

 9   reporter, although Mr. Jackson that says 21 to 25.

10           THE COURTROOM DEPUTY:  Twenty-one of 25, Judge.

11           THE COURT:  Twenty-one of 25.  So that's what we're

12   going to give the court reporters so they can have the names

13   and won't be interrupting to get spellings.

14           Is that acceptable to defense counsel?

15           MS. MACEDONIO:  Yes, of course, Your Honor.

16           THE COURT:  Why don't you give that to the court

17   reporter, Mr. Jackson.  The court reporter is here?

18           THE COURT REPORTER:  Yes.

19           MR. HAGGANS:  Your Honor, would the Court like us to

20   make a second copy for the Court?

21           THE COURT:  Yes.

22           MR. HAGGANS:  I'll do that.  I just wanted to note

23   on the record --

24           THE COURT:  Why don't you sit down and use the

25   microphone.

PROCEEDINGS

1          MR. HAGGANS:  Yes, Your Honor.  I'll note, because

2   we already sequenced one through 25 and in particular the

3   binders assigned to the jury, that one will not have a number

4   assigned.  I just wanted to note that fact on the record.

5          MS. MACEDONIO:  25A.

6          MR. HAGGANS:  Forgive me, Your Honor.

7          THE COURT:  All I'm doing is saying that you guys

8   should have given a list of these names, which are not Joe

9   Smith and John Jones to the court reporters in advance so it

10  would help facilitate their Herculean efforts to get all the

11  names accurately.  And since we're now breaking at this point,

12  I think it would be a good idea to provide the documents with

13  the names so the court reporters will be fully up to speed

14  tomorrow.

15          I'm happy to give them that folder, they can give it

16  back to me tomorrow morning.  This is just sort of an

17  overnight for them.  It's not about having binders unaccounted

18  for.  It's about facilitating the quality of the record.  I

19  would have thought you guys would have given them the names or

20  a list of names.

21          When I was in practice if I had names that were

22  beyond John Jones or Joe Smith, whether it was chemical names

23  of compounds or names of individual witnesses or names of

24  locations, it was my practice, civil for the most part, but my

25  practice to give them a list of names.  That being said, all I

PROCEEDINGS

1    want to do is let them have the advantage of having the names

2    that are being referred to.  So that's all we're talking

3    about, okay?  Is that clear?

4              MR. PRAVDA:  Your Honor, I'm happy to say that I

5    followed your practice and at the outset of the trial I did

6    give the court reporter a list of names --

7              THE COURT:  With all due respect, it's clear to me

8    that today they were having trouble with the names.  So all

9    I'm saying is we're going through this process, why don't you

10   give them a set of these documents in this folder overnight so

11   they can have greater facility with the names and you'll get

12   the folder -- the Court will get the second folder back

13   tomorrow.  That's just a suggestion.

14             Is that okay?  Because it is not -- whatever you did

15   before, with all due respect, wasn't really working well from

16   my vantage point in terms of the court reporters.  I haven't

17   asked them because I haven't had to ask them.  They are

18   obviously struggling to get the names, so let's give them the

19   papers so they can do it overnight.  It will be a cleaner

20   record for both sides, no harm, no foul, but let's do it to

21   make the record better for all parties.  Okay.  We're going to

22   do it that way.

23             Anything else?

24             MS. SHARKEY:  No.

25             THE COURT:  Anything else from the government?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

1            MR. HAGGANS:  No.

2            THE COURT:  We're adjourned.  Have a good night.

3            MR. PRAVDA:  No, Your Honor.  Thank you.

4            (Whereupon, the trial adjourned at 5:00 p.m. to

5     resume Thursday, September 19, 2019 at 9:30 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X

 2   WITNESS                              PAGE

 3   LORENZO VIDINO

 4   DIRECT EXAMINATION   BY MR. HAGGANS      182

 5   CROSS-EXAMINATION    BY MS. MACEDONIO    216

 6   REDIRECT EXAMINATION BY MR. HAGGANS      233

 7

     ABROR HABIBOV

 8   DIRECT EXAMINATION   BY MR. KESSLER      249

 9

10                    E X H I B I T S
     GOVERNMENT                 PAGE
11   39C                        188
     200                        237
12   101-124                    238
     130-132                    238
13   151-164                    238
     185-187                    238
14   202                        239
     20                         240
15   204                        240
     44, 45, 46                 241
16   205                        241
     50T                        243
17   Attachment 1               243
     5                          265
18   8                          272
     6                          274
19   7                          274
     4                          275
20   1                          275
     203                        279
21   40, 41A, 42, 57, 203       281
     46                         290
22   3                          309

23

24

25
```

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*