```
1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------x
                                        15-CR-95(WFK)
3   UNITED STATES OF AMERICA,
                                        United States Courthouse
4            Plaintiff,                 Brooklyn, New York

5            -against-                  September 19, 2019
                                        9:30 a.m.
6   DILKHAYOT KASIMOV,

7            Defendant.
    ------------------------------x
8

9            TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
           BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
10              UNITED STATES DISTRICT JUDGE
                     BEFORE A JURY
11

12  APPEARANCES

13  For the Government:      UNITED STATES ATTORNEY'S OFFICE
                             Eastern District of New York
14                           271 Cadman Plaza East
                             Brooklyn, New York 11201
15                           BY:  DOUGLAS M. PRAVDA, AUSA
                                  DAVID K. KESSLER, AUSA
16                                MATTHEW HAGGANS, AUSA

17

18  For the Defendant:       ELIZABETH E. MACEDONIO, P.C.
                             40 Fulton Street - 23rd Floor
19                           New York, New York 10038
                             BY:  ELIZABETH E. MACEDONIO, ESQ.
20
                             KELLEY J. SHARKEY
21                           26 Court Street - Suite 2805
                             Brooklyn, New York 11242
22                           BY:  KELLEY J. SHARKEY, ESQ.

23                           LORD & SCHEWEL
                             233 Broadway - Suite 2220
24                           New York, New York 10279
                             BY:  ABRAHAM RUBERT-SCHEWEL, ESQ.
25
```

APPEARANCES(Continued)


Also Present:              ERIKA LOPEZ, PARALEGAL SPECIALIST
                          SPECIAL AGENT MEGAN DOLAN

                          NODIRA MATYAKUBOVA, INTERPRETER
                          SANJAR BABADJANOV, INTERPRETER

Court Reporter:           GEORGETTE K. BETTS, RPR, FCRR, CCR
                          Phone:  718-804-2777
                          Email:  Georgetteb25@gmail.com

Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

PROCEEDINGS

1              (In open court; jury not present.)

2              THE COURTROOM DEPUTY:  All rise.  The Honorable

3    William F. Kuntz, II is now presiding.

4              Criminal cause for trial.  Docket number 15-CR-95.

5    U.S.A. versus Kasimov.

6              Counsel, please your state appearances for the

7    record.

8              MR. PRAVDA:  Good morning, Your Honor.  Doug Pravda,

9    David Kessler, Matthew Haggans, Erika Lopez and Megan Dolan

10   for the United States.

11             MR. HAGGANS:  Good morning, Your Honor.

12             THE COURT:  I think we have the spellings.  You may

13   be seated.

14             MS. MACEDONIO:  Good morning, Your Honor.  Elizabeth

15   Macedonio, Abraham Rubert-Schewel and Kelley Sharkey for

16   Mr. Kasimov.

17             THE COURT:  Good morning.  We have the spellings.

18   You may be seated.

19             The record should reflect we do have the interpreter

20   present as well, yes.  Thank you.

21             THE DEFENDANT:  Good morning, Your Honor.

22             THE COURT:  The defendant has been produced, he's

23   being seated.

24             Do we have any preliminary issues before we bring

25   the witness in that we need to discuss outside the presence of

PROCEEDINGS

1    the jury and outside of the presence of the witness?

2            MR. PRAVDA:  Your Honor, just one item that

3    Mr. Haggans is going to address for the government.

4            THE COURT:  Yes.

5            MR. HAGGANS:  Your Honor, it concerns one of the

6    stipulations the parties moved in yesterday.

7            THE COURT:  Uh-oh.  Usually I don't get in trouble

8    with the Court of Appeals for a stipulation, but who knows.

9    Go ahead.

10           MR. HAGGANS:  And we intend to continue that

11   pattern, Your Honor.

12           THE COURT:  I hope.  Let me make my own mistakes.

13           MR. HAGGANS:  The parties have agreed on quite a bit

14   in this case and with respect to one stipulation we agreed so

15   much we agreed to put in an exhibit that does not exist.  So

16   we have --

17           THE COURT:  Fake news, alternative facts, I

18   understand.

19           MR. HAGGANS:  So we have discussed that with defense

20   counsel.  We've prepared a replacement and at an appropriate

21   point some time today we would propose that we just read that

22   replacement in to the record.

23           THE COURT:  I think that's absolutely appropriate.

24   I take it that's appropriate as far as defense counsel is

25   concerned?

PROCEEDINGS

1          MS. MACEDONIO:  Yes, Your Honor.

2          THE COURT:  Okay.

3          MS. MACEDONIO:  I do have one issue that Mr. Kasimov

4    would like me to put on the record, Your Honor.

5          THE COURT:  Of course.

6          MS. MACEDONIO:  On Saturday afternoon the Bureau of

7    Prisons placed Mr. Kasimov in the Special Housing Unit.

8          THE COURT:  I'm going to ask you again, slow it down

9    Vader, go ahead.

10         MS. MACEDONIO:  For several days thereafter, he did

11   not have his legal materials, which he has been working on for

12   the past four and a half years.  I emailed the MDC legal

13   department and asked them to make certain that Mr. Kasimov got

14   his legal materials.  He has since received his legal

15   materials, however, they were -- from his review of the

16   materials, they were clearly tampered with.  Somebody had gone

17   through them, although he doesn't know who, he doesn't know

18   when, he doesn't know why, but the materials were out of place

19   and specifically the -- his review of the materials -- during

20   his review of the materials he had composed some areas of

21   cross-examination of Mr. Habibov that he has been unable to

22   locate.  And so for that reason he has asked me to ask the

23   Court that after Ms. Sharkey does her main cross of

24   Mr. Habibov, if we could have a few minutes to regroup to make

25   sure that all of the areas that he wanted covered were

PROCEEDINGS

1    covered.  So that is my application to the Court.

2              THE COURT:  So it's just an application for an

3    adjournment so you can discuss with him after you've completed

4    your cross-examination of Mr. Habibov, is that the request?

5              MS. MACEDONIO:  That is the request, Your Honor.

6              THE COURT:  Of course.

7              MS. MACEDONIO:  Thank you.

8              THE COURT:  I would allow you to do that just in the

9    ordinary course as a matter of courtesy.

10             MS. MACEDONIO:  Thank you.

11             THE COURT:  It's the kind of thing I liked when I

12   was trying cases.

13             MS. MACEDONIO:  Also, Your Honor, I did email the

14   MDC yesterday because Mr. Habibov has not been able to shower

15   or shave.

16             MR. KESSLER:  Kasimov.

17             MS. MACEDONIO:  I'm sorry, Mr. Kasimov.

18             THE COURT:  Kasimov.  I was going to say.

19             MS. MACEDONIO:  I have not gotten a response to

20   that.  I am concerned about it because clearly the jury is

21   looking at him every day and he's been unable to shave.

22             THE COURT:  Just for the record he looks great to

23   me.  And he smells great too.  So put that on the record.

24             MS. MACEDONIO:  He asked that I make a record of

25   that, I now have done so.  I will also follow up with the MDC

PROCEEDINGS

1   to inquire as to when they might provide him with those basic

2   necessities.

3         THE COURT:  Right, I will certainly -- you can tell

4   them that the Judge thinks it is appropriate for them to

5   provide him with those services.  The MDC has had enough in

6   the way of, shall we say, less than positive publicity as a

7   result of what happened in December and they ought to keep the

8   lights on and the water running.

9         MS. MACEDONIO:  Thank you, Your Honor.

10         THE COURT:  Even HUD manages to do that most of the

11   time.

12         What else do we have?

13         MR. KESSLER:  Your Honor, obviously we don't have a

14   an objection to Mr. Kasimov conferring with his counsel at the

15   end of Ms. Sharkey's cross-examination, the only thing I would

16   put on the record is it sounds like --

17         THE COURT:  But again Vader.

18         MR. KESSLER:  It sounds like this is an issue that

19   had been spotted by Sunday and it's only being raised now and

20   it's the first we're hearing about it --

21         THE COURT:  You're talking about the paper

22   shuffling.

23         MR. KESSLER:  The not having the legal papers first

24   and then receiving the legal papers with maybe something

25   missing or --

334

PROCEEDINGS

1          THE COURT:  Well, I was advised -- I thought I was

2     advised, I thought it was on notice to you that there was an

3     issue with another person that resulted in some SHU time, as

4     we call it.  No?  Yes?  There was some issue that resulted in

5     the defendant not having access; is that right?  Am I

6     misremembering?

7          MS. MACEDONIO:  I don't recall that, Your Honor, I'm

8     sorry.

9          THE COURT:  I thought there was a problem with the

10    cellmate.  In any event, my concern, candidly, is that the

11    defendant have appropriate access to his papers and

12    appropriate access to all cleanliness features.  Let's make

13    sure that happens.

14         MR. KESSLER:  And we agree with that, I just wanted

15    to make it clear, you know, that had this been raised to our

16    attention earlier, as it could have been, we all might have

17    been able to discuss this and try to resolve it faster.

18         THE COURT:  Understood.  Understood.

19         Do we have any other preliminary issues?

20         MR. KESSLER:  No.

21         THE COURT:  Nothing from the government.

22         From defense counsel.

23         MS. MACEDONIO:  No, thank you, Your Honor.

24         THE COURT:  So we can have the witness return, yes?

25         MR. KESSLER:  Yes.

HABIBOV − DIRECT − KESSLER

1              MR. HAGGANS:  Yes, Your Honor.

2              THE COURT:  Then we will bring in the jury.

3              Good morning, sir.

4              Does everyone have their realtime?

5              MS. MACEDONIO:  Yes, Your Honor.

6              MS. SHARKEY:  Yes, Your Honor.

7              MR. KESSLER:  Yes, I'm just going to check up at the

8    podium.

9              (Jury enters courtroom.)

10             THE COURT:  Good morning, ladies and gentlemen of

11   the jury.  Again, thank you for your promptness and for being

12   here, we very much appreciate it.

13             As you see the books from yesterday are just as you

14   left them, so if you would take those books and be seated

15   we're going to resume with the testimony of the witness.

16             Sir, you are still under oath.  Please be seated.

17   And counsel will continue the direct examination to be

18   followed by cross−examination.

19             So please continue, counsel.

20             MR. KESSLER:  Thank you, Your Honor.

21   **ABROR HABIBOV**, called as a witness, having been previously

22   duly sworn/affirmed, was examined and testified further as

23   follows:

24   DIRECT EXAMINATION

25   BY MR. KESSLER:

HABIBOV – DIRECT – KESSLER

1   Q    Good morning.

2   A    Good morning.

3   Q    Do you have a binder transcript in front of you this

4   morning?

5   A    I don't have it.

6   Q    Has the government asked you to review the transcripts

7   that are Government Exhibits 101T through 132T?

8   A    Yes, sir.

9   Q    The government asked you to review the transcripts?

10  A    No, no, it hasn't, they haven't.

11  Q    All right.  Yesterday we ended with Government

12  Exhibit 124, which is an audio recording from February 24th at

13  6:12 p.m.  The transcript for that is in the transcript

14  binders that the jury, the Court and counsel have behind

15  Tab 124T.

16          Mr. Habibov, do you recall that that phone call was

17  about getting money to Saidakhmetov for his trip?

18  A    Yes.

19  Q    And that was at 6:12 p.m. on February 24th, correct?

20  A    Yes.

21          MR. KESSLER:  Your Honor, if I could ask Mr. Jackson

22  to turn on the ELMO, I'd like to show Government Exhibit 166,

23  which is in evidence.

24          THE COURT:  Any objection?

25          MS. MACEDONIO:  No.

HABIBOV – DIRECT – KESSLER

1            THE COURT:  You may publish.

2            And, Mr. Jackson, would you dim the lights slightly

3    so that the jurors in the back row can see the drop-down

4    screen more clearly.  Thank you.

5            Go ahead.

6    BY MR. KESSLER:

7    Q    What I'm showing, just to be clear, I put Government

8    Exhibit 166 on the ELMO and I have covered everything except

9    the first row which begins 6:25 -- I'm sorry, yes 6:25:38 in

10   the evening.

11           Mr. Habibov, at 6:25 in the evening, approximately

12   13 minutes after that phone call, Government Exhibit 124, did

13   you send the defendant a text message?

14   A    Yes, I have.

15   Q    What did you say in your text message?

16   A    On text message I ask him how did he settle the topic we

17   were discussing, which is it meant to be the raising fund to

18   Akhror Saidakhmetov's trip.

19   Q    Okay.  Well, you wrote, "Bro, how do you settle the guy's

20   request, he's leaving today," correct?

21   A    Yes.

22   Q    You wrote that in Uzbek but I've read the English

23   translation?

24   A    Yes, I did in Uzbek.

25           THE COURT:  What's the date of that transmission?

HABIBOV – DIRECT – KESSLER

1           MR. KESSLER:  February 24th –– sorry.

2    Q    Mr. Habibov, could you read the date of that

3    transmission?

4    A    This is February 24th, 2015, at 6:25 p.m.

5    Q    So when you wrote, Bro, how do you settle the guy's

6    request, he's leaving today, what did you mean?

7    A    I meant if he made any further on –– if he did get

8    anything done.

9    Q    So I'm now going to uncover the next row in Government

10   Exhibit 166.  What time is this next text message?

11   A    6:29 p.m.

12   Q    Is this a text message from the defendant?

13   A    Yes, it is.

14   Q    What did he write?

15   A    It said if I give you $500 would it be enough for you.

16   Would it be enough, yeah.

17   Q    So he was asking you if him giving $500 would be enough?

18   A    Yes.

19   Q    Let me uncover the next row.  What time is this next

20   text?

21   A    6:30 p.m.

22   Q    Is this from the defendant or from you?

23   A    This is from defendant.

24   Q    What did he write?

25   A    It said if others having difficulties to pay, I would

HABIBOV - DIRECT - KESSLER

1   offer you a thousand dollars.

2   Q    Had you asked him to give a thousand dollars?

3   A    I haven't.

4   Q    I'm going to uncover the next row in the text.  When was

5   this next text sent?

6   A    6:34 p.m.

7   Q    Was it from you or the defendant?

8   A    This is from defendant.

9   Q    What did the defendant write?

10  A    How much you are short.  How much money do you need.  How

11  much you are short.

12  Q    Okay.  I'm going to uncover the next row.  And actually

13  to be clear, I've uncovered the next three messages.

14       So first at 6:42 p.m., did you text the defendant?

15  A    Yes.

16  Q    What did you say?

17  A    I said, "Yes, I am."

18  Q    That was at 6:42, right?

19  A    6:42, yes.

20  Q    At 7:02 --

21       MR. KESSLER:  Just one second, Your Honor.

22       I apologize.  I am going to put the final version of

23  Government Exhibit 166 and I'll make clear the difference.

24       THE COURT:  So you're presenting a different version

25  or the same version, just so the record is clear.

| | |
|---|---|
| 1 | MR. KESSLER:  So I am presenting a version that is |
| 2 | slightly different. |
| 3 | THE COURT:  Let's have the slightly different |
| 4 | version that you're now presenting marked as perhaps |
| 5 | Government Exhibit 166T-1, would that make sense? |
| 6 | MR. KESSLER:  Sure. |
| 7 | THE COURT:  The other one was 166. |
| 8 | MR. KESSLER:  The other one was just 166. |
| 9 | THE COURT:  Why don't you make this 166-1, so the |
| 10 | record is clear. |
| 11 | Is that acceptable? |
| 12 | MS. SHARKEY:  Yes. |
| 13 | THE COURT:  Is it acceptable to have that admitted |
| 14 | in evidence? |
| 15 | MS. SHARKEY:  Yes. |
| 16 | THE COURT:  All right.  You may publish it to the |
| 17 | jury. |
| 18 | (Government Exhibit 166-1, was received in |
| 19 | evidence.) |
| 20 | (Exhibit published.) |
| 21 | MR. KESSLER:  Thank you, Your Honor. |
| 22 | Q    Mr. Habibov, let's just go back to the 6:42 text, what |
| 23 | did you write? |
| 24 | A    I said, Yes. |
| 25 | Q    And then at 7:02:36 p.m., what did you write? |

HABIBOV - DIRECT - KESSLER

1    A    I said $500 would be good enough.

2    Q    So you were not asking for a thousand dollars just 500?

3    A    No.

4    Q    Now I'm going to uncover the next text at 7:02:53

5    seconds, do you see that?

6    A    Yes.

7    Q    What did you write?

8    A    I said, Whenever you have a chance can you call me back.

9    Q    All right.  So I'm now going to play you Government

10   Exhibit 110 and the transcript for that will be in the

11   transcript binder behind the tab labeled Exhibit 110T.  This

12   is a call at 7:06 p.m.

13             MR. KESSLER:  Mr. Jackson, if I could have the

14   laptop.

15             (Audiotape played.)

16             (Audiotape stopped.)

17   Q    Who was speaking on Government Exhibit 110?

18   A    On this phone call it's me and with the defendant.

19   Q    Did this phone call take place about three minutes after

20   you asked the defendant to call you back in Government

21   Exhibit 166?

22   A    Yes, it did.

23   Q    What were you talking about with the defendant on this

24   call?

25   A    On this call I called him and I ask him if he's even

HABIBOV - DIRECT - KESSLER

1   unable to drop them off about Saidakhmetov I was talking, and

2   that they were going to airport.  I said if you are unable to

3   drop him off because you are working next day in the morning,

4   at least can you drop him off -- drop off some money to them,

5   to Saidakhmetov.

6   Q    So now I'm going to ask you some specific questions.

7   A    Sure.

8   Q    For the jury's reference referring to line 13 in the

9   transcript on page 1.  Mr. Habibov, did you tell the defendant

10  that the brothers are leaving at night?

11  A    Yes.

12  Q    Did he ask you which brothers you were talking about?

13  A    No, he didn't.

14  Q    With respect to lines 18 through 19 of the transcript,

15  did you -- it's on page 2, did you tell the defendant how much

16  money other people had given?

17  A    Yes.  I roughly calculated during that phone

18  conversation.  I said somebody's giving $300 and $200 and with

19  yours would be $1,000 and then I ask him if he could drop off

20  $1500 to the -- to Saidakhmetov.

21  Q    Did the defendant say whether he had $1500 to drop off?

22  A    Yes, he said I'll -- I have it and I'll drop it off.

23  Q    Did you talk about the defendant having money for food

24  and that thing?

25  A    Yes, I did.

343

HABIBOV – DIRECT – KESSLER

1    Q    What did you mean by that thing?

2    A    That thing I meant for weapon.

3    Q    Did the defendant ask you what you meant by that thing?

4    A    He didn't.

5    Q    Did the defendant ask you when the brothers were leaving?

6    A    Yes.

7    Q    Referring to lines 28 through 29, what did you tell him?

8    A    I told him they are leaving tonight around probably 12 or

9    past 12.

10   Q    Referring to line 30 in the transcript, did the defendant

11   give you an answer about whether he would take Saidakhmetov to

12   the airport?

13   A    Yeah, he offered he could drop them off himself he would

14   be available 10:30 p.m.

15   Q    Referring to lines 38 through 39, did the defendant tell

16   you words to the effect I will take care of everything?

17   A    He said I'll take care of everything, I'll get it done

18   everything.

19   Q    So that call was at 7:06 p.m.  I'm now going to play

20   Government Exhibit 113, 1-1-3.  The transcript for that is

21   behind the tab labeled Exhibit 113T.

22            (Audiotape played.)

23            (Audiotape stopped.)

24   Q    Who is talking in Government Exhibit 113?

25   A    That's me on this phone conversation with my business

344

HABIBOV - DIRECT - KESSLER

1   partner, Jamshid Bekhmatov.

2   Q    What are you talking about?

3   A    I was talking about if he was in New York -- I was trying

4   to ask him if he was in New York if he was available if he

5   could deliver $1500 to Saidakhmetov.

6   Q    Is this after the defendant had told you he wasn't free

7   until 10:30?

8   A    Yes.

9   Q    So referring to lines 21 through 23 of the transcript on

10  page 2, did you tell Mr. Bekhmatov what the defendant was

11  doing that night?

12  A    Yes.

13  Q    Where did you tell him the defendant was?

14  A    I said he's not -- he won't be available 'til 10 I

15  mentioned.

16  Q    Did you say whether he was at work or doing something

17  else?

18  A    I said he's working, he's...

19  Q    Referring you -- referring to lines 43 through 44 on

20  page 3, did you talk to Mr. Bekhmatov about someone named

21  Askar?  And that's A-S-K-A-R.

22  A    Yes, I did.

23  Q    What did you say about Askar?

24  A    He suggested if I should call to Askar if I want to get

25  it done and I told him I'm not sure, what if he becomes

HABIBOV – DIRECT – KESSLER

1    suspicious.

2    Q    What did you mean by that?

3    A    I meant that if Saidakhmetov tells Askar about his plan

4    going to Syria that would have made it a problem for me.

5    Q    Why was it a problem to tell Askar about Syria but not

6    some of the other people who were contributing money?

7    A    Because I believed Askar is very nationalist and he

8    values about our government system and I was worried that he

9    would have told Uzbek government about what I was doing in

10   America.

11           MR. KESSLER:  Mr. Jackson, if I could switch back to

12   the ELMO for a moment.  I'm showing -- this is Government

13   Exhibit 166 again, the same text messages we were looking at

14   earlier.  And I'm now going to uncover the next text

15   message -- actually the next two text messages.

16   Q    Mr. Habibov, did you send the defendant two text messages

17   at 8:31 p.m.?

18   A    This is defendant sending to me.

19   Q    I'm sorry.  Did the defendant send you two text messages

20   at approximately 8:31 p.m.?

21   A    Yes.

22           MR. KESSLER:  And for the record I said 166, but I

23   meant 166-1.

24           THE COURT:  Understood.

25   Q    These text messages were about five minutes or so after

HABIBOV - DIRECT - KESSLER

1    you talked to Mr. Bekhmatov?

2    A    Yes.

3    Q    And what did the defendant write to you?

4    A    He said I cannot talk to you, can I call you in 15

5    minutes.

6              MR. KESSLER:  I'd now like to play Government

7    Exhibit 114.  The transcript for that is in the transcript

8    binder behind the tab Exhibit 114T.  This is a phone call at

9    8:41 p.m.

10             (Audiotape played.)

11             (Audiotape stopped.)

12   Q    Who were you talking to in Government Exhibit 114?

13   A    It's me talking to Saidakhmetov, Akhror on this

14   conversation.

15   Q    What were you talking about?

16   A    I was talking about me being how to get him money on time

17   before he departures.

18   Q    At the time you placed this call were you confident that

19   you would be able to get $1500 to him before he took off?

20   A    I wasn't confident.  I wasn't sure if I could get it

21   done.

22   Q    Referring to transcript lines 51 to 52 on page 3, did

23   Saidakhmetov talk to you about communicating secretly?

24   A    Yes, he did.

25   Q    What did you take that to mean?

A I took it to be careful and if we talked further on discussing to be careful on it.

Q Transcript line 55, page 3. Did you talk to Mr. Saidakhmetov about Telegram, WhatsApp, which is spelled W-H-A-T-S-A-P-P or Viber, which is spelled V-I-B-E-R?

A Yes.

Q What are those?

A In my understanding they are the apps you could use as -- for text messaging, Internet text messaging.

Q Referencing line 62 to 63 on page 3, did you talk to Mr. Saidakhmetov about -- I'm going to spell this -- Abdullah Bukhari's place. And that's spelled A-B-D-U-L-L-A-H, capital B-U-K-H-A-R-I?

A Yes, I did.

Q What is that?

A That's an Iman name in Turkey and he had the school in Turkey and that's why I mentioned Abdullah Bukhari's place.

Q Why did you ask Mr. Saidakhmetov whether he'd be spending some time there?

A Yes, I said because we had different conversations, he said initially he would be spending little time 'til he finds somebody in order to go to Syria.

MR. KESSLER: Government Exhibit 114 was at 8:41 p.m. Mr. Jackson, if I could have the ELMO, I'm going to go back to Government Exhibit 166-1.

HABIBOV – DIRECT – KESSLER

1  Q    Did you send the defendant another text approximately 10

2  minutes after that 8:41 p.m. phone call?

3  A    Yes.

4  Q    What time did you send the text?

5  A    I sent it 8:52 p.m.

6  Q    What did you tell him?

7  A    I said, brother is taking off -- no.  Brother, they are

8  leaving to airport right now and how soon you will be

9  available.  Yeah.

10  Q    I'm now going to turn the page of Government

11  Exhibit 166-1 to the second page.

12        Did the defendant send you a text about a minute

13  later at 8:53 p.m.?

14  A    Yes, he did.

15  Q    What did he say?

16  A    He said I'll call you back in 10 minutes.

17        MR. KESSLER:  I'm now going to play Government

18  Exhibit 115, which is a call at approximately 8:53 p.m.  The

19  transcript for that is behind the tab labeled 115T in the

20  transcript binder.

21        (Audiotape played.)

22        (Audiotape stopped.)

23  Q    Who was talking in Government Exhibit 115?

24  A    In this phone conversation it's me and talking to

25  Saidakhmetov.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

HABIBOV – DIRECT – KESSLER

1   Q    What are you talking about?

2   A    Talking about still trying to get how to deliver the

3   money to Saidakhmetov.

4   Q    Are you also talking about who will take Saidakhmetov to

5   the airport?

6   A    Yes.

7   Q    In the conversation do you refer to Home Depot a few

8   times?

9   A    Yes, I did.

10  Q    Why were you referring to Home Depot?

11  A    I was referring to defendant's address.

12  Q    That he lived near Home Depot?

13  A    Yeah, he lived near Home Depot, which is located on

14  Cropsey Avenue.

15  Q    Now referring to lines 45 through 48 of the transcript on

16  page 3, did you tell Mr. Saidakhmetov whether the defendant

17  wanted or didn't want to drop him off?

18  A    He offered to -- I told him he wanted to give him a ride

19  himself but being a hard time to get him, get him on the

20  phone.

21  Q    Did you say something about a call in 10 minutes?

22  A    Yes.  I told him -- he said he's going to be free in 10

23  minutes, he's going to call me back, then I'm waiting for his

24  phone call.

25  Q    Was that a reference to the text message we just read in

350

HABIBOV - DIRECT - KESSLER

1  Government Exhibit 166-1?

2  A    Yes, it was.

3         MR. KESSLER:  I'm now going to play Government

4  Exhibit 116.  This is a call at 9:03, approximately 10 minutes

5  after the previous call.

6         (Audiotape played.)

7         (Audiotape stopped.)

8  Q    Who was talking in Government Exhibit 1116?

9  A    That's me talking to defendant.

10  Q    What are you talking about with him?

11  A    I was talking about if -- if there is -- about still

12  trying to deliver the money to Saidakhmetov.

13  Q    Did you -- referring to lines five to six in the

14  transcript for the jury and the Court, did you continue to ask

15  the defendant to take Mr. Saidakhmetov to the airport?

16  A    No.  On this one I didn't.

17  Q    Did you continue to ask him to bring the money to the

18  airport?

19  A    Yes, I did.

20  Q    Was there then a discussion about Queens and Brooklyn and

21  different locations?

22  A    Yes.

23  Q    What was that discussion about?

24  A    That discussion was about defendant being -- he's in

25  either in Queens or Manhattan or Brooklyn.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

HABIBOV - DIRECT - KESSLER

1    Q    Referring to lines 28 through 29 in the transcript on

2    page 2, was there also a discussion about someone who was

3    supposed to transfer funds to Tashkent?

4    A    Yes.

5    Q    Where is Tashkent?

6    A    Tashkent is located in Uzbekistan, it's the capital city.

7    Q    Why were you talking about someone who might transfer

8    money to Tashkent?

9    A    He said on this phone conversation somebody wanted to

10   give him some money in order to transfer to Tashkent.

11   Q    Why was that relevant to figuring out how to get money to

12   Mr. Saidakhmetov?

13   A    That the defendant was advising there would be the person

14   he would have money so they could pick them up from him.

15   Q    He was suggesting Mr. Saidakhmetov could go to that

16   person?

17   A    Yes, go to that person and to pick up the money.

18   Q    At the end of this phone call at approximately 9:03 p.m.,

19   was it your understanding that the defendant was still going

20   to go to the airport to bring money?

21   A    Yes -- at that time, no.

22   Q    You thought the money was going to get there in some

23   other way?

24   A    We were trying to find other way how to get money to

25   Saidakhmetov.

HABIBOV – DIRECT – KESSLER

1        MR. KESSLER:  I'm now going to play Government

2   Exhibit 117, 1-1-7, which is a call at 9:09 p.m. approximately

3   six minutes later.

4               (Audiotape played.)

5               (Audiotape stopped.)

6   Q    Who was talking in this phone call?

7   A    On this phone conversation it's me and defendant talking.

8   Q    When we talked about the previous phone call the person

9   who's going to transfer money to Tashkent, was that person

10  located in Brooklyn?

11  A    Yes.

12  Q    So was it your understanding at 9:03 p.m. that

13  Saidakhmetov might go to that person to pick up the money?

14  A    Yes.

15  Q    Now turning back to Government Exhibit 117, did the

16  defendant call you back shortly after that previous call?

17  A    He called me back after.

18  Q    Referring to line 2, what did he say about getting the

19  money to Saidakhmetov?

20  A    He said what about myself deliver the money to the guy's

21  who's leaving.

22  Q    So he called you back to offer --

23  A    He called me back and offered, offered -- offered himself

24  to deliver the money.

25  Q    Did he say anything about whether he wanted to meet the

HABIBOV - DIRECT - KESSLER

1   people at the airport?

2   A    Yes, he wanted to meet them in person.

3   Q    How did you respond?

4   A    I said, yeah, no problem.  And I said to him if my phone

5   turns off, then he ask me what terminal he should go in to

6   drop off money to Saidakhmetov.

7   Q    As far as you knew, had the defendant met

8   Mr. Saidakhmetov at this point?

9   A    No.  As far as I knew, I don't have any knowledge if he

10  met Saidakhmetov or not.

11  Q    How were you going to make sure that defendant could meet

12  up with Mr. Saidakhmetov?

13  A    I was thinking maybe he could call and from there they

14  could arrange a meeting.

15  Q    Were you going to provide Saidakhmetov's number to the

16  defendant?

17  A    Phone numbers to them each, the defendant's and

18  Saidakhmetov's number to the person.

19          MR. KESSLER:  I'm now going to play Government

20  Exhibit 118, that's 1-1-8.  The transcript for that is behind

21  the tab marked Exhibit 118T.  This is a call approximately one

22  minute after Government Exhibit 117 at 9:10 p.m.

23          (Continued on the next page.)

24

25

HABIBOV – DIRECT – KESSLER

1    (In open court.)

2    (Recording played.)

3   DIRECT EXAMINATION

4   BY MR. KESSLER (continuing):

5   Q    Who were you talking to in Government Exhibit 118?

6   A    That's me talking to Saidakhmetov.

7   Q    What were you talking about?

8   A    Since defendant asked about which terminal they would be

9   in and would be at and I was asking him -- I was asking

10  Saidakhmetov what terminal they would be at so in order

11  defendant could deliver the money himself.

12  Q    What terminal did Mr. Saidakhmetov tell you?

13  A    He said Terminal 7.

14  Q    What airline did Mr. Saidakhmetov tell you?

15  A    He said Ukrainian Airlines they would be taking.

16  Q    Referring to line 12 in the transcript -- for the jury

17  and the court -- did you tell Mr. Saidakhmetov not to tell

18  anyone else about what you were doing?

19  A    Yes.

20  Q    Why did you say that?

21  A    I just wanted to be secret.  And I was -- yeah, I was

22  careful as well of anybody finding out.

23       MR. KESSLER:  Mr. Jackson, if I could have the ELMO

24  back.

25  Q    So Government Exhibit 118 was at approximately 9:10 p.m.

*MICHELE NARDONE, CSR -- Official Court Reporter*

355

HABIBOV - DIRECT - KESSLER

1          I'm now showing you Government Exhibit 1661.  Those

2    are the text messages.  I'm going to show you the last text

3    message.

4          When was the last text message in this exhibit that

5    you sent?

6    A    I sent to defendant Saidakhmetov's phone number.

7    Q    When did you send Saidakhmetov's phone number?

8    A    I sent at 9:12 p.m.

9    Q    Was that approximately one minute after your call with

10   Saidakhmetov?

11   A    Yes, it was, approximately.

12   Q    Did you talk to Mr. Saidakhmetov again that night?

13   A    Can you say the question?

14   Q    Did you talk to Mr. Saidakhmetov again that night?

15   A    I don't remember.  I don't think I have called him after

16   this phone call.

17   Q    Did you talk to the defendant later that night?

18   A    I do not remember if I called him again.

19          MR. KESSLER:  One moment.

20          (Pause.)

21          MR. KESSLER:  No further questions, Your Honor.

22          THE COURT:  Your witness.

23          MS. SHARKEY:  Judge, may I have a moment to set up?

24          THE COURT:  Yes, you may.

25          Ladies and gentlemen, we will take our 15-minute

                    *MICHELE NARDONE, CSR -- Official Court Reporter*

USA v. Kasimov

1    break now while counsel sets up for cross-examination.  Please

2    do not talk about the case and leave your books on your seat

3    place as you take your break.  Thank you.  See you in 15

4    minutes.

5              (Jury exits.)

6              (Witness exits courtroom.)

7              THE COURT:  You may be seated.  The jury has left

8    the courtroom.  The witness has been secured.

9              Do we have any other procedural issues to address

10   outside of the presence of the jury?

11             MR. KESSLER:  No.

12             MS. SHARKEY:  No, judge.

13             THE COURT:  Thank you.  See you in 15.

14             (Recess.)

15             THE COURT:  Back on the record.  The defendant has

16   been produced.

17             Do we have any procedural issues to address before

18   we bring the witness back to the stand and bring in the jury?

19             MR. KESSLER:  Not from the government.

20             MS. SHARKEY:  No, judge.

21             THE COURT:  Okay.  Let's do it.

22             MS. SHARKEY:  Judge, can we approach?

23             THE COURT:  Yes, you may.  Both sides, one side?

24             MS. SHARKEY:  Both sides.  Okay.

25             THE COURT:  On the record?

USA v. Kasimov

1          MS. SHARKEY:  Yeah.

2          THE COURT:  All right.

3          MS. SHARKEY:  I'm just approaching so in case the

4    jury comes back up.

5          THE COURT:  We are holding the jury.

6          MS. SHARKEY:  I notice in the courtroom is Agent Vu,

7    who well may be called for a prior inconsistent statement.

8          THE COURT:  On the defense case?

9          MS. SHARKEY:  On the defense case.  I don't think

10   she should be present.

11         THE COURT:  Have you designated this person as a

12   witness?

13         MS. SHARKEY:  We haven't heard the testimony yet.

14         THE COURT:  That's not my question.  Have you

15   designated this person as a witness in your case, where you

16   can designate witnesses in the pretrial process?

17         MS. SHARKEY:  No, we have not.

18         THE COURT:  You have not.  Have you listed this

19   person as a potential witness, prosecutors, yes or no?

20         MR. KESSLER:  We listed her originally.

21         THE COURT:  Is she listed on your -- talk amongst

22   yourselves.  Then you can answer my question.

23         (Pause.)

24         MR. KESSLER:  We were just consulting.

25         THE COURT:  Yes, I realize that; but I'm asking a

USA v. Kasimov

1    question, which is:  Is she listed?  Is this person listed --

2              MR. KESSLER:  Yes.

3              THE COURT:  Let me finish my question.

4              Is she listed on the revised list that you provided

5    to the court right before we started the trial, yes or no?

6              MR. PRAVDA:  Yes, Your Honor.

7              MR. KESSLER:  No, she is not.

8              THE COURT:  Which is it, yes or no?  Can we have an

9    answer, please.  I know there are three of you, but.

10             MR. HAGGANS:  On the revised list she is not listed.

11   For clarity, she was listed on an earlier list.

12             THE COURT:  I assume the revised list was the

13   governing list, that's why it was revised; or do we go back to

14   the original list?  It's up to you guys.  Which list do you

15   want me to operate from, the original list or the revised

16   list?

17             MR. HAGGANS:  The revised list, Your Honor.

18             THE COURT:  So you are not intending on calling this

19   person for a witness, correct?

20             MR. HAGGANS:  Correct, Your Honor.

21             THE COURT:  The bid is back to you, defense counsel.

22             Do you intend to call this person as a witness who

23   is not on the revised list?

24             MS. SHARKEY:  It is my intention to call her as a

25   witness, if necessary.

USA v. Kasimov

1          THE COURT:  All right.

2          MS. SHARKEY:  So I would say yes.

3          THE COURT:  So you are going to now inform the court

4    and inform the government that you do have someone that you

5    intend to call potentially, in addition to the

6    cross-designated witnesses, right?

7          MS. SHARKEY:  That's correct, Your Honor.

8          THE COURT:  Okay.  Now you are on notice that they

9    may call this person.  What's the name?

10         MR. KESSLER:  It's Special Agent Michelle,

11   M-I-C-H-E-L-L-E, Vu, V-U.

12         THE COURT:  All right.  So what is your view with

13   respect to the position that's just been asserted by defense

14   counsel?  Do you believe that this person should be excluded

15   from being in the courtroom, in light of their potential

16   possibility of calling her?  What's your view?

17         MR. KESSLER:  We don't object to that, Your Honor.

18         THE COURT:  You don't object to the person being

19   excluded?

20         MR. KESSLER:  That is correct.

21         THE COURT:  All right.  Then I'm going to order them

22   to be excluded.

23         MS. SHARKEY:  Thank you very much.  Thank you,

24   counsel; and I apologize for not bringing it to the court's

25   attention earlier.

360

USA v. Kasimov

1        THE COURT:  No harm, no foul.  Anything else?

2        MS. SHARKEY:  No, Your Honor.

3        THE COURT:  All right.  Can we have the witness

4   brought to the witness stand.

5        (Mr. Habibov resumes the stand.)

6        THE COURT:  Please be seated.

7        THE WITNESS:  Thank you.

8        THE COURT:  Mr. Jackson, will you let the CSO know

9   we are ready for the jury to be brought back.

10        THE CLERK:  Yes, judge.

11        THE COURT:  Thank you.

12        (Pause.)

13        THE COURT:  Just before the jury is returned, on the

14   record.  I just want to point out that Rule 615 of the Federal

15   Rules of Evidence with respect to excluding witnesses says, at

16   a party's request the court must order witnesses excluded so

17   that they cannot hear other witnesses' testimony, or the court

18   may do so on its own; but the rule does not authorize

19   excluding, A, a party who is a natural person; B, an officer

20   or employee of a party that is not a natural person, after

21   being designated as the party's representative by its

22   attorney; C, a person whose presence a party shows to be

23   essential to presenting the party's claim for defense; or, D,

24   a person authorized by statute to be present.

25        So that is the governing rule, as I'm sure

1    distinguished counsel know.  I thought I would make it

2    explicit upon the record.

3              MR. KESSLER:  Thank you, Your Honor.

4              THE COURT:  You are very welcome.

5              MR. KESSLER:  I need to make something else explicit

6    on the record.  If the jury starts to come in --

7              THE COURT:  I can stop the jury coming in.  I have

8    that much power at least.

9              MR. KESSLER:  So also present in the courtroom, as

10   they were yesterday, are Special Agent Elaine Rothlisberger,

11   E-L-A-I-N-E R-O-T-H-L-I-S-B-E-R-G-E-R, and Richard Paugh,

12   R-I-C-H-A-R-D P-A-U-G-H.  They both work for the FBI.  They

13   both were present for at least one and, I believe, more than

14   one meeting with the witness.

15             They are the two agents who are -- in whose custody

16   the witness is today by virtue of a takeout order.  So

17   excluding them from the courtroom poses much more complicated

18   problems than excluding the special agent.

19             THE COURT:  That is why the court, in its

20   discretion, is not going to exclude them.

21             Is there any objection to the court not excluding

22   those special agents that have just been identified?

23             MS. SHARKEY:  No, I don't object.  I would normally

24   ask, but if the court doesn't want them excluded, that's fine.

25             THE COURT:  I do not want them excluded for the

Habibov - Cross/Sharkey

1    reasons that have been stated.

2              MS. SHARKEY:  No objection.

3              THE COURT:  Thank you.

4              MR. KESSLER:  Thank you.

5              (Pause.)

6              (Jury enters.)

7              THE COURT:  Welcome back, ladies and gentlemen of

8    the jury.  Please remove those books and be seated.

9              We are now going to have cross-examination.

10             Ms. Sharkey, I understand you are going to be doing

11   the cross-examination.  Is that correct?

12             MS. SHARKEY:  Yes, sir.

13             THE COURT:  Please come forward and begin your

14   cross-examination of the witness who, of course, is still

15   under oath.

16             MS. SHARKEY:  Thank you, judge.

17   CROSS-EXAMINATION

18   BY MS. SHARKEY:

19   Q    Mr. Habibov, you testified yesterday that you signed a

20   cooperation agreement, correct?

21   A    Yes.

22   Q    And your understanding as to the cooperation agreement,

23   at the conclusion of your efforts on behalf of the United

24   States Government you will receive a break at sentence, right?

25   A    They would file a motion.  If I'm being truthful,

Habibov – Cross/Sharkey

1  according to the cooperation agreement, they will file a

2  motion.

3  Q    And that motion would recommend or inform the court that,

4  in their opinion, the court is not bound by what's called the

5  guidelines, right?

6  A    Yes.

7  Q    And you would hope to receive less than the amount of

8  time to which you are subject, correct?

9  A    I would hope, yes.

10  Q    And at the moment you are subject to 35 years in jail,

11  right?

12  A    Yes.

13  Q    And you were arrested in Florida on February 25 of 2015,

14  right?

15  A    Yes.

16  Q    And you were brought to New York in March of 2015,

17  correct?

18  A    Yes.

19  Q    And you were assigned counsel, right?

20  A    Yes.

21  Q    You have two lawyers working on your behalf, right?

22  A    Yes.

23  Q    You have two lawyers that are guiding you through this

24  process, correct?

25  A    They had given me the consult during my incarceration.

364

Habibov - Cross/Sharkey

1   Q    Okay.  There is nothing wrong with having counsel.

2           My question, sir, is:  You have two persons who are

3   giving you legal advice, correct?

4   A    Yes.

5   Q    And when you were arraigned, when you were initially

6   brought to this courthouse and you were arraigned on your

7   indictment, you were charged with three crimes, right?

8   A    Yes.

9   Q    You were charged with conspiracy to provide material

10  support, right?

11  A    Yes.

12  Q    And you can receive 15 years in jail for that, right?

13  A    Yes.

14  Q    You were charged with attempt to provide material

15  support, correct?

16           MR. KESSLER:  Objection.

17  A    Yes.

18  Q    And you can receive 15 years on that, right?

19           MR. KESSLER:  Objection.

20           THE COURT:  Your objection is overruled.

21           Go ahead.

22  A    Yes.

23  Q    And you were also arraigned on conspiracy to use a

24  firearm, right?

25  A    Yes.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Habibov - Cross/Sharkey

1    Q    And so that adds up to 50 possible years in jail on the

2    indictment, right?

3    A    Yes.

4    Q    But after you signed a cooperation agreement with the

5    government you were only required to plead guilty to two of

6    those three charges, correct?

7    A    Yes.

8    Q    So instead of facing 50 years before you even get a 5K,

9    you are only facing 35 years, right?

10   A    In my understanding, yes.

11   Q    Now, you testified on direct examination that you met

12   with the government numerous times, correct?

13   A    Yes.

14   Q    And you said more than ten, right?

15   A    Yes.

16   Q    In fact --

17             THE COURT:  You have to let her finish before you

18   answer.

19   Q    More than ten?

20   A    Yeah.

21   Q    In fact, it was more than 20, correct?

22   A    It could be.  I was not counting.

23   Q    Let's count.  Your Honor, may I ask Mr. Jackson to

24   provide a copy of the front page of documents 0702 to 03,

25   0704, 0709, 0716, 0724, 0730, 0737, 0745, 0743, 0751, 0753,

Habibov – Cross/Sharkey

1    0755, 0756, 0761, 0763, 0773, 0767, 0779.

2            THE COURT:  Any objection?

3            MR. KESSLER:  Only that those are all in the same

4    document.  So it may be easier just to give the witness the

5    whole document, in case he needs to refer to other things.

6            THE COURT:  Well, any objection to the witness being

7    shown those pages that counsel has just referred to?

8            MR. KESSLER:  No.

9            THE COURT:  All right.  The witness may see those

10   pages.

11           Now, how are you referring to that for record

12   purposes, other than by the number?  Have you made it a

13   composite exhibit, just so the jury will know if they want to

14   see it later what we are talking about here?

15           MS. SHARKEY:  Certainly, judge.  That would be

16   3500-AH-07.

17           THE COURT:  3500-AH-07 that's the entire document

18   reference?

19           MS. SHARKEY:  That's the entire document reference.

20   It's massive.  So I have selected the front pages for review.

21           THE COURT:  So if the jury were to ask for the

22   document you are referring to, that's what you would ask for,

23   ladies and gentlemen of the jury.

24           So, yes, it's certainly admitted and you may publish

25   it to the witness.  Do you have a hard copy, or do you want to

*MICHELE NARDONE, CSR –– Official Court Reporter*

Habibov - Cross/Sharkey

1   do it on the ELMO?

2            MS. SHARKEY:  I'm not seeking to admit it; to

3   refresh his recollection at this juncture.

4            THE COURT:  Mr. Jackson, would you take the document

5   from counsel.  That's what you are requesting?

6            MS. SHARKEY:  Yes, sir.

7            THE COURT:  If you don't want to do it

8   electronically, that's fine.  Put the document in front of the

9   jury.

10           This again, ladies and gentlemen of the jury, is a

11  document that may never come into evidence but is used to

12  refresh the witness' recollection.  That's why.  It's for that

13  purpose.

14           So you may inquire, counsel.

15  BY MS. SHARKEY:

16  Q    Mr. Habibov, I ask that you take a moment to look through

17  that, and I'm going to direct your attention to the top

18  right-hand corner of those documents that have a date on them.

19  Okay?

20  A    Okay.  Do you want me --

21           THE COURT:  No.  What she wants you to do is to look

22  at the paper.  Now, counsel is going to ask you a series of

23  questions to see if your recollection is refreshed by having

24  these documents in front of you.  She is going to ask you if

25  this refreshes your recollection with respect to certain

*MICHELE NARDONE, CSR -- Official Court Reporter*

Habibov – Cross/Sharkey

1    items.

2         Is that right, counsel?

3         MS. SHARKEY:  That's right, judge.

4         THE COURT:  Okay.  So do what she asks.  Go ahead.

5    Q    Mr. Habibov, take your time.  Okay.  I ask that you take

6    a look at the first document, on page 2 of that first

7    document, and look at the date in the upper right-hand corner.

8    A    Okay.  Yeah.  It says March 19, 2015.  But I never seen

9    this paper.

10   Q    I recognize that, sir.

11        The second page of that document, sir.

12   A    Okay.

13   Q    Do you see the date 11/28/2016?

14        MR. KESSLER:  Your Honor, I object to reading the

15   document.

16        THE COURT:  Sustained.  Don't read the document.

17   Q    Do you see the date in the upper right-hand corner?

18   A    Right corner?  Is it February 25, 2015?

19        THE COURT:  Counsel, it would be presumptuous of me

20   to suggest how you should do this, but let me perhaps hint at

21   a suggestion.  Does it refresh your recollection that you met

22   with the government on day X might be a way to go through it,

23   if that's what you are getting at.  Otherwise, I will be

24   quiet.

25        MS. SHARKEY:  No, judge.  I appreciate the court's

*MICHELE NARDONE, CSR –– Official Court Reporter*

Habibov - Cross/Sharkey

1    suggestion.

2    Q    Mr. Habibov, turn the first page, please.  Look in the

3    upper right-hand corner.

4    A    Yeah.

5    Q    Turn the second page.

6            Do you remember meeting with the government, with

7    your attorneys present and agents from the U.S. Attorney's

8    Office and other venues, on November 28, 2016?  Does looking

9    at that document refresh your recollection?

10           THE COURT:  Does it refresh your recollection that

11   you had the meeting on that date, yes or no?

12           THE WITNESS:  On that day, no, I don't remember.

13           THE COURT:  It doesn't refresh your recollection.

14   Okay.  Fine.  It does not refresh his recollection.  Next

15   question.

16   Q    Turn the page, please.

17   A    Yes.

18   Q    Does that document refresh your recollection that you met

19   with the government on December 6, 2016?

20   A    I met with the government several times, but --

21           THE COURT:  The question is -- excuse me.  You have

22   to answer her question.  Her question is a focused one.  It

23   says:  Does looking at that document refresh your recollection

24   that you met with the government on that day?  Either, yes, it

25   does refresh your recollection or, no, it doesn't.  So answer

370

Habibov - Cross/Sharkey

1    her question yes or no.

2              THE WITNESS:  Okay, Your Honor.

3    A    No, it doesn't.

4    Q    I would ask that you turn to the document that at the

5    bottom says 0017.

6    A    Same page?

7    Q    No.  Try 0016, sir.

8    A    00 -- one-seven, you said?

9              THE COURT:  One-six.

10             THE WITNESS:  One-six.

11   Q    One-six, one-seven, whichever works for you.

12   A    Okay.  Yeah.

13             THE COURT:  And the question?

14   A    (Continuing) I found it.

15   Q    Does that refresh your recollection that you were

16   interviewed by government counsel, with your attorneys and

17   agents, on December 6, 2016?

18   A    It doesn't.  It doesn't refresh my recollection.

19   Q    Does it refresh your recollection that you met with

20   agents and your counsel on January 18, 2017?

21   A    No, it doesn't.

22   Q    Now, Mr. Habibov, you have in front of you a stack of

23   documents, right?

24   A    Yes.

25   Q    With dates on them, correct?

Habibov - Cross/Sharkey

1    A    Yes.

2    Q    Now, when you met with government counsel and your

3    attorneys, there were agents from different law enforcement

4    agencies present, right?

5    A    Yes.

6    Q    Did you notice that they were taking notes while you were

7    talking?

8    A    Sometimes I have noticed.

9    Q    And is it your testimony that that group of documents

10   doesn't refresh your recollection as to the exact days you met

11   with the government, right?

12        Do you understand the question?

13   A    No, I didn't.

14   Q    Okay.  Is it your testimony today that you met with the

15   government many times but you don't know exactly what day,

16   right?

17   A    Yes.

18   Q    Okay.  And you said yesterday that it was more than ten,

19   right?

20   A    Yes.

21   Q    It would be accurate to say, if you remember, that it was

22   actually more than 15, right?

23   A    I do not remember more than ten, yes.  I do not remember

24   how many times more than ten I said yesterday, yes.

25   Q    Where did you get the number ten?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Habibov – Cross/Sharkey

1    A    I just approximately.  I just –– because I went out a few

2    times, several times, and I put it ten or more.

3    Q    Okay.  But my point, sir, is that it's many more than

4    ten, correct, yes or no?

5    A    Possibility.  Could be.

6    Q    How many times did you talk to the government this month?

7    A    I do not remember.  It's a few times.

8    Q    You talked with them yesterday?

9    A    I didn't.

10   Q    Prior to your testimony you talked to them, correct?

11   A    Yesterday, no.

12   Q    Day before?

13   A    With the government, no.

14   Q    Who did you speak with the day before yesterday?

15   A    The day before yesterday?

16   Q    Yes.

17   A    The day before yesterday I was just sitting in the room

18   and listening Pandora.

19   Q    How many times have you been brought from MDC to this

20   courthouse this month?

21   A    I do not remember how many times, but there are several

22   times.

23   Q    When you say "several," what does that mean to you?

24   A    Several, like around seven, six.

25   Q    Okay.  So that's six times in the month of August,

Habibov - Cross/Sharkey

1    right -- month of September.

2              Would you agree with me that you met with the

3    government over the course of your cooperation many more times

4    than ten, yes or no?

5    A    Yes, yes.

6    Q    Now, in addition to meeting with the government and

7    government agents many more times than ten, you met with your

8    counsel, right?

9    A    Meet you mean?

10   Q    At any time during the period you have been cooperating

11   with the government.

12   A    Anywhere with my counsel or?

13   Q    You meet with your counsel on a regular basis, yes or no?

14   A    Yes.

15   Q    And when you were initially proffering with the

16   government, your counsel was present, yes or no?

17   A    Yes.

18   Q    And proffering -- so the jury knows what we are talking

19   about -- is when you go to the courthouse building, you meet

20   with the government, you answer their questions, right?

21   A    Yes.

22   Q    And there are many people there, correct?

23   A    Where?

24   Q    At your meeting with the government.

25   A    The government and, yeah, it's a few people.  Government

Habibov - Cross/Sharkey

1  and agents, yeah.

2  Q    And people take notes during that period, if you noticed,

3  yes or no?

4  A    I have noticed.

5  Q    So the answer is yes, right?

6  A    Yes.

7  Q    And in addition to proffering with the government, after

8  your proffer meetings you sometimes met with your attorneys,

9  right?

10 A    Yes.

11 Q    And you would talk about many things, including your

12 conversation with government agents and government counsel,

13 right?

14            MR. KESSLER:  Objection to the question.

15            THE COURT:  Overruled.  She can ask if that's what

16 they talked about.

17            You can answer that yes or no, without getting into

18 any attorney-client communications.  The question is did he

19 talk with them.  So overruled.

20            Did you talk with them, yes or no?

21 A    I do not remember if I discussed with my counsel about

22 the government questions and answers stuff.  What we discussed

23 during the meetings, I do not remember discussing it with my

24 counsel about.

25 Q    Well, the whole point of your meeting with government

Habibov - Cross/Sharkey

1   counsel was so you could get less time in jail, right?

2   A    The hope is, yes.

3   Q    And you had experienced lawyers to guide you through that

4   process, right?

5   A    They were giving advice, yeah.

6   Q    And you spoke to them, yes or no, about the questions the

7   government asked you, right, yes or no?

8   A    No.

9   Q    Never?

10  A    I do not remember exact what questions government asked.

11  I always discussed my case with my counsel.

12  Q    And part of your case was achieving a cooperation

13  agreement, right?

14  A    Yes.

15  Q    So is it your testimony today that you talked about ways

16  to achieve that cooperation agreement?

17          Do you understand my question?

18  A    No.

19  Q    The government asked you questions about your illegal

20  activities, right?

21  A    During the meetings, yes.

22  Q    And they asked you questions about others' activities,

23  right?

24  A    Yes.

25  Q    And you spoke about your conversations with the

Habibov - Cross/Sharkey

1    government with your lawyers, yes or no?

2    A    I discussed with my counsel before I met the lawyers,

3    before I met the government too.

4    Q    But when you have been -- the first time that you met

5    with the government to seek a cooperation agreement, right,

6    that was in 2016, right?

7    A    It does recollect my memory, but I have spoke to my

8    lawyers before meeting the government.

9    Q    I'm asking you a different question, sir.

10   A    I didn't understand.

11   Q    If you don't understand a question, please advise me.

12   A    Sure.

13   Q    You met with government counsel to achieve a cooperation

14   agreement for the first time in 2016, yes or no?

15   A    Yes.

16   Q    And that was in November of 2016, yes or no?

17   A    I do not remember, again, about the month.  Yes, 2016 I

18   remember meeting with them.

19   Q    It's a big deal, right?

20   A    Big deal for?

21   Q    For you to achieve a cooperation agreement, right?

22   A    Yes.

23   Q    It was a big decision on your part?

24   A    It is.

25   Q    Do you remember what season it was that you met with

Habibov - Cross/Sharkey

1  government counsel, to talk about your possible cooperation?

2  A    MDC is really -- it's lockdown situation.  So you cannot

3  even tell the season is changing.  It's like there is a little

4  rec area.  It's always you can see only sky, but I do not

5  remember the season.

6  Q    So you don't remember if it was July or December?

7  A    No, I do not remember.

8  Q    You don't remember if it was November or May, yes or no?

9  A    I do not remember, no.

10 Q    Now, when you testified about the requirements of your

11 receiving a 5K letter, right, you said you had to tell the

12 truth, correct?

13 A    Yes.

14 Q    Do you understand that you have to tell the truth on

15 direct and cross-examination?

16 A    Yes, ma'am.

17 Q    So is it your testimony today that you don't know what

18 season it is?

19 A    I do not remember what season it was.  Today I know what

20 season it is.

21 Q    And is it your testimony that you don't remember what

22 days or what months you met with government counsel prior to

23 today, yes or no?

24 A    Which year we are talking about?

25 Q    Let's talk about this year.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Habibov - Cross/Sharkey

1    A    Yes, I do remember meeting with the government before

2    this trial started.

3    Q    You met with them many times, right?

4    A    Several times.

5    Q    You, sir, were born in 1985?

6    A    1985.

7    Q    You grew up in Uzbekistan?

8    A    Yes, ma'am.

9    Q    And you grew up in an upper middle class or a privileged

10   family, correct?

11   A    It's a low-class family.

12   Q    You went to boarding school, right?

13   A    I went to boarding school.

14   Q    And boarding school isn't free, right?

15   A    In Uzbekistan it was free.

16   Q    You went to boarding school and you learned English,

17   right?

18   A    Yes.  That was -- I started learning English in boarding

19   school.

20   Q    And you had aspirations to be a medical doctor, correct?

21   A    At that time?  No.  At that time, no.  I wanted to become

22   interpreter.

23   Q    And did you also have aspirations to become a medical

24   doctor, sir?

25   A    Medical personnel, and later, before, prior my arrest,

Habibov – Cross/Sharkey

1    yes.

2    Q    So the answer is yes?

3    A    Yes.

4    Q    You had aspirations to become a medical doctor, right?

5    A    Medical personnel.  Doctor, it's like never been my

6    thought.  It's too many years it requires to study.

7    Q    You are a well-educated man, right?

8    A    I believe so.

9    Q    And you came to the United States in 2006, right?

10   A    Yes.

11   Q    And you testified on direct examination that you came

12   with a student visa, right?

13   A    Yes, it was work and travel.

14   Q    I'm sorry?

15   A    It's called a work and travel visa, yes.

16   Q    When you came here did you enroll in school?

17   A    When did I come here?

18   Q    Yes.

19   A    Yes, I went to school.

20   Q    You testified yesterday that at one point you lied about

21   your intention to go to school, correct?

22   A    Yes.

23   Q    And, in fact, you told -- you sent an application to a

24   university in California during the 2000 and 2009 time period,

25   right?

Habibov – Cross/Sharkey

1    A     Yes.

2    Q     And you had no intention of attending class, right?

3    A     There is -- I didn't have any intention, but if they call

4    you, you have to attend for two --

5    Q     My question was:  When you enrolled in that school did

6    you have any intention of attending, yes or no?

7    A     No, ma'am.

8               (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Habibov - Cross/Sharkey

1    CROSS-EXAMINATION(Continued)

2    BY MS. SHARKEY:

3    Q     In fact, you enrolled so you could have legal status in

4    this country, right?

5    A     Yes.

6    Q     And that didn't work out very well did it?

7    A     It didn't.

8    Q     The director of the school in which you enrolled was

9    arrested and indicted, right?

10   A     Yes.

11   Q     He was a fake, right?

12   A     That was a fake.

13   Q     It was a fraud, right?

14   A     That was fraud, yeah.

15   Q     Did the government ask you to plead guilty to filing

16   false documents with the immigration authority, yes or no?

17   A     No.

18   Q     Would you agree with me that you have a complicated

19   relationship with the truth, yes or no?

20   A     In the past is the question?  Is it in the past, ma'am?

21   Q     My question is:  Would you agree with me that you have a

22   complicated relationship with the truth, sir?

23   A     In the past, yes, ma'am.

24   Q     Now you talked yesterday a little bit about your marital

25   status, right?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

Habibov - Cross/Sharkey

1   A    Did we talk?  Or do you mean we -- can you --

2   Q    Did you testify yesterday that you're divorced?

3   A    Yes.

4   Q    And that's your second divorce, right?

5   A    That was my first divorce, and second I don't know if I

6   was divorced but I was separated and we don't talk any longer.

7   Q    Well, let's talk about the first time you got married.

8   A    Yeah.

9   Q    That was in the 2008, 2009 period after the school which

10  you falsely applied to became unavailable to you -- let me

11  rephrase that.  When the president of that false university

12  was arrested, you were not able to get your visa papers back,

13  right?

14  A    Right.

15  Q    And so you needed some way to have legal status in this

16  country, right?

17  A    Yes.

18  Q    And what you did to achieve legal status is you paid a

19  young girl $5,000 to marry you, right?

20  A    I married, but not $5,000.

21  Q    How much did it cost?

22  A    There was a middleman, I paid him $13,000.

23  Q    $13,000?

24  A    Yes.

25  Q    And this girl's name was Lakiesha, right?

Habibov – Cross/Sharkey

1    A    I remember, yes.

2    Q    You paid $13,000 so you could get a green card, right?

3    Yes or no.

4    A    Yes.

5    Q    And you never lived with that girl, did you?

6    A    No, I haven't.

7    Q    She went to one interview with you, right?

8    A    She went to interview with me, yes.

9    Q    But then she didn't cooperate with you any more, right?

10   A    Yes, there is a time came she stopped cooperating with.

11   Q    You never lived with her, right?

12   A    I never lived with her.

13   Q    And when she stopped cooperating with you, you were

14   unable to attend your immigration interviews, correct?

15   A    Yes.

16   Q    And that was preventing you from getting a green card,

17   right?

18   A    Yes.

19   Q    And because you couldn't get a green card by being

20   married to this girl, you tried another way to get a green

21   card, right?

22   A    No, I gave up at that time.

23   Q    Oh, let's talk about that.

24   A    Yeah.

25   Q    At some point -- do you remember what year you got

<center>Habibov - Cross/Sharkey</center>

1   married?

2   A    To which one?

3   Q    To Lakiesha.

4   A    2008.

5   Q    You got a marriage certificate, right?

6   A    Yes.

7   Q    And it was Lakiesha or persons who worked with Lakiesha

8   who you gave $13,000 to, right?

9   A    Yeah.

10  Q    Where did that money come from?

11  A    I was working in a restaurants as a busboy and in a

12  catering services as a waiter.

13  Q    You had an extra $13,000 to pay for a false marriage from

14  being a busboy, yes or no?

15  A    Yes, I've been saving a lot.

16  Q    Now, you filed a request with the immigration authorities

17  to gain legal status as a battered spouse, right?

18  A    Yes.

19  Q    And you talked about that a little bit, right,

20  yesterday --

21  A    To who?  Yes.

22  Q    -- on your direct examination.

23          THE COURT:  Let her finish the question.

24  Q    Right?

25  A    Sorry.

385

Habibov - Cross/Sharkey

1          THE WITNESS:  Sorry, Your Honor.

2          THE COURT:  Put the question again and wait and then

3    answer the question.  Counsel.

4          MS. SHARKEY:  Sure, Judge.

5    Q    You testified yesterday that you filed for legal status

6    as a battered spouse, right?

7    A    Yes.

8    Q    And that was a lie, right?

9    A    Battered -- battered husband?

10   Q    Yes.

11   A    Yeah, that was lie.

12   Q    That was a lie?

13   A    Yes.

14   Q    So you filed papers with a federal agency which you lied

15   about, right?

16   A    That was -- federal agency you mean immigration?

17   Q    Yes.

18   A    Yes.

19   Q    Did the government ask you to plead guilty to immigration

20   fraud during your conversations?

21   A    No, ma'am.

22   Q    And you weren't required to plead guilty to immigration

23   fraud, right?

24   A    Yes.

25   Q    You were not required to plead guilty, correct?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

Habibov - Cross/Sharkey

1    A    No, I wasn't required.

2    Q    Now, you filed some papers with immigration, a false

3    letter that you referenced yesterday in your testimony,

4    correct?

5    A    Yes.

6    Q    And it was a letter to the immigration court explaining

7    how you were battered by this girl, correct?

8    A    Yes.

9    Q    And it was a very long letter, agreed?

10   A    Yes.

11   Q    And one of things you said to the immigration was, quote:

12   Our romantic relationship led to our first sex in 10 days,

13   October 7th, after we started dating.  I was with her most

14   weekends her beauty especially her lips forced me to get

15   her -- to get to know her more.  After our prolonged and

16   frequent meetings I knew we were one soul.  We shared the same

17   values and had deep respect for each other.

18        Do you remember writing that to the immigration

19   authorities?

20   A    Yes, ma'am.

21   Q    That was a lie?

22   A    That was lie.

23   Q    You never lived with that girl?

24   A    I never lived with her.

25   Q    You never kissed that girl, right?

387

Habibov - Cross/Sharkey

1    A    Only one time.

2    Q    But you did marry her, right?

3    A    I did marry her.

4    Q    You married her on March 3rd, right?

5    A    Yes.

6    Q    Did you have a wedding reception?

7    A    No, I register on the City Hall and yeah -- no, I didn't.

8    Q    So when you told the immigration authorities that, quote:

9    Her mother agreed on marriage only if it takes place in the

10   church.  Even though it was against my religion, I gave my

11   consent on marrying in the church.  It was completely against

12   my belief and the entire world of mine, but I agreed because I

13   really loved her and that was more important than anything.

14             Your words not mine, true or lie?

15   A    That was lie.

16   Q    You told the immigration authorities that once you got

17   married it was a different story.  One month after we got

18   married things changed.  Do you remember that?

19   A    Yes.

20   Q    Did you tell the immigration authorities that you tried

21   hard to provide for her with all the comfort she needed but in

22   a few months she got upset with me, she insulted me, she

23   called me ignorant.  Do you remember that?

24   A    Yes, ma'am.

25   Q    Lie?

Habibov - Cross/Sharkey

1    A    That is lie.

2    Q    Do you remember telling the immigration authorities,

3    after half a year of our marriage her attitudes toward me

4    completely changed.  She spoke to me and constantly cursed and

5    yelled and used the "F" word all the time.  Lie or true?

6    A    Lie.

7    Q    She called me and my friends, quote, your words not mine,

8    fucking aliens, freak, fucking losers.  The next morning she

9    appeared at our home, she was still drunk and she had no

10   panties on.  True or lie?

11   A    Lie, ma'am.

12   Q    She controlled every step I took.  I was deceiving myself

13   by believing that everything was working out.

14        You wrote that to the immigration authorities?

15   A    Yes.

16   Q    And that was so that you could get status as a battered

17   spouse, right?

18   A    Yes, ma'am.

19   Q    You wrote to the immigration authorities that on

20   January 27th, 2009 she was drunk.  I was asleep in my bed, I

21   was awakened by screaming as she came through the bedroom door

22   swinging a baseball bat and trying to smash my legs but I

23   managed to avoid most of the blows and took the bat away.

24   True or lie?

25   A    Lie, ma'am.

Habibov - Cross/Sharkey

1    Q    She screamed, she said I'm going to kill you, you son of

2    a bitch.  I was already living in the living room but she was

3    holding a kitchen knife and I was shocked and afraid.  True?

4    A    Lie.

5    Q    Your words not mine, tell us if this is true or a lie.

6    She embarrassed me.  She humiliated me in public places in

7    malls and grocery stores.  She would tell her friends publicly

8    why sex with me was difficult and she would tell them she

9    would prefer a dildo instead of having sex with me.  True or

10   lie?

11   A    Lie, ma'am.

12   Q    But that wasn't the only document you filed with

13   immigration, was it?

14   A    It wasn't only.

15   Q    And this is when you have a complicated relationship with

16   the truth, right?

17   A    Yes.

18   Q    And you filed multiple letters on your behalf by people

19   who supposedly saw this horrendous treatment to you, right?

20   A    Yes.

21   Q    You drafted those letters yourself, right?

22   A    Yes, I did.

23   Q    Did these people even know you were writing?

24   A    Some of them knew.

25   Q    Did Dilshod Khusanov know that you wrote a letter?

Habibov - Cross/Sharkey

1    A    Yes.

2    Q    How about Maksoudoff?  Did Mr. Maksoudoff know that you

3    wrote a letter, signed his name and even had a notary public?

4    A    Yeah, I ask him if he can notarize.  I told him I wrote

5    the letter.

6    Q    How many of these letters did you write?

7    A    I remember three or more.

8    Q    Now did you get this story from a novel or did you make

9    it up yourself?

10   A    I made it up myself, ma'am.

11   Q    Now, you've never been charged with conspiracy to commit

12   immigration fraud, right?

13   A    No, I never.

14   Q    You told the agents in this case on November[sic] 16th of

15   2019, just a few days ago, that your lawyer at the time

16   suggested that you claim spousal abuse knowing that his spouse

17   did not abuse him, right?

18   A    My lawyers suggested writing such a letter.

19   Q    Did the government ask you who the lawyer's name is?

20   A    Yes, they did.

21   Q    And have you testified in any proceeding, any conspiracy

22   proceeding concerning the charges of conspiracy to commit

23   immigration fraud?

24   A    No.

25   Q    And you haven't pled guilty to that, right?

Habibov - Cross/Sharkey

1    A    Yes.

2    Q    You haven't pled guilty --

3    A    I haven't pled guilty of those charges.

4    Q    -- to immigration fraud.

5         You're not subject to any penalties that would flow

6    from that federal crime, right?

7    A    I don't know about that.  I'm --

8    Q    Have you been charged with it?

9    A    No.

10        (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HABIBOV - CROSS - MS. SHARKEY

1   CROSS-EXAMINATION (Continued)

2   BY MS. SHARKEY:

3   Q    Did you marry again?

4   A    Yeah.

5   Q    And in order to marry again, you had to be divorced from

6   this young girl in Virginia, right?

7   A    Yes.

8   Q    And you didn't tell her anything about your writing to

9   the government, right?

10  A    I didn't understand the question.

11  Q    You didn't tell her that you informed immigration that

12  she was physically and mentally abusing you, right?

13  A    No, I didn't tell her.

14  Q    And that was in 2008, 2009, right?

15  A    Yes.

16  Q    And then you wrote again to immigration on May 8th of

17  2013, right?

18  A    I do not remember, but I writing as embarrassed husband;

19  I remember.

20        I do not remember the date.

21  Q    There's a folder --

22  A    Yes.

23  Q    -- to your left.  Next to the Court.

24        THE COURT:  The manila folder?

25        MS. SHARKEY:  There's a manila folder.

HABIBOV - CROSS - MS. SHARKEY

1    THE COURT:  Right in the middle, sir.  That's the

2    folder.

3    Q    I ask that you look at that two-page document.

4        For the record, and the government's information,

5    it's 3500AH141, page 120 and 122.

6        Take a look at that document, sir, and take a look

7    at the date on page 2.

8    THE COURT:  Read it to yourself.

9        (Whereupon, the, witness is reviewing the document.)

10   A    This is the first line.

11   THE COURT:  Read it to yourself.

12   Q    It says, "To whom it may concern" in the top middle of

13   the first page.  It's only two pages.

14   THE COURT:  Do you see the two-page document, sir?

15       Do you have it in front of you --

16   THE WITNESS:  I found it.

17   THE COURT:  -- from that folder?

18   THE WITNESS:  I found it.

19   THE COURT:  You have that document, sir?

20   THE WITNESS:  Yes.

21   THE COURT:  Two pages, right?

22   THE WITNESS:  Yes, Your Honor.

23   THE COURT:  There's a page that says "To whom it may

24   it concern," right?

25   THE WITNESS:  Yes, Your Honor.

HABIBOV - CROSS - MS. SHARKEY

1    THE COURT:  That's what you're being asked about.

2    Go ahead, counsel.

3  Q    Can you take a look at that, please?

4    THE COURT:  Look at it.

5    THE WITNESS:  Okay.

6  Q    Look at page 2 on the bottom.

7  A    Yeah.

8  Q    Wouldn't it be accurate to say that years later, after

9  your first contact with immigration, you filed another letter

10  with them, right?

11  A    Yes.

12  Q    And you told immigration that you got a letter stating

13  that you haven't presented required documentation, right?

14  A    Can you rephrase your question.

15  Q    Sure.  That was a bad question.

16    You told immigration again that, quote, I've always

17  loved Lakiesha every day.  I flew on my wings after my work

18  shift to hold her, embrace her and kiss her, right?

19  A    Yes, I would.

20  Q    And you told them that because you wanted to obtain a

21  divorce, because you were engaged to another woman, a fiancée,

22  who was a U.S. citizen, right?

23  A    Yes.

24    And she wasn't a U.S. citizen.  I'm sorry,

25  counselor.  She wasn't a U.S. citizen.

HABIBOV - CROSS - MS. SHARKEY

1   Q    Did she have what?

2   A    It's my second wife of mine.  She's not a U.S. citizen.

3   Q    And the second wife, does she have legal status?

4   A    She had a legal status.

5   Q    And so you were hoping to obtain legal status through

6   that marriage, right?

7   A    Not really.

8        No, because she didn't have a U.S. citizenship yet.

9   Q    But they expected a U.S. citizenship?

10  A    If she has, that was a possibility I could get through

11  her, too.

12  Q    That was the point, right?

13  A    Marrying the second wife?

14  Q    Yes.

15  A    No, that was basically love and everything.

16  Q    Are you married now?

17  A    No.

18  Q    Now, let's talk about some more of your testimony

19  yesterday.

20  A    Yes, ma'am.

21  Q    Now, you testified yesterday that you had a business of

22  kiosks through various malls in the United States, right?

23  A    Yes.

24  Q    And that you were partners on many of those kiosks with

25  Akmal Zakirov, A-K-M-A-L, Z-A-K-I-R-O-V, right?

396

HABIBOV – CROSS – MS. SHARKEY

1    A     Yes.

2    Q     When did you first meet Mr. Zakirov?

3    A     I do not remember exactly.  I met him when I was

4    living -- that was an apartment located near to Avenue X.

5    Q     Did you meet him when you were roommates with Kosim?

6    A     Yes.

7    Q     And would that be in 2009?

8    A     Approximately, yeah.

9    Q     So you knew Mr. Zakirov since 2009, correct?

10   A     Yes.

11   Q     And you and he were close in age, right?

12   A     I believe he was born in the same year or one year after

13   me.

14   Q     And how old are you now?

15   A     Thirty-four years old.

16   Q     And in 2015, how old were you?

17   A     2015, if we subtract four, 30 years old.

18   Q     And you both worked at malls throughout the United

19   States, correct?

20   A     Yes, ma'am.

21   Q     On the eastern seaboard, right?

22   A     Eastern, yes.

23   Q     And you worked at a mall in Binghamton, New York, right?

24   A     Yes.

25   Q     And you worked with other Uzbekis, correct?

HABIBOV - CROSS - MS. SHARKEY

1    A    Yes, ma'am.

2    Q    And you didn't own that first kiosk that you worked at,

3    right?

4    A    I didn't.

5    Q    But Zakirov also worked in that mall, correct?

6    A    Yes, ma'am.

7    Q    And you and Zakirov decided to join resources and obtain

8    your own malls, correct?

9    A    Yes, ma'am.

10   Q    And you and Zakirov also hired Uzbekis to work in these

11   malls, right?

12   A    Uzbekis and other nationalities, yes.

13   Q    And one of the reasons you did that is that you wanted to

14   help other persons from your country gain employment, right?

15   A    Yes, ma'am.

16   Q    It would be fair to say that the Uzbeki community tries

17   to help each other, correct?

18   A    Yes, ma'am.

19   Q    In lawful and legal ways, correct?

20   A    The lawful and legal ways.

21         I was just helping other Uzbekis to get a job, yes.

22   Q    And there was nothing wrong with those Uzbekis working

23   for you, correct?

24   A    Nothing wrong with it.

25   Q    And you opened a kiosk in Middletown, New York with

398

HABIBOV – CROSS – MS. SHARKEY

1   Zakirov, right?

2   A    Yes, ma'am.

3   Q    And you opened a cash-for-gold kiosk in Philadelphia,

4   right?

5   A    Yes, ma'am.

6   Q    And Zakirov was your partner there?

7   A    No, he wasn't?

8   Q    Who was partner there?

9   A    Jamshid Bekmatov.  B-E-K-M-A-T-O-V.

10  Q    And Bekmatov is the individual that you referenced in

11  your testimony this morning concerning one of the

12  conversations you had on February 24th, right?

13  A    Yes, ma'am.

14  Q    Bekmatov was one of the persons you called, right?

15  A    Yes, ma'am.

16  Q    And you and he opened a cash-for-gold kiosk near Philly,

17  right?

18  A    Yes, ma'am.

19  Q    And with Zakirov you opened a mall -- I'm sorry, a kiosk

20  at a mall in Delaware, right?

21  A    Yes, ma'am.

22  Q    At a mall in Georgia, right?

23  A    Yes, ma'am.

24  Q    At a mall in Virginia, right?

25  A    Yes, ma'am.

HABIBOV - CROSS - MS. SHARKEY

1    Q     You're quite the businessman, agreed?

2    A     Yes.

3    Q     And you were making a lot of money, right?  Yes or no?

4    A     Yes.

5    Q     And you testified a couple minutes ago that you hired

6    other Uzbeks to work for you, right?

7    A     Yes.

8    Q     And you housed these young men, right?  They all lived in

9    an apartment together, correct?

10   A     They lived -- all the employees, no?  Every single

11   location had one single person, or sometimes two Uzbekis, or

12   two nationalities; two employees at the same time.

13   Q     But you would move these employees around to given kiosks

14   in different states; yes or no?

15   A     Yes, ma'am.

16   Q     And you helped them obtain housing; yes or no?

17   A     Yes.

18   Q     Did you pay for the housing?

19   A     Sometimes I did some of it.  Sometimes they paid the rest

20   of it.

21   Q     Now, Saidakhmetov --

22   A     Yes.

23   Q     -- has been the focus of your testimony today, correct?

24              MR. KESSLER:  Objection.

25              THE COURT:  Overruled.  You can answer.

HABIBOV - CROSS - MS. SHARKEY

1   A    I really -- can you rephrase your question?

2        Yes, Saidakhmetov was mentioned in my testimony

3   today several times.

4   Q    Saidakhme -- you may have to forgive me.

5        THE COURT:  Saidakhmetov.

6   A    Yeah.

7   Q    Sai-da-met-ov?

8   A    You can say "Akhror," it's the first name.

9   Q    Saidakhmetov worked for you?

10  A    Yes, ma'am.

11  Q    And he worked for you initially at what mall?

12  A    We hired him originally for Georgia.

13  Q    And you first met him before the Christmas holidays in

14  2014, right?

15  A    Yes, ma'am.

16  Q    And you met him in October of 2014, correct?

17  A    No, I met him September 2014.

18  Q    Okay.

19       And you brought him to Georgia to train, right?

20  A    I send him to Georgia to get trained.

21  Q    And who trained him in Georgia?

22  A    Georgia, I'm not sure.  There's -- it could be other --

23  there is one of two other employees.  It could be -- the names

24  is -- if you need names, I'll provide you with the names.

25  Q    Sure.  Provide with us the name.

HABIBOV - CROSS - MS. SHARKEY

1   A    One second give me.

2            Amin.  That's his first name.  I don't know his last

3   name.

4   Q    Fine.

5   A    Second -- it's been some time.  I can't remember his --

6   that first name.  I can't remember that second person.  It's

7   from Kabistan as well.

8   Q    Well, you moved Saidakhmetov around between Virginia,

9   Delaware and Philadelphia; yes or no?

10  A    Yes, ma'am.

11  Q    And you knew from other employees that Saidakhmetov spoke

12  about traveling, to Syria, right?

13  A    Say your question?  Did I have the knowledge that he been

14  talking to other employees?

15  Q    Yes.

16  A    Is that the question?

17           I was aware he talked to them, yes.

18  Q    And you spoke to him before Thanksgiving at the Oxford

19  mall in Pennsylvania at a Starbucks, right?

20  A    With?

21  Q    Saidakhmetov.

22  A    I believe I had been talking him in the Oxford mall, yes.

23  Q    And you talked to him about his views on traveling to

24  Syria, right?

25  A    They were many conversations I talked to him about his

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

HABIBOV – CROSS – MS. SHARKEY

1    traveling, yes.

2    Q    And you had numerous persons that you worked with

3    obtaining supplies for your kiosks and also for hiring them

4    working at your kiosks, correct?

5    A    Yes, ma'am.

6    Q    And one of those people was AbdulAzizz, right?

7    A    No.

8    Q    Well, in December of 2014, didn't you travel to

9    Connecticut to obtain SPLAT balls; yes or no?

10   A    I was buying from him, yes.

11   Q    So the answer is yes, you bought product from AbdulAzizz,

12   right?

13   A    Yes, but he wasn't working.

14        Yes, I bought it from him.

15   Q    And AbdulAzizz said to you that you should go to Syria

16   and fight, right?

17   A    Yes.

18   Q    And he said that to you on more than one occasion, right?

19   A    Several occasions, yes.

20   Q    He taunted you, agreed?

21   A    That word I don't understand.

22   Q    He criticized you for not going to Syria, right?

23   A    Yes.

24   Q    He said to you, you have three brothers at home.  You

25   should not be so obsessed with money, right?

HABIBOV – CROSS – MS. SHARKEY

1    A    No, he -- I don't remember him saying those things.  But

2    there were friends of mine, yes, and they were criticizing me

3    I shouldn't be like worried, I had three brothers.

4    Q    So more than one of your friends said you should travel

5    to Syria, right?

6    A    Yes, ma'am.

7    Q    You didn't want to travel to Syria, right?

8    A    I didn't want to, no.

9    Q    And other persons who said that to you were Khusanov,

10   right?

11   A    Yes, ma'am.

12   Q    And what's Khusanov's full name?

13   A    Dilshod Khusanov.  D-I-L-S-H-O-D.  That's his first name.

14   And last name is Khusanov, K-H-U-S-A-N-O-V.

15   Q    And he's one of the persons whose name you used in your

16   immigration fraud, right?

17   A    Yes, ma'am.

18   Q    And he had the letter that -- that you wrote signed by

19   notary, right?

20   A    Yes, ma'am.

21   Q    And Khusanov often challenged you and asked you for your

22   excuse for not going to Syria?

23   A    Yes, ma'am.

24   Q    And you testified on direct examination that you were

25   friends with a number of persons in the Uzbek community,

HABIBOV - CROSS - MS. SHARKEY

1   correct?

2   A     Yes, ma'am.

3   Q     And some of them had views and traveled to Syria, right?

4   A     Yes, ma'am.

5   Q     And some of them were hard working immigrants hoping to

6   make a life for themselves in the United States, right?

7   A     Yes.

8   Q     And you have friends in both circles, agreed?

9   A     Agreed.

10          THE COURT:  Yes or no?

11  A     Yes.

12  Q     Now, yesterday you were asked questions by the government

13  concerning the tea party, correct?

14  A     Yes, ma'am.

15  Q     And before you testified at trial, you had conversations

16  with the government about the truthfulness of your testimony,

17  right?

18  A     Yes, ma'am.

19  Q     And that your answers had to be full and complete, right?

20  A     It has to be truthful and honest, yes.

21  Q     And you heard the judge yesterday affirm that it was he

22  who decided what sentence you would get, right?

23  A     Yes, ma'am.

24  Q     Now, when you testified yesterday about the tea party,

25  you didn't give a full answer that the jury, or the judge, or

HABIBOV - CROSS - MS. SHARKEY

1    anyone in this courtroom could accurately evaluate; did you?

2    A    The -- it has a lot the details about tea party, no, I

3    just didn't say everything.  There is no time for this.

4          I mean if there's time, yes.

5    Q    You did not give a full answer to the government when

6    they asked you some of the questions about the tea party

7    allowing the jury, and the judge, and everyone else here to

8    evaluate your testimony; yes or no?

9    A    Yes.

10         If they ask specific question, I would always answer

11   truthfully, yes.

12   Q    So it's the government's fault that you didn't answer

13   fully yesterday?  Is that what you said?

14   A    No, I'm not saying that.

15         If anybody today, government or you, ma'am, asks

16   specific question about tea party, I will answer.

17   Q    Well, let me ask the same question the government asked.

18   A    Sure.

19   Q    What are the goals of a tea party?  All of them?

20   A    All of them.

21         Raising funds and sending people to go to Syria to

22   fight.  And providing them with every means.  If they need

23   uniforms.  Food.  And their family as well, whoever left their

24   family behind, and helping them as well financially,

25   everything's financially.

HABIBOV – CROSS – MS. SHARKEY

1    Q     Oh.  So the last part --

2    A     Yes.

3    Q     -- helping widows and orphans in Syria, you left out of

4    your answer yesterday; didn't you?  Yes or no?

5    A     Yes, ma'am.

6    Q     They didn't tell you to leave it out, right?

7    A     They didn't ask.

8    Q     They didn't tell you to leave it out, right?

9    A     Yes.

10   Q     You left it out of your own accord, right?

11   A     Yes.

12   Q     Now, in your circle of friends, some people contributed

13   to the tea party, right?

14   A     Yes, ma'am.

15   Q     And some people contributed to the tea party not knowing

16   that it was going to support ISIS; yes or no?

17   A     Yes.

18   Q     And you didn't say that yesterday; did you?

19   A     I didn't say that, yes.

20   Q     Now, you testified yesterday that Kosim was one of the

21   persons who collected for the tea party, right?

22   A     Yes, ma'am.

23   Q     He was, in fact, your roommate, right?

24   A     Yes.

25   Q     And you testified to that yesterday, correct?

HABIBOV - CROSS - MS. SHARKEY

1    A    About Kosim, yes.

2    Q    And you had a complicated relationship with Kosim, right?

3    A    I have good relationship and a complicated relationship

4    at the same time.

5    Q    Didn't he taunt you?  Did he criticize you for not

6    traveling to Syria?

7    A    Yes, he did.  I can recall.

8    Q    And didn't he insult you in front of the mosque, in front

9    of other people if you didn't give money to the tea party?

10   A    Yes, he would.

11   Q    In November or October of 2014, you told your business

12   partner that you planned to raise money for Saidakhmetov's

13   travel, right?

14   A    I do not remember 2015, yes.  But late 2014 and 2015,

15   early 2015.

16   Q    In 2014, you spoke to your partner, Akmal Zakirov, that

17   you planned to raise money for travel; yes or no?

18   A    I do not remember, no.

19   Q    When do you say was the first time that you spoke with

20   Zakirov about raising money for tea party travel?

21   A    Probably late 2014.  Right after Christmas is over, yes.

22   Q    And you testified on direct examination that you asked

23   Zakirov to contact other persons to raise money for travel

24   also, right?

25   A    Yes, ma'am.

408

HABIBOV - CROSS - MS. SHARKEY

1    Q    And that wasn't the first person that you and Zakirov had

2    raised money for to travel, correct?

3    A    Can you rephrase your question?

4    Q    You told federal authorities questioning you that you and

5    Akmal Zakirov were the first responders when anyone was

6    looking to travel; yes or no?

7    A    To say Akmal, yes.  Not -- and everyone else, it's not

8    true.  I didn't understand your question.

9              First responders, yes.

10   Q    For everyone else, what were you going to say?

11   A    Not for everyone else, it's -- first responders, I -- I

12   have to understand what you mean by that.

13   Q    Let's back up.

14             When you started to say, I told Zakirov --

15   A    Yes.

16   Q    -- but for everyone else, why don't you finish that

17   sentence for us?

18   A    No, I said for everyone else, I do not know if we will be

19   first responders for everyone else.

20             For Zakirov, yes, we were first responders.

21   Q    And first responders means you and Zakirov donated money

22   for other travelers; yes or no?

23   A    Yes.

24   Q    And this was something that you didn't publicize, right?

25   A    What do you mean by "publicize"?

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

HABIBOV - CROSS - MS. SHARKEY

1  Q     Well, you testified on direct examination with government

2  counsel that sometimes you used coded language, right?

3  A     Yes, ma'am.

4  Q     And some people you didn't want to know that you were

5  contributing to the tea party, right?

6  A     Yes.

7  Q     Now, Saidakhmetov was much younger than you, right?

8  A     Yes.

9  Q     He is much younger than you, right?

10 A     Much younger.

11 Q     He's like ten years younger than you, correct?

12 A     Yes, ma'am.

13 Q     And he looked up to you as a figure, or as an authority

14 figure, as a boss, or as a substitute father, right?

15 A     As a boss, he always accepted me as a boss when we

16 working together, yes.

17 Q     He didn't have a father, right?

18 A     I believe they were divorced.  I don't know about him not

19 having a father.

20 Q     Saidakhmetov confided you in, right?

21 A     Confided, I don't know.

22 Q     He spoke to you and asked you for personal advice,

23 correct?

24 A     He did -- he discussed this plan, but not seeking for

25 advice.

HABIBOV - CROSS - MS. SHARKEY

1    Q    You knew that he was a odd character; didn't you?

2    A    He was very eager charactering, with the eager character.

3    Q    He was difficult to get along with unless you were of the

4    same mindset with him, right?

5    A    He gets along with person.  It's like -- it's different

6    age, maybe it's an age difference.

7    Q    Other employees complained about him, right?

8    A    Yes, they did.

9    Q    And you knew that he was sometimes depressed, sometimes

10   suicidal, right?

11   A    I don't have any knowledge for that.

12   Q    You never heard that?

13   A    I do not remember that.

14   Q    You knew his mom took away his passport, right?

15   A    Yes, he told me.

16   Q    And you did everything you could to help Saidakhmetov

17   travel, right?

18   A    When he decided his final decision, yes, I did help him.

19   Q    He was 19 years old, right?

20   A    I do not know.  But he was teenager, yes; 19 or 20.

21   Q    And you did everything you could to help him travel; yes

22   or no?

23   A    Yes, ma'am.

24   Q    You drove between New York and Philadelphia to get him so

25   he'd get his picture taken for his papers; yes or no?

HABIBOV – CROSS – MS. SHARKEY

1   A    Yes, ma'am.

2   Q    You drove him to get a ticket and gave him money for it,

3   right?

4   A    Yes, ma'am.

5   Q    And you shared the fact that you paid for his ticket with

6   other people, right?

7   A    Yes.

8   Q    You bragged about it with certain people; didn't you?

9   A    Yes, I told other people.

10  Q    You told Rakhmatov, right?

11  A    Yes, I did.

12  Q    You told your wife, right, or your girlfriend?

13  A    Yes.

14  Q    Did you tell Furkat?

15  A    Yes.

16  Q    Firdaus?

17  A    Yes.

18  Q    Avaz?

19  A    I don't know.

20  Q    And you told Zakirov to raise money and get as much money

21  as you can for this guy, right?  Yes or no?

22  A    Can you ask the question again, please.

23          MS. SHARKEY:  Could I have it read back?

24          THE COURT:  Yes, read it back.

25          (Whereupon, the record was read.)

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

HABIBOV - CROSS - MS. SHARKEY

1    A    Yes.

2    Q    And you wanted to raise money and tell other people who

3    you felt safe with, but you didn't want to give them any more

4    of your money; isn't that true?

5    A    Yes, ma'am.

6    Q    And, in fact, you considered, and you stated to a federal

7    agent that the 500-dollar airline ticket was a business

8    expense to you.

9              Do you remember that?

10   A    Yes.

11   Q    And what you meant by that was so you looked good in the

12   community, right?

13   A    To?

14   Q    You looked good in front of --

15   A    Yes.

16   Q    -- Kosim?

17   A    Yes.

18   Q    You looked good in front of Rakhmatov, right?

19   A    Yes.

20   Q    And you manipulated it so Saidakhmetov had the tools to

21   travel, and you took credit for it, right?

22             MR. KESSLER:  Objection.

23             THE COURT:  Overruled.

24   A    Can you rephrase your question?

25             MS. MACEDONIO:  Can I have that read back?

HABIBOV - CROSS - MS. SHARKEY

1    THE COURT:  Read it back.  Read it back.

2    If you can't answer it, counsel will rephrase it.

3    THE WITNESS:  Sure.

4    (Whereupon, the record was read.)

5  A    I don't quite understand that question, ma'am.

6  Q    You considered it good business.  Right?

7  A    Yes, ma'am.

8  Q    And at the same time -- withdrawn.

9    Now, you knew Dilkhayot Kasimov, right?

10 A    Yes.

11 Q    You knew a couple of things about Dilkhayot, right?  You

12 knew he was anxious to get married, right?

13 A    Yes, ma'am.

14 Q    And you knew that he was looking for a bride, correct?

15 A    Yes, ma'am.

16 Q    And your business relationship with Dilkhayot was that he

17 made banners and business cards for you, right?

18 A    Yes, ma'am.

19 Q    And you described Dilkhayot in your sessions with the

20 government as a productive young man buying and selling

21 electronics, right?

22 A    Yes, ma'am.

23 Q    Now, you testified --

24    One moment, Judge, I'm sorry?

25    THE COURT:  Yes, of course.

HABIBOV - CROSS - MS. SHARKEY

1  Q    You testified on direct examination -- I'm sorry, excuse

2  me -- on direct examination yesterday and this mourning about

3  certain texts and phone conversations, right?

4  A    Yes.

5  Q    And the government had gone over them with you prior to

6  your testimony today, right?

7  A    Yes.

8  Q    That wasn't the first time you heard the questions,

9  right?

10 A    No.

11 Q    Now, I want to draw your attention to the questions that

12 were asked this morning by government counsel.  And they asked

13 you about someone named Askar, right?

14 A    Yes, ma'am.

15 Q    And they asked you about a conversation that you had with

16 Askar; remember that?

17 A    Me having conversation with Askar?  No, they didn't ask.

18 Q    Do you remember -- no, you know what, I'm sorry, that was

19 not phrased very well.

20        They asked you about the recording between yourself

21 and Bekmatov on February 14th, 2015, right?

22 A    I do not know that was February 14th or I had a

23 conversation with Bekmatov?

24 Q    I'm sorry, that's my fault.

25 A    Yeah.

HABIBOV - CROSS - MS. SHARKEY

1  Q    They asked you about a conversation on February 24th,

2  2015, yes?

3  A    Yes, ma'am.

4  Q    And that conversation was between you and Bekmatov,

5  right?

6  A    Yes, ma'am.

7  Q    And we talked about little bit about Bekmatov earlier,

8  right?

9  A    Yes.

10 Q    And you testified this morning that when Bekmatov --

11            I'm sorry, may I have one second, Judge, I lost my

12 page in the transcript?

13            THE COURT:  Go ahead.

14            And I'm not going to hold you to this, but how much

15 longer do you have with the witness because it's past 12:30,

16 so if this a convenient time to break...

17            MS. SHARKEY:  This is a convenient time to break.

18            THE COURT:  Okay.  We'll do that.

19            Ladies and gentlemen of the jury, it's 12:30.  Why

20 don't we resume at 2:00.  After the lunch break, we'll

21 continue cross-examination.

22            Again, please do not discuss the case amongst

23 yourselves.  You can leave the books there on your seats.

24 Thank you.

25            (Jury exits the courtroom.)

HABIBOV - CROSS - MS. SHARKEY

1          THE COURT:  You may be seated.

2          The jury has left the courtroom.  The witness has

3   been escorted from the stand.

4          Are there any procedural issues we need to address

5   before we take our luncheon recess?

6          MR. KESSLER:  Just to note on the record, Your

7   Honor, that based on our conversation --

8          THE COURT:  Use the microphone, sir.

9          MR. KESSLER:  To note on the record, that based on

10  our conversation from before the cross-examination starting,

11  Special Agent Vu was not in the courtroom during that

12  cross-examination.

13         THE COURT:  So noted.

14         Anything else?

15         MR. KESSLER:  No.

16         THE COURT:  Anything else from the defense?

17         MS. MACEDONIO:  No, thank you, Judge.

18         THE COURT:  Good.  We'll see you at 2:00.  Enjoy

19  your lunch.

20         MR. KESSLER:  Thank you, Your Honor.

21         THE COURT:  Thank you.

22         (Whereupon, a recess was taken at 12:33 p.m.)

23

24

25

417

Proceedings

1              A F T E R N O O N   S E S S I O N

2              (In open court.)

3              THE CLERK:  All rise.  Judge Kuntz presiding.

4              THE COURT:  Good afternoon.  We have the

5    appearances.

6              Do we have any procedural issues that we need to

7    discuss before bringing the witness back and the jury out?

8              MS. SHARKEY:  Yes.

9              THE COURT:  Do we need to wait for your client?

10             MS. SHARKEY:  We would like some more time with our

11   client.  I apologize.

12             THE COURT:  No need to apologize.  This is an

13   important trial.  If you need more time with your client,

14   you've got it.  Twenty minutes, a half hour?

15             MS. MACEDONIO:  A half hour would be great.

16             THE COURT:  Half hour, you have it; and we will tell

17   the CSO that we are going to resume at 3:00, so the jury

18   knows.  And, as I always say to them when they come out, that

19   part of these timeouts are designed to cut down the time we

20   need to have sidebars and interruptions.  So while they may

21   not be completely happy about staying in the jury room, I

22   assure you they are happier about that than sitting over there

23   while we have the obnoxious white noise machine going on and

24   have sidebars, which, as we all know, have their own limits.

25             So we will resume at 3:00, if that's okay with you.

*MICHELE NARDONE, CSR -- Official Court Reporter*

418

Proceedings

1        MS. MACEDONIO:  Much appreciated.

2        MS. SHARKEY:  Thanks.

3        THE COURT:  I assume the government has no problem

4   with that.

5        MR. HAGGANS:  No problem.

6        MR. PRAVDA:  No problem.

7        THE COURT:  So we will see you at 3:00.

8        Off the record.

9        (Recess.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings

1              (In open court.)

2              THE CLERK:  All rise.  Judge Kuntz presiding.

3              THE COURT:  Thank you.  Would you please bring the

4    defendant out.  We have the appearances.

5              Ladies and gentlemen of the public, you may be

6    seated.

7              Counsel, you may be seated as well.

8              MS. MACEDONIO:  Thank you, Your Honor.

9              THE COURT:  Of course.  All right.  We are back on

10   the record after our extended luncheon break.  The defendant

11   is present.  All counsel are present.

12             Do we have any applications that we need to hear

13   outside of the presence of the jury?

14             MS. MACEDONIO:  Yes, Your Honor.  The defense is

15   requesting an ex parte conference with the court.  The reason

16   for that is because --

17             THE COURT:  You can sit down.  Thank you,

18   Ms. Macedonio.  Just use the microphone.

19             MS. MACEDONIO:  The reason for our requesting an

20   ex parte conference is because we believe that some of the

21   issues we are going to discuss with the court, if not all of

22   the issues, involve defense strategy; and we are trying to

23   avoid any disruption in front of the jury.  So we think that

24   there are some issues that the court needs to address on an

25   ex parte matter, and that is our application.

420

Proceedings

 1              THE COURT:  What is the view of the government with

 2     respect to the defense application?

 3              MR. KESSLER:  No objection.

 4              MR. PRAVDA:  The government has no objection, Your

 5     Honor.

 6              THE COURT:  You have no objection?

 7              MR. PRAVDA:  That's correct.

 8              THE COURT:  All right.  Mechanically, how do you

 9     suggest we do this at this point?  We obviously have security

10     concerns, and we have a jury that's located nearby.  So we are

11     not going to do it in chambers.

12              All of our proceedings typically, as everyone knows,

13     in the United States of America, are in open court.  You can't

14     close the courtroom for the trial without express request of

15     the Attorney General of the United States, which we have not

16     gotten.  So we are in this rather Twilight Zone arena.

17              I think the only way to do this, if the parties are

18     amenable, would be to have the ex parte communication

19     physically conducted on the record in this courtroom, excusing

20     the government and excusing the members of the public during

21     the course of the ex parte communication, then inviting the

22     government and the members of the public back once we have

23     completed the ex parte portion; but we obviously -- I

24     shouldn't say obviously -- but logistically we are not going

25     to do it in chambers, given the nature of the situation.

Proceedings

1          So, that being said, is that an acceptable way to

2    proceed, the government?

3          MR. PRAVDA:  Your Honor, the government has no

4    objection.

5          THE COURT:  I'm going to ask you to use the

6    microphone, Mr. Pravda.

7          MR. PRAVDA:  Your Honor, the government has no

8    objection.

9          I would just note, however, that right now the court

10   reporter is connected to the realtime feed.  So if there was

11   some way for the court reporter to disconnect so that the

12   ex parte conference doesn't come up on either the government's

13   computer or on the sidebar or podium computers that are

14   connected to the realtime feed, I think that would be

15   appropriate.

16         THE COURT:  Very often, when I don't want to have

17   realtime disconnected, it's happened.  This is the first time.

18   It feels like going to my doctor and having him tell me I need

19   to gain weight.  I suppose it could happen, but it hasn't

20   happened in my lifetime.

21         Madam Reporter, is that something you can do

22   comfortably?  Yes?  You are nodding yes.  You have to say yes.

23   Yes?

24         THE COURT REPORTER:  Yes.

25         THE COURT:  Is that acceptable to defense counsel?

Proceedings

1            MS. MACEDONIO:  It is, Your Honor.

2            THE COURT:  All right.  That is how we will proceed.

3            We will ask the government -- strike "ask" -- direct

4     the government and direct the members of the public to please

5     step outside.  We are going to have an ex parte communication

6     with the court, on agreement of the government; and the

7     defendant, obviously, will be present for this, as will his

8     counsel.

9            Don't leave any recording devices.  I know those

10    little tricky, wascally (sic) approaches.  Make sure that door

11    is closed appropriately so we don't have any spillover.

12           The record should reflect the fact that the witness

13    is obviously not present.  We are just with defense counsel

14    and the defendant and everybody else, other than the court

15    reporter and the marshals and the interpreter and my courtroom

16    staff and the paralegal for the defendant, left.

17           (Continued on the next page.)

18

19

20

21

22

23

24

25



424



Case 1:15-cr-00095-WFK   Document 435   Filed 12/05/19   Page 99 of 152 PageID #: 3112

425











430



431



432



PROCEEDINGS

9      (In open court; Jury not present.)

10     THE COURTROOM DEPUTY:  All rise.

11     Judge Kuntz presiding.

12     THE COURT:  Thank you.  We have our appearances.

13     Are we ready to bring the witness back to the stand

14 and bring in the jury?

15     MR. KESSLER:  Yes.

16     MR. PRAVDA:  Yes.

17     MS. SHARKEY:  Yes, sir.

18     THE COURT:  Okay.  Can we get the witness back on,

19 and then we'll bring in the jury.

20     And you may be seated, ladies and gentlemen.

21     Thank you very much.

22     (Whereupon, the witness resumes the stand.)

23     THE COURT:  Thank you, sir.  Please have a seat back

24 in the witness stand.

25     And are we ready to bring in the jury?

PROCEEDINGS

1           MR. PRAVDA:  Yes.

2           THE COURT:  Mr. Jackson, will you let the CSOs know

3    to do that?

4           THE COURTROOM DEPUTY:  Yes, Judge.

5           THE COURT:  Thank you.

6           (Jury enters the courtroom.)

7           THE COURT:  Thank you, ladies and gentlemen, for

8    your patience.  I assure you, ladies and gentlemen of the

9    jury, the time was well spent and it will pay dividends, and

10   we were not at all simply sitting here twiddling our thumbs.

11   So be assured.

12          And also, you're going to hold me to that 5:00

13   deadline, which means in 55 minutes or less you will be

14   excused for the day.  So no worries about that.  And I want to

15   thank you again.

16          So please remove those binders and have a seat, and

17   we're going to continue.

18          You may sit down, sir, members of the jury, and the

19   public, and we're going to continue with the examination,

20   cross-examination.

21          MS. SHARKEY:  I have no further questions, Your

22   Honor.

23          THE COURT:  See what I mean?  There you go.

24          Now, do we have any redirect?

25          MR. KESSLER:  Very briefly.

HABIBOV - REDIRECT - MR. KESSLER

1          THE COURT:  Very briefly.  Well, we will see about

2    that.  Okay.

3          MR. KESSLER:  May I proceed?

4          THE COURT:  Yes.

5    REDIRECT EXAMINATION

6    BY MR. KESSLER:

7    Q    Good afternoon, Mr. Habibov.

8    A    Good afternoon.

9    Q    You were asked some questions this morning about lies you

10   made in documents relating to or your visa, to your

11   immigration status, and to your marriage.

12          Do you remember that?

13   A    Yes, sir.

14   Q    Had you previously told the U.S. Government all about

15   those lies?

16   A    Yes.

17          Before coming to trial today, yes, I have.

18   Q    And before signing your cooperation agreement?

19   A    Yes, I have.

20   Q    Do you speak truthfully about them today?

21   A    Yes.

22   Q    Are you hiding anything about that conduct?

23   A    No.

24   Q    You were also asked some questions about all the people

25   you told about buying an airplane ticket for the defendant?

HABIBOV – REDIRECT – MR. KESSLER

1   A    Yes.

2             MS. SHARKEY:  Objection.

3             THE COURT:  Sustained.

4             MR. KESSLER:  Withdraw that question.

5             THE COURT:  It's already been sustained.

6             In other words, there's an objection, if the

7   objection is sustained, then the question just didn't happen

8   because there's no answer.

9             And, again, evidence is the testimony that you hear

10  from the witnesses, not the questions that are asked by

11  lawyers.

12            So there was an objection, it's sustained.  As we

13  say in the law:  Move on, Counsel.

14  BY MR. KESSLER:

15  Q    You were also asked some questions about all of the

16  people you told about buying the airplane ticket for

17  Saidakhmetov?

18  A    Yes.

19  Q    Did you tell the defendant about buying that airplane

20  ticket?

21  A    Yes, I told.

22  Q    Finally, you were asked some questions about the goals of

23  the tea party?

24  A    Yes.

25  Q    Yesterday I asked you if you were part of the group that

HABIBOV - REDIRECT - MR. KESSLER

1   raised money to support fighters in Syria.

2           Do you remember that?

3   A    Yes.

4   Q    And you said that group was the tea party?

5   A    Yes.

6   Q    I didn't ask you about all the goals of the tea party;

7   did I?

8   A    No, you didn't.

9   Q    And it's true that at points, one of the goals of the tea

10  party was to raise money for widows and orphans of fighters in

11  Syria; is that right?

12  A    Yes.

13  Q    Was Saidakhmetov a widow?

14  A    No.

15  Q    Was Saidakhmetov an orphan?

16  A    No.

17  Q    Do you recall we played a phone call this morning where

18  the defendant volunteered to bring money to Saidakhmetov at

19  the airport?

20          MS. SHARKEY:  Objection as to form.

21          THE COURT:  Sustained.  Stop leading.

22  Q    Do you recall all the conversations we played yesterday

23  and today?

24  A    Yes.

25  Q    Was there a discussion about widows or orphans in any of

HABIBOV - REDIRECT - MR. KESSLER

1   those?

2   A    No.

3   Q    Finally, Your Honor --

4        THE COURT:  Another finally.  It's the second

5   finally.  You only get two.

6        See what I mean about moving things along?

7        Go ahead.

8        MR. KESSLER:  If I could ask Mr. Jackson to put the

9   ELMO on for the jury?

10       THE COURT:  Yes.

11       (Exhibit published.)

12  Q    I'm putting back up Government Exhibit 165.  These are

13  text messages from February 19th, 2015.

14       Mr. Habibov, do you see that first text message at

15  4:00?

16  A    Yes, I do.

17  Q    The defendant wrote to you:  Peace be upon you.  When

18  should I give some money to the brother who is needed?

19       Do you see that?

20  A    Yes, sir.

21  Q    Was he talking about widows or orphans?

22  A    No, he is not.

23       MR. KESSLER:  One moment.

24       THE COURT:  One moment.

25       MR. KESSLER:  No further questions.

439
PROCEEDINGS

1          THE COURT:  There you go.

2          Okay, anything else?

3          MS. SHARKEY:  No cross.

4          THE COURT:  Thank you.

5          All right.  Do we need to take another break for

6   logistics or -- I think we may need to.

7          MS. SHARKEY:  I believe we do, Your Honor.

8          THE COURT:  I apologize.  I know I need more

9   exercise than any of these guys.  Five minutes, a real five

10  minutes, and then we'll get you back.  And trust me, we'll be

11  out of here before 5:00 today.  Thank you.

12          (Jury exits the courtroom.)

13          THE COURT:  The witness may step down.

14          (Whereupon, the witness was excused.)

15          THE COURT:  All right, who is the next witness.

16          MR. PRAVDA:  Your Honor, the government intends to

17  call Special Agent Mariano Capellan.

18          THE COURT:  Okay.  Is the special agent available?

19          MR. PRAVDA:  He is.  Yes, Your Honor.  He's outside.

20          THE COURT:  Okay, why don't we bring him in.

21          MR. PRAVDA:  Yes, sir.

22          THE COURT:  And let's get the jury back.

23          Stand right here.  When the jury comes back, we'll

24  swear you in in their presence, if you wouldn't mind.

25          You can actually sit down, because they'll be

440

PROCEEDINGS

1    passing through that way.  When they come in, I'll ask you to

2    stand and be sworn.

3              (Pause.)

4              (Jury enters the courtroom.)

5              THE COURT:  Thank you, ladies and gentlemen of the

6    jury.  You see I really do know what five minutes really

7    means.

8              I appreciate it.  You can be seated.  And we have a

9    new witness.

10             Mr. Jackson, would you swear the witness, and then

11   counsel will inquire.  And we will have our hard stop at

12   5 p.m.

13             (Witness takes the witness stand.)

14   **MARIANO CAPELLAN**, called as a witness, having been first duly

15   sworn/affirmed, was examined and testified as follows:

16             THE COURTROOM DEPUTY:  Do you solemnly swear or

17   affirm that the answers you are about to give to the Court

18   will be the truth, the whole truth, nothing but the truth, so

19   help you God?

20             THE WITNESS:  Yes, sir.

21             THE COURT:  Thank you.  Please be seated, sir.  I'm

22   going to ask you to speak directly into this microphone that's

23   in front of you.  It will swivel to you, and that way you can

24   be heard.

25             So please state your name and spell it and then

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

CAPELLAN – DIRECT – MR. PRAVDA

1    counsel will inquire.

2              THE WITNESS:  My name is Mariano, M-A-R-I-A-N-O,

3    Capellan, C-A-P-E-L-L-A-N.

4              THE COURT:  You may inquire, counsel.

5              MR. PRAVDA:  Thank you, Your Honor.

6    DIRECT EXAMINATION

7    BY MR. PRAVDA:

8    Q    Good afternoon.

9    A    Good afternoon.

10   Q    Where do you work?

11   A    I work at the Joint Terrorist Task Force with the FBI.

12   Q    What is it your title at the Joint Terrorist Task Force?

13   A    I'm a surveillance officer.  Detective.

14             THE COURT:  See what I mean by swiveling it, it will

15   move.  The whole thing will move.  It's like a snake but it

16   won't bite you.  Move it front of your mouth so you will sound

17   like this.

18             Okay.

19   BY MR. PRAVDA:

20   Q    For how long have you served in the Joint Terrorist Task

21   Force?

22   A    I've been there for approximately 16 years; one six.

23   Q    And now you said you were a detective?

24   A    Yes, I am, a first grade detective.

25   Q    And with what entity is that?

CAPELLAN - DIRECT - MR. PRAVDA

1   A   The NYPD.

2   Q   You're a detective with the NYPD?

3   A   Yes, I'm a detective with the NYPD assigned to the FBI.

4   Q   And for how long have you been a detective with the NYPD

5   overall?

6   A   Approximately 20 -- 26 years.

7   Q   And during that time, you've been assigned to the Joint

8   Terrorist Task Force for about 15?

9   A   Approximately 16.

10  Q   Now, you mentioned surveillance operations.

11      Is that your current assignment within the JTTF?

12  A   Yes, it is.

13  Q   What is "surveillance operation"?

14  A   Surveillance is the unit that specifically follow people

15  around either to confirm or to find out the truth with regards

16  to allegations.

17  Q   And do you assist other squads within the Joint Terrorist

18  Task Force with their surveillance operations?

19  A   Yes, we do.  We -- we assist every squad that needs

20  someone with undercover surveillance, including every other

21  state that needs us, we'll go out there and do the

22  surveillance.

23  Q   So, Detective Capellan, let me direct your attention to

24  February 24th, 2015.

25      What was your assignment that day?

443

CAPELLAN - DIRECT - MR. PRAVDA

1   A    My assignment that day was to do surveillance of an

2   individual that we already knew was going to travel out of the

3   country.

4   Q    Do you know the name of that individual?

5   A    To be honest, I have a hard time pronouncing his name.

6   We refer to him as "AS".

7          If you need me to pronounce his whole name, I need

8   to refresh my memory with the report.

9   Q    So "AS" is the initials for Akhror Saidakhmetov?

10  A    Correct.

11  Q    When did the surveillance begin that day on

12  February 24th, 2015?

13  A    It began approximately about 2 p.m. out in Brooklyn, on

14  Tenth Street.

15  Q    And where did you observe -- what did you observe

16  Saidakhmetov do that afternoon into the early evening hours?

17  A    I was watching the residence where AS resides, his home.

18         I had spent a lot of other days prior to that date,

19  so I saw him when he exited his residence, his apartment, with

20  bags, and he got into a taxi, a cab service.

21  Q    Where did the taxicab go?

22  A    The car service went from his home to Kennedy Airport.

23         MR. PRAVDA:  Your Honor, Kennedy International.

24  A    John F. Kennedy International Airport.

25  Q    Did you follow Mr. Saidakhmetov to the airport?

CAPELLAN - DIRECT - MR. PRAVDA

1  A    Yes, I was part of the team that followed the car service

2  with him and to JFK.

3  Q    What did you observe when they arrived at the airport?

4  A    They exited the vehicle, took out the bags, and went

5  inside the airport.

6  Q    Do you know what terminal they went into?

7  A    Yes.  It was Terminal 7.

8  Q    Do you recall what time that was?

9  A    They left, um -- to give you the exact time, I need to

10 refresh my memory, but it was after 9:00 that they left

11 Brooklyn.

12 Q    Did you prepare any reports afterwards documenting the

13 surveillance that you conducted?

14 A    I was not the one that wrote the report.  But we have to

15 prepare a report for everything that we do.  When we observe,

16 we have to write it down.

17       One -- one person on the team -- I was part of a

18 team of eight different people.  It was not just me alone.

19 And one person's in charge of doing that report.  I was not

20 the one doing that report.

21 Q    Would reviewing that report refresh your recollection as

22 to the time that Saidakhmetov arrived at JFK Airport?

23 A    Yes, for the exact time that he left his residence.

24       MR. PRAVDA:  With the Court's permission, could I

25 have Mr. Jackson hand to the witness what's marked for

CAPELLAN – DIRECT – MR. PRAVDA

1    identification as Government 3500-MC-1?

2              THE COURT:  Any objection to it being shown to the

3    witness?

4              MR. RUBERT-SCHEWEL:  No, Your Honor.

5              THE COURT:  All right, you may show it to the

6    witness.

7              Thank you, Mr. Jackson.

8         (Proffering.)

9              (Whereupon, the witness is reviewing the document.)

10             THE COURT:  And the question, again, Mr. Pravda, for

11   the witness is:  Does it refresh his recollection?

12             MR. PRAVDA:  Yes, Your Honor.

13   Q    Detective Capellan, have you had a chance to review that

14   adequately?

15   A    I'm sorry?

16   Q    Have you had a chance to review that report,

17   Detective Capellan?

18   A    I'm in the process of looking at it.

19             THE COURT:  Well, what is the question you have for

20   the witness?

21   Q    Does it refresh your recollection as to the time

22   Mr. Saidakhmetov arrived at JFK Airport?

23   A    Yes, it will refresh my recollection as soon as I have a

24   chance to see it.

25             Yes.

CAPELLAN - DIRECT - MR. PRAVDA

1    Q    Does it refresh your recollection?

2    A    Yes.

3    Q    Is your recollection now refreshed what time

4    Mr. Saidakhmetov arrived at JFK Airport?

5    A    Yes, it was approximately 9:10 p.m.

6    Q    And I think you testified you went into Terminal 7?

7    A    Seven.

8    Q    Did you perform any surveillance inside Terminal 7?

9    A    I did not go inside the airport.  I had other team

10   members inside.  I stayed outside in my car.

11   Q    Now, did you conduct surveillance of any other individual

12   that evening?

13   A    Yes.

14   Q    Can you describe that surveillance?

15   A    Yes.

16        I received radio communication -- the whole team has

17   a radio, that when they speak, even the people inside the

18   airport, I could hear that conversation in the car and

19   everybody else.  And I was given a description of an

20   individual that had met with the main target inside.  And my

21   job was to see, when he exit the Terminal 7, to see where he

22   was gonna go.

23        And I saw that individual come out of Terminal 7.

24   Q    When you say "main target," are you referring to Akhror

25   Saidakhmetov?

CAPELLAN - DIRECT - MR. PRAVDA

1    A    Correct.

2    Q    When the individual came out of Terminal 7, what did you

3    observe him do?

4    A    I saw him walk out and go to a black car that was parked

5    illegally.  It was a black, four-door Toyota Camry.

6           He went to the car.  I was parked on the street

7    outside the terminal.  I went to see to confirm that he went

8    inside the car and he was the driver of that car.

9    Q    Was he, in fact, the driver of that car?

10   A    Correct, he was.  He was the only one.

11   Q    And what did you observe at that point?

12   A    He went inside the car and began moving the car towards

13   the -- towards the parking lot.

14          Because the car was not in the parking lot, it was

15   outside in the common street where everybody drives through.

16   Q    Did you have an opportunity to observe the license plate

17   on the car that that individual was driving?

18   A    Yes.  As soon as I saw the license plate, I put a BOLO so

19   everybody else that was with me could identify the car that

20   that individual was operating.

21   Q    What is "BOLO"?

22   A    What is what?

23   Q    You said "BOLO"?

24          You said you put the license plate in what?

25   A    Oh, I'm sorry.

CAPELLAN - DIRECT - MR. PRAVDA

1      "Over", meaning that's the term that we use when we

2   put it on the radio.  We say "over the radio".

3   Q   Do you recall the license plate number of the car that

4   that individual was driving?

5   A   I don't have that number memorized, but I could refresh

6   my memory with the report and give it to you.  But I don't

7   have it memorized.

8   Q   Would you please review the report to see if that

9   refreshes your recollection?

10  A   Yes.

11          THE COURT:  Is that the report in front of the

12  witness, or is there another report that he needs to have?

13          MR. PRAVDA:  No, Your Honor, this is the report that

14  is in front of the witness.

15          THE COURT:  Okay, take a look at the one you've got

16  in front of you, sir, and see if that refreshes your recollect

17  with respect to the license plate number, if that's the

18  question that's being asked.

19          (Whereupon, the witness is reviewing the document.)

20  A   That license plate is T, as in Thomas, 622543C, as in

21  Charlie.

22  Q   Now, Detective Capellan, did you ever come to learn the

23  identity of that individual who got into that car?

24  A   Yes.  The name was mentioned over the radio.

25  Q   Do you recall the name?

CAPELLAN – DIRECT – MR. PRAVDA

1   A    I do not have the name memorized.  I know it's a name

2   that's very hard for me to pronounce it with my Spanish

3   accent.  But I could refresh my memory looking at the report.

4   Q    Could you please review the report in front of you to see

5   if that refreshes your recollection as to the identity of the

6   individual that you observed?

7   A    Okay.

8              THE COURT:  Absolutely.

9              (Whereupon, the witness is reviewing the document.)

10  A    I apologize if I mispronounce your name.

11             Dilkhayot Kasimov.

12  Q    Now, Detective Capellan, I'm showing you what is in

13  evidence as Government Exhibit 19.

14             Mr. Jackson, may I have the ELMO, please?

15             THE COURTROOM DEPUTY:  Yes, sir.

16             THE COURT:  It should be on the screen in front of

17  you, sir, as well as for the jury.

18             Can you dim the lights a bit, Mr. Jackson, so the

19  jury can see it.

20             Do you have it, sir?

21             THE WITNESS:  I don't have it.

22             THE COURT:  You don't have it.

23  A    What am I looking for?

24  Q    Detective Capellan, have you ever seen this document

25  before?

CAPELLAN - DIRECT - MR. PRAVDA

1    A     No, I have not.

2    Q     Okay, I'm going to zoom in to this area that says "LP

3    num" on the screen.

4          Do you see that?  And I'm circling it for you.

5    A     Yes, I do see that.

6    Q     What is the license plate number listed under the "LP

7    num" category?

8    A     It's T, as in Thomas, 622543C, as in Charlie.

9    Q     And is that the same car that you saw the individual you

10   now learned is Dilkhayot Kasimov get into that night at JFK

11   Airport on February 24th, 2015?

12   A     Yes.  That was the license plate that was on the car that

13   I described as a four-door Toyota Camry, black.

14         MR. PRAVDA:  Now, Detective Capellan, I'd like to

15   play a video clip for you that's in evidence.

16         Your Honor, if I may ask Mr. Jackson just show the

17   laptop at the podium.

18         THE COURT:  Yes.

19         Clear the screen, please, of the mark.

20         Mr. Pravda, would you please touch the screen to

21   make the circle that you drew disappear?

22         There you go.  Okay.

23   Q     Detective Capellan, I'm showing you what's in evidence as

24   Government Exhibit 15F, as in frank, and I'm going to play

25   this clip for you.  It's a 15-second clip.

CAPELLAN - DIRECT - MR. PRAVDA

1          (Video recording played.)

2          MR. PRAVDA:  And I'm going to pause the video at the

3     end of the clip.

4          (Video recording stopped.)

5     Q    Detective Capellan, do you recognize what's depicted in

6     this video clip?

7     A    Yes, I recognize the defendant walking out.

8          And I also recognize the black truck that you'll see

9     behind the same vehicle.  That's my government vehicle, and

10    that's what I used to work on that particular night.

11    Q    And were you in that vehicle when Mr. Kasimov just walked

12    by from exiting Terminal 7 at JFK Airport?

13    A    Yes, I was inside the vehicle, and as soon as I spotted

14    him, I moved -- I moved closer to where his car was.

15         MR. PRAVDA:  Detective Capellan, let me show you

16    what is now in evidence as Government Exhibit 15G.

17         (Video recording played.)

18         MR. PRAVDA:  And let me pause it for a second near

19    the first third of the clip.

20         (Video recording stopped.)

21    Q    Do you see your car in this image?

22    A    Yes.  You only see the lights.  I'm parked behind that

23    silver van, which is another of my coworker.

24    Q    I'm circling on the screen, towards the left side of the

25    image, the light that you described.

CAPELLAN - DIRECT - MR. PRAVDA

1          Is that your car?

2     A     Yes, that is my car.

3               MR. PRAVDA:  Okay, resuming the video.

4               (Video recording played.)

5               MR. PRAVDA:  Pausing the video now.

6               (Video recording stopped.)

7     Q     Where are you now?

8     A     I moved up next to the defendant's car, which was on the

9     street by where you see the car with the red brake light.

10    Q     So circling now on the right side of the screen; is that

11    your car?

12    A     Yes, it is.

13    Q     And where is Mr. Kasimov's car at that point in time?

14    A     Right there, he is to my left, right directly across from

15    my left.  From the left side of my vehicle.

16    Q     Would it be accurate to say it is where the arrow is that

17    I just drew on the screen?

18    A     Yes.

19              MR. PRAVDA:  Okay, I'm resuming the video again.

20              (Video recording played.)

21              (Video recording stopped.)

22    Q     Detective Capellan, what did you observe during the

23    remainder of that video?

24    A     That my coworker, which I mentioned that was driving that

25    silver van that I gave the information, he also went to follow

453

CAPELLAN - DIRECT - MR. PRAVDA

1    the vehicle with the target.

2    Q    And that was the silver van that we saw at the very end

3    of the clip?

4    A    Yes.  It's a silver Odyssey van.

5    Q    So that also a fellow team member?

6    A    Correct.

7    Q    Now, you testified earlier that you saw Kasimov move the

8    car towards the parking lot.

9              What happened after that?

10   A    He parked the vehicle in the parking lot, and then he

11   came back into Terminal 7.

12   Q    And was there -- did there come a time when he came out

13   of Terminal 7, again, and took the car from the parking lot?

14   A    Yes.

15   Q    Did you follow him at that point?

16   A    Yes, I did.

17   Q    And what happened when you followed him?

18   A    As you indicated, he went -- after he went inside the

19   terminal, he came back out, went into the parking lot, picked

20   up his vehicle, and we followed him out of the airport all the

21   way to Brooklyn.

22              (Continued on next page.)

23

24

25

CAPELLAN - DIRECT - MR. PRAVDA

1    DIRECT EXAMINATION (Continued)

2    BY MR. PRAVDA:

3    Q    When you followed him out of the airport, where did you

4    follow him to?

5    A    He drove into Brooklyn into the vicinity of Cropsey and

6    Bay 53rd Street in Brooklyn.

7    Q    And is that near a Home Depot in that area?

8    A    Yes.  There is a Home Depot, it's the street that leads

9    to Coney Island, the highway was there.  There is a diner

10   across the street.  I'm very familiar with the area.

11   Q    How do you know that area?

12   A    I have lived in Brooklyn since I came into this country

13   more than 40 years ago and I used to take my kids to Coney

14   Island and also one of my kids plays in a baseball team in the

15   park that they use is right next to Home Depot and right near

16   that residence where he went into.

17   Q    So after the defendant drove to the vicinity of Cropsey

18   Avenue and 53rd, Bay 53rd Street in Brooklyn, what did you see

19   next?

20   A    He parked the vehicle, he sat in the vehicle for a little

21   while and then he came out of the vehicle and went into a

22   home.  At that time I left my vehicle on Cropsey, and I was

23   dressed like a bum and I walked by the street to see where he

24   was going into, what house he was going to because we didn't

25   know where he lived.

CAPELLAN – DIRECT – MR. PRAVDA

1   Q    Did you see the apartment that he went into?

2   A    Yes, I saw the building.  I gave the information to the

3   team that he had gone inside a building.  At the time I was

4   walking, trying to play like I belonged and I didn't see the

5   number, so I went back and confirmed the number where I had

6   seen him walk into.

7   Q    What was the address of the building that he had gone

8   into?

9   A    It's a house, not a large building, 138 Bay 53 Street,

10  Brooklyn.

11  Q    What apartment was in that house did he enter?

12  A    He walked -- I told the team he walked, like, towards the

13  basement of the house.

14  Q    What time was that?

15  A    That was approximately 12:30, 12:33 a.m. on the 25th.

16  Q    So 12:43 a.m. on February 25th, 2015?

17  A    Correct.

18  Q    What did you do at that point?

19  A    At that point, after we confirmed that he had gone in

20  there, that was then the end of the night for my work; I drove

21  home.

22  Q    Did you have any other involvement in this case since

23  February 25th, 2015?

24  A    No, nothing at all.

25           MR. PRAVDA:  No further questions, Your Honor.

**CAPELLAN – CROSS – RUBERT-SCHEWEL**

1           THE COURT:   Your witness.

2     CROSS-EXAMINATION

3     BY MR. RUBERT-SCHEWEL:

4     Q     Good afternoon, agent -- or sorry, detective.

5     A     Correct.   Good afternoon.

6     Q     On February 24th, 2015, you stated you were part of a

7     surveillance team, right?

8     A     Correct, yes.

9     Q     And this team consisted of approximately 10 other agents

10    or detectives?

11    A     Approximately eight, eight.

12    Q     And the target of this surveillance was Mr. Saidakhmetov?

13    A     Correct.

14    Q     And you stated that you had information that he may be

15    traveling?

16    A     Yes.

17    Q     And you began your observation of Mr. Saidakhmetov around

18    2 p.m. on that day?

19    A     Correct.

20    Q     And it was in the vicinity of 1501 East 10th Street in

21    Brooklyn?

22    A     Yes, sir.

23    Q     At some point on that date Mr. Saidakhmetov met with an

24    unidentified male?

25    A     Yes.

**CAPELLAN - CROSS - RUBERT-SCHEWEL**

1   Q    Who was not a target of your surveillance?

2   A    No.

3   Q    And he was not a target of your surveillance because he

4   was actually a confidential informant for the FBI?

5   A    I did not know that.

6   Q    Well, you did observe Mr. Saidakhmetov meet with another

7   individual around 5 p.m. on this date, right?

8   A    Yes.

9   Q    And your testimony is that you were not aware that he was

10  a confidential informant?

11  A    No, I was not.

12  Q    And you did observe Mr. Saidakhmetov and this individual

13  as they entered a Walgreens, right?

14  A    Correct.

15  Q    And as they walked together down Coney Island Avenue?

16  A    Yes.

17  Q    And as they walked together to a mosque?

18  A    That's correct.

19  Q    And then you observed Mr. Saidakhmetov and the

20  confidential -- the FBI informant as they entered another

21  residence?

22  A    I do not recall that residence.  Just keep in mind,

23  there's eight people --

24        THE COURT:  Just answer his question.  Never mind

25  telling him what to keep in mind.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

**CAPELLAN - CROSS - RUBERT-SCHEWEL**

1    A    Another residence, I do not recall.

2    Q    Do you recall seeing Mr. Saidakhmetov and this same

3    individual enter a taxi around 9:10 p.m.?

4    A    Yes.

5    Q    Do you recall that they had roughly three suitcases that

6    they got into the taxi with them?

7    A    Yes.

8    Q    And then soon after they arrived together at JFK Airport?

9    A    Yes.

10   Q    At approximately 11:30 p.m. that night Dilkhayot Kasimov

11   arrived at JFK.

12   A    Yes.  I did not know who he was.

13             THE COURT:  Just answer the question.

14             THE WITNESS:  Yes.  Sorry.

15   Q    And he arrived at Terminal 7?

16   A    Correct.

17   Q    To be clear, this was the first time on February 24th,

18   2015 that you observed Mr. Kasimov?

19   A    I just need to clarify.  Kasimov, your defendant, yes, I

20   saw him for the first time walking out of the airport.  I did

21   not know who he was prior to that.

22   Q    And so you saw Mr. Kasimov exit Terminal 7 at

23   approximately 11:44 p.m. that night?

24   A    Correct.

25   Q    And so to make it clear, that was the first time that you

459

**CAPELLAN – CROSS – RUBERT-SCHEWEL**

1    had observed Mr. Kasimov?

2    A     Yes.

3    Q     And you saw Mr. Kasimov enter a black sedan?

4    A     Yes.

5    Q     That was illegally parked?

6    A     Yes.

7    Q     And at some point after he then moved that sedan into a

8    parking garage?

9    A     Yes.

10   Q     At approximately 12:10 a.m. you testified Mr. Kasimov

11   exited the parking garage?

12   A     Yes.

13   Q     And drove to an area near Cropsey Avenue and 53rd Street?

14   A     Bay 53rd, yes.

15   Q     Where he parked his car?

16   A     Yes.

17   Q     Went into his residence?

18   A     Yes.

19   Q     And at that point you discontinued your surveillance?

20   A     Not right away.  First I confirmed the number of the

21   house and then I discontinued.

22   Q     So you discontinued your surveillance at approximately

23   12:50 a.m. that night?

24   A     Yes.

25             MR. RUBERT-SCHEWEL:  No further questions.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

460

RIVERA – DIRECT – PRAVDA

1          THE COURT:  Anything else?

2          MR. PRAVDA:  No redirect.

3          THE COURT:  Thank you.  You may step down,

4     detective.  Thank you very much.

5          (Whereupon the witness was excused.)

6          THE COURT:  Please call your next witness.

7          MR. PRAVDA:  The government calls Agent Marcus

8     Rivera.

9          THE COURT:  Please have the agent come forward and

10    be sworn.

11          Please come forward to be sworn, sir.

12          THE COURTROOM DEPUTY:  Raise your right hand, I'll

13    swear you in.

14          (Witness sworn.)

15          THE WITNESS:  I swear.

16    **MARCUS RIVERA,** called as a witness, having been first duly

17    sworn/affirmed, was examined and testified as follows:

18          THE COURT:  You swear yes?

19          THE WITNESS:  Yes.

20          THE COURT:  Okay, good.  Thank you.

21          Sit down please and state your name and spell it

22    clearly for the court reporter and then counsel will inquire.

23          THE WITNESS:  My name is Marcus Rivera.  M-A-R-C-U-S

24    R-I-V-E-R-A.

25          THE COURT:  Thank you.  You may inquire.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

RIVERA – DIRECT – PRAVDA

1    DIRECT EXAMINATION

2    BY MR. PRAVDA:

3    Q    Good afternoon, Special Agent Rivera.

4         Where do you work?

5    A    I work at the U.S. Attorney's Office, Eastern District of

6    New York.

7    Q    And is that the office that the prosecutors work at?

8    A    Yes.

9    Q    What do you do in the U.S. Attorney's Office?

10   A    I'm a special agent.

11   Q    Where are you assigned?

12   A    I'm assigned to the Joint Terrorist Task Force, also

13   referred to as the JTTF.

14   Q    For how long have you been assigned to the Joint

15   Terrorism Task Force?

16   A    I've been assigned to the JTTF for approximately three

17   years.

18   Q    What do you do there?

19   A    I conduct criminal investigations.  And all things

20   involving -- all things prosecuted by the U.S. Attorney's

21   Office.

22   Q    Prior to joining the U.S. Attorney's Office.  Where did

23   you work?

24   A    Before the U.S. Attorney's Office I was a -- I worked for

25   a small agency called the Office of Labor Racketeering and

RIVERA - DIRECT - PRAVDA

1   Fraud Investigations.

2   Q    What is the Office of Labor Racketeering?

3   A    It's a small part of the U.S. Department of Labor's

4   Office of Inspector General.

5   Q    What was your title there?

6   A    I was an assistant special agent in charge.

7   Q    For how long were you a supervisor?

8   A    I was a supervisor for a little over seven years.

9   Q    And prior to that were you a special agent?

10  A    Yes.

11  Q    For how long?

12  A    Prior to that I was a special agent for a little over

13  eight years.

14  Q    Now, Special Agent Rivera, I am going to show you a

15  number of documents.

16        MR. PRAVDA:  Your Honor, with the Court's permission

17  if I could just hand this stack to Mr. Jackson to provide to

18  the witness.

19        THE COURT:  What are the documents?  Would you just

20  describe them by number.  Are you going to have the witness do

21  that and see if there's any objection.

22        MR. PRAVDA:  It's Government Exhibits 150 through

23  164, and 119T through 123T all of which are in evidence.

24        THE COURT:  Any objection?  They're all in evidence.

25        MR. RUBERT-SCHEWEL:  No objection.

463

RIVERA - DIRECT - PRAVDA

1        THE COURT:  Fine.

2        Mr. Jackson would you please bring them to the

3    witness.

4        Are you going to publish them on the ELMO as well so

5    the jury can see them while he's going through, or is that not

6    necessary?

7        MR. PRAVDA:  I'm going to use the ELMO, sir.

8        THE COURT:  Okay, thank you.

9        Fire up the ELMO, please.

10   BY MR. PRAVDA:

11   Q    Special Agent Rivera, I placed on the ELMO what's been

12   identified as Government Exhibit 150.

13       Do you recognize that document?

14   A    Yes.

15   Q    What is it?

16   A    It's a chart of 0it's a chart of the text messages on

17   September 14th, 2014.

18   Q    Now you also have in front of you a document that I have

19   marked Government Exhibits 151 through 164.  What are those?

20   A    These are the actual text messages.

21   Q    So the document that Government Exhibit 150 contains a

22   chart of the text messages in Government Exhibits 151 to 164?

23   A    Yes.

24   Q    Did you review the chart to confirm that -- I'm sorry,

25   withdrawn.  Did you review the underlying text messages that

RIVERA - DIRECT - PRAVDA

1    are in Government Exhibits 151 through 164 to confirm the

2    accuracy of the chart?

3    A    I did.

4    Q    Now directing your attention to Government Exhibit 150,

5    who were the text messages between?

6    A    Juraboev and Saidakhmetov.

7    Q    What is the date of the text messages that are contained

8    in this summary chart?

9    A    September 14th, 2014.

10   Q    And over what time frame on that date were these messages

11   exchanged?

12   A    The text messages start at 7:12:23 a.m. Eastern Daylight

13   Time and end at 7:47:45 a.m.

14            THE COURT:  Mr. Pravda, could you move it so the

15   jury can see the entire exhibit because it cuts off.

16            MR. PRAVDA:  Yes, Your Honor.  I'm going to have

17   Special Agent Rivera read this so I'll just keep it up here so

18   the jury can see the messages as we use them.

19            THE COURT:  That's fine.  Go ahead.

20   Q    Agent Rivera, did you have do anything with respect to

21   the time in the first column?

22   A    I noticed that the time in the first column is the local

23   time for this area here, Eastern Daylight Time and it's

24   derived from the original texts which are UTC time, Universal

25   Coordinated Time.

RIVERA - DIRECT - PRAVDA

1   Q   So, Special Agent Rivera, beginning with these first

2   texts at 7:12:43 a.m., could you read these for the jury.

3   A   Juraboev:  I am talking to the Syrian brothers.

4       Do you want me to continue down?

5   Q   Please continue, yes.

6   A   Saidakhmetov:  What's new?  Any information?

7       Juraboev:  He says that the only way to go is via

8   Turkey via Istanbul.  Supposedly none of them can help.  In

9   other words, since they don't know us they won't help us.

10      Saidakhmetov:  But a brother I talked to told me

11  that if I go to Tuela he would send the brothers to pick me

12  up.  He told me that.  In which part of Turkey is that Tuela

13  located?  Would you please ask?

14  Q   Turning to page 2 of Government Exhibit 150.

15  A   Juraboev: Hilofatnews.com.  Presently a situation is

16  such that you cannot just pack and go, someone has to meet you

17  in Syria, otherwise they will not let you in, if they don't

18  know you, that's why it is better you communicate first.

19  That's what our brother said.

20      Saidakhmetov:  Then it's better to discuss with a

21  brother on my site because he told me he would meet me/you/us.

22  Please go -- please get on my site and check if that guy

23  responded.

24      Juraboev:  No answer.

25  Q   Turning to page 3 of Government Exhibit 150.

RIVERA - DIRECT - PRAVDA

1   A    Juraboev: Delete. Edit. 7:41. My God, take us out of

2   darkness into a light. Will you/we be caught by enemies of

3   Islam or by the guards of Islam. That's what we need to find

4   out. Delete. 7:44 hilofatnews.com.

5          First of all, a Turkish border heavily guarded right

6   now especially at Dawla side. If one doesn't know a route, he

7   may get caught. Secondly, once you cross the border of the

8   Islamic State someone has to receive you there. There is a

9   border there as well. The people who receive you, they will

10  say, this man belongs to us and they will take you in.

11  Q    Agent Rivera, directing your attention now to Government

12  Exhibit 119T, the transcript, do you have that in front of

13  you?

14          MR. PRAVDA: Your Honor, for the record these

15  transcripts are also in the jury binders under Tab 119T.

16          THE COURT: Yes, you may consult those tabs over the

17  next 10 minutes, then we're going to adjourn for the day.

18          THE WITNESS: I have it, yes.

19  BY MR. PRAVDA:

20  Q    Special Agent Rivera, what is Government Exhibit 119T?

21  A    Did you say what is 119T?

22          THE COURT: Yes, what is it.

23  Q    119T, what is it?

24  A    It's a transcript of a conversation.

25  Q    Who is the conversation between?

467

RIVERA - DIRECT - PRAVDA

1    A    The conversation is between Saidakhmetov, Kasimov.

2    Q    What date in time did it take place?

3    A    It took place on February 25th, 2015 starting at 2:17:36

4    Universal Coordinated Time.

5    Q    What is that in local time?

6    A    That's going to be approximately -- at that time it will

7    be five hours ahead of us, the local time will be five hours

8    back.

9    Q    So just looking at the second line in the header, what is

10   the local date and time there?

11   A    Oh, I see it.  9:17 p.m. eastern.

12   Q    On February 24th, 2015?

13   A    On February 24th, yes, the day before.

14   Q    Could you read the conversation that took place between

15   Kasimov and Saidakhmetov.

16   A    Saidakhmetov:  Hello?

17            Kasimov:  Hello.  Peace be upon you.

18            Saidakhmetov:  Peace be upon you too.  Who is this?

19            Kasimov:  Are you doing well, brother?  I got your

20   number from brother Abror.  I am Dilkhayot.

21            Saidakhmetov:  Oh yes, yes, yes, yes.  Okay, okay,

22   uh-huh.

23            Kasimov:  How are you doing, all right?  Has your

24   cab arrived?

25            Saidakhmetov:  Oh, the cab has already arrived.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

RIVERA - DIRECT - PRAVDA

1    We're actually riding in it right now.

2             Kasimov:  Oh, are you already heading to the

3    airport?

4             Saidakhmetov:  Yes, yes, we're on our way to the

5    airport.

6             Kasimov:  Oh, okay, okay.  What is your terminal

7    number, brother?

8             Saidakhmetov:  Seven.  It's a Terminal 7.

9             Kasimov:  Terminal 7?  Okay, brother, I'll go there

10   too then.

11            Saidakhmetov:  Sure, okay, uh-huh.

12   Q    So Special Agent Rivera directing your attention to

13   Government Exhibit 120T, the next conversation, did that take

14   place in local time on February 24th, 2015 at 9:58 p.m.?

15   A    Yes.

16   Q    Is that also between Kasimov and Saidakhmetov?

17   A    Yes.

18   Q    Could you read the conversation for the jury, please.

19   A    Saidakhmetov:  Hello.

20            Kasimov:  Hello, big brother.

21            Saidakhmetov:  Yes.  Peace be upon you.

22            Kasimov:  And peace be upon you too.  How are you?

23   Doing well?  What time is your flight?  When does the plane

24   take off?

25            Saidakhmetov:  At 12:30.

RIVERA - DIRECT - PRAVDA

1    Kasimov:  Oh, okay, okay.  Don't get on yet, okay?

2    It's just -- I couldn't get more than a thousand -- I couldn't

3    get more than 1,000 from the ATM, you know.  I'll get some

4    more and bring it to you.

5    Saidakhmetov:  Sure, sure, uh.

6    Kasimov:  It's just I'm in Queens right now, you

7    know.  I was going to go straight to the airport but couldn't

8    withdraw more than a thousand from the bank.  I'll go take

9    some from home and bring it to you, okay?

10    Saidakhmetov:  Oh.  Uh-huh, uh-huh.  Well actually

11    there's a little issue here at the airport so it's not clear

12    yet, but I may end up not flying out today.

13    Kasimov:  Oh, really?  Why?

14    Saidakhmetov:  Um, there is a little issue with my

15    travel documents.

16    Kasimov:  Ah.

17    Saidakhmetov:  Because, phonetic, a guy next to me,

18    uh, his papers will already be done by 12 o'clock but there's

19    an issue with mine.

20    Kasimov:  Okay, okay.  Well, you go ahead and do

21    what you need to do.  I'll come up anyway.  If you, God

22    willing, are to leave, then you'll leave.  If not, then we'll

23    take care of those and anyway we'll do that, uh, what's it

24    called, you know.

25    Saidakhmetov:  Yes, God willing.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

470

RIVERA - DIRECT - PRAVDA

1          Kasimov:  All right.  God willing.  Then I'll go

2  home and get that.

3          Saidakhmetov:  Uh-huh.  Okay.  Thank you.

4          Kasimov:  All right.  We'll talk again.

5          Saidakhmetov:  Okay.  Peace be upon you.

6          Kasimov:  If in a half an hour, 40 minutes you know

7  that you're not leaving, let me know so that I wouldn't be

8  coming and we'll just meet tomorrow in Brooklyn.

9          Saidakhmetov:  Sure, sure.  Uh-huh, okay.

10         Kasimov.  If, God willing, you are leaving or it's

11 not clear yet if you are, then I'll still go ahead and bring

12 that.

13         Saidakhmetov:  (Overlapping voice.)  Sure.  [UI]

14 unintelligible.

15         Kasimov:  (Overlapping voice.)  I'm in Queens right

16 now heading home.  We're heading to Brooklyn right now.

17         Saidakhmetov:  Oh, okay, okay, uh-huh.

18         Kasimov:  Okay, big brother.

19         Saidakhmetov:  Peace be upon you.

20 Q    Special Agent Rivera, directing your attention to

21 Government Exhibit 121T.  Is this also a conversation between

22 Kasimov and Saidakhmetov?

23 A    Yes.

24 Q    Did it take place at 11:11 p.m. on February 24th, 2015?

25 A    Yes.

RIVERA - DIRECT - PRAVDA

1    Q     And could you read that conversation, please.

2    A     Saidakhmetov:  Peace be upon you.

3          Kasimov:  And peace and mercy of God be upon you

4    too.  So what's happening with your thing, brother?

5          Saidakhmetov:  Well at this time we're just waiting

6    around.  We called a lawyer.  The lawyer says it should all

7    work out but these people aren't giving permission, you know.

8    They're say, uh, a visa is required.  Apparently, the lawyer

9    explains them that this is a travel passport.  The visa will

10   be provided upon entering Turkey, but these people are not --

11   what's it called, uh...so we're just waiting.

12         Kasimov:  Oh, okay, okay.  And I'm running a bit

13   late because of some little issue here.  God willing, I will

14   arrive in five to 10 minutes.

15         Saidakhmetov:  Okay, uh-huh, all right.

16         Kasimov:  Okay, brother, I'll call you when I get

17   there.

18         Saidakhmetov:  All right.

19   Q     Directing your attention to Government Exhibit 122T, is

20   this also a conversation between Kasimov and Saidakhmetov?

21   A     Yes.

22   Q     Did it take place at 11:33 p.m. Eastern Time on

23   February 24th, 2015?

24   A     Yes.

25   Q     Could you read the conversation, please?

RIVERA - DIRECT - PRAVDA

1    A    Saidakhmetov:  Peace be upon you.

2              Kasimov:  And peace and mercy of God be upon you,

3    too.  Brother, I'm here.

4              Saidakhmetov:  Uh...

5              Kasimov:  So what's going on?  [UI] Unintelligible,

6    overlapping.

7              Saidakhmetov:  It is still, still not clear, you

8    know, so I don't know.  I'm waiting.

9              Kasimov:  Hmm.  Should I wait for you to see if

10   something happens now?

11             Saidakhmetov:  Yes.  So uh -- I mean, God willing,

12   maybe let's wait until 12, 12-ish, huh.

13             Kasimov:  (Overlapping voice).  Oh, sure, sure.  God

14   willing, God willing. (phonetic.)

15             Saidakhmetov:  (Overlapping voice).  We'll wait

16   until 12 o'clock.  If it happens, it happens, God willing.  If

17   not, then we'll go back, you know.

18             Kasimov:  Yes, sure, sure.  I -- I'm now --

19             Saidakhmetov:  (Overlapping voice).  Can you like,

20   uh, can you wait for me?  Are you with a car?

21             Kasimov:  Yes, I am.  They gave me some money for

22   you.

23             Saidakhmetov:  Oh, uh-huh, uh-huh.

24             Kasimov:  We don't want to be in a great hurry if

25   now it is suddenly decided that you are flying out, you know.

RIVERA - DIRECT - PRAVDA

1    I'm outside waiting in the car.

2              Saidakhmetov:  Uh-huh.

3              Kasimov:  Or should I just park the car and get

4    inside too?  (Pause.)  Yes, that's it.  I'll just do that.

5              Saidakhmetov:  (Overlapping voice).  Yes, you can go

6    inside, yes.

7              Kasimov:  (Overlapping voice).  Okay, then I'll go

8    ahead park the car and go inside.

9              Saidakhmetov:  Yes, yes, go inside.  No problem.

10   Uh-huh, all right.

11             Kasimov:  Okay.

12             THE COURT:  Okay, and it's 5 o'clock and we're

13   stopping for the day.  You are not to speak with anyone about

14   your testimony.  You will be under oath, you will resume

15   tomorrow at -- should we resume at 9:30 or at 10, what would

16   be the appropriate time to start?

17             MR. PRAVDA:  9:30 would be preferable for the

18   government, Your Honor.

19             THE COURT:  9:30 work with you or do we need

20   10 o'clock?

21             MS. MACEDONIO:  9:30 is fine, Your Honor.  Thank

22   you.

23             THE COURT:  9:30.  We have the same drill, ladies

24   and gentlemen of the jury, don't talk about the case with

25   anyone.  You can talk about the upcoming baseball subway

RIVERA - DIRECT - PRAVDA

1    series between the Mets and the Yankees, now that Boston has

2    been sent to wherever Boston is supposed to go.  So have a

3    nice night.

4           Leave the books there on your chairs.  Thank you

5    very much for your attention.  See you tomorrow morning and

6    we'll start at 9:30.  Thank you.

7           (Jury exits courtroom.)

8           THE COURT:  Thank you, sir, you may step down.

9           (Witness excused.)

10          THE COURT:  We'll see you tomorrow morning when we

11   begin at 9:30.

12          THE WITNESS:  Yes, Your Honor.

13          THE COURT:  You may be seated everyone.  The jury

14   has left the courtroom.

15          Do we have any procedural issues to go over outside

16   of the presence of the jury and while all parties are present.

17   Anything from the government?

18          MR. PRAVDA:  Your Honor, I think --

19          THE COURT:  Why don't you sit down and use the

20   microphone.  Everybody use the microphone.

21          MR. PRAVDA:  Your Honor, I think we just wanted to

22   talk briefly about the schedule.  There is a possibility that

23   the government may rest tomorrow.  I don't want promise

24   because --

25          THE COURT:  I understand.

475

RIVERA - DIRECT - PRAVDA

1          MR. PRAVDA:  -- it might not happen.

2          THE COURT:  I understand.  I understand.  As I said,

3    I used to do the practice of law.  Go ahead.

4          MR. PRAVDA:  I have discussed with or we have

5    discussed with defense counsel and we'd like to propose that,

6    to the extent the government does rest tomorrow and the

7    defense did not have a case to present, that we adjourn for

8    the weekend so that the parties could present closings on

9    Monday as opposed to closing tomorrow.

10         THE COURT:  Is that acceptable to defense counsel?

11         MS. MACEDONIO:  Yes, very much so, Your Honor.

12         THE COURT:  All right.  Well, tomorrow the Court, to

13   show I have not been completely idle or to be more accurate to

14   show you my law clerks have not been completely idle, we will

15   give you our draft of the jury charge tomorrow at the

16   conclusion of the day, whether the day is in the middle of the

17   afternoon, late morning or as you see, a ruthless 5 p.m.  But

18   in any event, whenever we conclude tomorrow's court session,

19   we will hand you the draft that we've prepared of the jury

20   charge and we will then schedule time for our charge

21   conference, which will of course be held before summations are

22   given.

23         Is that acceptable to all parties?

24         MR. PRAVDA:  Yes, it is, Your Honor.

25         MS. MACEDONIO:  Yes, it is, Your Honor.

476

RIVERA - DIRECT - PRAVDA

1           THE COURT:  Wonderful.  Anything else?

2           MR. HAGGANS:  One minor item, Your Honor.

3           THE COURT:  That's what they always say.

4           MR. HAGGANS:  The government has prepared a

5    replacement set for the transcript 124T.  The only change to

6    this transcript is a correction to the length of the

7    transcript that is reflected as compared to the duration of

8    the call and that appears at the top.  We obviously didn't

9    want to replace them in the juror's binders without letting

10   the Court know, so we are letting court know that now and with

11   the defense's consent we'll replace them in Mr. Jackson's

12   presence after the conclusion of the proceeding.

13          THE COURT:  Have we had testimony about 124T?

14          MR. HAGGANS:  We have, Your Honor, it was placed in

15   evidence yesterday.

16          THE COURT:  Well, I have a problem with just a

17   replacement.  I think it would make more sense to make it

18   124T-2 so the record is clear that, as we did with 166-1 now

19   we'll make this 124T-1.

20          Are you willing to do that as a replacement so the

21   record is crystal clear.  Because I don't want there to be an

22   issue later about will the real 124T stand up.  Is that fair?

23          MR. HAGGANS:  Absolutely, Your Honor.  We'll be

24   happy to replace them and we'll come over tomorrow morning so

25   that we can achieve that before the proceedings start.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

477

RIVERA - DIRECT - PRAVDA

1          THE COURT:  I don't have a problem if you want to

2    take -- if you have additional stickers, maybe you don't know,

3    you can do a 124T-1 now and have those inserted, but you can

4    do it tomorrow morning.  That's fine.

5          MR. HAGGANS:  Thank you, Your Honor.

6          THE COURT:  Tomorrow morning works.  The binders

7    will be here and I'll give you my court binders as well to

8    update.  Okay?

9          Is there anything else we need to address this

10   evening?

11         MR. PRAVDA:  Nothing else for the government.

12         THE COURT:  Thank you.  From defense counsel,

13   anything else we need to address?

14         MS. MACEDONIO:  No, thank you, Your Honor.

15         THE COURT:  Thank you very much.  We're adjourned

16   for the day.

17         MS. MACEDONIO:  Thank you, Judge.

18         THE COURT:  Thank you.

19         MR. PRAVDA:  Thank you.

20         THE COURT:  Thank you.

21         (Whereupon, the trial adjourned at 5:30 p.m. to

22   resume Friday, September 20, 2019 at 9:30 a.m.)

23

24

25

478

1                          I N D E X

2     WITNESS                           PAGE

3     ABROR HABIBOV

4     DIRECT EXAMINATION   BY MR. KESSLER      335

5     CROSS-EXAMINATION    BY MS. SHARKEY      362

6     REDIRECT EXAMINATION BY MR. KESSLER      435

7
      MARIANO CAPELLAN
8
      DIRECT EXAMINATION   BY MR. PRAVDA       441
9
      CROSS-EXAMINATION                        456
10                         BY MR. RUBERT-SCHEWEL

11    MARCUS RIVERA

12    DIRECT EXAMINATION   BY MR. PRAVDA       460

13                      E X H I B I T S

14    GOVERNMENT               PAGE
      166-1                    340
15

16

17

18

19

20

21

22

23

24

25