479

1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - X
3
    UNITED STATES OF AMERICA,      : 15-CR-95(WFK)
4                                  :
                                   :
5                                  :
        -against-                  : United States Courthouse
6                                  : Brooklyn, New York
                                   :
7                                  :
                                   : Friday, September 20, 2019
8   DILKHAYOT KASIMOV,             : 9:30 a.m.
                                   :
9           Defendant.             :
                                   :
10
    - - - - - - - - - - - - - X
11
            TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
12      BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
             UNITED STATES DISTRICT JUDGE
13
                A P P E A R A N C E S:
14
    For the Government:  RICHARD P. DONOGHUE
15                       United States Attorney
                         Eastern District of New York
16                         271 Cadman Plaza East
                           Brooklyn, New York 11201
17                       BY:DOUGLAS M.  PRAVDA, AUSA
                         DAVID KESSLER, AUSA
18                       MATTHEW HAGGANS, AUSA

19
    For the Defendant:   ELIZABETH E. MACEDONIO, P.C.
20                       40 Fulton Street-23rd Floor
                         New York, New York 10038
21                       BY:ELIZABETH E. MACEDONIO, ESQ.

22  For the Defendant:   KELLEY J. SHARKEY
                         26 Court Street - Suite 2805
23                       Brooklyn, New York 11242
                         BY:  KELLEY J. SHARKEY, ESQ.
24

25

                MDL      RPR      CRR      CSR

480

```
 1
 2      APPEARANCES:

 3      For the Defendant:      LORD & SCHEWEL
                                233 Broadway - Suite 2220
 4                              New York, New York 10279
                                BY:ABRAHAM RUBERT-SCHEWEL, ESQ.
 5
 6      Also present:           Erika Lopez, Paralegal Specialist

 7                              Nodira Matyakubova, interpreter
                                Shahnoca Rahmanova, interpreter
 8
 9      Court Reporter:  Michele D. Lucchese, RPR, CRR
                         Official Court Reporter
10                       E-mail: MLuccheseENDY@gmail.com

11      Proceedings recorded by computerized stenography.  Transcript
        produced by Computer-aided Transcription.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Proceedings                                          481

1            (In open court - jury not present.)

2            THE COURTROOM DEPUTY:  All rise.  The Honorable

3    William F. Kuntz, II is now presiding.  Criminal cause for

4    trial.  Docket No. 15-CR-95, USA versus Kasimov.

5            Counsel, please state your appearances for the

6    record, including the Uzbek interpreter.

7            MR. PRAVDA:  Good morning, Your Honor, Doug Pravda,

8    David Kessler, Matthew Haggans, and Erika Lopez for the United

9    States.

10           THE COURT:  Good morning.  We have the spellings.

11   You could be seated.

12           Ladies and gentlemen of the public, you could be

13   seated as well as.

14           MR. PRAVDA:  Special Agent Dolan had a family

15   emergency this morning, so she won't be joining us today.

16           THE COURT:  Okay.  I'm sorry to hear that.  Give the

17   agent our best.

18           Yes.

19           MS. MACEDONIO:  Good morning, Your Honor.  Elizabeth

20   Macedonio, Kelley Sharkey, and Abraham Rubert-Schewel for Mr.

21   Kasimov.

22           MS. SHARKEY:  Good morning, Judge.

23           THE COURT:  Good morning.

24           And also at counsel table?

25           THE INTERPRETER:  Nodira Matyakubova, Uzbek

Proceedings                                        482

1   interpreter, N-O-D-I-R-A, last name M-A-T-Y-A-K-U-B-O-V-A.

2          THE COURT:  Thank you.  And also.

3          THE INTERPRETER:  Shahnoca Rahmanova, Uzbek

4   interpreter, S-H-A-H-N-O-C-A.  And the last name

5   R-A-H-M-A-N-O-V-A.

6          THE COURT:  Thank you.  You are may be seated.  Do

7   we have any -- and the defendant is present.  Yes.  Good

8   morning.  Do we have any procedural issues to address before

9   we bring in the jury?

10          MR. PRAVDA:  Your Honor, just very, very briefly.  I

11   have a revised witness list to update what has happened during

12   the trial.  I have a revised witness list to update what has

13   happened during the trial and who remains to be called.  I

14   have provided a copy to Ms. Macedonio.  I have shared the list

15   with the court reporter and I have a copy that I can hand up

16   to Mr. Jackson.

17          THE COURT:  Yes, of course, thank you, Mr. Pravda.

18          Thank you.

19          MR. PRAVDA:  And then, just for the record, Special

20   Agent Vu, who was not present for the cross-examination

21   testimony of Mr. Habibov is now back and present in the

22   courtroom.

23          THE COURT:  Yes.  Thank you.

24          Any other procedural issues from the Government

25   before we bring in the jury?

```
                        Proceedings                      483
```

1           MR. PRAVDA:  No, Your Honor.

2           THE COURT:  From the defense, any procedural issues

3    before we bring in the jury?

4           MS. MACEDONIO:  No, Your Honor.

5           THE COURT:  All right.  Mr. Jackson, let the CSO

6    know to bring in the jury.

7           Have you filed this the Government's second revised

8    list of potential witnesses under seal on ECF or should I have

9    Mr. Jackson do that?  It has to be part of the record

10   electronically, as well as the paper copy.

11          MR. PRAVDA:  We are happy to do that.

12          THE COURT:  Why don't you do it?

13          MR. PRAVDA:  Or Mr. Jackson could do it.

14          THE COURT:  So why don't you guys do it if you

15   wouldn't mind?  File it under seal.  Obviously, it will be

16   accessible to the defendants.  I think it should be filed

17   electronically.

18          MR. PRAVDA:  That's fine.  Mr. Kessler advised me he

19   can do it on his laptop this morning.

20          THE COURT:  I admire you youths for being able to do

21   such things.

22          MR. PRAVDA:  Should we bring in the witness, Your

23   Honor?

24          THE COURT:  Beg your pardon?

25          MR. PRAVDA:  Should we bring in the witness, Your

Proceedings                                    484

1   Honor, while we're getting the injury?

2          THE COURT:  Oh, yes.  We still have the incarcerated

3   witness.

4          MR. KESSLER:  No.  The witness who was on at the

5   close of court yesterday.

6          THE COURT:  We can wait then until the jury is

7   seated.

8          MS. MACEDONIO:  May we have a moment?  I don't think

9   Mr. Kasimov is feeling very well.

10         THE COURT:  Oh, I'm terribly sorry.  All right.

11  Well, you tell me.  Should we tell the CSO not to bring in the

12  jury?

13         MS. MACEDONIO:  Yes.

14         THE COURT:  All right we can do that.  I'm sorry.

15  And just say we are going to be another what, 15 minutes?

16         Tell the CSO to hold them.

17         MS. MACEDONIO:  Well, Judge, we would like -- the

18  mic is not working, I don't think.

19         THE COURT:  You have to go old school and project.

20  Go ahead.

21         MS. MACEDONIO:  We would like him to have some

22  Tylenol, which we have.  We know that sometimes there is a

23  concern with that, but he has a splitting headache and is

24  starting to feel nauseous from the headache.  He believes that

25  Tylenol will do the trick.  Could we give it to him?

Proceedings                                    485

1          THE COURT:  Well, let me ask what the Government's

2    view is with respect to Tylenol and they will probably want to

3    know how many tablets, what the strength is.  I can call my

4    brother, and my wife, or my daughter, each of whom are

5    physicians, but, you know.  What is the strength, how many?

6          MS. MACEDONIO:  The strength is 50 milligrams each

7    and the recommended dosage is I believe -- let me see.

8          THE COURT:  I can see why none of us went to medical

9    school.

10          MS. MACEDONIO:  Two tablets every six hours.

11          THE COURT:  Why don't you show it to the Government,

12    see if they have any problem with the defendant taking two

13    Tylenols with water, I trust.

14          MS. MACEDONIO:  Thank you, Judge.

15          THE COURT:  Is that acceptable?

16          MR. PRAVDA:  Yes, it is.  It is acceptable.

17          THE COURT:  There you go.  This does not mean that I

18    am practicing medicine without a license.  I don't want to

19    hear from the judicial ethics people about that, or my wife

20    for that matter about that.

21          MS. SHARKEY:  Can we give it ten minutes to take

22    effect, 15 minutes to take in effect?

23          THE COURT:  Sure.  Why don't we sit here and wait

24    until he is good to go.

25          MS. SHARKEY:  Thank you, Judge.

MDL      RPR      CRR      CSR

Proceedings                                    486

1            (Pause in the proceedings.)

2            THE COURT:  Is everything good now?  All the systems

3    are good?  Everybody has what they need to have?

4            MR. HAGGANS:  For the Government as well.

5            THE COURT:  Let me ask defense counsel:  How is your

6    clients's head?

7            Are you good?  Sir?  Yes?

8            MR. ABRAHAM RUBERT-SCHEWEL:  Yes, Your Honor.

9            MS. SHARKEY:  Thank you, Judge.  Thank you very

10   much.

11           THE COURT:  There is an old saying, if you love law

12   or sausage, never watch either being made.  What can I tell

13   you.

14           All right.  Are we now all systems go?  Yes?  We can

15   release the techies and call them back if we need them.  Yes?

16           MR. PRAVDA:  Yes.

17           THE COURT:  From defense?

18           MR. RUBERT-SCHEWEL:  Yes.

19           MR. PRAVDA:  Yes, we can release the techs.

20           THE COURT:  Okay.  Release the techs.

21           MR. PRAVDA:  Your Honor, the Government has an

22   application.

23           THE COURT:  I hope it's not electronic.

24           MR. PRAVDA:  So, the Government's next witness,

25   Craig Roth, has a wedding that he needs to leave for.  We

Proceedings                    487

1   anticipated finishing the first witness and then putting him

2   on.  At this point, we believe it would be more prudent to go

3   out of order even though Mr. Rivera is continuing over from

4   yesterday.

5           THE COURT:  I don't mind taking a witness out of

6   order.  Is that the application, to take a witness out of

7   order?

8           MR. HAGGANS:  Yes.

9           MR. PRAVDA:  Yes.

10          THE COURT:  Any objection?

11          MS. MACEDONIO:  No.

12          THE COURT:  The application is granted.  Let's do

13  it.

14          So who is the next witness going to be?

15          MR. HAGGANS:  Craig Roth, Your Honor.

16          THE COURT:  Let's bring him forward and get the jury

17  in.  We will get him sworn.

18          We don't need any electronics for this witness or do

19  we?

20          MR. HAGGANS:  We do not.

21          THE COURT:  I will administer the oath and get the

22  jury in.  Tell the CSO to bring the jury in.

23          I am going to ask you, sir, just to come into the

24  witness box, stand in the middle.  When we get the jury in, I

25  will administer the oath.  My courtroom deputy is off doing

Proceedings                                        488

1   something else and he will be back and then we will be good to

2   go, sir.

3            MR. HAGGANS:  For Your Honor's information, I will

4   be able do this without the use of the ELMO if I am permitted

5   to hand the witness a couple of items.

6            THE COURT:  What you will do is ask Mr. Jackson or

7   one of my law clerks to bring it up to the witness, but

8   leaving the podium is not allowed.

9            (Jury enters the courtroom.)

10           THE COURT:  Good morning.  Yes, it is still morning.

11  Ladies and gentlemen of the jury, we have had some tech

12  issues, we have had some sidebar issues.  We believe we have

13  straightened out most of the tech issues, but I'm the last

14  person in the world to do tech.  We have a new witness.  We

15  are taking him out of sequence.  We will continue with the

16  other witness later on.

17           So, please be seated.  Thank you for returning so

18  promptly.  I am now going to administer the oath.  My

19  courtroom deputy is off doing some other things on this case

20  and he will be back momentarily.

21           Please raise your right hand.

22           (Witness sworn.)

23           THE WITNESS:  Yes, I do.

24           THE COURT:  Please be seated.  I'd like you to state

25  your name, spell it for the court reporter, and then counsel

Roth - direct - Haggans                    489

1   will inquire.

2           By the way, that microphone, see it, move it close

3   to you.  It swivels, okay.  When you speak into it, you sound

4   almost like me.

5           THE WITNESS:  Okay, thank you.

6           THE COURT:  There you go.

7           All right.  State your name and spell it and then

8   we'll get started.

9           THE WITNESS:  Sure.  First name is going to be

10  Craig.  C-R-A-I-G.  Last name is Roth, R-O-T-H.

11          THE COURT:  Thank you.

12          Counsel, you may inquire.

13  CRAIG ROTH,

14      called by the Government, having been duly

15      sworn, was examined and testified as follows:

16  DIRECT EXAMINATION

17  BY MR. HAGGANS:

18  Q    Good morning, Mr. Roth.

19  A    Good morning.

20  Q    For whom do you work?

21  A    I am currently employed by the FBI.

22  Q    Is that Federal Bureau of Investigation?

23  A    Yes.

24  Q    What is your title at the FBI?

25  A    I am an It Specialist, forensic examiner.

Roth - direct - Haggans                490

1    Q    How long have you been a forensic examiner with the FBI?

2    A    For about nine years now.

3    Q    Could you please describe your duties and

4    responsibilities in that position?

5    A    Sure.  So we preserve, extract, and analyze electronic

6    media in a forensically sound manner.

7    Q    What is your educational background?

8    A    I have an undergraduate in information technology from

9    the University of Hartford and I have a master's in computer

10   information systems from Boston University.

11   Q    Have you received training either as part of your work

12   for the FBI or otherwise in the field of the forensic

13   examination of digital evidence?

14   A    Yes, I have.

15   Q    What sort of training, if you could briefly describe it?

16   A    Sure.  So for the first year, you're considered an

17   examiner trainee and for about a year, year and a half process

18   you have to undergo a series of examinations, multiple, you

19   know, external and internal training.  And at the end of that,

20   you have to attend a moot trial and also pass a few more

21   examinations as well to be considered a certified examiner.

22   Q    Are you a certified examiner?

23   A    Yes, I am.

24   Q    Have you ever -- during your employment with the FBI,

25   have you ever had the occasion to conduct forensic

Roth - direct - Haggans                    491

1  examinations of cellular telephones or mobile telephones?

2  A    Yes, I have.

3  Q    Could you estimate approximately how many times you have

4  conducted such examinations?

5  A    Over the past several years, I'd have to say several 100.

6  Q    Have you ever testified in court concerning the results

7  of any such examination?

8  A    Yes, I have.

9  Q    Approximately how many times?

10 A    Three.

11 Q    I'm going to show you an item that is in evidence on the

12 ELMO, please.

13         MR. HAGGANS:  For the record, this is Government

14 Exhibit 40, four-zero.

15         THE COURT:  You may publish.

16         (Exhibit published.)

17 Q    Mr. Roth, do you recognize the device in Government

18 Exhibit 40?

19 A    Yes, I do.

20 Q    What is it?

21 A    This is a Samsung LG Flex phone.

22 Q    I'm zooming in on this labeling.  How is it that -- how

23 is it that you are able to recognize this specific device?

24 A    My initials are located as CR.  And I also assign a

25 unique bar code to each evidentiary item, which is also listed

Roth - direct - Haggans                           492

1    right there.

2    Q    When you mention your initials, I'm just pointing to a

3    section on the label.  Are those the initials you are

4    referencing?

5    A    Yes.

6    Q    You recognize those to be your initials?

7    A    I do.

8    Q    This label appears to bear a date.  Could you please read

9    that date into the record?

10   A    Sure.  March 3, 2015.

11   Q    Are you familiar with the term forensic extraction as it

12   relates to your work?

13   A    Yes, I am.

14   Q    Did you perform a forensic extraction of the device

15   contained in Government Exhibit 40?

16   A    Yes, I did.

17   Q    Did you perform that extraction on or about or around

18   March 3, 2015?

19   A    Yes, I did.

20   Q    Did you use software to conduct that work?

21   A    Yes, I did.

22              THE COURT:  I'm sorry, what was the date again in

23   March?

24              THE WITNESS:  March 3, 2015.

25              THE COURT:  Okay.  Go ahead.

Roth - direct - Haggans                    493

1   Q    Did you use software to perform that extraction?

2   A    Yes, I did.

3   Q    Have you been trained in the use and operation of that

4   software?

5   A    Yes, I have.

6   Q    In your experience using that software, is that software

7   reliable?

8   A    It is, yes.

9           MR. HAGGANS:   Mr. Jackson, could I please have the

10  ELMO just for the witness.

11  Q    Sir, I'm showing you a disc that has been marked for

12  identification as Government Exhibit 41-B, as in boy.  Do you

13  recognize this item, sir?

14  A    Yes, I do.

15  Q    What is it?

16  A    This is an optical disc that contains three files that

17  were extracted from the cell phone report.

18  Q    When did you create this disc?

19  A    I created this disc this morning.

20  Q    And the cell phone report that you referenced, was that

21  the forensic extraction of Government Exhibit 40 about which

22  you previously testified?

23  A    Yes.

24  Q    Does the information contained on Government Exhibit 41-B

25  contain true and accurate copies of items contained within

Roth - cross - Rubert-Schewel                494

1   that forensic extraction?

2   A    Yes.

3   Q    Does this disc bear your name at some point?

4   A    Yes.

5   Q    And your initials?

6   A    Yes.

7           MR. HAGGANS:  Your Honor, at this time I move to

8   admit Government Exhibit 41-B.

9           THE COURT:  Any, objection?

10          MR. RUBERT-SCHEWEL:  No, Your Honor.

11          THE COURT:  It is admitted.

12          (Government's Exhibit 41-B received in evidence.)

13          THE COURT:   You may publish it to the jury.

14          MR. HAGGANS:  I have no further questions, Your

15  Honor.

16          THE COURT:  Thank you.

17          Any cross?

18          MR. RUBERT-SCHEWEL:  Very briefly.

19          THE COURT:  I hope so.

20  CROSS EXAMINATION

21  BY MR. RUBERT-SCHEWEL:

22  Q    Good morning, Mr. Roth.

23  A    Good morning.

24  Q    You stated that in your career you have examined several

25  100 phone extracts?

Roth - cross - Rubert-Schewel                    495

1    A    Yes.

2    Q    And in this case you completed the extraction of an LG

3    Flex phone?

4    A    Correct.

5    Q    And from this phone you recovered a number of different

6    types of data?

7    A    Cell phone extractions will recover several files off the

8    phones.

9    Q    Call logs?

10   A    Yes.

11   Q    Chats?

12   A    Correct.

13   Q    Contacts?

14   A    I can't remember what exactly was extracted from this

15   phone, but that would be generally what is extracted.

16   Q    E-mails?

17   A    Correct.

18   Q    SMS messages?

19   A    It's possible, correct.

20   Q    And on this phone there were thousands of files?

21   A    Generally there are several thousands of files if the

22   phone is highly used.

23           MR. ABRAHAM RUBERT-SCHEWEL:  No further questions.

24           THE COURT:  Anything else?

25           MR. HAGGANS:  No redirect.

Roth - cross - Rubert-Schewel                    496

1          THE COURT:  You may step down.

2          THE WITNESS:  Thank you, Your Honor.

3          (Witness steps down.)

4          THE COURT:  Next witness.

5          MR. PRAVDA:  Your Honor, the Government would like

6     to resume the examination of Special Agent Marcus Rivera.

7          THE COURT:  Yes, please bring him forward.

8          Please resume the witness stand.  Special Agent, you

9     are still under the oath.

10         Let me ask you, did you speak with anyone about your

11    testimony since leaving the witness stand yesterday?

12         THE WITNESS:  No.

13         THE COURT:  All right.  Continue, Mr. Pravda.

14         MR. PRAVDA:  Thank you, Your Honor.  With the

15    Court's permission, I would ask Mr. Jackson to hand the

16    witness Government Exhibit 16, Government Exhibit 20-T as in

17    transcript and Government Exhibit 123-T as in transcript.

18         THE COURT:  Are these documents already in evidence?

19         MR. PRAVDA:  Except for Exhibit 16, yes, they are.

20         THE COURT:  All right.  Any objection to Government

21    Exhibit 16 coming in to evidence?

22         MR. RUBERT-SCHEWEL:  No, Your Honor.

23         THE COURT:  It is admitted.  You may publish all of

24    them to the jury.

25         (Government's Exhibit 16 received in evidence.)

Rivera - direct - Pravda                    497

1       THE COURT:  Thank you, Mr. Jackson.  If you would be

2  good enough to get them and put them in front of the witness.

3       Thank you, sir.

4       THE COURTROOM DEPUTY:  You're welcome.

5  MARCUS RIVERA,

6       called by the Government, having been previously duly

7       sworn, was examined and testified as follows:

8  DIRECT EXAMINATION

9  BY MR. PRAVDA:

10 Q    Special Agent Rivera, do you have the document marked

11 Government Exhibit 123-T in front of you?

12 A    Yes.

13      MR. PRAVDA:  And for the jury's reference, this is

14 in the transcript binder behind tab 123-T.

15 Q    Special Agent Rivera, is this a transcript of a telephone

16 conversation?

17 A    Yes.

18 Q    Did it take place on February 24, 2015 at 11:41 p.m.?

19 A    Yes.

20 Q    Is the caller Dilkhayot Kasimov?

21 A    Yes.

22 Q    And who did he call?

23 A    Saidakhmetov.

24 Q    Now, Agent Rivera, you will notice that these transcripts

25 identify the parties to the conversation as Kasimov and?

Rivera - direct - Pravda                    498

1          Individual-1:  Do you have any knowledge about that?

2    A    No.

3    Q    Would you please read the call to the jury?

4    A    Yes.

5          Individual-1:  Hello, peace be upon you.

6          Kasimov:  Brother, peace be upon you.

7          Individual-1:  And peace be upon you too.

8          Kasimov:  Brother, uh, what's it called?  Where are

9    you guys?

10          Individual-1:  (Overlapping voice.)  At terminal.

11    We're at terminal 7.

12          Kasimov:  Where?  At terminal 7?

13          Individual-1:  (Overlapping voice.)  Yes.  Once you

14    -- once inside, you should have immediately turned to the

15    right, brother.

16          Kasimov:  Okay.  Oh, okay, (phonetic).

17          Individual-1:  (Overlapping voice.)  I mean, instead

18    of going straight.  You should have turned right at the, uh,

19    whatchamacallit...at the door as soon as you got in.  You need

20    to turn to the right.  There are some signs there, can you

21    see?  It says Ukraine Airlines on them.

22          Kasimov:  Oh, yes, I see.  I see them.

23          Individual-1:  Do you?  Are you coming?

24          Kasimov:  Uh-huh, I'm here.

25          Individual-1:  Okay. [Pause] clears throat] [Pause].

Rivera - direct - Pravda                    499

1    He can't find us apparently.

2              End of transcript.

3    Q    Now, agent Rivera, directing your attention to Government

4    Exhibit 20-T which, for the jury reference, is also located in

5    the transcript binder at the first document under tab 20-T.

6              Agent Rivera, turning to the second page, would you

7    read the portion of the recording that begins 3 hours, 42

8    minutes and 30 seconds into the recording and concludes 3

9    hours, 45 minutes, and 42 seconds into the recording.

10   A    Yes.

11             Phone rings in the background.

12             Saidakhmetov:  Go, this, get the money from him.

13   I'll be here.

14             CHS:  Should I go and take the money?

15             Saidakhmetov:  Yes.  Find out where he is and take

16   the money.  [Unintelligible].

17             CHS answers phone.

18             CHS:  Hello?  Hi, yeah, termi -- We're in terminal

19   7.  You should have turned right at the entrance, brother, uh,

20   instead of going straight.  You should've turned right as soon

21   as you entered, uh -- there are signs, Ukraine Airlines.

22   Arrows.  Are you coming then?  Uh-huh, okay.

23             CHS hangs up.

24             CHS:  Turns out he can't find us.  I see him.  He is

25   coming.

Rivera - direct - Pravda                          500

1           Saidakhmetov:  Should I go?

2           CHS:  Yes, it is the guy.

3           Saidakhmetov:  If he is bearded, it would have been

4    better if he didn't come.

5           CHS:  Let him come and we'll see.

6           Kasimov:  Hi.

7           CHS:  Are you Dilkhayot?  How are you?

8           Kasimov:  Yes.  Good, thanks.  What happened,

9    brother?

10          CHS:  Oh, well, there are -- is an issue with a

11   document.  We are trying to solve it.  We are almost done.

12          Kasimov:  Are you working on it?

13          CHS:  Yes, we are.

14          Saidakhmetov:  When we were almost done [inaudible].

15          Kasimov:  Hope you guys are okay.  Well, let me give

16   you that thing.  Let me give you the money now.

17          Saidakhmetov:  I wish you put it inside an envelope

18   or something.

19          Kasimov:  I almost didn't make it here.

20   [Unintelligible].  Let me wait in the car then just in case,

21   God willing.

22          Saidakhmetov:  Sure, sure.  Uh --

23          CHS:  In case it doesn't work out, you will take us

24   back.

25          Kasimov:  Yes, I will take you back if it doesn't

Rivera - direct - Pravda                          501

1    work out.

2          Saidakhmetov:  I'll give you a call in case, you

3    know.

4          Kasimov:  Yes.  That will work.  To be honest, I

5    work from 6, uh, till 6, you know.

6          Saidakhmetov:  Uh-huh.

7          Kasimov:  I was tired and almost nodded off while

8    driving here, therefore, I am late a bit.

9          CHS:  It is good you came as we were getting worried

10   in case it wouldn't work out.  We didn't know what to do about

11   him going back.

12         Kasimov:  In case it doesn't work out, God willing,

13   I will take you back.

14         Saidakhmetov:  [Inaudible] I'm not sure, but there

15   is some kind of issue again.

16         Kasimov:  Let me [unintelligible], the car and I

17   will be back, okay?

18         Saidakhmetov:  Yeah, sure.  [Pause].  They already

19   took the bags on to the plane.  Right?

20         CHS:  Right.

21   Q    Now, Agent Rivera, could you continue reading please from

22   the time marked 3 hours, 53 minutes and 54 seconds into the

23   recording through the time marked 4 hours, 8 minutes and 20

24   seconds into the recording?

25   A    Yes.

Rivera - direct - Pravda                    502

1          CHS:  Tired of waiting.  I'm about to explode.

2  [Pause].  It is uncomfortable to stare at them, at someone

3  who's working, [indistinct airport announcement].  All three

4  of us are staring and getting stressed waiting to see when

5  they do it.  [Coughs].  Are you from Tashkent, brother?

6          Kasimov:  Yes.

7          CHS:  Which part?

8          Kasimov:  Chorsu.

9          CHS:  Chorsu?  I have been to Tashkent only twice.

10  It's been a while.

11          Kasimov:  [Unintelligible].

12          CHS:  We have tickets.  Anyway, there will be more

13  waiting when we're inside.

14          Kasimov:  If it takes off at 12:30, it will do it

15  about now.

16          CHS:  [Unintelligible].

17          Kasimov:  12:10 [Unintelligible].

18          Saidakhmetov:  I hope it won't.  [Unintelligible].

19          CHS:  We'll make it.  [Pause].  They should do it

20  within five minutes.  They are the ones keeping us waiting.

21          Kasimov:  They will close the door 15 minutes before

22  departure.

23          Saidakhmetov:  [Inaudible].  Why don't they just let

24  us go instead of keeping us here?

25          CHS:  Should we wait for you once we're in Istanbul?

Rivera - direct - Pravda                           503

1        Kasimov:  What?

2        CHS:  Should we wait for you?

3        Kasimov:  God willing, brother.

4        Saidakhmetov:  [Inaudible].

5        Kasimov:  [Inaudible].

6        CHS:  [Coughs] [Pause] Are you married?

7        Kasimov:  No.

8        CHS:  Then leaving should be easy.  This brother

9   here is saying that we'll get married there.  [Pause].

10        I know that it is possible to receive a Turkish visa

11   there at the airport, right?  Now they're giving us a

12   headache, saying we have no visa.  I told them it was possible

13   to get a visa there and that they should check it.  Now, they

14   are doing that.

15        Saidakhmetov:  Once I am there, in Turkey, could

16   there be any issues?

17        CHS:  Once there, there are booths that you a visa.

18   If there is an issue, you will just head back in a flight

19   aboard a plane.  [Sneezes].  That's impossible.  [Pause].  We

20   will be late for...for the flight?

21        Unknown male:  Yeah, I'm sorry.  It's taking

22   forever, the documents, you know?

23        CHS:  Yeah.  He is saying it will be one, two

24   minutes.

25        Saidakhmetov:  One, two minutes?  Is it going to

```
                    Rivera - direct - Pravda                504
```

1   happen?

2          CHS:  Yes, they are saying one, two minutes [Pause].

3   Did you leave your car in a parking lot?

4          Kasimov:  Yeah [Unintelligible].

5          CHS:  Hope they won't tow it.

6          AS and DK [inaudible].

7          CHS:  You probably work a lot.

8          Kasimov:  From six to six.  Today, [Unintelligible],

9   return from work.

10          CHS:  We troubled you today then.  You will have to

11   go to work at 6 tomorrow then?  How many hours will you sleep

12   today then?

13          Kasimov:  We will see depending on when I get back,

14   [Unintelligible].

15          CHS:  To a better work?

16          Kasimov:  Yes, I'm in this job temporarily for a

17   couple of weeks.

18          CHS:  What are you doing now?

19          Kasimov:  I'm doing it temporarily.

20          CHS:  A restaurant.

21          Kasimov:  No, car service.

22          CHS:  Car service?  Oh, huh, I see.

23          Kasimov:  God willing, I could start driving for

24   Uber starting next week.

25          CHS:  For what?

Rivera - direct - Pravda                    505

1           Kasimov:  Uber.

2           CHS:  Uber?

3           Kasimov:  There is new car service called Uber, a

4    taxi.

5           CHS:  I see.  Will you make more money there.

6           Kasimov:  The hours work out better.  Schedule is

7    better.

8           CHS:  It has a better schedule?

9           Kasimov:  You can choose hours that work for you and

10   rest at other times.

11          CHS:  Does car service pay well?

12          Kasimov:  Not so much with the current one.  I have

13   to do it now to learn Manhattan streets better.  Once I start

14   Uber, people say it should be better [Unintelligible].

15          CHS:  You work in Manhattan mainly, right?

16          Kasimov:  Yes.

17          CHS:  You can't be hailed down; right?

18          Kasimov:  No.  It is through phone.

19          Saidakhmetov:  [Inaudible].

20          CHS:  [Unintelligible].

21          Unknown female one:  You're good to go.

22          CHS:  Oh, we're good to go.  Oh, great.

23          CHS:  Why?  Is it yours?

24          Unknown female one:  [Inaudible].

25          CHS:  Someone's, I don't know.  We are good.

Rivera - direct - Pravda                    506

1    [Indistinct background chatter]

2             CHS:  Thanks a lot brother for coming.

3             Kasimov:  Have a good trip.

4             Saidakhmetov:  God willing, [Unintelligible].

5             Kasimov:  Bye, brothers.

6             CHS:  See you later.  May the peace, mercy, and the

7    blessings of Allah be with you too.  What?

8    Q    Agent Rivera, let me stop you there.  The rest is the

9    transcript in the binder.

10            Agent Rivera, did you have any involvement in this

11   case?

12   A    No.

13   Q    In either the investigation or prosecution other than

14   reading these documents into evidence?

15   A    No.

16            MR. PRAVDA:  No further questions.

17            THE COURT:  Your witness.

18            MR. ABRAHAM RUBERT-SCHEWEL:  The defense has no

19   questions for this witness, Your Honor.

20            THE COURT:  Thank you.  You may step down.

21            (Witness steps down.)

22            THE COURT:  Please call your next witness.

23

24            (Continued on next page.)

25

MDL        RPR        CRR        CSR

1   (Continuing.)

2           MR. HAGGANS:  The government calls Jamshid Ochilov.

3           THE COURTROOM DEPUTY:  Raise your right hand, sir.

4           (Witness sworn/affirmed.)

5           THE COURT:  Be seated and state and spell your name.

6   Pull the microphone to you and after you state and spell it,

7   counsel will inquire.

8           THE WITNESS:  My name is Jamshid Ochilov,

9   J-A-M-S-H-I-D O-C-H-I-L-O-V.

10  **JAMSHID OCHILOV**,

11      called as a witness, having been duly

12      sworn, was examined and testified as follows:

13  DIRECT EXAMINATION

14  BY MR. HAGGANS:

15  Q    Good morning, sir.

16  A    Good morning.

17  Q    In what city and country were you born?

18  A    Samarkand, Uzbekistan.

19  Q    Could you spell Samarkand?

20  A    S-A-M-A-R-K-A-N-D.

21  Q    In what year were you born?

22  A    1984.

23  Q    What language did you speak in your household growing up?

24  A    Uzbek.

25  Q    When did you first come to the United States?

SN      OCR      RPR

Ochilov - direct - Haggans                    508

1   A    2004.

2   Q    After coming to the United States have you continued to

3   speak Uzbek on occasion?

4   A    Yes.

5   Q    How frequently would you say you speak Uzbek in your

6   daily life?

7   A    Every day.

8   Q    When approximately did you begin to learn and speak

9   English?

10  A    Late 1990s.

11  Q    How far did you go to school in Uzbekistan?

12  A    I finished high school and three years of college.

13  Q    Have you attended any schooling in the United States?

14  A    Yes, I did.

15  Q    How far did you go in school in the United States?

16  A    I earned my Bachelor's degree in the U.S.

17  Q    Who is your current employer?

18  A    Federal Bureau of Investigation.

19  Q    What is your current title?

20  A    Special Agent.

21  Q    Since approximately when have you been a special agent?

22  A    Since earlier this year.

23  Q    Prior to becoming a special agent, did you also work for

24  the FBI?

25  A    Yes, sir.

SN        OCR        RPR

Ochilov - direct - Haggans                    509

1    Q    What was your prior title for the FBI?

2    A    Linguist.

3    Q    Can you describe what you mean by the term "linguist" for

4    the FBI?

5    A    It means I provided linguistic, language, support to the

6    FBI's ongoing cases involving the violations of U.S. law and I

7    provided language services in Uzbek and Turkish.

8    Q    It's fair to say it's translation support; is that an

9    accurate summary?

10   A    That is correct, sir.

11   Q    Approximately how long were you a linguist for the FBI?

12   A    A little over four years.

13   Q    Were you a linguist for the FBI during the period of

14   early 2015?

15   A    Yes, sir.

16   Q    During your period of service as a linguist, did you

17   receive any specialized training to perform that job?

18   A    Yes, sir.

19   Q    Can you describe that in brief terms?

20   A    I received various trainings to improve my translation

21   and interpretation skills and related analytical skills at

22   different times.

23   Q    Can you give us a brief description of your duties over

24   the course of a day or week in support of an FBI case when

25   providing linguistic support?

Ochilov - direct - Haggans                510

1   A    So, during weekdays I provided translation and

2   interpretation services in Uzbek and Turkish languages.

3   Q    Did that include in connection with criminal cases, sir?

4   A    Involving various cases, sir.

5   Q    How frequently did you provide those kinds of services

6   for the FBI?

7   A    Every weekday.

8   Q    Are you familiar with an investigation conducted by the

9   FBI involving an individual by the name of Dilkhayot Kasimov?

10  A    Yes, I am.

11  Q    Directing your attention to the late winter and early

12  spring of 2015, did you participate in the investigation in

13  some way during that period?

14  A    Yes, sir.

15  Q    Can you describe what the principal nature of your

16  participation was?

17  A    I participated in an interview --

18  Q    I'm sorry, withdrawn.

19        Did you provide linguistic support to the

20  investigation?

21  A    Yes, sir.

22  Q    In what language did you provide that linguistic support?

23  A    Uzbek.

24  Q    Did you review documents, communications, recordings and

25  other media in Uzbek in the course of your participation in

Ochilov - direct - Haggans                511

1   the investigation?

2   A    Yes, sir.

3   Q    Did you translate those items into English on an

4   as-needed basis?

5   A    That's correct, sir.

6   Q    Did you also participate in a review of the contents of

7   certain devices that were associated with the defendant?

8   A    Yes, sir.

9   Q    Did that include review of various text-type or

10  messaging-type applications and their content?

11  A    Yes, sir.

12  Q    And, am I correct that you would translate Uzbek text

13  into English text based on those items?

14  A    Yes, sir.

15  Q    Did you review communications during that period of your

16  participation relating to an application called Viber on a

17  device belonging to the defendant?

18  A    Yes, sir.

19  Q    I will spell Viber, VIB, as in boy, E-R?

20  A    Yes.

21  Q    What was your practice if, during the course of your

22  review, you identified an information that might be relevant

23  to the investigation but was in Uzbek?

24  A    I would review the material.  I would translate it,

25  document it and relay information to the investigators.

Ochilov - direct - Haggans                 512

1  Q    By "translate," do you mean translate into English?

2  A    That is correct, sir.

3  Q    And by "document," do you mean write it down in some

4  fashion?

5  A    Yes.

6       MR. HAGGANS:  Mr. Jackson, could I please have the

7  ELMO just for the witness?

8  BY MR. HAGGANS:

9  Q    Sir, I am showing you a document that has been marked

10 Government Exhibit 43-b for identification.  Have you seen

11 this document before?

12 A    Yes, sir.

13 Q    What is it?

14 A    These are the messages exchanged between Mr. Kasimov and

15 another individual.

16 Q    Can you please identify the name of the other individual

17 based on this document?

18 A    Mahliyo.

19 Q    Could you please spell that for the record?

20 A    Mahliyo, M-A-H-L-I-Y-O.

21 Q    This document appears to have some columns.  Am I correct

22 that some of the columns contain material in Uzbek and other

23 of the columns contain material in English.

24 A    Yes, sir.

25 Q    With reference to the English-language columns, did you

SN       OCR       RPR

Ochilov - direct - Haggans                      513

1  participate in the generation of those translations?

2  A    Yes, I did.

3  Q    Did the information reflected in this document in English

4  accurately reflect the translation support that you provided

5  during the course of this investigation as it relates to the

6  Uzbek messages reflected in this document?

7  A    Yes, sir.

8  Q    In preparing for your testimony today, have you reviewed

9  this document?

10  A    Yes, I did.

11  Q    Did you participate in its generation?

12  A    Yes, I did.

13  Q    Is this document a true and accurate summary of some of

14  the communications that you identified accompanied by

15  translations that you drafted during the period of your

16  participation in this investigation?

17  A    Yes, sir.

18  Q    Was the source of the communications reflected here one

19  of the defendant's electronic devices?

20  A    Yes, sir.

21       MR. HAGGANS:  Your Honor, I offer Government's

22  Exhibit 43-b into evidence.

23       THE COURT:  Any objection?

24       MR. RUBERT-SCHEWEL:  No, Your Honor.

25       THE COURT:  It is admitted.  You may publish it to

Ochilov - direct - Haggans                    514

1    the jury.

2                   (Government's Exhibit 43-B received in evidence.)

3                   (Exhibit published.)

4                   MR. HAGGANS:  Your Honor, if I could ask the court

5    to ask Mr. Jackson to dim the lights?

6                   THE COURT:  Yes.

7                   Would you do that, Mr. Jackson?

8                   THE COURTROOM DEPUTY:  Yes, Judge.

9                   THE COURT:  Thank you.

10   BY MR. HAGGANS:

11   Q    Sir, I just want to take a moment to orient us to the

12   content of this document.  The column that I am pointing to

13   here on the left-hand side, is it fair to say that that's the

14   timestamp or the time that the communication was sent or

15   received?

16   A    Yes, sir.

17   Q    These two columns under the term or the name Mahliyo, is

18   it fair to say that those were the communications sent by that

19   user?

20   A    Yes, sir.

21   Q    And the two columns under the column titled Dilkhayot

22   Kasimov, is it fair to say that those were the communications

23   sent by that user?

24   A    Yes, sir.

25   Q    Could you please read into the record the portions of

Ochilov - direct - Haggans                    515

1   text beginning at the time stamp 10:16:28 p.m.?  And with the

2   Court's permission I will read the portions attributed to the

3   other user, Mahliyo.

4            THE COURT:  You have it.  It's in evidence.

5   BY MR. HAGGANS:

6   Q    Go ahead, SIR.  And, for the record, I would ask you to

7   read the English-language portions.

8            THE COURT:  Please.

9   A    I got buddy let me give him your number.  Try talking to

10  him.

11  Q    No thank you.  Not necessary.

12  A    He can't take you to Saudi but still a great kid.  Your

13  girlfriend's husband, Shohruh, also knows him.

14           MR. HAGGANS:  With the Court's permission I ask

15  Mr. Jackson to give the Court Reporter a copy of Government

16  Exhibit 43-b for convenience.

17           THE COURT:  Yes, that would be fine.  Do you have an

18  extra copy?

19           MR. HAGGANS:  I do, Your Honor.

20  BY MR. HAGGANS:

21  Q    Continuing at 10:18:31.  What is the point, neither do I

22  fall in love nor get used to someone that poor guy can

23  unintelligible.  I won't anyone who lives here.  There was a

24  thinker in Florida I said I wouldn't marry him if he wouldn't

25  go no one heard back from him he probably dropped dead or

1   something, smiley teeth emoticon.  Plus it would become more

2   obvious if/when I leave in 14 days (nerd) God willing so I

3   don't need any Problem.

4   A    Okay.  Is the one who you want in Saudi?  I mean, that

5   guy.

6   Q    I am still young.  I don't want to end up killing my poor

7   groom.  He won't endure it.  Even my dad couldn't stand me for

8   a year when I wanted things my way.  I am turning 19.  I have

9   to learn how to cook.  I will punch him if he tells me that my

10  mom didn't teach me how to cook.  You see that is why you

11  shouldn't give my number out to anyone.  You know my dad if

12  you want to get rid of me then do it but these dreams won't

13  come true any time soon.  He's better off not writing to me.

14  I am having fun now this is much better.

15  A    Not to Saudi.  Would you go if it were Palestine or Gaza?

16  Q    Yeah.  The person I marry will go to fight in those

17  places you'll see we'll go together serious (laugh).

18  A    Do you want a good advice?  I would advise the same if it

19  were my own sister.

20  Q    Sure, go ahead.  Let it out of your system.  Smiley teeth

21  emoticon, smiley teeth emoticon.

22  A    A quick reminder first.  I am not saying this because I

23  am still hopeful about you, because I no longer have any plans

24  for you this is an honest advice it's hard for someone who is

25  educated and pious to go to Saudi no matter what you wish the

1   reason is that those pious ones are going to Gaza, Syria or at

2   least to Iraq.

3   Q    One can go there only after getting education is a must

4   after obtaining an education one can go there.

5   A    Then you should ask your person that you have feelings

6   for in Saudi in Egypt or wherever he is I don't know to come

7   here and take you along.  Otherwise your problem is hard to

8   resolve.  Education is not given a priority when jihad is

9   fardayn.  You too are thinking like those fools in Saudi.

10  That is why Saudi is attracting you.

11           MR. HAGGANS:  No further questions, Your Honor.

12           THE COURT:  Your witness.

13           MR. HAGGANS:  I apologize, Your Honor, one

14  additional question.

15  BY MR. HAGGANS:

16  Q    Sir, what is the date of the messages reflected in this

17  document?

18  A    August 19, 2014.

19           THE COURT:  August what?

20           THE WITNESS:  August 19 of 2014.

21           THE COURT:  Anything else?

22           MR. HAGGANS:  Nothing further questions, Your Honor.

23           THE COURT:  You may examine.

24           MR. RUBERT-SCHEWEL:  May I have one second, Your

25  Honor?

1          THE COURT:  You may.

2          (Pause in proceedings.)

3   CROSS-EXAMINATION

4   BY MR. RUBERT-SCHEWEL:

5   Q    Good morning, Mr. Ochilov.

6   A    Good morning, Mr. Counsel.

7   Q    You are employed as an FBI agent?

8   A    Yes, sir.

9   Q    With what division?

10  A    With the Washington field office.

11  Q    And are you with any specific unit?

12  A    Counterterrorism, sir.

13  Q    But you were previously employed by the FBI as a

14  translator or a linguist?

15  A    That is correct, sir.

16  Q    And you are testifying today in your capacity as a

17  translator or linguist?

18  A    That would be correct to say.

19  Q    And for this case you translated a number of documents?

20  A    When I was a linguist, yes, sir.

21  Q    And you actually translated the full conversation between

22  Mr. Kasimov and Mahliyo, the young lady?

23  A    Are you referring to this specific chat, Mr. Counsel?

24  Q    I am.

25  A    Let me think about that for a second.

1   Q    Would looking at the PDF of the original document refresh

2   your recollection?

3   A    Yes, it would.

4        MR. RUBERT-SCHEWEL:  Your Honor, permission to show

5   on the ELMO just to the witness the underlying conversation?

6        THE COURT:  Yes, you may.  Just to the witness.

7   BY MR. RUBERT-SCHEWEL:

8   A    Mr. Counsel, I remember --

9        THE COURT:  Sorry, he's asking you a specific

10  question.  Does it refresh your recollection?  Either the

11  answer is yes, and then counsel will inquire, or no.  So does

12  it refresh your recollection?

13       THE WITNESS:  Yes, Your Honor.

14       THE COURT:  Okay.  Next question.

15  BY MR. RUBERT-SCHEWEL:

16  Q    And the entire conversation is actually much longer than

17  what is reflected in Government Exhibit 43-b; right?

18  A    That is correct, sir.

19  Q    And the conversation actually began -- sorry, on 43-b it

20  states that the conversation began at 10:16; right?

21  A    I believe so.

22       MR. RUBERT-SCHEWEL:  Your Honor, permission to

23  publish to the jury what is Government Exhibit 43-b already in

24  evidence.

25       THE COURT:  You may publish it again to the jury and

1   to the witness as well.

2             (Exhibit published.)

3             MR. HAGGANS:  Your Honor, could I have a brief

4   moment to discuss with defense counsel to see if a sidebar is

5   needed with reference to the document he showed the witness,

6   Your Honor, that is not in evidence?

7             THE COURT:  Well, it refreshed his recollection.

8             So continue with your examination.  I don't think

9   there's a need to have a sidebar here.  Go ahead.

10  BY MR. RUBERT-SCHEWEL:

11  Q    Sir, this is Government Exhibit 43-b; is that right?

12  A    Yes, sir.

13  Q    And this conversation started at 10:16, right, or this

14  excerpt of the conversation?

15  A    Yes, sir.

16  Q    But the document I previously showed you was the

17  beginning of the conversation and that part actually started

18  at 9:46 p.m.; right?

19  A    I don't remember looking at that portion.

20  Q    Would looking at that portion again refresh your

21  recollection of the time the conversation started?

22  A    Yes, counsel.

23            MR. RUBERT-SCHEWEL:  Your Honor, I'm now going to

24  show the witness what is the underlying document and I would

25  ask that the ELMO just be shown to the witness.

1              THE COURT:  Yes.

2    BY MR. RUBERT-SCHEWEL:

3    Q    Can you see the portion that I'm referring to?

4    A    9:46.

5    Q    Does that indicate that the conversation began at 9:46

6    p.m.?

7              THE COURT:  Well, the document is not evidence so

8    the question is does it refresh his recollection as to what

9    time the conversation started, yes or no.

10             Does it refresh your recollection?

11             THE WITNESS:  Yes, it does.

12             THE COURT:  With your recollection refreshed, what

13   is the answer to the question counsel has asked?  What time

14   did it start?  Again, this document is not in evidence.  The

15   question is now that you've looked at it and your recollection

16   is refreshed, sir, what time did the conversation occur?

17             THE WITNESS:  9:46 p.m.

18             THE COURT:  Okay.  Continue.

19   BY MR. RUBERT-SCHEWEL:

20   Q    So the exchange began approximately 30 minutes before the

21   excerpt on 43-b; right?

22   A    Yes, sir.

23   Q    And it contained many more text exchanges than the one in

24   43-b; right?

25   A    Yes, sir.

1   Q    And prior to what's in 43-b, there was a conversation
2   between Mr. Kasimov and Mahliyo asking about assistance with a
3   video editing project; right?
4   A    I don't remember that specific portion, counsel.
5   Q    Would looking at the underlying document refresh your
6   recollection?
7   A    Yes, it would, sir.
8           MR. HAGGANS:  Your Honor, could we have a brief
9   sidebar on this issue, please?
10          THE COURT:  No, not in the middle of the
11  examination.  He's asking to have his recollection refreshed.
12  There is no need for a sidebar.
13  BY MR. RUBERT-SCHEWEL:
14  Q    Mr. Ochilov, I would just ask that you give me an
15  indication when you are done reviewing that.
16          MR. RUBERT-SCHEWEL:  With the permission of the
17  Court.
18          THE COURT:  Of course.
19  A    (Reviewing.)
20          Counsel, I reviewed it.
21  Q    Okay.  And is your recollection refreshed?
22  A    Sir, I didn't --
23          THE COURT:  Is your recollection refreshed, yes or
24  no?
25          THE WITNESS:  Yes, sir.

Ochilov - cross - Rubert-Schewel          523

1          THE COURT:  Next question.

2    BY MR. RUBERT-SCHEWEL:

3    Q    And do you also recall that prior to what's in evidence

4    in 43-b much of the conversation was flirtatious or about

5    marriage?

6    A    Yes, sir.

7    Q    Can you explain to the jury -- one second.  Withdrawn.

8          Mr. Ochilov, can you explain to the jury what an

9    emoji or an emoticon is?

10   A    It's an expression of one's feelings.

11   Q    Okay.  And you translated this document, right, 43-b?

12   A    Correct, sir.

13   Q    And you reviewed it?

14   A    Correct.

15   Q    And --

16          MR. RUBERT-SCHEWEL:  Your Honor, permission to

17   publish to the jury, 43-b.

18          THE COURT:  You have it.  It is in evidence.

19          (Exhibit published.)

20   BY MR. RUBERT-SCHEWEL:

21   Q    And Mr. Ochilov, at 10:18:31 where you wrote smiley teeth

22   emoticon, that was actually reflected as a picture of a yellow

23   smiley face or an emoji; right?

24   A    I believe so, Counsel.

25          MR. RUBERT-SCHEWEL:  No further questions.

Ochilov - redirect - Haggans                524

1           THE COURT:  Your witness.

2    REDIRECT EXAMINATION

3    BY MR. HAGGANS:

4    Q    I've placed 43-b on the ELMO.

5           (Exhibit published.)

6    Q    You were asked some questions about timestamps.  Do you

7    recall that testimony?

8    A    Yes, sir.

9    Q    In preparation of this document, do you recall whether or

10   not the time stamps were converted to the eastern time zone as

11   of that date reflected, August 19, 2014?

12   A    Yes, sir.

13   Q    Is it fair to say that the timestamps reflected here are

14   expressed, therefore, in local time?

15   A    Correct, sir.

16          MR. HAGGANS:  No further questions.

17          THE COURT:  Anything else?

18          MR. RUBERT-SCHEWEL:  No, Your Honor.

19          THE COURT:  You may step down.  You are done.

20          (Witness excused.)

21          THE COURT:  Next witness, please.

22          MR. HAGGANS:  Just one moment, Your Honor, please.

23          MR. KESSLER:  Your Honor, at this point the

24   Government would like to read a stipulation.  Your Honor, this

25   is a stipulation that's been marked Government Exhibit 205-a

1   and it has been signed by the Government and by counsel.

2            THE COURT:  Any objection to 205-a being admitted

3   into evidence?

4            MR. RUBERT-SCHEWEL:  No, Your Honor.

5            THE COURT:  You may publish it to the jury as you

6   read it?

7            MR. KESSLER:  Thank you.  "It is hereby stipulated

8   and agreed, by and between the undersigned attorneys for the

9   Government and for the defendant, Dilkhayot Kasimov, that; 1.

10  If called as a witness at trial, an interpreter with expertise

11  in translating Uzbek to English would testify as follows:  The

12  Government's exhibits listed in Column A of Attachment 1 to

13  the stipulation contains accurate Uzbek-to-English

14  translations of the Uzbek audio or written communication

15  identified in the corresponding row of Column B of Attachment

16  1.  Each of the exhibits listed in Column A of Attachment 1

17  may be admitted as evidence as trial."

18            Moving to the second page:  "This stipulation,

19  including Attachment 1, may be admitted as evidence at trial."

20  I will not read Attachment 1, but I am publishing each page to

21  the jury to show that there is a list of exhibits.

22            Your Honor, at this time -- actually Government

23  Exhibit 205-a is in evidence so I will withdraw that.  All of

24  the exhibits in Attachment A are already in evidence with the

25  exception of 124-T-1, so I would also offer that in evidence

Ochilov - redirect - Haggans                526

1   at this time.

2           THE COURT:  Any objection?

3           MR. RUBERT-SCHEWEL:  No, Your Honor.

4           THE COURT:  It is admitted.

5           MR. KESSLER thank you.

6           THE COURT:  You are welcome.

7           Please call your next witness.

8           MR. HAGGANS:  For the Government's next witness we

9   will be setting up the laptop so we may need a moment to do

10  that, perhaps a ten-minute break here, Your Honor.

11          THE COURT:  I think it's an opportune time for a

12  15-minute break.  Do not talk about the case.  We're getting

13  towards the conclusion so see you in 15 minutes.

14          (Jury exits.)

15          THE COURT:  You may be seated.  The jury has stepped

16  out.  Any procedural issues we need to discuss in the absence

17  of the jury?

18          MR. PRAVDA:  No, Your Honor.

19          THE COURT:  Defense?

20          Ms. Macedonio.  No, Your Honor.

21          THE COURT:  Okay.  Take 15.

22

23          (Continued on the following page.)

24

25

527

1          (In open court; outside the presence of the
2     defendant and the jury.)
3          THE COURT:  Counsel, are we ready to resume the
4     trial?
5          MR. HAGGANS:  We are, Your Honor.
6          THE COURT:  Defense.
7          MS. MACEDONIO:  Yes, Judge.
8          THE COURT:  Mr. Jackson, would you let the jurors
9     know we are good to resume?
10         THE CLERK:  Yes, sir.
11         (Defendant present.)
12         THE COURT:  How many more witnesses do you
13    anticipate?
14         MR. HAGGANS:  The government has two, Your Honor.
15         THE COURT:  Thank you.
16         MR. HAGGANS:  Your Honor, should we bring the
17    witness in?
18         THE COURT:  Yes.
19         (Jury enters.)
20         THE COURT:  Thank you, ladies and gentlemen of the
21    jury.  I appreciate your promptness.  Please be seated and we
22    will call our next witness.
23         MR. HAGGANS:  The government calls Nehad Abusuneima.
24         THE COURT:  Okay.  Please bring the witness forward.
25         THE CLERK:  Sir, come forward and I will swear you

528

1    in.

2              Please raise your right hand.

3              (The witness is duly sworn/affirmed by clerk.)

4              THE COURT:  Please be seated, sir.  I am going to

5    ask you to sit down and spell your name, state your name and

6    spell it for the court reporter and then counsel will inquire.

7              Speak right into that microphone, sir.

8              THE WITNESS:  Okay.  My name is Nehad, N-E-H-A-D,

9    and the last name is Abusuneima, A-B-U-S-U-N-E-I-M-A.

10              THE COURT:  Thank you.

11              Counsel, you may inquire.

12              MR. HAGGANS:  Thank you, Your Honor.

13              (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1   DIRECT EXAMINATION

2   BY MR. HAGGANS:

3   Q    Sir, who do you work for?

4   A    I work for the Federal Bureau of Investigation.

5   Q    I think you may want to stay close to the microphone.

6   All right?

7   A    Okay.

8   Q    What is your title with the FBI?

9   A    I'm a language specialist.

10  Q    In what languages are you a specialist for the FBI?

11  A    In Arabic and French.

12  Q    Can you identify the city where you were born, sir?

13  A    I was born in Beirut, Lebanon.

14  Q    How long have you been speaking Arabic?

15  A    Since my childhood.

16  Q    Is it fair to say that was your household language

17  growing up?

18  A    That's correct.

19  Q    Do you continue to speak Arabic on a regular basis?

20  A    Yes, sir.

21  Q    Do you translate Arabic into English on a regular basis?

22  A    Yes, sir.

23  Q    How long have you been employed by the FBI as a language

24  specialist?

25  A    Thirteen years.

Abusuneima - direct - Haggans                530

1   Q    Can you give us a sense of the types of cases where
2   you've provided language specialist services?
3   A    The cases that I worked on, criminal cases but most of
4   the cases is counterterrorism.
5   Q    Can you define what you mean by the term
6   "counterterrorism" in brief terms?
7   A    Counterterrorism was cases investigating terrorist
8   groups, terrorist individuals, individual who have intention
9   to harm our national security or to harm people.  So those are
10  cases that I work on.
11  Q    In the past several years, is it fair to say that your
12  focus has been counterterrorism cases?
13  A    Yes, that's fair to say.
14  Q    In the course of that work, have you become familiar with
15  an entity or organization commonly referred to as ISIS?
16  A    Yes, sir.
17  Q    Can you give us a brief description of what ISIS is?
18  A    ISIS stands for Islamic State in Iraq and al-Sham.
19  That's a terrorist organization that surfaced on the
20  international level back in 2014.  They've been known to be --
21         MS. MACEDONIO:  Your Honor, I object to this line of
22  questioning.
23         THE COURT:  Overruled.  Go ahead.
24  A    -- that known to be very aggressive, very violent group.
25  Q    Thank you, sir.

Abusuneima - direct - Haggans                 531

1          As part of your work as a language specialist for

2     the FBI, have you had occasion to engage and translate Arabic

3     language texts and media that relates to ISIS?

4     A    Yes, sir.

5     Q    Without identifying any particular investigation, can you

6     give us some description -- withdrawn.

7          Without identifying any particular investigation,

8     can you identify some examples of the types of ISIS related

9     texts and media that you've translated from Arabic into

10    English?

11    A    Mainly the documents, video, chats, like, small clips

12    identifying the nature of their propaganda and the nature of

13    their actions.

14    Q    In preparation for your testimony today, did you have

15    occasion to review three video clips?

16    A    Yes, sir.  Yes.

17    Q    Were those video clips associated with WhatsApp?

18    A    Yes, sir.

19          MR. HAGGANS:  Your Honor, at this time, I'm going to

20    be publishing some video clips from Government Exhibit 41-B in

21    evidence.

22          THE COURT:  "D" or "B"?

23          MR. HAGGANS:  B, as in "boy," Your Honor.

24          THE COURT:  Yes.  It is already in evidence.

25          MR. HAGGANS:  And I would ask that the lights be

1   dimmed for that.

2            THE COURT:  Mr. Jackson, please.

3            MR. HAGGANS:  And, Mr. Jackson, if I can please have

4   the laptop podium.

5   Q    I'm going to publish a video located on Government

6   Exhibit 41-B in evidence.  The title of the video is VID --

7   that's Victor, India, David, dash, 20141206-WA0000.MP4,

8   recovered from Government Exhibit 40.

9            I'm sorry for the delay.

10           (Video played.)  (Video stopped.)

11  Q    Sir, what was the language being sung in the voiceover

12  portion of that video?

13  A    It's the Arabic language.

14  Q    There were subtitles on that video?

15  A    Yes.

16  Q    Did you create those subtitles?

17  A    No, sir.

18  Q    Is there any relationship between the voiceover audio and

19  the subtitles on this exhibit?

20  A    The subtitles are the exact translation of the audio.

21           MR. HAGGANS:  Could I have the laptop just for the

22  witness, please, Mr. Jackson.

23  Q    Sir, on the screen, I'm showing you a document that's

24  been marked Government Exhibit 211.

25  A    Yes.

Abusuneima - direct - Haggans                533

1  Q    Is this a true and accurate screenshot of an image

2  contained in the video that we just watched --

3  A    Yes, sir.

4  Q    Please let me finish my question.

5  A    I'm sorry.

6  Q    That's all right.

7          Is this a true and accurate screenshot of an image

8  contained in the video we just watched, that is, the file on

9  Government Exhibit 41-B, Bravo, ending in WAO000.MP4?

10 A    Yes.

11         MR. HAGGANS:  Your Honor, I move to admit Government

12 Exhibit 211.

13         THE COURT:  Any objection?

14         MS. MACEDONIO:  No, Your Honor.

15         THE COURT:  It's admitted.  You may publish it to

16 the jury.

17         (Government Exhibit 211 so marked.)

18 Q    Sir, looking at Government Exhibit 211, there appears to

19 be an image or a flag over the featured singer's shoulders.

20 Do you see that, sir?

21 A    Yes, I do.

22 Q    In the course of your work reviewing and translating ISIS

23 related media, have you come to become familiar with the flags

24 and insignia of ISIS?

25 A    Yes.

Abusuneima - direct - Haggans                    534

1   Q     Do you recognize the flag depicted in this photograph?

2   A     Yes.

3   Q     What is it?

4   A     That's the flag for ISIS.

5             MR. HAGGANS:  Your Honor, I'm now going to publish a

6   video which is in evidence.  It's located on Government

7   Exhibit 41-B recovered from Government Exhibit 40, the

8   defendant's phone.  The title of the clip is VID, that's

9   Victor, India, David, dash, 20141206-WA0001.MP4.

10            THE COURT:  You may publish.  It's in evidence.

11            (Video played.)  (Video stopped.)

12  Q     Sir, what was the language being sung in the voiceover

13  portion of that video?

14  A     It is the Arabic language.

15  Q     Can you give us a summary of the content of the singing

16  portion?

17  A     It is a song about, inspiring new recruits to join the

18  jihadi movement and to join the other people who are in the

19  land of caliphate.  So it's mostly an inspirational song for

20  recruits, for new recruits about jihad.

21  Q     You used the term "caliphate."  In the course of your

22  work, what does the term "caliphate" refer to?

23  A     Caliphate is the government system that all these jihadis

24  live under.  It's a government system so it is taken from the

25  Islamic history and it is used by ISIS in the land they are

CMH      OCR      RMR      CRR      FCRR

Abusuneima - direct - Haggans          535

1  occupying.

2          MR. HAGGANS:  Mr. Jackson, if I can have the laptop

3  just for the witness, please.

4  Q    I'm showing you what have been marked for identification

5  as Government Exhibit 212 and Government Exhibit 213.

6          Have you seen these before, sir?

7  A    Yes.

8  Q    Do they represent true and accurate screenshots of images

9  contained within the video that we just watched, that is, the

10 file on Government Exhibit 41-B taken from the defendant's

11 phone, Government Exhibit 40, ending in WA0001.MP4?

12 A    Yes.

13         MR. HAGGANS:  Your Honor, I move admission of

14 Government Exhibits 212 and 213.

15         THE COURT:  Any objection to 212?

16         MS. MACEDONIO:  No, Your Honor.

17         THE COURT:  It is admitted.

18         (Government Exhibit 212 so marked.)

19         THE COURT:  Any objection to 213?

20         MS. MACEDONIO:  No, Your Honor.

21         THE COURT:  It is admitted.  You may publish to the

22 jury.

23         (Government Exhibit 213 so marked.)

24         MR. HAGGANS:  Thank you, Your Honor.

25 Q    Sir, in that image over the featured individual's right

Abusuneima - direct - Haggans                 536

1    shoulder, what does that vehicle appear to you to be?

2    A    It's a tank.

3              THE COURT:  And that's in 212, right?

4              MR. HAGGANS:  Government Exhibit 212, Your Honor.

5              THE COURT:  Right.

6    Q    During the course of the video, there appear to be a

7    number of black flags, waving black flags at various portions.

8    Did you recognize those flags, sir?

9    A    Yes.

10   Q    What were those?

11   A    Those are the flags of ISIS.

12             MR. HAGGANS:  One moment, please.

13             THE COURT:  Yes.

14             (Pause.)

15   Q    I'm now moving to Government Exhibit 213.  The vehicle on

16   the center of the image, sir, what does that appear to you to

17   be?

18   A    It is a tank.

19             MR. HAGGANS:  Your Honor, I'm now going to publish a

20   video clip in evidence.  It's located on Government

21   Exhibit 41-B, as in boy.  It is titled VID, that's Victor,

22   India, David, dash, 201412220WA0000.3G, as in golf, P, as in

23   papa.

24             THE COURT:  You may publish it.

25             MR. HAGGANS:  And just for the Court's attention,

CMH      OCR      RMR      CRR      FCRR

Abusuneima - direct - Haggans                537

1  during the video, I intend to pause at certain points and pose

2  some questions and I'll note those pauses on the record.

3            THE COURT:  Thank you.

4            (Video played.)  (Video stopped.)

5            MR. HAGGANS:  For the record, I'm pausing at time

6  stamp 1 minute and 6 seconds.

7  Q    Sir, I'm going to ask you a series of yes or no

8  questions.

9            In the course of that sequence, did you hear the

10 term "jihad"?

11 A    Yes.

12 Q    Could you spell that for the record, please?

13 A    Jihad?  That's J-I-H-A-D.

14 Q    In the course of that recording, did you hear the term

15 "kufar"?

16 A    No -- I'm sorry.  Can I redact?  Yes, I heard "kufar."

17 Q    Are you sure, sir?

18 A    I am sure.

19 Q    Could you spell that term for the record, please?

20 A    Kufar?  That's K-U-F-A-R.

21            MR. HAGGANS:  I'm going to resume the recording at

22 this time.

23            (Video played.)  (Video stopped.)

24            MR. HAGGANS:  For the record, I'm pausing the

25 recording at time stamp 1 minute and 54 seconds.

Abusuneima - direct - Haggans                538

1   Q     Sir, did that appear to you to be a large explosion?
2   A     Yes.
3            MR. HAGGANS:  I'm resuming the video, Your Honor.
4            (Video played.)  (Video stopped.)
5   Q     Sir, what was the language, the principal language of
6   that video clip that we just played?
7   A     It's the Arabic language.
8   Q     Did you hear during the course of that video the phrase
9   "allahu akbar"?
10  A     Yes.
11  Q     Can you spell that?
12  A     "Allahu" is A-L-L-A-H-U.  "Akbar" would be A-K-B, as in
13  boy, A-R.
14           MR. HAGGANS:  Could I have one moment, please,
15  Your Honor?
16           THE COURT:  Yes, of course.
17           MR. HAGGANS:  Thank you.
18           (Pause.)
19           MR. HAGGANS:  Thank you, Your Honor.
20  Q     Sir, the portion of the video, did you see a portion of
21  the video in which it appeared that there was a man sitting
22  behind a steering wheel?
23  A     Yes.
24  Q     Could you please give us a summary translation or gist of
25  what you understood that man to say?

CMH       OCR       RMR       CRR       FCRR

1   A    He was giving advice to his fellow human beings or fellow

2   mujahideens in this video to stick to the Qur'an and to be

3   loyal to the caliphate and encourage them to do martyrdom

4   attacks.  According to him, that's the shortest way to heaven.

5   Q    Did he use any term or terms in Arabic for the concept

6   that you just noted martyrdom attack?

7   A    Yes.

8   Q    What is that term in Arabic?

9   A    "Shahada."

10  Q    Can you spell that term for the record?

11  A    S-H-A-H-A-D, as in David, A.

12  Q    Is there a term in Arabic for an individual who conducts

13  or performs a "shahada"?

14  A    Yes.

15  Q    What is that term in Arabic?

16  A    "Shaheed."

17  Q    Could you spell that term for the record, sir?

18  A    S-H-A-H-E, as in echo, E as in echo, D as in David.

19       MR. HAGGANS:  Can I now please have the laptop just

20  for the witness, Mr. Jackson.

21  Q    I'm showing the witness what has been marked for

22  identification as Government Exhibits 214 and 215.

23       Sir, the Government Exhibits 214 and 215 appear to

24  be true and accurate screenshots from the video that we just

25  reviewed?

Abusuneima - cross - Macedonio                      540

1    A    Yes.

2             MR. HAGGANS:  Your Honor, I move to admit Government

3    Exhibits 214 and 215.

4             THE COURT:  Any objection to 214?

5             MS. MACEDONIO:  No, Your Honor.

6             THE COURT:  It's admitted.

7             (Government Exhibit 214 so marked.)

8             THE COURT:  Any objection to 215?

9             MS. MACEDONIO:  No, Your Honor.

10            THE COURT:  It's admitted.

11            (Government Exhibit 215 so marked.)

12            MR. HAGGANS:  If I can have just one moment.

13            THE COURT:  Yes.

14            (Pause.)

15            MR. HAGGANS:  I have no further questions,

16   Your Honor.

17            THE COURT:  You may cross.

18   CROSS-EXAMINATION

19   BY MS. MACEDONIO:

20   Q    Good afternoon.

21   A    Good afternoon.

22   Q    You testified on direct examination that you are an

23   Arabic interpreter, is that correct?

24   A    Correct.

25   Q    And you work for the FBI, correct?

Abusuneima - cross - Macedonio                    541

1   A    Correct.

2   Q    Would it be fair to say that there's a difference between

3   the Arabic language and the Uzbek language?

4   A    Yes.

5   Q    In fact, they're two completely different languages,

6   correct?

7   A    Correct.

8   Q    Do they even have a different alphabet?

9   A    I believe so.

10  Q    Do you speak -- you speak Arabic, right?

11  A    Right.

12  Q    But do you speak Uzbek?

13  A    No.

14       MS. MACEDONIO:  Thank you, Your Honor.  No further

15  questions.

16       THE COURT:  Anything else?

17       MR. HAGGANS:  No.

18       THE COURT:  You may step down.  Thank you.

19       (Witness excused.)

20       THE COURT:  Please call your next witness.

21       MR. HAGGANS:  The witness government recalls Lorenzo

22  Vidino.

23       THE COURT:  Please step up, Doctor.  I remind you

24  you are still under oath.

25       (Witness recalled; previously sworn.)

```
                         Vidino                      542
```

1        THE COURT:  I'm going to ask you have you spoken

2    about your testimony with anyone since you left the witness

3    stand?

4        THE WITNESS:  No.

5        THE COURT:  The answer to that question is no.

6        Go ahead.

7        MR. HAGGANS:  Your Honor, I think I should make

8    clear, I want to make sure I understand Your Honor's question.

9    Was Your Honor referring to the witness' prior testimony?

10       THE COURT:  Did you understand my question?

11       When you left this witness stand, have you spoken

12   with anyone about any of your testimony, whether this past

13   testimony or the testimony you're about to give now?

14       THE WITNESS:  Neither.

15       THE COURT:  Have you spoken with the U.S. Attorney's

16   Office at all since leaving the stand?

17       THE WITNESS:  I have spoken.

18       THE COURT:  You have spoken to them?

19       THE WITNESS:  Yes.

20       THE COURT:  What did you talk to them?

21       THE WITNESS:  About me coming back, the logistics of

22   traveling.

23       THE COURT:  Other than the logistics of coming back

24   and the fact that you were going to come back, did you talk in

25   any way, shape and form about the substance of what you are

Vidino                                    543

1  going to be asked and what you anticipate your answers to be

2  now at all?

3          THE WITNESS:  I was provided with the three videos.

4          THE COURT:  You were what?

5          THE WITNESS:  I was provided with the three videos.

6          THE COURT:  You were provided with three videos?

7  Okay.  If you are shown those videos, I would like you to

8  identify those videos as videos you were shown and if you were

9  not shown those videos, I am sure defense counsel will ask you

10 what those videos were.

11         So, anything other than being provided with the

12 three videos?

13         THE WITNESS:  No.

14         THE COURT:  Did you discuss your testimony about

15 those three videos with the government?

16         THE WITNESS:  Yes.

17         THE COURT:  Okay.  What did you say to them or what

18 did they say to you about the videos?

19         THE WITNESS:  Whether I identified the videos --

20         THE COURT:  I'm sorry?

21         THE WITNESS:  Whether I identified the videos as,

22 what my opinion of the videos was, whether I identify them as

23 ISIS videos.

24         THE COURT:  What did you say to the government about

25 that?

Vidino - direct - Haggans                    544

1              THE WITNESS:  I did.

2              THE COURT:  You said they were ISIS videos?

3              THE WITNESS:  Yes.

4              THE COURT:  Okay.  Other than those three videos and

5    the fact that you said they are ISIS videos, anything else?

6              THE WITNESS:  No.

7              THE COURT:  Okay.  Your witness.

8    DIRECT EXAMINATION

9    BY MR. HAGGANS:

10   Q    So since you've testified in this case, you reviewed

11   three videos, is that correct?

12   A    Correct.

13   Q    Before I address the videos, are you aware of any

14   relationship between the country of Saudi Arabia and ISIS?

15   A    There's I would say animosity between the two.

16   Q    It's a hostile relationship?

17   A    Absolutely.

18             MR. HAGGANS:  Your Honor, I'm now --

19             THE COURT:  Microphone, sir.

20             MR. HAGGANS:  I'm sorry.  Your Honor, I'm now going

21   to display Government Exhibit 211 which is in evidence.

22             THE COURT:  You may publish it to the witness and

23   the jury.

24             THE CLERK:  Laptop podium?

25             MR. HAGGANS:  I'm sorry.  It's on the laptop and if

Vidino - direct - Haggans                545

1  you can please dim the lights.

2  Q    Dr. Vidino, does this screenshot appear in one of the

3  videos that you reviewed?

4  A    Yes, it does.

5  Q    Are you familiar in the course of your work with ISIS'

6  insignia and flags?

7  A    Yes.

8  Q    There appears to be a flag or flags in this video behind

9  the featured speakers, behind the featured speaker?

10  A    Yes.

11  Q    Did you identify that flag?

12  A    That's the ISIS flag.

13  Q    Having reviewed this video prior to your testimony and

14  based on your work and research in this area, do you have any

15  opinions on the purpose of this video as it relates to ISIS?

16  A    This is quintessential, pure ISIS propaganda video.

17  Q    What's the basis of your opinion?

18  A    It matches with the countless videos that ISIS has

19  produced.  It has -- it was produced by ISIS.  It has the

20  logos of ISIS.  It has the language of ISIS.  It has the

21  flags.  It was produced by one of the media companies of ISIS.

22  It is an ISIS video.

23  Q    Do you recall seeing subtitles when you reviewed this

24  video?

25  A    Yes.

Vidino - direct - Haggans                    546

1   Q    Do you recall seeing a subtitle that appeared to identify

2   the individual who's the principal speaker?

3   A    Yes.

4   Q    Was the content of that subtitle Commander Abu, that's

5   A-B-U, Usamah, U-S-A-M, as in Michael, A-H, al-Maghribi,

6   that's al-Maghribi, was that the name featured in the

7   subtitle?

8   A    Yes, it was.

9   Q    Are you familiar with the term "kunya"?

10  A    Yes.

11  Q    What is a "kunya"?

12  A    "Kunya" in Arabic is an alias.

13  Q    And prior to -- I'm sorry.  Withdrawn.

14        Are you aware of any relationship, current or

15  historical, between Abu Usamah al-Maghribi and ISIS?

16  A    He's a fairly known -- he was a fairly known commander

17  within ISIS.

18  Q    Is it fair to say that Abu Usamah al-Maghribi is a

19  "kunya" or alias?

20  A    Yes, absolutely.

21        MR. HAGGANS:  Your Honor, I'm now going to display

22  Government Exhibits 212 and 213 which are in evidence.

23        THE COURT:  You may publish.

24  Q    Dr. Vidino, are these screenshots drawn from one of the

25  video files that you reviewed?

CMH      OCR      RMR      CRR      FCRR

Vidino - direct - Haggans                    547

1   A    Yes.

2   Q    This video file, the video file that contains these

3   screenshots, do you know what, do you, have you -- I'm sorry.

4   Withdrawn.

5         The video containing these screenshots, do you have

6   any opinions about the purpose of this video as it relates to

7   ISIS?

8   A    This is an ISIS propaganda video.

9   Q    Do you know if this video was distributed by ISIS?

10  A    Yes, it was.

11  Q    Do you know if it was distributed by any particular

12  entity or arm associated with ISIS?

13  A    I believe it was by Al Hayat.

14  Q    Are you familiar with an entity or associate of ISIS by

15  the name of Al-Furqan Establishment for Media Production?

16  A    Yes.

17  Q    Is there any relationship between that entity and this

18  video to your knowledge?

19  A    Al-Furqan is one of the media producing companies for

20  ISIS.

21        MR. HAGGANS:  I'm now going to, with Mr. Jackson's

22  assistance, please display on the ELMO Government Exhibit 38-C

23  which is in evidence.

24        THE COURT:  You may publish.

25  Q    With reference to the text that I'm pointing to on

Vidino - direct - Haggans                    548

1   Government Exhibit 38-C, beginning there, can you read that

2   into record up to the semicolon?

3   A    From the top?

4   Q    No, starting from --

5   A    Sorry.  "Also known as Al-Furqan Establishment for Media

6   Production."

7   Q    And just for the record, 38-C is one of the portions of

8   the Federal Register relating to the designation of ISIS as a

9   foreign terrorist organization, is that correct?

10  A    Correct.

11        MR. HAGGANS:  I'm now going to display the

12  screenshots, Government Exhibit 214 and 215 which are in

13  evidence.

14        THE COURT:  Any objection?  They're in evidence.

15        MS. MACEDONIO:  They're in evidence.  No objection.

16        MR. HAGGANS:  From the laptop, Mr. Jackson.

17        (Continued on next page.)

18

19

20

21

22

23

24

25

CMH      OCR      RMR      CRR      FCRR

Vidino - direct - Haggans                          549

1    DIRECT EXAMINATION (Continuing)

2    BY MR. HAGGANS:

3    Q    Dr. Vidino, do these screen shots, Government Exhibit 214

4    and 215, do they come from one of the video files that you

5    reviewed?

6    A    Yes.

7    Q    Based on your review of that video and your work in this

8    field, have you formed any opinions about the purpose of this

9    video as it relates to ISIS?

10   A    They're propaganda videos, in this case, showing a

11   suicide bombing, which is one of the most difficult propaganda

12   showing military operations by ISIS.

13   Q    Are you familiar with the term shaheed?

14   A    Yes.

15   Q    What does that term mean anything in relation to this

16   video?

17   A    A shaheed used by ISIS in this context is somebody who

18   dies in a military operation, dies fighting.

19   Q    Would ISIS consider an attack like the one depicted in

20   this video to be a military attack?

21   A    Most definitely.

22   Q    I believe in your earlier testimony you addressed the

23   term kafir.  Do you recall that testimony?

24   A    Yes.

25   Q    Are you familiar with the term kuffar?

Vidino - direct - Haggans                550

1   A    Kuffar is the plural of kafir, same word.  They both mean

2   infidel.  One is singular; one is plural.

3   Q    In this video, when you reviewed it, do you recall the

4   portion towards the second half of the -- pardon me, towards

5   the middle of the video that is depicted here in Government

6   Exhibit 215, do you recall whether the term or phrase Allahu

7   Akbar was used during that portion?

8   A    Yes, it was.

9   Q    You are familiar with the meaning of that phrase?

10  A    Yes.

11  Q    Does that phrase have, in certain context, a benign

12  meaning?

13  A    Of course, yes.

14  Q    What is the translation of that phrase?

15  A    God is the greatest.

16  Q    Does that phrase have equivalents in other languages and

17  religions?

18  A    Yes.

19  Q    Do you recall your prior testimony to the effect that

20  certain terms and their usage, their meaning depends upon the

21  context?

22  A    Yes.

23  Q    What was the context of the usage of the term of Allahu

24  Akbar in the portion of  the video that is depicted as

25  Government Exhibit 215?

Vidino - cross - Macedonio                551

1   A    It's celebratory here.  It's celebrating something

2   positive, the attack.

3          MR. HAGGANS:  I have no further questions, Your

4   Honor.

5          THE COURT:  Your witness.

6   CROSS EXAMINATION

7   BY MS. MACEDONIO:

8   Q    Dr. Vidino, welcome back.

9   A    Thank you.

10  Q    You testified on your direct examination today that the

11  videos that have been entered into evidence by the Government

12  that you recently reviewed are quintessential ISIS propaganda;

13  correct?

14  A    Correct.

15  Q    Now, before your testimony earlier in the week, had the

16  Government given you these videos to look at?

17  A    No.

18  Q    Okay.  So when you were preparing to come and testify

19  earlier in the week, they hadn't given you these videos, they

20  had only given you these videos after you had completed your

21  testimony here earlier in the week; correct?

22  A    Correct.

23  Q    I think you were here on Tuesday; is that right?  Maybe

24  Wednesday?

25  A    I don't remember.

Vidino - cross - Macedonio                    552

1    Q    So it wasn't until after that that you were asked to

2    review these videos; correct?

3    A    Correct.

4    Q    Now, you testified on direct examination here today that

5    there were countless ISIS videos; is that correct?

6    A    Correct.

7    Q    Okay.  So, when you use the term countless, can you put a

8    number on that?

9    A    Thousands.

10   Q    Thousands upon thousands?

11   A    Yeah.

12   Q    Okay.  And those videos are sent out by various

13   distributors on behalf of ISIS; is that fair to say?

14   A    Yes.

15   Q    And then those videos can be re-distributed from one

16   individual to another; correct?

17   A    Yes.

18   Q    So you don't have to have direct contact with a

19   particular distributor to be able to get one of these ISIS

20   videos; right?

21   A    That's correct.

22   Q    And is it fair to say, Dr. Vidino, that you yourself have

23   viewed thousands of ISIS propaganda videos?

24   A    Correct.

25   Q    Now, it doesn't mean that because you've viewed these

Vidino - cross - Macedonio                  553

1    videos that you subscribe to what's in them; right?

2    A    Of course.

3    Q    Okay.  And, in fact, you don't subscribe to what's in

4    them at all?

5    A    No.

6    Q    Despite the fact that you have viewed thousands of them,

7    fair to say?

8    A    Correct.

9    Q    In your body of work, would it be fair to say that a

10   person who subscribes to ISIS who receives this propaganda

11   would redistribute it so that he or she could entice others to

12   join ISIS as well?

13   A    Some would; some wouldn't.  I would say not necessarily.

14   It wouldn't be unusual, but it's not a given.

15   Q    You were asked about a term.  I'm going to say the

16   English, God is the greatest.  Are you familiar with that

17   term?

18   A    Allahu Akbar.

19   Q    Thank you.  And is it correct, Dr. Vidino, that Muslims

20   use this five times a day when they're calling for prayer?

21   A    Yes.

22   Q    Because Muslims pray five times a day?

23   A    If they are pious, yes.

24   Q    How about the term -- I'm going to spell it

25   S-H-A-H-E-E-D?

1    A    Shaheed.

2    Q    Shaheed.  And what are the various meanings of shaheed?

3    A    Shaheed means to bear witness.  So it's to testify that

4    you believe in God.  As for the terms we've been discussing

5    over the last few days, there's, I would say, a mainstream

6    meaning within Islam and then a certain separate and less

7    benign meaning that ISIS uses.

8          Shaheed is commonly known as a martyr, someone who

9    dies fighting jihad.

10   Q    It's fair to say that it has multiple meanings?

11   A    Yes.

12   Q    One of them, at least one of them which is benign, right?

13   A    Yes.

14   Q    You testified, when you were here earlier in the week,

15   that you have been given north of $10,000 for your testimony,

16   fair to say?

17   A    I haven't been given it yet.

18   Q    Well, you are expected to be paid?

19   A    Expected to be paid, yes.

20   Q    Is it fair to say that the Government calling you back

21   today caused that to go a little further north, Dr. Vidino?

22   A    We haven't discussed that yet.

23   Q    You charge by the hour; right?

24   A    Yes.

25   Q    And you came from Washington, D.C.?

```
                       Proceedings                     555
```

1    A    I did.

2    Q    And, so, you get to bill for your travel; right?

3    A    Yes.

4    Q    And you get to bill for the time you're sitting in the

5    hallway waiting to be called?

6    A    Yes.

7    Q    So it's fair to say it's going further north; correct?

8    A    Yes.

9              MS. MACEDONIO:  I have no further questions.

10             THE COURT:  Your witness.

11             MR. HAGGANS:  I have no redirect, Your Honor.

12             THE COURT:  You may step down.  Thank you.

13             THE WITNESS:  Thank you.

14             THE COURT:  Please call your next witness.

15             MR. PRAVDA:  Your Honor, the Government rests.

16             THE COURT:  The Government rests and that means,

17   ladies and gentleman, that it is now time for your lunch.  It

18   is about ten minutes to 1:00.  Why don't we resume at, let's

19   say, 2:10.  Thank you.  Please don't talk about the case yet.

20   We are not done.  But as I said to you earlier today, we're

21   getting close.  So, thank you.

22             (Jury exits the courtroom.)

23             THE COURT:  You may be seated.  The jury has left

24   the courtroom.

25             Do we have any motions?

Proceedings                                556

1        MS. MACEDONIO:  Yes, Your Honor with the Court's

2   indulgence, it seems that might be productive if we were able

3   to have another ex-parte conference.  There are some

4   additional matters that have arisen.  We have discussed this

5   with the attorneys.

6        THE COURT:  We can do that, but we can do that after

7   we have any motions and we will take our luncheon break and

8   the Court will take its comfort break.  Let's see if there are

9   any motions first.

10       MS. SHARKEY:  Sure, Judge.  Pursuant to Rule 29, we

11  request that the Court find that the Government's case was

12  insufficient.

13       THE COURT:  Any response to that?

14       MR. PRAVDA:  Yes, Your Honor.  The Government

15  believes that the evidence presented in this case, including

16  evidence that the defendant traveling to JFK Airport to meet

17  with Mr. Saidakhmetov contributing his own money to Mr.

18  Saidakhmetov knowing that Mr. Saidakhmetov was going to be

19  traveling to Turkey and then to Syria to join ISIS, evidence

20  that the defendant had ISIS propaganda on his phone, all of

21  that is more than sufficient to allow the jury to deliberate

22  on the question of whether the defendant is guilty beyond a

23  reasonable doubt of crime charged, conspiracy to provide

24  material support to ISIS and attempt to provide material

25  support to ISIS.

Proceedings                            557

1          THE COURT:  Any response from defense?

2          MS. MACEDONIO:  We respectfully disagree with the

3     Government and we assert that the Government has failed to

4     prove its case beyond a reasonable doubt and, therefore, we

5     ask the Court to dismiss the charges.

6          THE COURT:  Any response from the Government?

7          MR. PRAVDA:  Yes, Your Honor.  Just briefly, the

8     Court only has to find that there is sufficient evidence for

9     the case to be presented to the jury at this stage, not that

10     the Government has failed to prove its case beyond a

11     reasonable doubt.

12          THE COURT:  Any response from the defense?

13          MS. MACEDONIO:  No, Your Honor.

14          THE COURT:  The motion of defense is denied.  We

15     will now take our luncheon break and when we resume, we will

16     have whatever initial applications we have, either ex-parte or

17     otherwise from either counsel.  Enjoy your lunch.

18          Why don't we plan to be back here at two minutes

19     before 2 o'clock if that works for everybody.

20          MS. SHARKEY:  Thank you, Your Honor.

21          THE COURT:  Thank you.

22          MR. PRAVDA:  Thank you, Your Honor.

23          MS. MACEDONIO:  Thank you, Your Honor.

24          THE COURT:  Thank you.

25          (Continued on following page with afternoon session.)

Proceedings                                    558

AFTERNOON SESSION

 1                        AFTERNOON SESSION

 2           (In open court; outside the presence of the jury.)

 3           THE COURTROOM DEPUTY:  All rise.  Judge Kuntz

 4    presiding.

 5           THE COURT:  We are waiting for the defendant to be

 6    produced.

 7           You may be seated, everyone.  Can we have

 8    appearances?

 9           MR. PRAVDA:  Doug Pravda.

10           THE COURT:  No, we have appearances.

11           MR. PRAVDA:  Sorry, Your Honor.  The realtime said

12    can we have appearances.

13           (Defendant present.)

14           MS. SHARKEY:  Your Honor, we have a new interpreter

15    this afternoon.

16           THE COURT:  Hello.  I am going to ask you, ma'am, to

17    state your name as the interpreter on the record and then we

18    will swear you as interpreter.  Okay.  Would you sit down and

19    state your name into the microphone and spell it for the court

20    reporter.

21           THE INTERPRETER:  Dilafurz Karimova.

22           THE COURT:  Ma'am, you have to spell that.

23           THE INTERPRETER:  D-I-L-A-F-R-U-Z.  K-A-R-I-M-O-V-A.

24           THE COURT:  Thank you.  And you are a Uzbek

25    interpreter?

Proceedings                                                559

1           THE INTERPRETER:  Yes.

2           THE COURT:  Have you previously been sworn in

3    Federal Court?

4           THE INTERPRETER:  This is first time.

5           THE COURT:  First time.  Well, Mr. Jackson will give

6    you the oath.  We love to have first-time customers.  Please

7    stand up and raise your right hand.

8           (Interpreter sworn.)

9           THE COURT:  Thank you.  You may be seated, ma'am,

10   and welcome.  You are no longer a first-timer.  Okay.

11          Now, do we have any applications before we bring the

12   jury in from either side?

13          MS. MACEDONIO:  Your Honor, we had made an

14   application earlier to have an ex-parte conference.  We think

15   this would be the appropriate time to do that.

16          THE COURT:  All right.  I take it the Government

17   agrees with that.

18          MR. PRAVDA:  No objection, Your Honor.

19          THE COURT:  No objection.  I am going to ask the

20   Government and the public and everybody else, other than

21   defense counsel and the defendant and obviously the Court

22   security folks, to leave the courtroom now.  We will get you

23   back in a few minutes.  Don't go far.  This won't take long.

24          MR. PRAVDA:  Your Honor, I would just remind the

25   Court again about the realtime.

MDL        RPR        CRR        CSR

Proceedings                               560

1          THE COURT:  I get it.

2          MR. PRAVDA:  Thank you.

3          THE COURT:  I am a slow learner but not that slow.

4          (Continued on next page.)

Sealed by Order of the Court                561

1      (The following portion is sealed by Order of the

2   Court.)





Sealed by Order of the Court                    562



Sealed by Order of the Court                    564



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22          (End of sealed ex-parte portion of the record.)

23          (Continued on next page.)

24

25

Proceedings                                          565

1   (Continuing.)

2        THE COURT:  Please come in and please restore

3   realtime, Madam Reporters.

4        All right.  We have had an agreed-upon, or at least

5   not objected to, ex parte conference with defense counsel and

6   defense counsel has an application to make with respect and I

7   would like them to make it on the record and in the presence

8   of the prosecution with respect to the timing of the trial, to

9   put it generically.

10        MS. MACEDONIO:  Your Honor, it is the defense

11   application that we adjourn for today and continue the trial

12   on Monday.

13        THE COURT:  What is the Government's response to

14   that application?

15        MR. PRAVDA:  May we have one moment to consult?

16        THE COURT:  You may have two moments.

17        (Pause in proceedings.)

18        MR. PRAVDA:  Your Honor, the Government did not have

19   an objection, but wants to make sure that we are clear that,

20   is the defendant resting today or is the application of the

21   defendant to potentially come back and put a case on Monday?

22        THE COURT:  The answer to the question as posed is

23   yes.  In other words, we are where we are.  We have had the

24   Government rest.

25        MR. PRAVDA:  Yes.

Proceedings                              566

1          THE COURT:  There was a motion to dismiss the

2     Government's case.  That motion was denied and we are now at a

3     point where the defense will or will not put on a case and

4     they will advise the Court and the prosecution of their

5     decision with respect to either put on a case or to rest on

6     Monday morning at 9:30.

7               I would remind all parties that there was a request

8     by this old Wall Street guy who has taken depositions until 2

9     in the morning, to allow you to have the weekend to prepare

10    summations and to have the jury charge conference; although, I

11    also told you that we have the proposed jury instructions for

12    your review and we can do this, as one fellow I used to

13    practice with used to say, the hard way or the easy way.  We

14    can adjourn until Monday morning at 9:30 as defense has

15    requested and they will advise us at that time if they want to

16    put on a case or not or I could force them to tell us now

17    whether they're going to put on a case or not and I can force

18    the parties to sum up, even before the charge conference and

19    then I can give you the jury charge after I force you to sum

20    up, the way some old school judges have done, and then I can

21    give the jury charge to the jury on Monday morning.

22              So, in light of that, do you have any objection to

23    their request?

24              MR. PRAVDA:  We still have no objection, Your Honor,

25    and thank you for that clarification.

Proceedings                                          567

1           THE COURT:  I like to be as clear as I can be.  So,

2      why don't we get the jury back and we will tell them the

3      parties have agreed to adjourn today and we will resume on

4      Monday at 9:30 a.m. and I will admonish them not to discuss

5      the case.  Then I will ask counsel to sit tight because we

6      have a gift bag, a treat bag as my kids used to say, to take

7      home with you.  Do we have their gifts in the courtroom?

8                (Jury enters.)

9           THE COURT:  Ladies and gentlemen of the jury, I

10     thank you for your patience yet again and remember when I said

11     that I would send you home at 5 o'clock, the good news is that

12     I am going to violate that by saying we are adjourned for the

13     day right now.  I know that feeling.  It's like a snow day

14     when I was a little kid.  We will resume on Monday morning at

15     9:30, but I want you to know that your presence and your being

16     here means everything to us and we are so appreciative of it.

17     We will see you Monday at 9:30.  Do not talk with anyone about

18     the case or read anything about the case.

19               Just think about how we have one team in the

20     playoffs, maybe two teams, and if you have any friends in

21     Boston say a big smiling judge said, take that, Boston.  Aside

22     from that, we are adjourned.  I want to thank you for your

23     continued service.  We will see you Monday morning.  We are

24     adjourned for the day and for the weekend.  I was going to say

25     class dismissed.

Proceedings                                            568

1          (Jury exits.)

2          THE COURT:  A very happy jury has left the

3    courtroom.  Be seated and now, as promised, we have your

4    homework assignments.  My law clerks and I, and I put it in

5    that order, but they're the ones that did the heavy lifting

6    with the drafts.  If there's anything wrong, it's on me.  We

7    have the drafts, jury charge and verdict forms to take home

8    with you.

9          The way we do this is pretty straight forward.  We

10   have what has been marked as Court Exhibit 1, the jury charge,

11   and then we will have Court Exhibit 2, the verdict-reached

12   form.  The reason I have that innovation is because perhaps in

13   half of the cases that I have handled as a judge, despite the

14   instruction to wait until the verdict has been reached not to

15   hand out the verdict form, the folks hand out the verdict form

16   and send it back in and say, no, you've got to bring it in

17   when you come out so this is a form that says to the Court, we

18   have reached a decision and then we have Court Exhibit 3 which

19   is the verdict sheet itself and we are going to bring those,

20   Court 2 and Court 3, out to you in addition to Court 1 which

21   my law clerk has just given you.

22         The way we will proceed on Monday is we will go page

23   by page and I will ask if there are any objections to anything

24   contained on page one and I will start with the Government and

25   you will say yes or no and then you will say what your

Proceedings                                    569

1   objection is to page one and I will turn to the defense and I

2   will ask what your objection is and I will rule on the

3   objections page by page as we go through the jury charge and

4   so that is how we will proceed.

5          If I accept the proposed changes, if any, I will

6   note the changes and make them.  And if I reject proposed

7   changes, you have your objection preserved for the record.

8   You don't have to say I object on to the record.  You object

9   and it's preserved for the record and then we go to page 2.

10  And go page-by-page asking the Government first and then

11  defense counsel.  This is not a collective drafting exercise.

12  I know how brilliant all the lawyers are around the table.  I

13  get that.

14         This is your opportunity to object to something in

15  the charge.  I am always willing to listen to what lawyers

16  have to say about a better way to write it, but, remember, if

17  you think I loved Dearie and Korman and Johnson, I loved the

18  late Judge Sand and Mr. Siffert is a friend of mine so when

19  you see references that look like they come from Sand, it's

20  because for the most part, they do.

21         We are now going to give you the,

22  jury-has-reached-its-decision form and the jury verdict form.

23  That is to say, Court 2 and Court 3 for your review and for

24  your comments.  Honestly we will go page-by-page Monday on the

25  record so feel free to be prepared to do that.  In the event

Proceedings                                        570

1    that there is something that you wish to discuss with your

2    adversaries in cyberspace over the weekend where there is

3    something that each of you finds is problematic, whether it's

4    on page 15 and you want to make a joint application to modify

5    something on page 15 or 27 or anything else, feel free to do

6    that.  You can do it either before the conference by filing it

7    on ECF or you can wait for the conference.  I am not

8    suggesting that you do that because we have spent a lot of

9    time and effort obviously in getting these drafts done for

10   your review, but we want you to take your time doing it but if

11   there is something that you feel you want to make a joint

12   proposal in advance, feel free to do it.

13          Once I have gotten your changes your suggested

14   changes, we will have a final iteration of the jury charge

15   which we will give to you as soon as we can.  And then we will

16   have the defense case.  If they put on a case and then we will

17   have summations.  The Government will go first, then the

18   defendant, then there will be rebuttal and then the jury

19   charge and then will jury will have the case.  That's as

20   traditional as one can get in a criminal trial.  Questions?

21   Comments?

22          MR. PRAVDA:  Your Honor, if there is a defense case

23   on Monday, would the -- would the charge conference be

24   following the defense case?

25          THE COURT:  Yes.

                    SN        OCR        RPR

1            MR. PRAVDA:  And if there is no defense case we'll
2    just proceed with the charge conference at 9:30 on Monday?
3            THE COURT:  Yes.
4            MR. PRAVDA:  Okay, thank you.
5            THE COURT:  Unless there is something else we need
6    to do.
7            MR. PRAVDA:  Not for us.
8            THE COURT:  Does that work for defense counsel as a
9    procedure?
10           MS. MACEDONIO:  Yes, Your Honor.
11           THE COURT:  Is there anything else we need to
12   discuss today?
13           MR. HAGGANS:  Your Honor, we are going to put it in
14   the 124-T-1 exhibit.  It is in evidence and at the conclusion
15   of the proceeding we are just going to replace it in the
16   jurors' binders.
17           THE COURT:  I have asked you not to take anything
18   out of the jurors' binders that was in evidence.  So you can
19   just add to it, all right?  Do it that way rather than --
20   because what will inevitably happen, no disrespect to your
21   third grade skills in terms of pasting, but there will be one
22   juror who doesn't get the change and they'll say, gee -- so
23   just add to it and that way, they will have both and you can
24   make appropriate reference to it in the summations but I'm
25   loathe to have documents that were in evidence and that the

Proceedings                                           572

1    jury had an opportunity to see suddenly not being there

2    because sometimes my friends on the 17th floor get pretty

3    prickly about such things.

4              MR. HAGGANS:  Understood, Your Honor.

5              THE COURT:  Anything else from defense counsel?

6              MS. MACEDONIO:  No, judge.

7              THE COURT:  Anything else from the Government?

8              MR. PRAVDA:  No, Your Honor.

9              THE COURT:  Have a wonderful weekend, a relaxed one.

10

11    (Matter adjourned to Monday, September 23, 2019 at 9:30 a.m.)

12

13

14

15                          - ooOoo -

16

17

18

19

20

21

22

23

24

25

SN       OCR       RPR

573

1                                    I N D E X

2

3    <u>WITNESS</u>                                                      <u>PAGE</u>

4      CRAIG ROTH                                                489

5          DIRECT EXAMINATION BY MR. HAGGANS                      489

6          CROSS EXAMINATION BY MR. RUBERT-SCHEWEL                494

7      MARCUS RIVERA                                              497

8          DIRECT EXAMINATION BY MR. PRAVDA                       497

9      JAMSHID OCHILOV

10         DIRECT EXAMINATION BY MR. HAGGANS                      507

11         CROSS-EXAMINATION BY MR. RUBERT-SCHEWEL                518

12         REDIRECT EXAMINATION BY MR. HAGGANS                    524

13     NEHAD ABUSUNEIMA                                           527

14         DIRECT EXAMINATION BY MR. HAGGANS                      529

15         CROSS-EXAMINATION BY MS. MACEDONIO                     540

16     LORENZO VIDINO                                             541

17         DIRECT EXAMINATION BY MR. HAGGANS                      544

18         CROSS EXAMINATION BY MS. MACEDONIO                     551

19

20

21

22

23

24

25

574

1                           **E X H I B I T S**

2

3        Government's Exhibit 41-B                        494

4

5        Government's Exhibit 16                          496

6

7        Government's Exhibit 43-B                        514

8

9        Government Exhibit 211                           533

10

11       Government Exhibit 212                           535

12

13       Government Exhibit 213                           535

14

15       Government Exhibit 214                           540

16

17       Government Exhibit 215                           540

18

19

20

21

22

23

24

25