UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____X

United States of America,

       -vs-                                      15 Cr. 095 (WFK)

Dilkhayot Kasimov,

                Defendant.
_____X

**Dilkhayot Kasimov's Sentencing Memorandum**

                                      Elizabeth E. Macedonio, Esq.
                                      Kelley J. Sharkey, Esq.
                                      *Attorneys for the Defendant*
                                      *Dilkhayot Kasimov*

**Memorandum in Aid of Sentencing**
**On Behalf of Dilkhayot Kasimov**

This memorandum is submitted on behalf of Dilkhayot Kasimov in support of his application for a below-guidelines sentence. We respectfully submit that a sentence below that called for by the guidelines is warranted based on Mr. Kasimov's history and characteristics, the conditions of confinement he has endured, his rehabilitative efforts, his limited participation in the offense, and the sentences received by his co-defendants in this case. Moreover, a below guideline sentence would comply with the purposes set forth in Title 18 U.S.C. § 3553(a) and can be crafted to be "sufficient, but not greater than necessary" to achieve the purposes of sentencing.

On September 24, 2019, after a trial before Your Honor, Mr. Kasimov was convicted of the two counts brought against him. Count One charges that between August of 2014 and February of 2015, Mr. Kasimov and others conspired to provide material support and resources to a foreign terrorist organization. Count Two charges that Mr. Kasimov and others attempted to do the same.

In furtherance of this submission, attached as Exhibit "A" are letters of support from Mr. Kasimov's friends and family. Attached as Exhibit "B" are letters from fellow inmates. And attached as "Exhibit C" are certificates from the Metropolitan Detention Center ("MDC") with respect to the numerous programs Mr. Kasimov has participated in and completed. Sentencing is currently set for June 3, 2022.

## I.   Background of the Case

The investigation in this case began in August of 2014, when the Joint Terrorism Task Force discovered a social media post of co-defendant Juraboev. In the post Juraboev pledged his support for ISIL, expressed a desire to be a martyr for ISIL and threatened to kill the President of the United States. During two interviews with law enforcement, Juraboev admitted making the post on social media, reiterated his support for ISIL, expressed his desire to fight with ISIL in Syria and noted his intention and plan to kill then-President Barack Obama and to bomb Coney Island. Juraboev also reported to the agents that his friend, and now co-defendant Saidakhmetov had discussed committing terrorist acts in the United States and traveling to Syria to fight with ISIL.

The agents did not immediately arrest Juraboev, but instead decided to conduct a larger scale investigation. The investigation revealed planning and coordination efforts by Juraboev, Saidakhmetov and co-defendant Habibov. Given the gravity of the situation, between August 2014 and February of 2015, agents conducted an intensive investigation into the group.

Despite the intensive investigation, Mr. Kasimov did not enter the picture until the night of his arrest. Mr. Kasimov was arrested after he delivered $1600 to Saidakhmetov at JFK International Airport at Habibov's request. There is no evidence that Mr. Kasimov had ever before

2

met with, or spoken to Saidakhmetov. Mr. Kasimov like co-defendant Rakhmatov had donated some money to Saidakhmetov's trip at Habibov's urging.

For this conduct, he now faces a statutory maximum sentence of thirty years in custody.

## II.     Mr. Kasimov's Background

Dilkhayot Kasimov is a native of Uzbekistan. When he was arrested in this case over seven years ago, he was only twenty-seven. At the time of his arrest, he had not been in the United States for a long period of time and he struggled with the English language. Despite these facts, he was gainfully employed and seeking a wife. Since his arrest on February 25, 2015, he has been in custody primarily at the MDC in Brooklyn, New York.

Mr. Kasimov is very close to his family and misses them terribly. He speaks fondly of his mother Feruza Kasimov, a university graduate. Mrs. Kasimov always worked outside the home, while at the same time caring for her four children. A strict parent, she instilled in her children a desire to succeed academically. Dilkhayot models himself after his grandfather who was a renowned mathematician in Uzbekistan. Dilkhayot's father, Shukhrat Kasimov, worked as a bookkeeper for many companies and at one point was a teacher of economics in college.

As Mr. Kasimov's family struggled financially, he and his brothers worked in various positions (furniture factory, shepherd for his uncle's livestock) to help support the family. His favorite times were when his entire family got together for holidays. His cousins are like siblings to him.

Although the family struggled, they managed for all of their children to attend higher education programs. Dilkhayot's brother, Dilmurold Kasimov, is the eldest child of the family. Born in 1985, he is a college graduate and works in bank security. He graduated from Architectural Design Institute and is married, with 3 children. Dilkhayot is closest to Dilmurold and confides in him about his plans for the future.

His brother Elmurod Kasimov, was born in 1986 and is a woodcarver. He and his business partner design doors for mosques. Elmurod also studied in college and is married, with 2 children.

Mr. Kasimov was third in line born in 1988.

Kamola Kasimov, the youngest child of the family, was born in 1992 and is a college graduate. She has an Associate Degree in Medicine and works as a medical technician. She has no children but is married.

Mr. Kasimov was born in the city of Tashkent. His grandparents lived in the country and were unable to help raise the family. The children's paternal uncle lived in the same apartment building and helped with childcare. Their uncle had three children of his own and their cousins helped the Kasimov children with schoolwork. Mr. Kasimov's aunt and uncle were teachers by profession and also believed in the importance of education.

The Kasimov brothers were well known in school and the local community as gifted and academically successful children. Dilkhayot graduated from high-school and college with honors and was an avid soccer player. He attended Tashkent University of Information Technologies from September 2008 until June 2012. There was a two-year gap between graduating from college and attending University. During that time, he worked as an IT specialist at the National Television of Uzbekistan. After University, Mr. Kasimov worked at Turin Polytechnical University in Tashkent, Uzbekistan.

As described in the family letters of support (Exhibit A) Mr. Kasimov is a valued and loving member of a close-knit family:

> I know Dilkhayot well from birth, he is a hard-working, smart, honest child who does not withhold help from people. - Ibragimov Doniyor Nizamovich – Uncle.
>
> . . .
>
> One day we had a long conversation with Dilkhayot.  He spoke about his plans and goals…he intended to go to the United States to study and improve his skills.  When I asked him what he wanted to study in the United States, he said that the United States is the most developed country of the world…I cannot describe my nephew Dilkhayot with the words. He had no bad habits…he was always polite and humble to all the people around him." - Kasimov Aziz Yuldashevich – Uncle
>
> . . .
>
> I have known Dilkhayot Kasimov since he was born because I am his elder brother…when I got married, my wife and I were students and I didn't work anywhere.  My brother helped me and my wife to pay the contract so that we could study…In the United States, he intended to study English and further his professional development. We talked to him every day via Skype…My brother used to send sweets, clothes and gifts to my parents, brother and nephews by mail to make us happy and help us. Even when in lives with good hopes and plans for the future. He keeps saying that if he gets married, he will have children and start his own business.  Dilmurod Kasimov – Brother

Mr. Kasimov has not had a visit with his family in the past seven years.

### III.   Life in the United States

In 2012, at the age of twenty-four, Mr. Kasimov legally came to the United States and settled in Philadelphia with a cousin. While in Philadelphia, he worked for an Uzbek picture framer but was unable to make ends meet. Soon thereafter he relocated to Brooklyn, where he was able to secure more lucrative employment as a freelance computer repair technician, reselling electronics and phones, working for ride-share and as a delivery person for a restaurant.

Used to being surrounded by family, Mr. Kasimov found life in the United States incredibly lonely. He spoke with his mother on a daily basis but it did not bridge the gap. He was in desperate need for friendship and to be a part of a community. While working as a delivery person for a Turkish restaurant he befriended young Uzbeks in the neighborhood. He started going to the local mosques and was involved in the religious life of the Uzbek community. Mr. Kasimov sometimes made donations for Muslims in need, a practice he learned about from attending religious services or from friends. For instance, he donated to a collection at al-Ansar Mosque after learning about a local Muslim family who lost their home in a fire.

Mr. Kasimov's main desire was to marry and start his own family. His brothers were married with children and he saw that path as a way to end his loneliness. He met an Uzbek girl in Philadelphia, but the relationship did not progress to a union. Later, Mr. Kasimov travelled to Florida to meet a young woman (Saodat) after his mother had called her from Uzbekistan to make a formal introduction. But his hope to marry was also not fulfilled. Undeterred, Mr. Kasimov remained focused on starting a family and was working to make enough money to buy an engagement ring for a future bride.

Mr. Kasimov's plans were interrupted by his arrest in the instant matter. This marks his first arrest.

## IV.    Conditions of Incarceration at MDC

Mr. Kasimov has been incarcerated since February 25, 2015 primarily at the MDC in Brooklyn, New York. In determining a suitable sentence for Mr. Kasimov, it is highly appropriate for the Court to consider the harrowing conditions of his confinement since he was taken into federal custody. As an inmate at the MDC for over seven years, Mr. Kasimov has been subjected to the harshest of conditions brought on as a result of institutional incompetence, corruption and the coronavirus pandemic.

The MDC, which opened in the early 1990s to alleviate crowding at the Metropolitan Correctional Center ("MCC") in Manhattan, has a long and well documented history of problems, including a [botched response to a weeklong power](#) failure in the winter of 2019, and an associate warden charged with killing her husband. MDC has been unfit for human habitation for a long time and conditions continue to deteriorate.

On January 27, 2019, an electrical fire at the MDC created a power outage affecting the facility's computer systems, phones, lighting and power for the 1,600 men housed in the West Building. (The Intercept ,"[Inspector General Report Treated Freezing Federal Jail a PR Blunder Rather Than a Humanitarian Disaster,"https://theintercept.com/2019/09/28/mdc-brooklyn-jail-heat/](#).) Six days prior to the fire, " 'multiple air handler heating coils in the West Building…burst due to cold weather.'" *Id*. (citing the DOJ's Review and Inspection of Metropolitan Detention Center Brooklyn Facilities Issues and Related Impacts on Inmates). The result of the power and heat outages was chaos:

> 'It's awful,' said David Patton, the head of the public-interest legal advocates Federal Defenders of New York, who also toured the

5

> facility. 'They've been on lockdown. There is no lighting. There is some heat, but it's sporadic unit to unit. We were in one cell where the temperature was 50 degrees and there was water leaking into the cell.' In some units, the heat is functioning, Patton said. 'But even then,' he added, 'you're talking about the high 60s, and people are wearing essentially short-sleeve hospital scrubs.'

(The Intercept, "'Vicious' and 'Brutal'" — Life Inside a Freezing Federal Prison with No Heat, https://theintercept.com/2019/02/02/federal-prison-no-heat-new-york-nadler-mdc/.)

When the pandemic hit this country in March of 2020, the Bureau of Prisons ("BOP") instituted a complete lockdown of its facilities. Inmates at all federal facilities were subjected to conditions of confinement far more punitive than the usual constraints of detention: lockdowns 24/7 lasting weeks and months, long-term isolation and quarantine, inadequate health and safety precautions, deprivation of family contact and legal visits. For weeks at a time, Mr. Kasimov was only let out of his cell for 30 minutes 3 days a week during the lockdowns. The remainder of the time he was locked in his cell.

Despite statements to the contrary from the BOP, during the pandemic social distancing was not observed, there was limited ability to clean one's cell, the communal areas were not sanitized and the inmates were not provided with cleaning supplies. In the beginning months, masks were not provided to the inmates, or if provided, they were not supplied to the detainees in sufficient quantity. The prison officers rarely wore masks nor did they practice social distancing.

For the first year of the pandemic, COVID ran rampart within the MDC and it periodically spiked thereafter. Movement of inmates with COVID caused an extreme amount of stress as the inmates had no control over whom they were housed with and oftentimes literally no medical care. If an inmate became sick, the guards would respond by ignoring the unit all together. It quickly became clear that the MDC had largely adopted a theory of not testing, in order to report no positive tests. Even those who complained of symptoms were often not tested. Despite consistent oversight by the Courts, medical care continues to be almost non-existent. So bad is the care that inmates who request the vaccine are often not provided with it.

Not surprisingly, Mr. Kasimov contracted COVID while at the MDC. His symptoms were intense and were coupled with an extreme amount of anxiety that he would die alone in his cell. He is now vaccinated and hopes that he will not suffer a relapse, but there is no guarantee.

With the recent announcement that the MCC was closing, MDC has been flooded with new inmates and levels of crowding and violence have increased dramatically. Due to lack of staffing and increased violence, lockdowns up to 23.5 hours a day are the norm and in-person and virtual counsel visits are regularly suspended. In October, for no less than ten days, the MDC had no lights, no water, and no hot food.[1] On October 13, 2021, officials discovered a gun in the Institution

---

[1] https://www.nydailynews.com/new-york/nyc-crime/ny-water-electricity-conditions-mdc-brooklyn-20211010-27q6mnw6jre4llsko6jbww4m74-story.html.

causing yet another lockdown.[2] Once again, legal and social visits were cancelled. In January of 2022, the MDC was on lockdown due to the Omicron variant of the coronavirus. That lockdown was in effect for over a month.

The MDC is filled with weapons and drugs. Inmates report stabbings and assaults regularly occurring. They also report drugs being readily available. Given that the jail has been shut off to the general public for almost two years, can there be any question as to how the drugs and weapons are getting into the building? It is clearly a corrupt institution, down to the core. Currently, the MDC is on lockdown as several inmates in multiple units were stabbed last week during violent outbreaks.

In looking over my notes with Mr. Kasimov during our calls from the last two years, Mr. Kasimov has reported the following disturbing events: the horror of surviving the black out, the staff's retaliation for protestors outside of the building, riots started by members of MS-13, stabbings on his unit, stress and anxiety caused by a lack of information and medical care related to the coronavirus, a lack of cleaning supplies, lockdowns leading to an inability to speak with family, the lack of his ability to address personal hygiene while locked in a cell with another individual, no commissary for weeks, no drinkable water for an extended period of time, inconsistent distribution of food, the consistent presence of K2 and other drugs and the consistent presence of weapons on the unit.

Mr. Kasimov's life while incarcerated at the MDC has been nothing short of horrific. Without question, this is an appropriate reason to impose a sentence lower than that called for by the guidelines.

## V.     **Productive Time Spent in Custody**

Despite the horrific nature of his time in custody, Mr. Kasimov has made every effort to educate himself (he currently speaks English fluently) and other inmates as well. Mr. Kasimov completed fifteen programs including:

Tutor Training - 2/6/16
GED Mathematics Tutor - 2/5/16
ACE GED Reading Language Arts - 3/9/18
Colombia University Certificate – Justice in Education - 4/13/18
Entrepreneurship - 9/9/17
Resume Writing – Reputation Management & Social-Media - 7/22/16
Turning Point - Coping Module - 1/14/21
GED ACE MATH - Tutor 5/29/18
Anatomy and Physiology - 7/2/20
Health Education - 6/6/16
GED Ace Math - 5/5/16
Meditation - 4/15/16

---

[2] https://www.nydailynews.com/new-york/ny-weapon-mdc-brooklyn-discovered-20211015-pmxmopa2ovcxla2ajk4kaulxw4-story.html?outputType=amp.

7

Structured Activity (Chess) - 6/30/21<br>
Sentry Recreation and Leisure Course - 8/29/21<br>
Structured Activity (Push up Challenge) - 9/18/21

Certificates from these programs are annexed as "Exhibit B."

What is even more telling is that Mr. Kasimov became a math tutor and has donated his time to help other inmates pass the GED exam. The letters from inmates who participated in his GED classes are insightful.

> I am a 52 yo man and have no high school diploma. … They did offer a G.E.D. math class which he offered to teach…I was the oldest and the one who was out of school the longest. … I was extremely embarrassed… he began to tutor me after class and on any free time he had…I can honestly say I would have never passed if was not for the help of Dilkhayot. - Vincent Calamia Inmate 85254-053

> . . .

> I was trying to pass my GED and I was looking for a tutor. Dilkhayot immediately offered his support and help. He was incredibly helpful to me and spent many hours going over the section in math I was having difficulties in… I always saw him doing something productive…He also got along with nearly everyone, which is tough in here. But I saw him many times work out issues calmly that could have led to problems. People trust him because he is fair and honest, which is also rare here. Inmate Mycheal Luckett Id. 90724-053.

> . . .

> It is important for you to know that I am an American citizen and a U.S. Army Veteran. My decision to join the Army was motivated by the 9/11 terrorist attacks…A devout Muslim, Mr. Kasimov vehemently opposed the ISIS interpretation of Islam and denounces ISIS…he has demonstrated a strong character of honesty, honor, respect, and integrity, in a place with very short supply of such attributes. Denis Savgir Inmate Id 76016-054.

These letters are attached as "Exhibit C."

**VI.** **Application of the Sentencing Guidelines**

The Probation Department arrived upon the following guideline calculation in the Presentence Report ("PSR").

| | |
|---|---|
| Base Offense Level: §2M5.3(a) | 26 |
| Specific Offense Characteristics: §2M5.3(b)(1)(E) | +2 |
| Victim Related Adjustment: §3A1.4 | +12 |
| Adjustment for Role: §3B1.1 and 3B1.2 | 0 |
| Adjustment for Obstruction of Justice §3C1.1 | 0 |
| **Total Offense Level** | **40** |

The defense respectfully disagrees with this calculation.

The defense agrees that the baseline offense is level is 26 pursuant to U.S.S.G.§ 2M5.3 (a). However, Probation wrongfully calculates that the defendant should be enhanced 2 levels pursuant to Section 2M5.3 (b)(1)(E) and an additional 12 levels pursuant to Section 3A1.4. Moreover, the defense asserts that Mr. Kasimov should receive a four-point reduction for his role in the offense.

Therefore, the defense arrives upon the following guideline calculation.

| | |
|---|---|
| Base Offense Level: §2M5.3(a) | 26 |
| Specific Offense Characteristics: §2M5.3(b)(1)(E) | 0 |
| Victim Related Adjustment: §3A1.4 | 0 |
| Adjustment for Role: §3B1.2(a) | -4 |
| Adjustment for Obstruction of Justice §3C1.1 | 0 |
| **Total Offense Level** | **22** |

### A) The Application of Section 2M5.3(b)(1)(E) – Specific Offense Characteristics, and Section 3B1.2(a) – Role in the Offense

Section 2M5.3(b)(1)(E) states " If the offense involved the provision of ...(E) funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act, increase by 2 levels."

A close reading of the trial transcript, however, reveals nothing to support a finding that Mr. Kasimov knew or had reason to believe that the funds provided would be used to commit or assist in the commission of a violent act.

A reduction under Section 3B1.2(a), however is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision,

9

the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant.

As noted in the PSR "Kasimov had no semblance of leadership, managerial or organizational involvement." (¶27) Mr. Kasimov did not know and the record does not reflect that he was aware of the full scope of the criminal intent and activity of his co-conspirators.

Last, there is no suggestion or evidence suggesting Mr. Kasimov received or would receive any benefit from the criminal activity. Compared to his co-defendants, Mr. Kasimov played a very minor role in the events outlined in the PSR. By way of example, he was never a member of the "Tea Party"; he never pledged allegiance to ISIS or intended to do so; he had no direct contact with any member of a terrorist organization; and he never discussed with anyone a desire to engage in acts of violence in the United States on behalf of ISIS.

For these reasons, the Court should not enhance the Guideline by two points pursuant to Section 2M5.3(b)(1)(E). However, as it is abundantly clear that Kasimov played a minimal role in the criminal events and meets the definition of a "minimal participant" under Section 3B1.2. The defense requests the Court decrease the offense by four levels.

### B) The Application of Section 3A1.4 – The Terrorism Enhancement

Probation also recommends a twelve-level enhancement pursuant to Section 3A1.4. This Section provides as follows:

> a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by **12** levels; but if the resulting offense level is less than level **32**, increase to level **32**.
>
> (b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

The application of this enhancement is not automatic to all material support cases. A defendant may provide material support to a terrorist group in violation of Title 18 USC 2339B without intending that the support or resources would influence, affect, or retaliate against government conduct. United States v. Chandia, 514 F.3d at 376 (4th Cir. 2008).

> [I]f a defendant's purpose in committing an offense is to 'influence or affect the conduct of the government by intimidation or coercion, or to retaliate against government conduct, application of the terrorism enhancement is warranted. Where there is no evidence that the defendant sought to influence or affect the conduct of the government', the enhancement is inapplicable.

*See*, United States v. Aafia Siddiqui 699 F.3d 690; 2012 U.S. App. LEXIS 22728 (2d Cir. 2012).

10

For the Court to find the defendant had specific intent, multiple factors must be considered by the Court. First, the defendant's intent cannot be imputed from the intent of co-conspirators. The Second Circuit has held that a mental state of a co-defendant is not "relevant conduct" for purposes of applying the terrorism enhancement. United States v. Stewart, 590 F.3d 93 (2d. Cir. 2009). Second, defendant's agreeing to help his co-defendants or knowing their activities does not prove he possessed "specific intent." See, United States v. Banol- Ramos, 516-App'x 43, 48-50 (2d. Cir. 2013). Third, the Court must find that the defendant committed the underlying offense with the specific intent to influence or affect the government conduct. See, United States v. Banol-Ramos, 516 F. App'x 43, 48-50. Fourth, the Court's analysis of the facts presented at trial should focus on defendant's conduct. See, United States v. Alhaggagi, 978 F.3d 693, 699-703 (9th Cir. 2020). In short, the record does not support that Dilkhayot Kasimov had a specific intent in the underlying felony calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.

Moreover, basic sentencing principles and fundamental fairness dictate that this Section not be applied for the following reasons: First, this Section increases Mr. Kasimov's Criminal History Category to that of a career offender with no empirical evidence that such a sentence is appropriate for a first-time offender. Second, this Section automatically increases Mr. Kasimov's offense level, ensuring that he will be sentenced as if conviction is among the most serious offenses addressed by the guidelines, regardless of the fact pattern. Notably, if the Court applies this Section, Mr. Kasimov's limited donation of five hundred dollars will be treated the same as the defendant who bombed the World Trade Center. As a result, the Section calls for a sentence that is disproportionate to Mr. Kasimov's conduct of conviction. Finally, the increase in prison time under Section 3A1.4 can be imposed based upon a judge's finding under a preponderance of the evidence standard, rather than jury findings beyond a reasonable doubt, giving rise to constitutional concerns and questions of fundamental fairness in our justice system.

For the reasons stated above the defense respectfully contends the correct guideline range is level 26. As Mr. Kasimov is in Criminal History Category I, the corresponding range of incarceration is 63-78 months' incarceration.

## VII. Analysis of Sentences Received by Similarly Situated Defendants

In the mid-1990s, the United States adopted two federal statutes, 18 U.S.C. §§ 2339A and 2239B, criminalizing the material support of a designated foreign terrorist organization. These material support statutes have been interpreted broadly, giving the government substantial leeway to prosecute individuals who, like Mr. Kasimov, attempt to provide assistance to another person in aid of that person's effort to travel to a foreign country intending to join a foreign terrorist organization. In sentencing Mr. Kasimov, the statute instructs this Court to consider, among other things, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. See, 18 U.S.C. § 3553(a)(6). A review of the sentences that are generally imposed in material support cases across the country demonstrates that individuals convicted of the same offense as Mr. Kasimov have largely received sentences at or about 10 years.

11

In 2012, the United States Sentencing Commission reported that the mean sentence imposed between 2008 and 2012 for providing material support to designated foreign terrorist organizations or for terrorist purposes was 111 months, a calculation that makes no distinction between defendants who pled guilty and those who were convicted after trial.[3] In 2017, the Center on National Security at Fordham Law School released a report analyzing the first 144 ISIS-related cases to proceed in U.S. Courts.[4] Of the 77 ISIS-related convictions at the time the report was issued, 12 were found guilty by trial and the remaining 65 had pled guilty. Most of the convicted individuals had been sentenced, resulting in an overall average prison sentence of 14.5 years. The average sentence for those who had pled guilty was 11.2 years.[5]

A 2019 review of attempted material support cases under 18 U.S.C. § 2339B in all circuits, revealed that among 18 defendants, the mean sentence was 133.8 months, or a little more than 11 years, with 50% (9 out of 18) defendants receiving sentences of 10 years or less, five receiving sentences between 11 and 13 years, and four receiving sentences of 15 years. Further, among the four who received 180-month sentences – only two received the statutory maximum.[6]

Like Mr. Kasimov, the vast majority of these defendants faced guidelines ranges of 360-life, before the operation of any statutory maximums to cap that number. Yet most of them received sentences that were significantly lower than the statutory maximums. This pattern suggests that these cases, as a group, fall well outside the heartland of cases to which the Terrorism Enhancement was intended to apply. Or perhaps it suggests that no such heartland exists.

One need only look to the sentences received in this case to see that a non-guideline sentence is appropriate. Co-defendants Juraboev and Saidakhmetov received sentences of 180 months. Co-defendant Rakhmatov received a sentence of 150 months. And related defendant Khusanov has pled guilty pursuant to Rule 11 (c)(1)(C) of the Federal Rules of Criminal Procedure and is expected to receive a sentence of 132 months. Despite Mr. Kasimov's decision to go to trial, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar or more egregious conduct, clearly dictates that he too should receive a non-guideline sentence.

**VIII.    Immigration / Deportation Consequences**

At the conclusion of Dilkhayot Kasimov's sentence, will likely be returned to Uzbekistan. In 2020, the United Nations issued a report on human rights violations in Uzbekistan. The Report noted that Uzbekistan has a zero-tolerance policy towards real or perceived Islamic extremism. (United States Commission on International Religious Freedom, 2021 Report on Uzbekistan Religious and Political Prisoners) Given this policy it is also possible that Uzbekistan may not

---

[3] See United States Sentencing Commission, Quick Facts: Offenses Involving National Defense (2012), at p. 2, available at http://bit.ly/1HkM5xv.
[4] Karen J. Greenberg et al., The American Exception: Terrorism Prosecutions in the United States – The Isis Cases, Center on National Security at Fordham Law (Sept. 2017).
[5] Id. at 3-4.
[6] See, United States v. Alimehmet, 16 Cr. 398 (SDNY)(PAE) Dkt#127.

12

accept Dilkhayot Kasimov back and he could remain stateless and incarcerated until he is accepted by a country.

The Supreme Court has recognized that deportation may result in the loss of "all that makes live worth living." "The impact of deportation upon the life of an alien is often as great, if not greater than, the imposition of a criminal sentence. A deported alien may lose his family, his friends and his livelihood forever. Returning to his native land may result in poverty, persecution and even death." Bridges v. Wixon, 326 U.S. 135 (1945)

The past administration of Uzbeki President Karimov incarcerated 7000 to 10,000 religious and political prisoners. Thousands more Muslims were on a blacklist. The current president, Shavkat Mirizioyoyev, has released some prisoners, including lawyers and civil rights leaders. However, ten percent of Uzbekistan's prison population are religious in nature. According to the Report "thousands of religious prisoners are still imprisoned and have now served sentences of more than 20 years." Uzbekistan's religious prisoners have some of the longest religion-related sentences on record. (United State Department's 2020 Country Report on Human Rights Practices - Uzbekistan)

What this means to Dilkhayot Kasimov remains uncertain. It is likely he will remain in the United States under custody until he is accepted by Uzbekistan or elsewhere. If accepted by Uzbekistan, it is anticipated that he will be incarcerated for a lengthy period of time. The defense respectfully requests that when determining sentence, the Court take into consideration the great likelihood that Dilkhayot Kasimov will remain in custody long after his sentence in this prosecution has been satisfied.

## IX.   Conclusion

Dilkhayot Kasimov has spent more than seven years at the MDC and awaits this Court's decision at sentencing. He realizes that he may spend many more years in custody, but he has not let that possibility distract him from being a positive life force. He continues to study and learn and share his knowledge with those who need his assistance. His term of incarceration has not been easy. He has endured the worst possible living conditions and still has remained optimistic and giving. He plans for the future and is determined to make his plans reality when he returns to the family that loves and supports him.

The fact pattern of this case does not define him. He is not a radical terrorist. He is not an ISIL supporter or sympathizer. His actions pale in comparison to that of his co-defendants. He was simply a young man with no rudder in a land where he was struggling with the culture and the language.

In fact, the investigation in this case sets Mr. Kasimov apart from his co-defendants. He had no sinister plan to assassinate the President of the United States or bomb Coney Island, yet he now faces a sentence double that of Juraboev and Saidakhmetov who in fact did have such plans. Mr. Kasimov was not even on the agents' radar until he literally arrived at the eleventh hour. Surely

13

this minimal conduct and the decision to go to trial, cannot result in a statutory maximum sentence of thirty years in the face of all of the mitigation presented.

  We ask that Your Honor consider all the facts and circumstances of this case and render a sentence that is just and reasonable.

            Respectfully submitted,

            ***Elizabeth E. Macedonio***
            Elizabeth E. Macedonio, Esq.
            Kelley J. Sharkey, Esq.
            *Counsel for the Defendant*
            *Dilkhayot Kasimov*