

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

AAS:DMP/DKK/JMH  
F. #2014R01413

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 27, 2022

<u>By ECF</u>

The Honorable William F. Kuntz, II  
United States District Judge  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

      Re:    <u>United States v. Dilkhayot Kasimov</u>  
            <u>Criminal Docket No. 15-95 (WFK)</u>

Dear Judge Kuntz:

      The government respectfully submits this memorandum in advance of the sentencing of defendant Dilkhayot Kasimov ("Kasimov" or "the defendant"), currently scheduled for Friday, June 3, 2022, at 10:00 a.m.  In September 2019, Kasimov was convicted following a jury trial of conspiring to provide and attempting to provide material support to the Islamic State of Syria and al-Sham ("ISIS").  For the reasons set forth below, the government respectfully requests that the Court:

      (1) Deny the defendant's Rule 29 and Rule 33 post-trial motions;

      (2) Adopt the factual findings and Guidelines calculations set forth in the Pre-Sentence Investigation Report ("PSR");

      (3) Sentence the defendant to a term of imprisonment of 20 years, which appropriately reflects the defendant's conduct, his role in the offense, his history and characteristics, and his lack of remorse; and

      (4) Impose a supervised release term of 10 years, to be served in the event that the defendant is not removed from the United States at the conclusion of his sentence.

I.    **Background**[1]

In 2014, the government began to investigate a group of individuals based in Brooklyn and elsewhere in the United States who either planned to travel to Syria to join ISIS or financed the travel of other individuals to Syria to join ISIS. PSR ¶¶ 8-10. In February 2015, Kasimov contributed money for a co-defendant to travel to Syria to join and fight with ISIS, and delivered to the co-defendant at JFK Airport, prior to the co-defendant's planned departure, the money that Kasimov and others had contributed. PSR ¶¶ 20, 24.

   A.    **Kasimov Conspires to Send Saidakhmetov to Syria to Fight for ISIS**

As the evidence presented at trial showed, in August 2014, the Federal Bureau of Investigation ("FBI") learned that co-conspirators Abdurasul Juraboev ("Juraboev") and Akhror Saidakhmetov ("Saidakhmetov") had expressed their support for ISIS in various online postings. See generally Tr. 129-131, PSR ¶¶ 8-9. By February 2015, Saidakhmetov, with substantial assistance from co-conspirator Abror Habibov ("Habibov"), was planning to depart the United States via John F. Kennedy International Airport ("JFK") in Queens, New York, bound for Istanbul, Turkey, and, ultimately, Syria, to fight for ISIS. See, e.g., Tr. 19, 131, 290.

In February 2015, Habibov raised funds to support Saidakhmetov's travel, from Kasimov and others. Tr. 272. Habibov turned to Kasimov as one potential contributor because Habibov had repeatedly discussed ISIS with Kasimov and knew the defendant to be sympathetic. Among other things, Kasimov had discussed his interest in living in the Islamic State and his knowledge of individuals who had gone to fight and die for ISIS in Syria. Tr. 285-289. Specifically, trial testimony showed that Kasimov discussed with Habibov "the people we knew who were on the battle ground with ISIS." Tr. 285. Kasimov mentioned his ex-roommate "going to Syria and fighting." Tr. 288.[2] Kasimov and Habibov also discussed an additional individual they had known in Brooklyn who had gone to Syria and "was fighting for ISIS" at the time he was killed in Syria. Tr. 289.

---

[1] The facts set forth herein are drawn from the Pre-Sentence Investigation Report ("PSR"), the trial transcript ("Tr.") and the exhibits presented at trial ("GX").

[2] That ex-roommate, Mirsad Kandic, was convicted earlier this week by a jury in this courthouse of six counts of providing and conspiring to provide material support to ISIS, including two counts of material support resulting in death. See United States v. Kandic, No. 17-CR-449 (NGG). Trial testimony from Kasimov's trial showed that Kandic had lived with Kasimov in an apartment on Bay Parkway in Brooklyn. Tr. 316. Notably, Kasimov appears to have told the Probation Officer that he lived alone when in Brooklyn, see PSR ¶ 62, apparently in an effort to disassociate himself from Kandic.

Kasimov's support for ISIS went beyond his discussions with Habibov. For example, in the summer of 2014, Kasimov sent text messages that showed support for ISIS (see GX 43b at 4 (defendant's text message stating that "pious ones are going to Gaza, Syria, or at least, to Iraq"), and he had "quintessential, pure ISIS propaganda" videos on his phone at the time of his arrest in February 2015, see Tr. 545; see also GX 41B (the three video files); GX 211-215 (screenshots from same). One of the videos depicted Abu Usamah al-Maghribi, a known ISIS commander. See Tr. 546; GX 41B. A second appeared to celebrate a "shahada" by a "shaheed"—i.e., a suicide bombing by a suicide bomber, also known as a "martyrdom" attack. See GX 41B; Tr. 539. This video depicted an exhortation from the "shaheed," followed by what appeared to be a large explosion, followed by celebratory exclamations. GX 41B; Tr. 538-39.

In February 2015, Habibov told Kasimov that Saidakhmetov was going to Syria to fight, either stating directly or implying that the fighting would be for ISIS. Tr. 289.

At all relevant times, ISIS was a designated foreign terrorist organization. See GX 38A-38D; Tr. 149, 267; PSR ¶¶ 4-5. On June 29, 2014—prior to Saidakhmetov's planned travel—ISIS declared itself as a caliphate, or state. Tr. 159; PSR ¶ 5. In the course of expanding and maintaining its territorial control, ISIS carried out terrorist attacks against civilians in Syria and Iraq, including: car bombings; suicide bombings; executions (via gruesome methods such as decapitation and immolation); and acts of enslavement and genocide. See, e.g., Tr. 192-97; PSR ¶ 7. In particular, during the August 2014 to February 2015 time period, ISIS committed high-profile attacks in which ISIS executed multiple American and other Western hostages, including two American journalists in brutal beheadings. In August 2014, ISIS murdered James Foley by decapitation, purportedly in retaliation for American airstrikes in Iraq. In September 2014, ISIS murdered Steven Sotloff by decapitation. In January 2015, ISIS released a video showing its murder of a Jordanian Air Force pilot, whom it burned to death in a cage after capturing him. These were high-profile, grisly executions that were videotaped and broadcast around the world, and provoked widespread outrage and condemnation of ISIS. See generally Tr. 195-98.

On September 10, 2014, President Barack Obama outlined in an address to the nation the United States' strategy to, along with coalition partners, "degrade and ultimately destroy" ISIS, which the president identified as "a terrorist organization, pure and simple" with "no vision other than the slaughter of all who stand in its way." During his address, the President detailed ISIS's history of extreme violence and its threat not just to the region but to the United States, noting that ISIS terrorists "are unique in their brutality" and "executed captured prisoners . . . kill children . . . enslave, rape and force women into marriage" and "in acts of barbarism, they took the lives of two American journalists, Jim Foley and Steven Sotloff." On September 22, 2014, in response to, inter alia, ISIS's violent attacks, including the beheading of two U.S. citi[]zens, and ISIS's territorial gains and widespread terrorist violence and the threat it posed to U.S. interests inside and outside the Middle East, United States military forces and those of its coalition partners launched direct combat operations against ISIS in Syria, beginning with a series of airstrikes against ISIS targets.

**B.   Kasimov Contributes Money for Saidakhmetov's Travel to Join ISIS**

Habibov also talked to Kasimov about Habibov's efforts to raise money for Saidakhmetov's travel to Syria to join ISIS. Tr. 289. Kasimov told Habibov that Kasimov would contribute to fund Saidakhmetov's travel. Tr. 306.

On February 19, 2015, Kasimov reached out to Habibov to ask "when should I give some money to the brother [Saidakhmetov] who is leaving?" GX 165. Habibov responded by advising Kasimov that Saidakhmetov had a plane ticket for a departure on February 25, 2015. Id.

In a phone conversation shortly after this text message exchange, Habibov told Kasimov again that the "little brother is leaving," referring to Saidakhmetov. GX 108T. Habibov stated, "Apparently he doesn't have anyone who would receive him or any other connections. Is there any way to find links to bigger ones here and there?" GX 108T. As Habibov explained, he was asking Kasimov if Kasimov knew of anyone who could receive Saidakhmetov after he had arrived in Turkey and "help him to cross the border to Syria." Tr. 314. Specifically, Habibov thought that Kasimov was in touch with someone who could connect Saidakhmetov with Kasimov's ex-roommate Mirsad Kandic, who at the time was fighting for ISIS in Syria. Tr. 315.

As Saidakhmetov's departure loomed, Habibov reached out to Kasimov on February 24, 2015, to remind him that Saidakhmetov was leaving. Kasimov responded by text message within minutes:

| 6:29:32 p.m. | Is it OK if I give 500? |
| 6:30:38 p.m. | If others can't afford it, I'll give 1000 |
| 6:34:09 p.m. | How much money do you need? |

GX 166-1. After offering a minimum of $500 for the cause, Kasimov kept offering more, essentially opening his wallet to contribute, even though Habibov had not responded. Habibov eventually told Kasimov that $500 was fine. Id.

In a subsequent phone call, Habibov asked Kasimov to deliver $1500 – $1000 that Habibov raised from other people and $500 from Kasimov – to Saidakhmetov at JFK Airport later that evening. Kasimov responded, "Done deal. God willing." Habibov stated that Saidakhmetov needed money for food and for "that thing," referring to a weapon. GX 110T, Tr. 342-343. Kasimov then offered to drop Saidakhmetov off at JFK Airport himself. GX 110T. Kasimov stated, "If you provide information whom to take where to drop off, I will take care of everything." GX 110T.

Because Kasimov was still working when Saidakhmetov wanted to leave for JFK Airport, Saidakhmetov took a taxi to the airport. Tr. 443.

At 9:03 p.m. on February 24, 2015, Habibov asked Kasimov whether he could still deliver the money to Saidakhmetov at JFK Airport. GX 116T. Kasimov realized he might have trouble withdrawing all that money from an ATM machine, and offered to arrange for Saidakhmetov to pick up $1500 from another individual on Saidakhmetov's way to the Airport. GX 116T.

Less than six minutes later, Kasimov called Habibov to say he changed his mind. Kasimov stated, "Brother [referring to Habibov]. Let me take it to the airport myself." GX 117T. In other words, Kasimov decided that the money was too important to entrust to someone else. Kasimov told Habibov why he wished to courier the funds personally. He wished to meet Saidakhmetov in person: "I actually would like to see those people myself, the people who are leaving." GX 117T.

### C. Kasimov's Delivery of $1600 to Saidakhmetov at JFK Airport

Saidakhmetov arrived at JFK at approximately 9:45 p.m. on February 24, 2015. Tr. 23. His flight was scheduled to depart a few hours later in the early morning hours of February 25, bound for Kiev, Ukraine, with continuing connection to Istanbul, Turkey. Tr. 107-109; GX 30.

Habibov connected the defendant with Saidakhmetov, and the defendant and Saidakhmetov spoke several times. Specifically, Habibov sent Kasimov a text message with Saidakhmetov's telephone number, see GX 166-1; Habibov told Saidakhmetov that "a brother," i.e., Kasimov, would meet Saidakhmetov at JFK, see GX 118T; and Kasimov called Saidakhmetov and agreed to meet him at JFK's Terminal 7, see GX 119T. Thereafter, Kasimov called Saidakhmetov back and told Saidakhmetov that Kasimov could only withdraw $1000 from the ATM and would need to go back to his residence to collect more cash, and would then meet Saidakhmetov at JFK Airport. GX 120T. Shortly before midnight, the defendant arrived at JFK, met with Saidakhmetov, and handed over the cash. Tr. 29-30. Kasimov stated to Saidakhmetov: "[L]et me give you that thing. Let me give you the money now." GX 20T at 2. The amount that Kasimov delivered to Saidakhmetov totaled $1600. Tr. 100.

The defendant and Saidakhmetov parted when Saidakhmetov left to board his flight. Saidakhmetov was arrested on the jetway prior to boarding, and the cash was recovered from his person. Tr. 99-100; see also GX 34 (cash recovered incident to Saidakhmetov's arrest); GX 34a (photograph of GX 34).

### D. Kasimov's Detention and Post-Arrest Admission

The defendant was detained in the early morning hours of February 25, 2015, shortly after Saidakhmetov's arrest. He was advised of his Miranda rights and agreed to

5

waive them and speak with the arresting officers. During that interview, Kasimov admitted that he had delivered the money seized from Saidakhmetov and stated his belief that Saidakhmetov "might be" traveling to Syria to join ISIS. PSR ¶ 26.

Kasimov also gave his consent to law enforcement to conduct searches of two cellular telephones, among other devices. These two telephones were later admitted at trial as physical exhibits GX 40 (an LG Flex telephone) and 42 (a Samsung Galaxy Note telephone). It was from these cellular telephones that law enforcement recovered the ISIS jihadist propaganda videos that the government admitted into evidence at trial. The government's expert witness testified as to the history and activities of ISIS, and opined that the three videos recovered from the defendant's cellular telephone were, in fact, ISIS propaganda. See, e.g., Tr. 544-46.

### E. **Kasimov Is Convicted After a Jury Trial**

Trial by jury began on September 17, 2019. The government presented the case largely as summarized above, including offering Habibov's testimony (as corroborated by other evidence) as to the nature and extent of the conspiracy and the defendant's knowing participation in the conspiracy, including in the objective to facilitate Saidakhmetov's travel to join ISIS and fight for ISIS in Syria. The jury returned its verdict of guilty on both counts on September 24, 2019.

### F. **Kasimov's Post-Trial Motions**

Following the jury's verdict, on December 2 and 5, 2019, Kasimov filed both counseled and pro se motions to dismiss the indictment, to enter a verdict of acquittal, and to grant him a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33. ECF Nos. 428, 438. Notably, in those motions, Kasimov accused an Assistant United States Attorney and an FBI Special Agent of engaging in misconduct during the grand jury presentation. Kasimov also suggested that there was insufficient evidence presented at trial of Kasimov's intent to join the charged conspiracy. On January 13, 2020, the government filed an opposition to those motions. ECF No. 444. On January 27, 2020, Kasimov filed a reply. ECF No. 447. The government respectfully requests that, at sentencing, the Court deny those motions for the reasons set forth in the government's opposition brief.

## II.     The Sentencing Scheme and the Guidelines Calculation

Kasimov was convicted on two counts – conspiring to provide material support to ISIS and attempting to provide material support to ISIS, both in violation of 18 U.S.C. § 2339B. As applicable here, that statute carries a sentencing range of up to 15 years' imprisonment on each count, for a total of 30 years' maximum imprisonment.[3]

As set forth below, and as the Probation Department concluded in the PSR and PSR Addendum, the Guidelines calculation yields an advisory Guidelines sentence of 30 years' (360 months') imprisonment, which is the statutory maximum for the offense.

### A.     The Guidelines Calculation

The PSR's total offense level of 40 is premised upon a base offense level of 26 (U.S.S.G. 2M5.3(a)), a two-level enhancement because the offense involved the provision of material support or resources to a foreign terrorist organization with the intent, knowledge or reason to believe that the support or resources were to be used to commit or assist in the commission of a violent act (U.S.S.G. 2M5.3(b)(1)(E)), and a 12-level enhancement because the offense involved or was intended to promote a federal crime of terrorism (U.S.S.G. 3A1.4).

The defendant's Criminal History category is VI based on the application of Section 3A1.4. With a total offense level of 40 and a Criminal History category of VI, the resulting Guidelines range is 360 months to life. However, because the statutory maximum sentence is 360 months, the effective Guidelines range is 360 months' imprisonment.

### B.     The Government's Response to Kasimov's Objections to the PSR's Guidelines Calculation

Kasimov agrees with the application of the base offense level, but objects to each of the enhancements. Kasimov also advocates for a minor role reduction. The Probation Department considered each of these arguments and issued an Addendum rejecting each of the defendant's claims. The Court should likewise reject the defendant's objections for the reasons set forth below.

---

[3] After the offense conduct was completed, Congress amended Title 18, United States Code, Section 2339B to increase the statutory maximum sentence for a violation of this statute to 20 years' imprisonment. At the time of the offense, however, the statutory maximum sentence was 15 years' imprisonment.

### 1. The Section 3A1.4 Enhancement Applies to Kasimov's Conduct

Guidelines Section 3A1.4, sometimes referred to as the terrorism enhancement, provides that "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism," the Court is to add 12 levels to a defendant's offense level and to increase the defendant's criminal history category to category VI. U.S.S.G. § 3A1.4. An offense "involves" a federal crime of terrorism where the offense itself meets the definition of "federal crime of terrorism," and an offense is "intended to promote" such a crime "when the offense is intended to help bring about, encourage, or contribute to a federal crime of terrorism." United States v. Awan, 607 F.3d 306, 314 (2d Cir. 2010).

The application notes to Section 3A1.4 give the term "federal crime of terrorism" the same meaning as set forth in 18 U.S.C. § 2332b(g)(5). Section 2332b(g)(5) defines a "federal crime of terrorism" as (a) a crime that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," and (b) constitutes a violation of one or more of a list of enumerated federal statutes. See 18 U.S.C. § 2332b(g)(5). Section 2339B is one of these enumerated crimes. Thus, as applicable here, a "federal crime of terrorism" is a violation of 18 U.S.C. § 2339B that is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. § 3A1.4(a).

Notably, the defendant's motive for committing the crime of conviction is not relevant in determining the application of the Section 3A1.4 enhancement. Determining whether an offense is "calculated to influence or affect" does "not require proof of a defendant's particular motive." Awan, 607 F.3d at 317 (terrorism enhancement applied where defendant "knew that the objective" of the foreign terrorist organization was to "influence the Indian government through violence" and "knew that the money he provided . . . would be used toward that end," even if defendant "may not have been personally motivated by that objective"); accord, e.g., United States v. Mohamed, 757 F.3d 757, 760 (8th Cir. 2014) ("motive is simply not relevant"). Instead, the definition requires only that an offense be "calculated, *i.e.*, planned—for whatever reason or motive—to achieve the stated object." Awan, 607 F.3d at 316 ("a person who murders a head of state, for instance, sure in the knowledge that his crime will influence or affect the conduct of government, satisfies the terms of § 2332b(g)(5)(A) even if his particular *motivation* in committing the murder is to impress a more established terrorist with his abilities").

The government bears the burden of proving the application of the Section 3A1.4 enhancement by a preponderance of the evidence. See, e.g., United States v. Norris, 281 F.3d 357, 359 (2d Cir. 2002); see also Awan, 607 F.3d at 312 (when finding facts relevant to sentencing for Guidelines calculation purposes, a district court is "required to use the preponderance of the evidence standard").

The defendant correctly notes that the application of the Section 3A1.4 enhancement is not automatic merely because the defendant was convicted of conspiracy and attempt to provide material support to ISIS. (Def. Mem. at 10). The defendant also argues that the application of the enhancement must turn on his own intent and conduct, and not that of his co-conspirators. (Id. at 11). Here, the trial evidence shows by a preponderance of the evidence that application of the Section 3A1.4 enhancement is warranted.

First, as the trial evidence showed, Kasimov gave money to Saidakhmetov knowing that Saidakhmetov was traveling to Syria and intended to join and fight for ISIS. Specifically, Habibov told Kasimov that Saidakhmetov was going to Syria to fight, either stating directly or implying that the fighting would be for ISIS. Kasimov was also aware that people who traveled to join ISIS and to fight in Syria fought, and died, on the battlefields in Syria. Indeed, Kasimov's ex-roommate Kandic had gone to fight in Syria, Kasimov and Habibov discussed Kandic and other individuals who were on the battleground with ISIS, and Kasimov and Habibov discussed another individual they had known in Brooklyn who was killed in Syria fighting for ISIS. Tr. 285-289, GX 108T. An expert witness testified that foreign fighters who joined ISIS both fought on ISIS's behalf and engaged in ISIS's propaganda efforts. Tr. 198-202.

Second, as the trial evidence also showed and as the jury necessarily found, Kasimov gave money to Saidakhmetov knowing that ISIS was a designated foreign terrorist organization or that ISIS engaged in terrorism or terrorist activity. See Tr. 721-22 (jury charge). As the government's expert testified, ISIS's principal objective was to establish a new state in Syria and Iraq, which it declared in June 2014. Tr. 159, 183-85. To do so, ISIS took control of a vast swath of territory, approximately the size of the country of France, located in eastern Syria and western Iraq, using various means to seize control of that land from the Iraq and Syrian governments and militaries. Tr. 183, 191-92, 227-28; GX 39C. The principal tactics by which ISIS achieved that objective included acts of terror and, as set forth in the PSR, "incomprehensible human rights violations." Tr. 191-98; PSR ¶ 7. It also conducted attacks on Americans and Westerners in part in an effort to send a message that ISIS would terrorize the West and should be feared. Tr. 196-98. ISIS's efforts to establish a caliphate in Iraq and Syria, and the violent means by which it did so, were well known and widely publicized. Tr. 183-85, 191-98. Moreover, Kasimov also possessed "quintessential, pure ISIS propaganda" videos on his phone at the time of his arrest in February 2015, including videos that depicted suicide bombings and large explosions, demonstrating ISIS's violent nature and terroristic ends. Tr. 544-51; GX 41B, 211-215.

Thus, Kasimov's own conduct—and the goal of the material support conspiracy of which the jury found Kasimov guilty—was to provide a fighter to participate in ISIS's activities, necessarily including the formation of the Islamic State. At the time Kasimov contributed money and helped send a fighter to join ISIS, ISIS had seized significant territory from the Syrian and Iraq governments and was fighting to defend its territory not only from those governments but from the U.S. government as well.

In short, the trial evidence proves by a preponderance of the evidence that the defendant gave money to fund Saidakhmetov's travel and personally delivered it to Saidakhmetov at JFK Airport because he wanted to advance ISIS's purpose of creating an Islamic State in Iraq and Syria. That is sufficient to support the application of the Section 3A1.4 enhancement. See, e.g., United States v. Chandia, 675 F.3d 329, 340 (4th Cir. 2012) (although knowledge of an organization's "terrorist purpose" is insufficient for application of terrorism enhancement, reasonable inference that defendant "intended to advance that purpose" was sufficient). Thus, Kasimov's offense of conviction both involved and was intended to promote a "federal crime of terrorism" because the conspiracy and attempt to provide material support to ISIS in violation of Section 2339B was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

Kasimov also argues that application of the Section 3A1.4 enhancement would be fundamentally unfair because the 12-level offense level increase would put him on par with a defendant who bombed the World Trade Center and because placing him in Criminal History Category VI would equate him with a career offender. (Def. Mem. at 11). This objection is not one to the application of the Guideline, but is rather better considered as an argument in mitigation for a below-Guidelines sentence, which argument the government will address in its analysis of the sentencing factors under 18 U.S.C. § 3553(a).[4]

### 2. The Court Should Reject Kasimov's Objection To The Two-Level Enhancement

Section 2M5.3(b)(1) of the Sentencing Guidelines applies where "the offense involved the provision of (A) dangerous weapons; (B) firearms; (C) explosives; (D) funds with the intent, knowledge, or reason to believe such funds would be used to purchase any of the items described in subdivisions (A) through (C); or (E) funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act."

Here, there is no dispute that Kasimov provided both funds (to support Saidakhmetov's travel) and other material support or resources, such as personnel

---

[4] Kasimov also appears to argue that Section 3A1.4 raises constitutional concerns because a sentencing judge may apply the enhancement by a preponderance of the evidence rather than a jury beyond a reasonable doubt. (Def. Mem. at 11). That argument has been rejected by the Supreme Court. See Alleyne v. United States, 570 U.S. 99, 116-17 (2013) (no constitutional violation in district court application of Guidelines enhancements that do not increase a statutory minimum or maximum sentence); United States v. Ibrahim, 529 Fed. App'x 59, 64 (2d Cir. July 12, 2013) (no constitutional violation in the application of the terrorism enhancement by the district court without jury findings as to the supporting facts).

10

(Saidakhmetov). Kasimov challenges that he did so with the "intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act," and argues that there is no such evidence in the trial transcript. (Def. Mem. at 9). As noted on p. 9 above, Kasimov knew that Saidakhmetov was traveling to Syria and intended to join and fight for ISIS. Thus, Kasimov knew or had reason to believe that his act of giving money to send a fighter to ISIS, who would fight and potentially die on the battlefields of Syria, would be "used to commit or assist in the commission of a violent act."

Moreover, Kasimov also knew that Saidakhmetov was going to join and fight for ISIS, specifically, and ISIS was a violent terrorist organization that carried out terrorist attacks against civilians in Syria and Iraq, including against Western targets; some of which included high-profile executions of multiple American and other Western hostages through beheadings and burning to death. E.g., Tr. 192-97. The presence of the ISIS propaganda videos on Kasimov's phone supports Kasimov's awareness of the violence that ISIS committed to support its violent nature. Giving money to send and sending a fighter into a conflict zone to serve a violent terrorist organization is a violent act. Thus, Kasimov knew and had independent reason to believe that his act of giving money to send a fighter to ISIS, who would fight and potentially die on the battlefields of Syria, would be "used to commit or assist in the commission of a violent act."

Notably, the Guidelines enhancement does not require that a defendant's act be violent, rather, it requires that "funds . . . be given with the intent, knowledge, or reason to believe" that they would be used to commit or assist in the commission of a violent act, a test that is amply satisfied here.

### 3. The Court Should Reject Kasimov's Request For a Minimal Role Reduction

Kasimov is not entitled to a minimal role reduction. He argues that he should receive a four-level reduction because of a variety of factors that, he contends, distinguish him from his co-conspirators, including that he (a) never expressed a desire to engage in violence within the United States, (b) had no direct contact with ISIS members, (c) never pledged allegiance to ISIS, (d) was not a member of the "tea party" financial facilitation network, and (e) did not receive any benefit from his criminal activity. As a factual matter, with the exception of the "tea party" fundraising activity, most of the members of the conspiracy did not engage in any of these activities and none received any "tangible" benefit for their conduct.[5]

---

[5] For example, only Juraboev and Saidakhmetov – the two individuals who were traveling to Syria to fight for ISIS – expressed any desire to engage in violent activity within the United States and only Juraboev was in touch with ISIS members.

11

The government's investigation revealed that Habibov, Zakirov, Rakhmatov, and others were part of a financial support network that raised money for, among other things, financing travel to Syria by individuals wishing to join and fight for ISIS. That network's participants referred to it as "chayxona," an Uzbek word that translates to the "tea house" or "tea party." The government does not dispute that Kasimov was not part of the "tea party" and did not, unlike others involved, give regular contributions to the "tea party."

But the conspiracy and attempt of which Kasimov was convicted was not a conspiracy or attempt alleging his participation in the "tea party." Rather, it was a conspiracy and attempt to provide money to finance Saidakmetov's travel and to send Saidakhmetov as a fighter to join and fight for ISIS in Syria. A "minimal participant" is someone who plainly among the least culpable of those in a group and lacks knowledge and understanding of the scope of the enterprise and activities of others. But the enterprise here was the effort to finance and facilitate Saidakhmetov's travel to Syria to join ISIS. While Kasimov did not have any leadership or organizational role in that effort, his conduct was essential to contributing sufficient money and to providing that money to Saidakhmetov prior to Saidakhmetov's planned departure. Accordingly, no role reduction is warranted.

As the Probation Department determined in the Addendum, because Kasimov helped finance Saidakhmetov's trip to Syria, gave Saidakhmetov his own cash and cash contributed by others, "the defendant's role in the offense was integral to the success of the operation" and no mitigating adjustment is warranted.

Nevertheless, the government acknowledges that, while a role reduction is not appropriate under the Guidelines, Kasimov was not part of the "tea party" and did not raise money for other travelers besides Saidakhmetov, and that it is appropriate for the Court to take into account, within the analysis of the Section 3553(a) factors, in fashioning an appropriate sentence.[6]

---

[6] The government notes that, even if the Court were to award Kasimov a 4-level reduction for minimal role, the resulting Guidelines range would be 324 to 405 months, above the sentence recommended by the government in this memorandum.

**III.     The Court Should Sentence the Defendant to 240 Months' Imprisonment**

The government respectfully submits that a sentence of 240 months' (20 years') imprisonment and 10 years' supervised release is sufficient, but not greater than necessary, to reflect the purposes of sentencing.

**A.     240 Months' Imprisonment Is the Appropriate Sentence**

In addition to the range recommended by the Guidelines, 18 U.S.C. § 3553(a) requires the Court to consider a number of factors in imposing sentence, including (among others) the nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1)); the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide a just punishment for the offense (§ 3553(a)(2)(A)); and the need for the sentence to afford adequate deterrence to criminal conduct (§ 3553(a)(2)(B)) and to protect the public from further crimes of the defendant (§ 3553(a)(2)(C)).

The offense conduct is undeniably serious and warrants a significant punishment. As discussed above, Kasimov provided money in order to help cover another person's costs to travel to Syria to join and fight with ISIS, which he knew to be a terrorist organization. Kasimov's conversations with Habibov showed Kasimov's knowledge of what it meant to travel to Syria to fight with ISIS. Kasimov knew other people who had traveled to Syria to join and fight for ISIS, and Kasimov and Habibov discussed one such individual who had died fighting for ISIS in Syria. At the time that Kasimov gave money to fund Saidakhmetov's travel to join ISIS, it was common knowledge that ISIS's principal objective was to establish a new state in Syria and Iraq and that ISIS used terrorism and other violent acts to accomplish that objective. Thus, Kasimov's conduct involved giving money to send a fighter to fight on behalf of a terrorist organization.

In this case, the Court should impose a sentence significant enough not merely to reflect the seriousness of the defendant's conduct, but also to deter the defendant from committing further crimes, deter others from providing funding to those who would travel to join ISIS or another foreign terrorist organization, and promote respect for the law.

The Guidelines themselves show that a substantial sentence is appropriate for deterrence purposes, by enhancing the defendant's criminal history category by 12 levels for a crime of terrorism and by placing the defendant in Criminal History Category VI. As the Second Circuit has explained, "Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003). The Court continued, "even terrorists with no prior criminal behavior are unique among criminals in the likelihood

13

of recidivism, the difficulty of rehabilitation, and the need for incapacitation." Id. The Second Circuit recently reaffirmed that:

> The Guidelines, while only advisory, appropriately reflect Congress's considered judgment that terrorism is different from other crimes. "[T]errorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal."

United States v. Mumuni, 946 F.3d 97, 112-13 (2d Cir. 2019) (internal quotation marks and citation omitted).

Notably, too, Kasimov has never expressed any remorse for his conduct. Indeed, in a 14-page pro se personal statement submitted in connection with sentencing, Kasimov sought to place the blame for his conduct on Habibov. Kasimov accused Habibov of taking advantage of him and stated that Kasimov resigned himself to Habibov's will. But the trial evidence does not support Kasimov's latest claims to avoid responsibility. For example, it was Kasimov, not Habibov, who initiated contact on February 19, 2015, five days before Saidakhmetov's travel, when the defendant wrote: "Peace be upon you, when should I give some money to the brother who is leaving?" GX 165; Tr. 306. And on February 24, 2015, it was Kasimov who essentially opened his pocketbook for Saidakhmetov, offering a minimum of $500 for the cause, then offering $1,000, and then asking "how much money do you need?" GX 166-1. As the evening progressed, Habibov tried to find Saidakhmetov a ride to JFK Airport, and the defendant volunteered to do it. GX 110T. Habibov also tried to find someone to courier the funds to Saidakhmetov at JFK Airport—and the defendant volunteered to be the courier. GX 110T, 117T. While Kasimov states at the end of his personal statement that he "has and will continue to have great remorse," that remorse is not for his conduct facilitating the travel of a fighter to fight on behalf of ISIS but rather "for his involvement in the events of this instant case." Nowhere does Kasimov express remorse for engaging in criminal activity. The consequences that he suffers are of his own making.

All of these factors warrant a substantial sentence.

### B. The Court Should Reject Kasimov's Request for Substantial Leniency

Some of Kasimov's arguments in support of a below-Guidelines sentence warrant consideration from the Court under Section 3553(a).

In particular, although the government disagrees that Kasimov's role in the offense warrants a reduction pursuant to the Guidelines, the government acknowledges that, in some ways, Kasimov is less culpable than several of his co-defendants. Specifically, while Kasimov fully participated in the conspiracy and attempt to contribute money to Saidakhmetov for his travel and to send Saidakhmetov as a fighter to join ISIS, Kasimov was not part of the "tea party" financial facilitation network in which his co-defendants were all

14

significant participants and Kasimov did not raise money for other travelers besides Saidakhmetov to travel to Syria to join ISIS.

Kasimov's co-defendants have thus far received sentences between 12.5 and 15 years. Specifically, Saidakhmetov and Juraboev, who intended to travel to Syria to join and fight for ISIS, received sentences of 15 years' imprisonment. Rakhmatov, who contributed money for Saidakhmetov's travel and expenses, including money for a firearm for Saidakhmetov, received a sentence of 12.5 years. In addition, as the defendant notes, Khusanov, who also gave money to fund Saidakhmetov's travel, has pleaded guilty, pursuant to a Rule 11(c)(1)(C) plea disposition, to conspiracy to provide material support with an agreed-upon sentence of 11 years' imprisonment.

Section 3553(a)(6) provides that the Court should avoid unwarranted sentencing disparities among similarly situated defendants who were found guilty of similar conduct. Unlike these other defendants, however, Kasimov did not accept responsibility for his conduct, and as discussed above, has not expressed remorse for his conduct. Accordingly, a more significant sentence is warranted for Kasimov than for his co-defendants. Taking into account the sentences imposed on Kasimov's co-defendants, Kasimov's overall role in the conspiracy, Kasimov's demonstrated lack of remorse and the other factors discussed above, the government recommends a sentence of 240 months' imprisonment for Kasimov.

The Court should reject Kasimov's arguments that further substantial leniency is warranted based on (a) sentences imposed on "similarly situated defendants," as those cited by Kasimov are not in fact similarly situated, and (b) the speculative consequences of Kasimov's potential removal from the United States at the conclusion of his sentence.

Kasimov seeks a below-Guidelines sentence based on his claims regarding "similarly situated defendants," including the claim that "individuals convicted of the same offense as Mr. Kasimov have largely received sentences at or about 10 years." (Def. Mem. at 11). A closer look at the statistics cited by the defendant show that claim to be inaccurate.

The defendant cited a 2017 Report by the Center on National Security at Fordham Law School (the "Report"), which reported an overall average prison sentence of 14½ years for "ISIS-related convictions." (Def. Mem. at 11). Notably, that statistic, which is based on ISIS-related cases between March 2014 and August 2017, is not specific to material support convictions nor to defendants who failed to accept responsibility for their conduct and proceeded to trial. In fact, the Report found that the average sentence for those who were convicted after trial, like Kasimov, was 32.5 years. Report at 27.[7]

---

[7] See The American Exception, Terrorism Prosecutions in the United States: The ISIS Cases (March 2014 – August 2017), available at https://news.law.fordham.edu/wp-content/uploads/2017/09/TheAmericanException9-17.pdf (last visited May 24, 2022).

15

The defendant also cited a Sentencing Commission report from 2012 that he describes as analyzing sentencing in material support cases from 2008 to 2012. The government was unable to access the report at the link cited in the defendant's footnote, but in any event the report (as described by the defendant) preceded the massive rise in ISIS-related cases, which led Congress to increase the statutory maximum sentence for a material support offense from 15 to 20 years, see n.3 supra, and led many sentencing judges to increase the sentences imposed for material support offenses in order to deter individuals from traveling to join and fight for ISIS, see, e.g., Report at 34, Figure 19 (showing substantial increase in average sentence between 2015 and 2017).

The defendant also argued that a "2019 review of attempted material support cases" in all circuits revealed a mean sentence of 133.8 months or a little more than 11 years, citing to United States v. Alimehmeti, No. 16 Cr. 398 (S.D.N.Y.) (PAE), Dkt. No. 127. (See Def. Mem. at 12 n.6). In fact, the cited document is a defense sentencing submission, not any judicial analysis or finding, and a review of the chart filed in support of that defense analysis shows that the analysis is irrelevant to Kasimov's sentence for multiple reasons. See id. Dkt. No. 127-1, Exhibit F, at 74-75. First, every single case analyzed was the result of a guilty plea, and of course whether a defendant accepted responsibility for his or her conduct by pleading guilty is a particularly relevant factor at sentencing. Second, of the 18 cases surveyed in the analysis, 11 had a statutory maximum sentence of 15 years and four more had a statutory maximum sentence of 20 years. That is not comparable to Kasimov, who faces a statutory maximum and Guidelines sentence of 30 years. Third, in any event, the defendant in Alimehmeti was sentenced to a total sentence of 264 months' custody, of which 240 months' imprisonment was for his attempt to provide material support to ISIS.

Kasimov also seeks a below-Guidelines sentence because of his potential deportation to and incarceration in Uzbekistan, and argues that he might remain in custody long after completion of his criminal sentence. (Def. Mem. at 12-13). The government disagrees that this is a basis for leniency, in part because it is entirely speculative. Even if Kasimov could not be removed to Uzbekistan, Kasimov has not shown that he would remain in custody indefinitely. See, e.g., Zadvydas v. Davis, 533 U.S. 678, 701 (2001) (noting that "a statute permitting indefinite detention of an alien would raise a serious constitutional problem"). Accordingly, the prospect that Kasimov may be released within the United States rather than removed to Uzbekistan at the conclusion of his sentence warrants a longer, rather than a more lenient, sentence. And if Kasimov is in fact removed to Uzbekistan, there is no way to know what, if anything, will happen to him in Uzbekistan. Any potential consequence in Uzbekistan is far too speculative to warrant a lower sentence now.

Balancing the mitigating factors against the advisory Guidelines range, the seriousness of Kasimov's conduct, the need for just punishment and to promote respect for the law, the need to provide both general and specific deterrence, and Kasimov's own lack of remorse for his criminal conduct, the government respectfully submits that a sentence of 240 months' imprisonment, to be followed by 10 years' supervised release, is appropriate.

16

### IV.     Conclusion

For all these reasons, the government respectfully requests that the Court sentence the defendant to 240 months' imprisonment to be followed by 10 years' supervised release in the event that the defendant is not removed from the United States at the conclusion of his sentence.

Respectfully submitted,

BREON PEACE
United States Attorney

By:     /s/ Douglas M. Pravda
       Douglas M. Pravda
       David K. Kessler
       J. Matthew Haggans
       Assistant U.S. Attorneys
       (718) 254-7000

cc:     Elizabeth Macedonio and Kelley Sharkey, Esq., counsel for Kasimov (by ECF)
       Clerk of the Court (WFK) (by ECF)